1

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                     FOR THE DISTRICT OF HAWAII

 3

 4   UNITED STATES OF AMERICA,      )  CR 00-00145 SOM
                                    )
 5                     Plaintiff,   )  Honolulu, Hawaii
        vs.                         )  November 3, 2003
 6                                  )  3:00 P.M.
     ALICIA VELORIA,                )
 7                                  )  Sentencing as to Count 1
                       Defendant.   )  of the Indictment
 8   _____)

 9
                      TRANSCRIPT OF PROCEEDINGS
10          BEFORE THE HONORABLE SUSAN OKI MOLLWAY
                  UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13   For the Government:         THOMAS J. BRADY, ESQ.
                                 Office of the U.S. Attorney
14                               PJKK Federal Bldg.
                                 300 Ala Moana Blvd., Ste. 6100
15                               Honolulu, HI 96850

16   For the Defendant:          SAMUEL P. KING, JR., ESQ.
                                 King & King
17                               735 Bishop St., Ste. 304
                                 Honolulu, HI 96813
18
     Also Present:               ANNE M. SHIMOKAWA
19                               U.S. Probation Office
                                 PJKK Federal Building
20                               300 Ala Moana Blvd., Ste. C126
                                 Honolulu, HI 96850
21
     Official Court Reporter:    Debra Kekuna Chun, RPR, CRR
22                               United States District Court
                                 300 Ala Moana Blvd., Ste. C285
23                               Honolulu, HI 96850
                                 (808) 534-0667
24
     Proceedings recorded by machine shorthand, transcript
25   produced with computer-aided transcription (CAT).
```



EXHIBIT K

1    MONDAY, NOVEMBER 3, 2003              3:06 O'CLOCK P.M.

2          THE CLERK:  Criminal 00-145 SOM, United States

3    of America versus Alicia Veloria.  This case has been

4    called for Sentencing as to Count 1 of the indictment.

5          Counsel, please make your appearances for the

6    record.

7          MR. BRADY:  Good afternoon.  Assistant United

8    States Attorney Tom Brady on behalf of the United States.

9          THE COURT:  Good afternoon.

10          MR. KING:  Good afternoon, Your Honor.  Sam King

11    present with the defendant.

12          THE COURT:  Miss Veloria, have you had a chance

13    to review the Presentence Investigation Report?

14          THE DEFENDANT:  Yes, Your Honor, I have.

15          THE COURT:  I have a Sentencing Statement from

16    your lawyer, which has objections to the report.  Are all

17    your objections stated by your lawyer?

18          THE DEFENDANT:  I believe most of them, yes.

19          THE COURT:  What other objections were not stated

20    by your lawyer?

21          THE DEFENDANT:  He has them.

22          THE COURT:  He has additional objections to

23    raise?

24          MR. KING:  It's not -- actually, this particular

25    objection doesn't relate specifically to the presentence

1    report as it does to the government's response to the
2    presentence report.  So I will mention that.
3             THE COURT:  Okay.  But it's not a new objection.
4    It's answering the government's response to your objection?
5             MR. KING:  Yeah.  I don't think it's an issue
6    that's even addressed in the presentence report, but it is
7    addressed in the government's motion; so she wants me to
8    mention that.
9             THE COURT:  But any other objections to the
10   Presentence Investigation Report?
11            THE DEFENDANT:  No, Your Honor.
12            THE COURT:  Okay.  You can be seated.
13            Okay.  I also have the government's response to
14   the Presentence Investigation Report in which the
15   government says it has no objections.  Is that right, Mr.
16   Brady?
17            MR. BRADY:  Yes, Your Honor.
18            THE COURT:  Then I want to go to Miss Veloria's
19   objections, and we'll go down this.
20            Okay.  The first issue raised by Mr. King in the
21   defendant's Sentencing Statement has to do with the amount
22   of the bond.  Since that's a matter of court record --
23            MR. KING:  Apparently, my client -- she mentioned
24   that was a concern of hers.  We put it in our response.
25   Apparently, it was checked, and, even though she may have

1    thought she was on $4,000, it was $5,000; so so be it.

2              THE COURT:  All right.  So that objection is

3    being withdrawn?

4              MR. KING:  I would say so, Judge, based on the

5    apparent double-checking on the documents.

6              THE COURT:  Okay.  Then let's look at paragraph

7    7.  Paragraph 7 has an objection by you to information

8    provided by an unidentified informant, but this only goes

9    to the basis of the warrant.

10             MR. KING:  True, but, you know, this is a report

11   that's going to be read by and used by the, you know,

12   prison authorities.  And all it says -- in fact, I think

13   the presentence officer agreed with our objection, said

14   they amended it to simply say she was suspected of dealing

15   cocaine and crack.

16             THE COURT:  Okay.  So do you still have any

17   objection?

18             MR. KING:  Well --

19             THE COURT:  I mean she was charged with drug

20   crimes; so, you know, to say the government -- defendant

21   was suspected of dealing cocaine and crack cocaine for a

22   number of years, is there an objection?

23             MR. KING:  We'd still object, Judge.

24             THE COURT:  Okay.  Well, that objection is

25   overruled.

1            MR. KING:  On the same basis as we already
2    stated.
3            THE COURT:  That objection is overruled.  It
4    seems to me this is a factual statement about what the
5    government thought, and I don't really see the prejudice.
6    I mean she was charged with drug crimes in the end anyway.
7            MR. KING:  Judge, just for the record what the
8    government thought we don't think is relevant.  And again
9    we don't want this prejudicing any chances she may have for
10   reasonable programs or whatever within the prison system.
11   And, you know, what they thought and whether they thought
12   it was for a number of years or, you know, in the last week
13   before they started their investigation, it's not relevant
14   to this case; so that's why we object.
15           THE COURT:  Okay.  I will still overrule the
16   objection.  I mean I don't see what this is -- how this is
17   prejudicing someone who was charged with possession with
18   intent to distribute cocaine base and cocaine.  Clearly,
19   the government thought that that's what she was doing; so
20   that would be overruled.
21           Okay.  Looking, then, at paragraph 8, as I
22   understand it, she objects to the word "rented."  We can
23   amend this to say the upstairs of the residence consisted
24   of two bedrooms.  You want to start the sentence there?  In
25   the second sentence it now reads the defendant rented the

```
 1   upstairs of the residence, which consisted of two bedrooms,
 2   one bathroom, a living room, kitchen, and patio.  To
 3   address your objection -- and the objection is you don't
 4   have any -- we have no basis for the rental other than what
 5   you say is a statement that should not be considered -- I'm
 6   willing to amend this to say the upstairs of the residence
 7   consisted of two bedrooms, one bathroom, a living room,
 8   kitchen, and patio.  Will that take care of the objection?
 9            MR. KING:  I think that does, Judge.  That's just
10   a factual statement about the description of the residence
11   and doesn't say anything about her relationship to the
12   residence; so that's okay.
13            THE COURT:  Any objection to that, Mr. Brady?
14            MR. BRADY:  No, Your Honor.
15            THE COURT:  So that's the change we're going to
16   make.  It will say the upstairs of the residence consisted
17   of and then the description of the rooms.
18            Okay.  Then, looking at paragraph 12, the
19   objection is to the description of Zachary Smith as her
20   boyfriend.  As I understand it, again the defendant is
21   saying other than her statement to the government, which
22   she says should not be relied on, there is no evidence of
23   the boyfriend.  I'm willing to change this to the defendant
24   and Zachary Smith were present during the search of the
25   residence.  That would be a change from the sentence as it
```

1   now stands, which is the defendant and her boyfriend at the

2   time Zachary Smith were present during the search of the

3   residence, and leave the rest of the paragraph unchanged.

4           MR. KING:  So, in other words, the defendant and

5   just strike her boyfriend at the time.

6           THE COURT:  Right.  The defendant and Zachary

7   Smith without the description.  Any objection to that, Mr.

8   Brady?

9           MR. BRADY:  None.

10          MR. KING:  Again, Judge, that's all right because

11  we're just down to a factual description rather than some

12  relationship, which she objects to.

13          THE COURT:  Okay.  So I'll have the paragraph 12

14  amended by striking the words, quote, her boyfriend at the

15  time.

16          Turning, then, to paragraph 13, this says that

17  the defendant objects to the inclusion of information from

18  an unnamed confidential informant.  This is not --

19  paragraph 13 doesn't go to information from the informant

20  relied upon -- this is background information to say why

21  the police acted in the way they did.

22          MR. KING:  Well, you know, if that's what it's

23  going to be used for, then I don't think it needs to be so,

24  you know, inflammatory as to the defendant.  Why can't they

25  just say police received information based upon which they

1    did whatever, as opposed to outlining it in great detail

2    when we don't have any proof that any of that is true.  In

3    fact, she was acquitted of the charge.  When they stopped

4    that truck -- of course, I wasn't there, Judge, but I hear,

5    and I've talked to the trial attorney and my client.  The

6    charge alleging that she was somehow dealing drugs out of

7    her truck.  And, apparently, there were drugs found in the

8    truck, but the jury acquitted her on that charge.

9          So I don't think -- if it's going to say that

10   police officers, you know, based on information police

11   received, they were looking for the defendant or something

12   like that, then at least it's not so inflammatory.

13         THE COURT:  I think this is just we had this

14   information only as an explanation for what action the

15   police took, and I think that's clearly what it's there

16   for.

17         MR. KING:  When you get right down to it, Judge,

18   it's really kind of irrelevant because you get down to --

19   that whole paragraph is irrelevant because you get down to

20   the next paragraph and it talks about how officers observed

21   the truck and an officer approached.  Of course, there's

22   nothing illegal about an officer approaching a truck.  He

23   doesn't need permission to do that.  Officer exited his

24   vehicle and knocked on the driver's side.  There's really

25   nothing, you know, to the extent that that may or may not

1  have been illegal, that was addressed in the motion to

2  suppress, which, of course, is going to be one of the

3  issues on appeal.  And it just goes on to describe the

4  incident.  There's really no reason to even have paragraph

5  13.

6        THE COURT:  Well, I'll overrule the objection.  I

7  see it as background information for what the police did.

8  And the fact that Miss Veloria was acquitted of the charge

9  of selling from the truck doesn't mean that I shouldn't

10  consider matters based on a preponderance of the evidence.

11  So I will overrule the objection to paragraph 13.

12        Okay.  Looking, then, to paragraphs 14 and 15, I

13  will overrule the objection to paragraphs 14 and 15.  The

14  defendant is saying that paragraphs 14 and 15 refer to

15  consent to a search of her truck, and she contests whether

16  she consented.

17        MR. KING:  Which, of course, is going to be one

18  of the issues on appeal on the motion to suppress.

19        THE COURT:  But since I ruled to deny the motion

20  to suppress I will overrule the objection to paragraphs 14

21  and 15 and factual findings that I did make in the motion

22  to suppress.

23        Okay.  Turning, then, to paragraphs 23 and 24.

24  Okay.  Now, during trial we had a great many discussions

25  about the pretrial statement --

1          MR. KING:  So I hear.

2          THE COURT:  -- by Miss Veloria, and it seems to

3   me that it wouldn't change anything if I simply struck

4   paragraphs 23 and 24.  I don't see what it would affect.

5   What, if anything, would it affect?  Because, if it

6   wouldn't affect anything, then what's the harm of striking

7   these two paragraphs and proceeding?  I don't think it's

8   going to affect the guideline range.

9          MR. KING:  Well, I think that's true.  We're

10  certainly objecting to the paragraphs.  If you're going to

11  strike them, that sort of eliminates our objection to them,

12  doesn't it.

13         THE COURT:  Mr. Brady.

14         MR. BRADY:  Judge, the problem with striking them

15  is that for the same reason that the court did not strike

16  paragraph 13 some of that evidence can be reviewed for the

17  purposes of preponderance of the evidence standard and

18  acquitted conduct standards that the court must look at

19  when it takes a look of the entire totality of the offense

20  before the court and in sentencing the defendant.

21         THE COURT:  Okay.  But, you know, even though it

22  is true that I said there may be circumstances that could

23  arise in which the government can introduce Miss Veloria's

24  statement at trial, during trial I found despite requests

25  by the government that those circumstances weren't present;

1    so I did not allow the government to introduce her

2    statement at trial.  By the same token I don't see how I

3    could point to the circumstances that trigger my use of her

4    pretrial statement at sentencing.

5            So, rather than give you folks another issue to

6    fight about, it seems to me that, if I strike this, it

7    won't affect my sentence.

8            MR. BRADY:  I agree.

9            THE COURT:  So I'm going to strike paragraphs 23

10   and 24, which describe a statement and draft of a plea

11   agreement.  Although, I will say that I mean I understand

12   what the Probation Office's explanation is as to why those

13   can be kept and considered by me, but I will say that the

14   circumstances under which I would consider it seem to go

15   under the analysis by the Probation Office of guideline

16   1B1.8 to a breach of a cooperation agreement.  And I'm not

17   looking here at circumstances in which a cooperation

18   agreement has been breached by Miss Veloria.  We're still

19   looking at whether Miss Veloria met the requirements for my

20   even considering her pretrial statement, and those have to

21   do with whether she testified at trial or so forth.  And

22   since she didn't I'll just strike paragraphs 23 and 24, and

23   that I think will moot out the objections by the defense to

24   those paragraphs.

25            Okay.  For the same reason it seems to me I can

1    strike paragraph 38, which goes to a reference to Miss

2    Veloria's pretrial statement.  And again I don't see how

3    this would affect my guideline calculation in any event.

4    So I will strike paragraph 38.  Okay?

5           Now, I'm going back to the other objections

6    raised by the defense.  The defense has objections to

7    paragraphs 25, 26, 27, 28, and 29.  These paragraphs all go

8    to Mr. Iaukea's statements, and the defendant says I should

9    disregard anything that Mr. Iaukea says because nobody

10   believed him.  Well, even though Miss Veloria was acquitted

11   on the charge involving dealing drugs from her truck, the

12   jury never said they didn't believe Mr. Iaukea with respect

13   to the testimony on the letter that Miss Veloria allegedly

14   wrote and that was received in evidence.  Do you want to

15   address that, Mr. King?

16          MR. KING:  Yes, Judge.  While it's true I don't

17   think the letter was an issue at trial -- of course, I

18   wasn't there, but I think I got that right.

19          THE COURT:  The letter was an exhibit at trial.

20          MR. KING:  But the jury didn't have to make -- I

21   mean I don't think there was any allegation of obstruction

22   of justice charge at trial, was there?  Just a straight

23   drug trial.  I mean they weren't asked to make a finding

24   about that one way or the other.  It may have been an

25   exhibit at trial, and I think was an exhibit at trial

1    because Iaukea testified about it.  But again he testified

2    about drug dealing in the truck.  He testified about a lot

3    of things.  And even though it looked pretty -- I mean if

4    the jury believed him just a little --

5            THE COURT:  It was an issue at trial.  I mean Mr.

6    Brady, as I recall, did argue to the jury that, "Look, Miss

7    Veloria even tried to get Mr. Iaukea to tell a different

8    story."

9            MR. KING:  Right.  But in spite of the fact that

10   she didn't even testify and merely cross-examined Mr.

11   Iaukea, who, as I say, even if the jury believed him a

12   little bit, there's probably enough to convict her there.

13   But they apparently didn't believe him at all because --

14           THE COURT:  Well, not just a little bit; right?

15   They would have had to have found evidence beyond a

16   reasonable doubt to convict her.

17           MR. KING:  True.  But you had drugs in the truck.

18   Supposedly he's saying they're not my drugs.  They're

19   her -- I mean all they have to do is believe him when he

20   says, "They're not my drugs.  They're her drugs."  It is

21   one or the other.  And the jury -- even though she didn't

22   even testify and deny it, the jury didn't believe anything

23   he had to say.

24           THE COURT:  I think you and I might be talking

25   about two different things.  If I forget about what he said

1    about what -- if I look only at the letter, okay, only at

2    the letter --

3              MR. KING:  Which is not signed by her, by the

4    way.  Just his statement that that's --

5              THE COURT:  But, if I look only at the letter,

6    then I am very much concerned that she was trying to

7    obstruct justice, just looking at the letter.

8              MR. KING:  Assuming what he says about the letter

9    is true, that she wrote it, you know.  I mean the only

10   foundation for that letter is his testimony.  That's it.

11   She never made any statement about that.  She never made

12   any admission about it.  Her signature is not on the

13   letter.  I think I've got that right.  Again I wasn't

14   there, but I've talked to my client.

15             THE COURT:  Well, what was in evidence was the

16   fact the letter came from Alaska, and we have no other

17   person that Mr. Iaukea knew from Alaska, except Miss

18   Veloria.  And the subject matter of the letter was the very

19   charge against Miss Veloria.  I mean, clearly, whoever

20   wrote that letter was writing about what Miss Veloria was

21   accused of.  It came from Alaska, and it was asking Mr.

22   Iaukea to get his story straight in a way that would be

23   very favorable to Miss Veloria.  Given those circumstances,

24   I think it's a fair conclusion on my part that Miss Veloria

25   wrote that letter, and I think that's an obstruction of

1    justice.  So I'm going to overrule your objections to

2    paragraphs 25, 26, 27, 28, 29, and 32, which goes to the

3    same issue.

4             MR. KING:  Judge, just for the record just so we

5    can make sure we get everything for appellate purposes,

6    first of all, my understanding -- I'm not quite clear

7    because I haven't seen the transcript of the entire trial

8    about Mr. Iaukea's record, but I mean he's got an

9    incredible record of 15 arrests and nine convictions.  And

10   I'm told -- and again I haven't seen the record yet -- that

11   there was a certain limited, if not total, ban of

12   cross-examination on him about those issues.  So -- but he

13   does have this incredible checkered history of conviction

14   after -- arrest after arrest, conviction after conviction.

15   He's not a credible witness, as was proven when the jury

16   acquitted my client on that charge.

17             THE COURT:  But, see, I don't see that the

18   acquittal necessarily establishes that he wasn't believed.

19   The acquittal may be simply a reflection on the part of the

20   jury that all of them could not find her guilty beyond a

21   reasonable doubt.  Most of them may have believed him.

22             MR. KING:  But even to acquit her they have to

23   unanimously agree that it wasn't proved beyond a reasonable

24   doubt.

25             THE COURT:  Right.  They'd have to unanimously

1      agree that there wasn't proof beyond a reasonable doubt,

2      but they would not have to unanimously agree that they

3      didn't believe Mr. Iaukea's testimony about the letter.

4              MR. KING:  Again she wasn't charged with

5      obstruction of justice about the letter per se.

6              THE COURT:  So it's left to me to make that

7      finding, and, having been at trial, it seems to me --

8              MR. KING:  I guess -- I'm sorry.

9              THE COURT:  Go ahead.

10             MR. KING:  I guess my argument is, you know, it

11     is left up to you, that's true, but I think you should at

12     least take the lead from the jury, I mean certainly they

13     must not have believed him.  His credibility must have been

14     severely damaged.  Even if cross-examination was limited,

15     he must have looked bad on the stand.  Plus whatever

16     cross-examination was used, the jury just didn't believe

17     anything he had to say about the drugs.  That's for sure.

18     And, if his credibility was that bad -- now, it is possible

19     that, you know, who knows what that meant.  So the letter

20     came from Alaska.  Miss Veloria has lots of friends in

21     Alaska.  Apparently, she had a friend who was sitting

22     through the trial assisting.  Who knows what the source of

23     that letter was.  Could have been some misguided friend

24     from Alaska.  Just don't know.  All you know is that he

25     says.  That's all you know.

1          THE COURT:  If indeed Miss Veloria thought one of

2    her friends wrote that letter, then I think it's highly

3    likely that I would have heard about this.  Either that

4    would have been presented in her defense -- although,

5    clearly, she doesn't have any obligation to present any

6    defense.  But you understand, of course, that the letter

7    was used in bail proceedings.  And I mean one of the

8    reasons that her bail was, you know, in issue had to do

9    with whether or not that letter had been sent.  She was

10   ultimately told she couldn't go to the Big Island because

11   of that, and it seems to me, if, in fact, she had someone

12   else to identify as the writer of the letter, I mean she

13   asked me at the end of trial please to let her go to the

14   Big Island to be with her family.  She wanted to go to the

15   Big Island.  So it's hard for me then to accept that she

16   knew her friend had written the letter, but she just shut

17   up about it because it didn't mean so much to her.  I mean

18   she was begging to go to the Big Island.  So I'm a little

19   surprised now that this possibility that one of her friends

20   wrote the letter unbeknownst to her comes up now, and this

21   was a big subject pretrial.

22          MR. BRADY:  Your Honor, if I may, Mr. King wasn't

23   privy to the trial, and I just want to clarify that Mr.

24   Iaukea not only testified as to count 2, he also testified

25   as to count 1 in which the defendant was convicted.  He was

1    allowed to testify that he had bought drugs from that same

2    location that Miss Veloria was living at just prior to law

3    enforcement coming in and finding drugs there.  So I don't

4    think, as the court has pointed out, that you can make that

5    leap that Mr. Iaukea was not credible from the stand.

6          THE COURT:  Anything else?

7          MR. KING:  Just to reiterate, Judge, I think the

8    jury made it pretty clear on count 2, on the truck count,

9    if you want to call it that, I mean he was the only witness

10    to testify about that.  And, if they didn't believe him on

11    that, it's highly unlikely they believed him on anything.

12          And, as far as the, quote, unquote, friend goes,

13    all I'm saying -- I'm not saying a friend did or did not

14    write it.  All I'm saying is that the only foundation laid

15    for that letter was Mr. Iaukea saying this is from her.  So

16    there you go.

17          THE COURT:  Okay.  Well, I'm going to overrule

18    the objection with respect to the letter.  That's the

19    objections raised to paragraphs 25, 26, 27, 28, 29, and

20    32.

21          Okay.  I already struck paragraph 38 based on the

22    objection about use of her pretrial statement.

23          Paragraph 45 goes to the Mr. Iaukea issue.  Your

24    objection to paragraph 45 goes to the Mr. Iaukea issue, and

25    I will overrule the objection by the defense to paragraph

1   45.

2           Now, paragraphs 53, 62, 67 to 69 have been

3   amended from the draft; so the final uses the information

4   presented in the defendant's Sentencing Statement.  The

5   same for paragraph 69 and paragraph 76 on her student loan

6   debt has been amended.

7           So I think there are no more objections that

8   require my ruling; am I correct?

9           MR. KING:  That seems to cover the list, Judge.

10          THE COURT:  Now, you did want to make a statement

11  about something the government had said, and what was that?

12          MR. KING:  Yes.  In the government's

13  memorandum -- and I think it's at the bottom of page 3 --

14  there's -- the government's responding memorandum to the

15  plea agreement (indicating).  The second paragraph on page

16  3 starts, "Shortly thereafter."  Then it goes down, says,

17  "Through her attorney Veloria agreed to draft a plea

18  agreement."  Then it says, "However, Veloria requested

19  additional time, and she was allegedly pregnant and could

20  not travel.  That information turned out to be false."  My

21  client advised me that she was pregnant at that time.  In

22  fact, she had a miscarriage.  I don't know why the

23  government or on what basis they're saying the information

24  turned out to be, quote, unquote, false.  But we want to at

25  least make that clear for the record from my client's point

1    of view.  As I said, it's not mentioned in the presentence

2    report one way or the other -- to my recollection anyway --

3    so it's not an issue for the presentence report per se.

4            THE COURT:  Okay.

5            MR. KING:  But we want to make the record clear,

6    as far as my client's recollection of the facts that she

7    knows to be true, is that she was pregnant at the time.  In

8    fact, it was twins.  And she had a miscarriage in Alaska.

9            THE COURT:  Okay.  You have that on the record.

10   This is actually -- the issue of her requesting additional

11   time is not some specific piece of information that I'll

12   base my sentence on in any event.

13           MR. KING:  Correct.  Thank you, Judge.

14           THE COURT:  So with the rulings that I've made I

15   will adopt the Presentence Investigation Report, amended as

16   I stated earlier, and I will then have this document filed

17   under seal but still available to the lawyers in its

18   amended form.  Also to be filed under seal but not

19   available to the lawyers will be the Probation Office's

20   recommendation to me.  So in amended form I will rely on

21   the PSR, and I adopt it.  And I have the following

22   conclusions:

23           The total offense level then is 30.  The criminal

24   history category is 1.  Before looking at the effect of

25   matters that I still have to rule on, I find that there is

1    a mandatory minimum of five years, a maximum of 40 years in

2    custody with a guideline range of 97 to 121 months in

3    custody.  Probation is not authorized by law.  Supervised

4    release by law is a minimum of four years, a maximum of

5    life, with a guideline range of four to five years.  The

6    maximum fine allowed by law is $2 million with a guideline

7    range of $15,000 to $2 million.  Restitution to the

8    community cannot exceed any fine imposed, and there is a

9    $100 special assessment.

10            Let me check first with Mr. King if there is any

11    dispute with those conclusions.

12            MR. KING:  Judge, based on your rulings I think

13    that's a correct calculation of what the guidelines are,

14    based on your rulings.  Of course, we object to some of the

15    rulings, but, based on your rulings, that is a correct

16    calculation.

17            THE COURT:  Okay.  Mr. Brady.

18            MR. BRADY:  No objection.

19            THE COURT:  Okay.  Then let us turn to the

20    defendant's request contained toward the end of the

21    defendant's Sentencing Statement for a downward departure.

22            Mr. King.

23            MR. KING:  Judge, I realize that we're talking

24    about post-offense rehabilitation, and I realize that it's

25    difficult for the -- based on your ruling right now that

1   there's an obstruction of justice shown by the defendant,

2   I realize you at least have to consider this strongly and

3   carefully, but I still think it's a valid argument to make.

4   Again I'm coming into this case relatively late in the

5   game, but I look back on the facts.  And assuming for a

6   second, as the jury found -- and, of course, this will be

7   an issue for appeal, and we'll see what happens as far as

8   appeal goes.  But assuming for a second, as the jury found,

9   that the defendant was some kind of a drug -- doing some

10  kind of drug dealing back in 1996 and assume that that's

11  true and assume that she was stupid and young and doing

12  stupid things in those days, in fact that case attempted to

13  be prosecuted twice in state court and was dismissed both

14  times.  She went on to study both in Hawai'i and in Alaska.

15  She was clearly -- by the time this case was charged in

16  federal court after two attempts to prosecute her in state

17  court -- and my understanding is that once the two attempts

18  at state court were over, she was aware that it might be

19  referred to federal court.  I think she had Mike Weight as

20  her Federal Public Defender just kind of overlooking it.

21  Nothing was happening.  She had no reason to believe

22  anything was going to happen.

23          She went on to totally self-rehabilitate to the

24  extent that she was doing anything back in 1996.  She went

25  to college in Hawai'i, as I said, got almost straight As on

1    many semesters, went to Alaska, was getting straight As.     I

2    think we've shown the court that she, in fact, graduated in

3    Alaska, was doing great up there, didn't appear to be

4    having any problems whatsoever, was at least by the time

5    she was charged was at least more than four years away from

6    whatever was happening in 1996.     Then all of a sudden she

7    gets dragged back into this.

8              Let's assume for a second she did write the

9    letter, which you're finding as a fact by a preponderance

10   of the evidence, to me you've got to look at this at least

11   to a certain degree from her point of view.     Whatever she

12   may have done in 1996 she was so far away from that it

13   could hardly be believed.     By the time this case went to

14   trial we're about six, almost seven, years down the pike.

15   She's done everything she can to set her life straight.

16   She succeeded in doing that.     She's doing great in school.

17   She has nothing but a good future ahead of her.     All of a

18   sudden all this comes back on her head.

19             Maybe if she did write that letter, if she did

20   attempt to obstruct justice, from her point of view -- it

21   needs to be looked at from her point of view -- she's

22   getting dragged back into this case.     And I think it's a

23   fair summary of this case to say that by the time she was

24   charged she was not a danger to anyone.     She was doing

25   great.     She was looking forward.     She was looking to the

1    future.  She was looking to be a productive member of

2    society.  And I think anybody who knew her up in Alaska at

3    that time -- and many letters attribute that fact -- that

4    she was doing exactly that.

5              So maybe she made some mistakes in 1996 and maybe

6    in desperation of getting dragged back into this thing

7    maybe she did attempt to obstruct justice.  But, you know,

8    Judge, I mean we've all seen a lot of drug dealers come and

9    go in this court, and we're now looking at an

10   eight-plus-year sentence for somebody who was doing at best

11   minor drug dealing back in 1996 after having left that life

12   many years before.

13             So we think, if you look at her from the point of

14   view of what she was doing in Alaska when she got dragged

15   back into this case, she had rehabilitated.  She had shown

16   significant post-offense rehabilitation.  And all we're

17   looking for, Judge, is a chance to go from eight years -- I

18   mean I have clients that are dealing pounds and pounds of

19   ice that, you know, they do a little bit of cooperating and

20   don't get sentences this long.  I just can't see that it's

21   a fair sentence or a reasonable sentence, even if you find

22   that she attempted to obstruct justice in this desperation

23   to deal with this problem that's facing her now.

24             I think it's at least a reasonable request to ask

25   the court to reduce the sentence to 60 months.  She's

1    looking at a five-year mandatory minimum anyway.  At least

2    reduce the sentence to 60 months so she can qualify for the

3    program which allows her to get significantly less time, if

4    she can get into it.  But it needs to be at 60 months.

5              So that's what we're asking for, Judge.

6              THE COURT:  Does she want to say anything?

7              MR. KING:  I think she does want to address the

8    court.

9              And we think it's a reasonable request, based on

10   the whole history of this case.

11             THE COURT:  Go ahead, Miss Veloria.

12             THE DEFENDANT:  Good afternoon, Your Honor.

13             THE COURT:  Good afternoon.

14             THE DEFENDANT:  I've written out an allocution

15   statement so I can hopefully keep my ideas in order for you

16   today.  And please bear with me because I'm really nervous.

17             I want to start at the beginning because this did

18   happen seven years ago; so I want to talk about that a

19   little bit.

20             On July 10th, 1996, at 7:15 in the morning when I

21   was 19 years old I was arrested pursuant to a search

22   warrant of a house.  I wasn't the only one there.  There

23   were three people that were arrested along with me.  Around

24   7:30 that evening I was released pending further

25   investigation along with, I believe, the other three as

1    well.

2            Around five months later a warrant was issued

3    arising from that incident, and I was again arrested.

4    $4,250 bail was posted on my behalf.

5            In January of 1997 on the date of my scheduled

6    preliminary hearing the State of Hawai'i dismissed the

7    charges without prejudice.  Soon thereafter on the advice

8    of my attorney I waived indictment in exchange that the

9    state would not require me to post bail again, as I

10   couldn't afford it.

11           Two weeks before my scheduled trial the State of

12   Hawai'i dismissed the charge without prejudice for a second

13   time.  I was informed that the state may turn my case over

14   to the feds for prosecution; so in 1997 in anticipation of

15   federal charges I applied for a Federal Public Defender,

16   and Mr. Michael Weight was appointed to represent me.

17           1997 passed.  1998 came and passed.  In May of

18   1999 I earned two degrees from Hawai'i Community College,

19   and I decided to transfer to the University of Anchorage

20   Alaska to pursue my bachelor's degree.

21           After living in Anchorage for a year and a half,

22   attending the university, I was arrested by three U.S.

23   Marshals on campus at UAA in my research and policymaking

24   class in front of all my classmates.  I was held in jail in

25   Anchorage for 10 days and was released on the condition

1    that I would fly back to Honolulu and appear in court on my

2    own.   During my pretrial release I have flown back to

3    Honolulu for court four times at my own expense.   I have

4    everything in my power to comply with the court's

5    restrictions in regards to my pretrial release.

6              I've had this arrest hanging over my head for

7    seven years.   Seven years of uncertainty.   Seven years of

8    not knowing what my future holds.   And for the last seven

9    years I have maintained employment, I've earned three

10   college degrees, and I've been an upstanding good citizen.

11             I provided the government with truthful

12   information.   I elected to proceed with trial because the

13   debriefing report contained an overwhelming amount of

14   inaccuracies and false statements, which I have no

15   incentive to make.   It says that I stated my parents were

16   divorced in 2001.   My parents were divorced in 1986.   It

17   states I reported Zachary Smith and I were released on bail

18   following the July 10th arrest.   We were both released

19   pending further investigation without being required to

20   post bail.   It states that I reported the incident when my

21   truck was seized happened at Mountain View Park rather than

22   Kea'au Ballpark.   And there are many more examples of

23   misrepresentations in that debriefing report.   Short of

24   finding that I'm a pathological liar, you must see that I

25   have no reason to lie about those items.

1          Prior to trial I repeatedly asked counsel to

2    obtain the agent's notes of the debriefing.  On

3    November 13th, 2002, the court ordered the government to

4    turn over the notes; although, I don't believe they were

5    ever given to Mr. Ling.

6          Throughout my entire trial the debriefing report

7    was held over my head.  I did not put up any defense.  Mr.

8    Ling had to be very careful during questioning of the

9    government's witnesses in fear that a response would be

10   elicited that opened the door and would allow the

11   debriefing report to be admitted against me as evidence.

12   Even though Mr. Silvert incorrectly advised me of the

13   weight of the debriefing statement had I chosen to proceed

14   to trial because he told me that it would only be used

15   against me if I chose to testify on my own behalf at trial

16   and I committed perjury.

17         I believe that I was denied the right to probe

18   the government witnesses for bias and prejudice by

19   introducing any of the numerous arrests and convictions.

20   Although the witnesses both stated that they did not

21   receive any benefit or favorable treatment, Mr. Brady

22   stated in court that Mr. Iaukea was waiting to testify as

23   he was eager to receive his furlough.  With careful

24   scrutiny the jury, the triers of fact, would have seen that

25   the witnesses, such as Mr. Iaukea and Miss Barcena, would

1   not have received such favorable treatment in light of both

2   of their extensive criminal records.

3          I believe that my jury panel was prejudiced as

4   well by the argument and threats within the deliberation

5   room between Mr. Paulino and Mr. Kuramoto.  If I was -- had

6   I personally been informed of this hostile argument within

7   the deliberation room, I would have wanted you to interview

8   all the jurors to determine if their impartiality had been

9   affected at all by this argument that took place and these

10  threats within the deliberation room.

11         Unfortunately, throughout the week of

12  deliberations Mr. Ling failed to inform me of, and allow my

13  involvement with, the jury communications; although, I was

14  patiently waiting outside the courthouse with my cell phone

15  in hopes that he would contact me regarding any of the

16  issues.  I was unaware of the eight jury communications

17  until after my conviction and incarceration.  Although I

18  asked Mr. Ling for copies of them, he never provided me

19  with them.  In order to get copies of those jury

20  communications I had to have a friend of mine in Alaska

21  order them from the court and have them mailed to me at the

22  Federal Detention Center.

23         I stand before you today with extreme

24  disappointment.  Although, as a criminal defendant in the

25  United States I have many rights given to me by the

1    constitutional amendments, throughout this entire
2    prosecution many of those rights were circumvented.  My
3    trial was continued on many occasions on account of Mr.
4    Ling's heavily burdened workload.  It seems that he was
5    scheduled for a different trial every week in both state
6    and federal court.  To further complicate issues he had to
7    serve military duty on several occasions.  And I believe
8    you also expressed frustrations at times with Mr. Ling's
9    complicated schedule because it seems like he was always
10   scheduled for trial in another courtroom all the time, like
11   my case never took precedence to him at all.  It wasn't
12   important.  Even though it was a federal case, even though
13   it was seven years ago, he always had another trial going.
14        Since being arrested on federal charges I have
15   accumulated a one-inch manila envelope full of one-way
16   correspondence to my previous attorneys:  Mr. Silvert, Mr.
17   Guerrero, and Mr. Ling.  The only attorney who even took
18   the time to respond to any of my questions and concerns was
19   Mr. Silvert.
20        Prior to and after the guilty verdict I've asked
21   Mr. Ling and Mr. King as well to submit to you a motion
22   requesting that I be given some time to visit with my
23   family prior to my incarceration.  My father is 70 years
24   old, and I haven't been able to see him or visit him for
25   the last couple of years on account of my pretrial release

1    travel restrictions.  My father is deaf in one ear and hard

2    of hearing in the other ear, and it's difficult to

3    communicate with him over the phone; so, as a result of

4    this charge, I haven't been able to spend time with him to

5    talk to him because I was ordered to remain in Anchorage

6    with specific instructions not to travel, unless getting

7    permission by the court.

8         In light of this I ask that you take my two years

9    and eight months pretrial status into consideration upon

10   sentencing.  I complied in every way and not once was there

11   ever a question that I was in violation of any of the

12   conditions imposed upon me.

13        Today you're going to formally sentence me, but I

14   want you to know that I've already been living with the

15   sentence for seven years, one that precluded me from moving

16   on with my life.  The uncertainty of not knowing what is

17   going to happen was very difficult.  But I did the best I

18   could and I worked hard, despite this large gray cloud that

19   was hanging over my head.  When I was offered a full-time

20   position working for an attorney in Anchorage, I had to

21   decline because I knew that I had this charge to deal with,

22   and they couldn't depend on me.  When the construction

23   company I worked for in Alaska chose me for an out-of-state

24   job, I had to decline because of this charge.

25        The PSI reflects my outstanding scholastic

1    achievements since this arrest as well as the fact that all

2    of my previous employers would consider me for rehire.  I

3    ask that in light of those truths you show compassion today

4    and give me a sentence that would enable me to be placed in

5    the Intensive Confinement Center, the boot camp program, in

6    Bryan, Texas.

7              Before you impose sentence upon me I would like

8    you to consider that this happened seven years ago, and I'm

9    not the person that I was seven years ago.  I'm not a

10   threat to society.  I'm not a danger to the community.

11   There's no lesson that can be gleaned from incarcerating me

12   for eight to ten years on account of this charge.  It's

13   just an additional burden on the taxpayer.

14             I don't need to be rehabilitated any further.  I

15   understand that you need to sentence me but eight to ten

16   years for something that happened seven years ago, I was 19

17   at the time, and I'm 27 now.  If I get 10 years, I could be

18   37 or maybe with good time 35 when I get out.  And then

19   I'll have supervised release for five years, and that means

20   I'll be 40 years old by the time I'll be done with this for

21   something that happened when I was 19.  And I ask that you

22   consider that when you impose sentence upon me.

23             And, lastly, I want to apologize to my family and

24   my friends, who have stood by me throughout this whole

25   entire process.  And I want to apologize to my father, and

 1    I'm sorry that I won't -- because of this I won't be able

 2    to be there for you in your old age when you need me the

 3    most.   And I'm sorry to my brother that he's had to sit in

 4    court and watch this so many times on my behalf.   And,

 5    mostly, I'm sorry for what's to come in the future because

 6    I know that, when people ask you guys how I'm doing, you're

 7    going to want to lie to them rather than tell them that I'm

 8    in federal prison somewhere in the mainland for eight to

 9    ten years of my life.   And I want you guys to know that no

10    matter where I'm at I'm always with you in spirit, and I

11    love you guys.

12              And that's all I have to say.   Thank you, Your

13    Honor.

14              THE COURT:   Thank you.

15              Okay.   Mr. Brady.

16              MR. BRADY:   Your Honor, the government is opposed

17    to the defendant's motion for a downward departure.   We've

18    outlined that in our moving memorandum.   We don't believe

19    that the fact that she's attended college and has been

20    successful in her endeavors at college is really

21    extraordinary in any means.   Section 5H1.2 of the United

22    States sentencing guidelines states that education and

23    vocational skills are not ordinarily relevant to the

24    sentencing.   And we would submit that there's nothing

25    extraordinary about it.

1            I think what is extraordinary is the fact that

2    Miss Veloria can say that she was young and stupid when she

3    did this offense but that was a long time ago and she's

4    changed, and yet I would submit to the court that in her

5    quest to avoid conviction she has manipulated the facts,

6    the witnesses, the jury, and this court and she has done

7    that right up until today.  She's come in here today and

8    for the first time said the reason I didn't agree with that

9    first initial plea agreement was because that there was

10   errors in that statement.  Not once did she ever come to

11   the government and say, "Hey, that was Mountain View not

12   that location.  My parents were divorced in 1997."  That is

13   a form of manipulation on this court.

14           THE COURT:  Well, I'll also say that I don't know

15   what other errors she thinks were in the report, but the

16   ones that she's pointed out today are not material errors.

17   In other words, when her parents were divorced, where --

18   what park a particular transaction occurred at, it's not

19   affecting any decision that I have to make and as -- I mean

20   the jury didn't have that report also; so --

21           MR. BRADY:  But I think it's just -- it's

22   important to see Miss Veloria's character.  And she says

23   she did something when she was young and stupid, but she's

24   been indicted under federal indictment since 2000, April

25   2000, and since then she has been nothing but manipulative

1    and deceitful to this court, and she's carrying that on

2    even today.

3            THE COURT:  Remind me of the date about when did

4    Mr. Iaukea get that letter?

5            MR. BRADY:  That was between, I believe, in

6    2000 -- he testified 2000-2001.  So that was while -- after

7    she had lost her initial motion to suppress and when she

8    was preparing for trial.  That's her true character.

9            I've sentenced a lot of defendants, and I know

10   the court has as well.  There's only one other person --

11   and he's to be sentenced in this courtroom as well.

12   There's only one other person that rises to the level of

13   manipulation as Miss Veloria, and I've outlined that in the

14   government's motion for supporting the obstruction of

15   justice.

16           We are opposed to the motion for downward

17   departure, we don't think her actions warrant it, and we

18   are asking that the court sentence her to 121 months.

19   We're asking for five years supervised release.  We're not

20   asking for a fine or restitution.  We are asking for a

21   special assessment of $100.

22           THE COURT:  Okay.  Mr. King, you want to say

23   anything further on your motion for downward departure?

24           MR. KING:  Judge, again, basically, I think we're

25   arguing motion for downward departure as well as

1    sentencing, if you don't mind, at this point.  Certainly,

2    you know, as I said to you before, we've all sentenced a

3    lot of defendants.  And I look at this case --

4          THE COURT:  Actually, I'm the only one in this

5    courtroom who's actually sentencing.

6          MR. KING:  I'm just using the same words the

7    prosecutor used.  We've been at a lot of sentencings, and

8    you've certainly sentenced a lot of defendants.  I look at

9    this case and I think, "Okay.  Maybe she was, you know, if

10   the jury is to be believed, maybe she was doing some drug

11   dealing back in 1996, and maybe she got desperate enough to

12   do stupid things about attempting to see what she could do

13   about avoiding a conviction."  But, you know, you stand

14   back and you look at the whole scope of things, eight to

15   ten years?  I mean this girl by the time she was up in

16   Alaska was a danger to nobody, and now we're looking at

17   eight to ten years?  And the government's asking for ten?

18   Judge, I have clients that have been moving pounds and

19   pounds of crystal meth into this town and haven't got

20   sentences like that.

21         Basically, all we're asking for is 60 months

22   instead of 97 months so she could qualify for boot camp.  I

23   mean I just can't see that as being an unreasonable

24   request, and I think that it's more than justified by the

25   rehabilitation efforts she showed once she put this behind

1    her.

2              THE COURT:  Okay.  Anything more, Mr. Brady?

3              MR. BRADY:  No, Your Honor.

4              THE COURT:  Okay.  Well, you know, I'm very much

5    aware that this crime is from many years ago and you were

6    very young.  But I will say that that would have a lot more

7    persuasive impact on me if I didn't have before me things

8    that you did more recently.  And I'm particularly concerned

9    about that letter where I found that by a preponderance of

10   the evidence that that letter is evidence that you tried to

11   obstruct justice.  And that was not when you were 19.  That

12   was, in fact, after you knew that you had these charges

13   against you.  And that was a powerful piece of evidence

14   against you when I had to calculate your sentencing

15   guidelines, and it's a powerful piece of evidence that I'm

16   considering in looking at your motion for downward

17   departure.  And that's not something I can ignore.

18            So this is what I'm going to do:  I'm going to

19   first deny the defendant's motion for downward departure.

20   It is a motion that argued to me that I should go below the

21   guidelines because of your significant post-offense

22   rehabilitation.  I certainly think that it is a very good

23   thing that you went on to get a college degree, and,

24   clearly, you are an incredibly intelligent person.  You had

25   straight As when you were in college, and you must have

1    worked very hard also to get that very impressive

2    achievement in college.  But the sentencing guidelines do

3    say that education and vocational schools are not

4    ordinarily relevant when I determine whether I should grant

5    or deny a motion for downward departure.  There may be

6    circumstances where they are indeed relevant, but my

7    concern is that, while you were doing that, you were also

8    using your very high level of intelligence and your

9    articulate writing skills to write that letter to Mr.

10   Iaukea.  And so it's hard for me then to say, gee, I ought

11   to reward you for your outstanding academic ability and

12   achievement by giving you a downward departure.

13           I know you also -- your attorney has noted for me

14   that, if I do downwardly depart, that you could qualify for

15   boot camp.  But this is also a factor that is not

16   ordinarily considered since that is something in the Bureau

17   of Prisons' discretion, and Bureau of Prisons' might not

18   put you in such a program anyway.  Given all of that, it

19   doesn't seem to me that I have a basis on which to grant a

20   motion for downward departure; so I am denying it.

21           However, it does seem to me, in spite of what Mr.

22   Brady has argued, that those are factors that I should take

23   into account in trying to figure out where in the guideline

24   range, which is 97 to 121 months, your sentence should

25   fall.  And, looking at those factors that were not enough

1    for me to grant you a downward departure but still taking

2    into account all of this and taking into account the length

3    of even the low end of the guideline range, my inclination

4    is to give you a sentence at the low end of that guideline

5    range.

6              Now, I'm happy to hear any further argument from

7    either side on where the appropriate sentence should fall

8    now that I have denied the motion for downward departure.

9              Anything more, Mr. King, on that?

10             MR. KING:  Judge, I think, basically, I've

11   already addressed that.  But just real briefly, then.  We

12   certainly think that a 97-month sentence -- you say low

13   end.  I would think that the -- we would argue the lowest

14   end of the guidelines is appropriate in this case.  Again,

15   all the factors which you just outlined and which we

16   argued, even though you've considered them in denying the

17   motion for downward departure, including the long length of

18   delay, I mean no matter how we phrase it, whether you call

19   it post-indictment delay or whether you call it

20   post-offense rehabilitation, it amounts to the same thing

21   is that for a significant period of time she was doing

22   great.  And, if she got desperate, if she did stupid things

23   in this case, which you found by a preponderance of the

24   evidence, okay.  So that's already throwing her way up on

25   the guidelines.  Even at the low end we're talking over

1    eight years, actually.  So I just can't see any

2    justification for going higher than eight years, especially

3    I think, you know -- you've sentenced many defendants --

4    comparing her to other defendants who, you know, have

5    records as long as our arms and are really dangerous

6    people, have guns all over the place, I just can't see any

7    basis for going higher than 97 months, Judge.

8              THE COURT:  Mr. Brady.

9              MR. BRADY:  Nothing further.

10             THE COURT:  Okay.  Well, Miss Veloria, the way I

11   do this is I state a proposed sentence, I include the

12   conditions that you would have to follow, and I include the

13   reasons for it, and then I check with your lawyer and the

14   government's lawyer to see if they think they have a legal

15   challenge to the sentence I've proposed.  This is not a

16   time for them to say that they disagree with the sentence.

17   It is, rather, a time for them to say, given the rulings

18   I've made so far in this case, do they think that my

19   sentence is not within what the law allows.  Okay?  If they

20   agree that, given the rulings I've already made, my

21   sentence does fall within what the law allows, then I'll

22   sentence you as I have propose.  Okay?

23             THE DEFENDANT:  (Nods head.)

24             THE COURT:  So this is the sentence I am

25   proposing:  a period in custody of 97 months, followed by

1   five years of supervised release.  I make the finding here

2   that you do not have the financial ability with which to

3   pay a fine; so I am not proposing a fine, but you do have

4   to pay a $100 special assessment, and you do have to follow

5   these conditions:

6          First, you have to follow all of the standard

7   conditions of supervision;

8          Second, you cannot commit any crimes, federal,

9   state, or local;

10          Third, you cannot possess any illegal controlled

11   substance;

12          Four, you cannot unlawfully use a controlled

13   substance.  You have to have a drug test within 15 days of

14   getting out of prison, and after that you have to have at

15   least two more drug tests;

16          The fifth condition is that you must participate

17   in a substance abuse program, and that may include drug

18   testing directed by the Probation Office;

19          The sixth condition is that you cannot possess a

20   firearm;

21          The seventh condition is that you cannot possess

22   any illegal or dangerous weapon;

23          The eighth condition is that you have to provide

24   the Probation Office with any financial information

25   requested;

1          The ninth condition is that you have to submit

2     yourself, your residence, your place of employment, and

3     your vehicle to a search by the Probation Office at a

4     reasonable time and in a reasonable manner if it has a

5     reasonable suspicion that you have contraband or it has

6     evidence that you have violated a condition of supervision.

7     If you don't submit to the search, then supervised release

8     could be revoked.  What that means is I could send you back

9     for more prison time.  You have to warn people you live

10    with about this condition so they know that their home

11    could be searched.

12         Now, here are the reasons I propose this

13    sentence.  You know, I'm going to change something that

14    I've just proposed.  I had proposed a five-year supervised

15    release.  I should have said four years supervised release.

16    I'm sorry.

17         And here are the reasons that I've proposed this

18    sentence.  You've come before me 27 years old, having been

19    found guilty by a jury of possession, with intent to

20    distribute, more than five grams of cocaine base.  What I

21    had to do here was calculate the sentencing guidelines, and

22    I looked at the 22.6 grams of cocaine base and 539.8 grams

23    of cocaine that I found you responsible for.  I looked at

24    your obstruction of justice.  I looked at your lack of

25    acceptance of responsibility and your limited criminal

1    history.  You were not eligible for the safety valve

2    provision, given my rulings.

3        Now, something that works against you -- we call

4    this aggravating factor -- is your extensive involvement in

5    dealing drugs.  We had witnesses who said that, even after

6    your home was raided by police, you still kept dealing

7    drugs out of your home.  I know you have training in school

8    in criminal justice, and I don't know whether that helped

9    you to get your way through this case.  You may have been

10   able to do that anyway because I realize that you are an

11   extremely intelligent and articulate person.  But in any

12   event it does seem to me that you were very much hands on

13   in the way that your case was handled.  And, of course,

14   well you might be because this is going to affect your

15   life, but at the same time it does seem to me, having

16   watched you at trial, that you were very careful in walking

17   the line during trial and you were skillful in doing that

18   so that I would not bring in your pretrial statement and

19   place that before the jury.  But it seems to me that, you

20   know, I know you stood up before me and made a number of

21   complaints about your attorneys.  Those may or may not be

22   the subject of later proceedings, but it does seem to me

23   that you were -- from what I observed during trial that you

24   were very much in control of your defense.

25        Now, you do have a history of substance abuse

1    with limited history.  And, taking all of that into

2    account, those are issues of concern.

3            But there are mitigating factors.  You have had

4    fairly stable employment history.  You're very well

5    educated.  You clearly have marketable skills, and you

6    don't have to be involved in crime to support yourself.

7    You do have a very supportive family, and that speaks very

8    well for you and gives me hope for how your life will turn

9    out when you get out of prison.  You don't have a history

10   of mental illness or emotional problems.  And, given all of

11   that and given how long even the low end of the guideline

12   range is in terms of a prison sentence, it seems to me that

13   97 months will be a sufficient sentence for you.  That is

14   the low end of the guideline range that I have calculated.

15           Okay.  Let me hear from Mr. King whether, given

16   the rulings I've already made, there is a further legal

17   challenge to what I have proposed.

18           MR. KING:  No, Your Honor.

19           THE COURT:  Mr. Brady.

20           MR. BRADY:  No, Your Honor.

21           THE COURT:  Okay.  Then at this time I am

22   imposing sentence on you, Miss Veloria.  For the reasons I

23   stated with the proposed sentence and with all of the

24   conditions I stated with the proposed sentence I'm

25   sentencing you to 97 months in custody, followed by four

1    years of supervised release.  I make the finding here that

2    you do not have the financial ability with which to pay a

3    fine; so I am not sentencing you to any fine, but you do

4    have to pay a $100 special assessment.

5            Okay.  Now, you only have 10 days in which to

6    take an appeal; so talk to Mr. King about this right away

7    so that you can make sure that, if you are going to process

8    an appeal, an appeal is filed within the time frame

9    permitted by court rules.  Okay?

10            Now, are there any requests by the defense with

11    respect to where the Bureau of Prisons might designate Miss

12    Veloria?  I'll tell Miss Veloria this is totally up to the

13    Bureau of Prisons.  I have no control over where you will

14    be or what kind of programs you'll be in, but I can make

15    recommendations.

16            (Counsel and defendant conferring.)

17            MR. KING:  Judge, we don't have any request for a

18    particular designation of location.  However, I would ask

19    that you recommend that she at least get substance abuse

20    treatment.  It's in the presentence report that she'd ask

21    for it and that they recommend it.

22            THE COURT:  I will recommend that.

23            MR. KING:  Not that she recommend it, but that

24    she asked for it.

25            THE COURT:  I will recommend that, but they will

```
 1   decide --
 2              MR. KING:  Correct.
 3              THE COURT:  -- whether that is appropriate for
 4   you.
 5              MR. KING:  Your recommendation helps, though.
 6              THE COURT:  I know they don't always follow it,
 7   though.
 8              Okay.  No recommendation for an institution?  She
 9   will probably be sent to Dublin?
10              Then we'll leave it to the Bureau of Prisons.
11              Anything else that anyone needs me to address?
12              MR. BRADY:  No, Your Honor.
13              MR. KING:  No, Your Honor.
14              THE COURT:  Thank you very much.
15         (Court recessed at 4:12 P.M.)
16
17
18
19
20
21
22
23
24
25
```

```
 1              COURT REPORTER'S CERTIFICATE
 2         I, Debra Kekuna Chun, Official Court Reporter,
 3    United States District Court, District of Hawaii, do hereby
 4    certify that the foregoing is a correct transcript from the
 5    record of proceedings in the above-entitled matter.
 6         DATED at Honolulu, Hawaii, February 16, 2004.
 7
 8                           _____
 9                           DEBRA KEKUNA CHUN
10                           RPR, CRR
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```