ORIGINAL

EDWARD H. KUBO, JR.
United States Attorney
District of Hawaii

ELLIOT ENOKI
First Assistant U.S. Attorney

THOMAS J. BRADY
Assistant U.S. Attorney
Room 6-100, PJKK Federal Bldg.
300 Ala Moana Boulevard
Honolulu, Hawaii   96850
Telephone:  (808) 541-2850

Attorneys for Plaintiff
UNITED STATES OF AMERICA

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

NOV 1 9 2002

at 3 o'clock and ʊt min. P̶ M
WALTER A. Y. H. CHINN, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. 00-00145 SOM |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S OPPOSITION TO |
| | ) | DEFENDANT'S MOTION TO SUPPRESS |
| vs. | ) | EVIDENCE; EXHIBITS A-C; |
| | ) | CERTIFICATE OF SERVICE |
| ALICIA VELORIA, | ) | |
| | ) | DATE:  November 26, 2002 |
| Defendant. | ) | TIME:  9:00 a.m. |
| | ) | JUDGE:  Susan Oki Mollway |

GOVERNMENT'S OPPOSITION TO
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

I.   INTRODUCTION

On October 21, 2002, defendant ALICIA VELORIA
(hereinafter "VELORIA"), through her attorney, filed a motion
seeking suppression of her statements obtained pursuant to an
interview conducted by Special Agent Jason Pa, Internal Revenue
Service (IRS) on September 3, 2001.  For the reasons stated
below, the motion should be denied.

EXHIBIT A

II.  PROCEDURAL BACKGROUND

On April 13, 2000, an Indictment was returned charging
VELORIA with the following offenses:  knowingly and intentionally
possessing with intent to distribute and distributing in excess
of five grams of cocaine base, in violation of Title 21, United
States Code, Section 841(a)(1) (Count 1); knowingly and
intentionally possessing with intent to distribute in excess of
500 grams of cocaine, in violation of Title 21, United States
Code, Section 841(a)(1) (Count 2).  Count 1 was the result of a
State of Hawaii search warrant executed on VELORIA's residence on
July 10, 1996 and Count 2 was a result of a State of Hawaii
search warrant executed on VELORIA's truck on November 23, 1996.

After several trial continuances, VELORIA filed a
motion to suppress evidence on July 23, 2001.  That motion was
heard by this Court on Thursday, August 30, 2001.  This Court
treated the motion to suppress as a motion for Franks hearing,
which was subsequently denied.  The following Monday,
September 3, 2001, VELORIA decided to cooperate with the
government and provided a statement to law enforcement about her
involvement and knowledge in drug trafficking and money
laundering.  See Government's Exhibit B.

Prior to making a statement to law enforcement, VELORIA
requested and was given a proffer letter from the government

2

outlining the terms and conditions for the proffered information by VELORIA.  See Government's Exhibit A.

On September 3, 2001, VELORIA stated that she sold cocaine and crack cocaine in Hilo, Hawaii throughout 1996. VELORIA further stated that she was reluctant to tell law enforcement who her source of drugs was as it was a close family member.  VELORIA provided the names of several other individuals on the Big Island that were actively engaged in drug trafficking along with VELORIA.  VELORIA acknowledge the drugs seized from her residence and truck, which formed the basis for Counts 1 and 2 of her Indictment, were part of VELORIA's drug trafficking activity.

Based upon the proffer and continued cooperation by VELORIA, both the government and VELORIA's attorney prepared a plea agreement in this matter.  After providing a final draft of the plea agreement to VELORIA, the government was given assurances that VELORIA would enter into the plea agreement and continue her cooperation with local law enforcement on the Big Island.  Even after VELORIA's counsel withdrew as counsel on January 22, 2002, the government was given assurances by VELORIA that VELORIA intended to enter into a plea agreement in this matter.  However, when new counsel was appointed, the government was informed that VELORIA's intentions were to go to trial in the above-entitled matter.

3

On July 5, 2002, VELORIA moved to have her second court-appointed counsel removed from her case. That motion was granted and VELORIA's current counsel was appointed by the Court. It was shortly thereafter that VELORIA's counsel notified the government that they had a witness, Mr. Darryl Wisneski, who was prepared to testify at trial that VELORIA was unaware of the cocaine found in her vehicle and that the drugs were not VELORIA's drugs.

III. <u>STATEMENT OF FACTS</u>

On July 10, 1996, Hawaii Police Department Detective Samuel Thomas, Jr. and Officer Marshall Kanehailua executed a State of Hawaii search warrant on the residence located at 69 Mauna Loa Street, Hilo, Hawaii. At that time, VELORIA was occupying the residence along with her then boyfriend, Zachary Smith.

Recovered in the search of VELORIA's residence was an aggregate weight of 24 grams of "rock" cocaine, an aggregate weight of 8.2 grams of marijuana, numerous items of drug paraphernalia, such as a Tanita brand gram scale and ziplock bags, as well as $7,248 in U.S. currency. VELORIA, Smith, and an apparent houseguest in a downstairs bedroom were arrested at that time, but did not cooperate with the police. (Smith gave a limited self-serving statement that he "used" to use cocaine, which was supplied by VELORIA. However, Smith stated he had

4

stopped several months ago and was unaware of any drugs in the
house at the time of his arrest.)  Both Smith and VELORIA were
subsequently released pending further review of the facts and
circumstances of their case.[1]

On November 22, 1996, at approximately 5:45 p.m.,
Officers Mitchell Kanehailua and Marshall Kanehailua, along with
Detective Manuel Bega, were traveling back to the Hilo Police
Department after completing an unrelated assignment.  At the
intersection of Route 130 and Route 11, they observed VELORIA's
turquoise pick-up truck parked at the Keaau Ball Park parking
lot.  They also observed a light-blue Volkswagen pull up and park
next to VELORIA's truck.  The driver of the Volkswagen, later
identified as Wallace Iaukea, got out of the Volkswagen, walked
over to VELORIA's truck, and sat on VELORIA's passenger seat.

In addition to their collective knowledge of the
cocaine and marijuana seized from VELORIA's residence back in
July 1996, the officers also had previous information that
VELORIA was distributing large amounts of cocaine from her truck.
With this in mind, the officers attempted to make contact and
identify the driver and passenger seated in VELORIA's truck.  As
the police pulled into Keaau Ball Park and parked along side

---

[1]  The case was later referred to the County of Hawaii Office
of the Prosecuting Attorney, which resulted in formal charges.
Those charges were later dismissed in lieu of federal
prosecution.

VELORIA's truck, the driver's side window, which was down, was immediately rolled up. As the window was tinted, it was difficult for the officers to see inside the truck.

Officer Marshall Kanehailua knocked on the driver's side window and VELORIA lowered the window to eye level. Officer Marshall Kanehailua immediately recognized VELORIA and stated that based upon his observations and information, he believed VELORIA was conducting a cocaine deal. VELORIA responded that she did not have any cocaine in the truck and that she was not dealing drugs. When asked if she would consent to a search of her truck, VELORIA declined. However, VELORIA did allow the officers to screen her truck with the use of a narcotic detection canine. Meanwhile, on the other side of the vehicle seated in the passenger's seat was a male identified as Wallace Iaukea.[2] Upon the police vehicle pulling up next to the pickup truck, Iaukea exited the vehicle, leaving the passenger's side door open.

Within five (5) minutes, "Malia," a narcotic detection canine, was screening the truck. As Officer Mitchell Kanehailua was conversing with VELORIA on the driver's side of VELORIA's

---

[2] Wallace Iaukea has cooperated with the government and has turned over several letters sent to him by VELORIA. Wallace Iaukea will testify that these letters sent by VELORIA was an attempt by VELORIA to get Wallace Iaukea to lie on VELORIA's behalf at the motion to suppress as well as trial. See Government Exhibit C.

vehicle, "Malia" alerted to the inside lower portion of the door panel on the passenger side of the truck. VELORIA immediately ran around her truck and attempted to push the passenger door closed. VELORIA was informed that she was free to leave, but that the truck would be towed to the Hilo Police Station where a search warrant would be prepared and executed. The following day, a subsequent search, pursuant to a warrant of VELORIA's truck, resulted in the seizure of approximately one (1) pound of cocaine along with an ounce of marijuana, drug paraphernalia such as a drug gram scale, and $2,500 in U.S. currency. The cocaine, contained in a plastic bag, was seized from the floor area of the passenger side of VELORIA's truck.

IV.  ARGUMENT

VELORIA argues that her proffered statement given to law enforcement on September 3, 2001, should be suppressed as she was under the belief that those statements, apparently under any and all circumstances, could not be used against her at trial. The Government submits that the proffer agreement which VELORIA prohibits the prosecution from offering evidence obtained during proffer session into evidence in its case-in-chief, but allows for the use of such evidence "for the purpose of cross-examination should VELORIA testify in contradiction to information given during said meetings, or to rebut any evidence

7

offered by or on behalf of VELORIA in connection with the trial."
See Government's Exhibit A, paragraph 4.

A.    Veloria's Proffer Agreement Did Not Provide for
      Complete Immunity and Specifically Carved-out
      Exceptions for the Use of Veloria's Statement

     1.    Applicable Law on Proffer Agreements

     Contract principles apply to interpretation of proffer

agreements. United States v. Chiu, 109 F.3d 624 (9th Cir. 1997).

The government submits that VELORIA has attempted to deceive this

Court as evidenced by her letters to Wallace Iaukea, requesting

Iaukea to help VELORIA "create doubt." When Wallace Iaukea

refused to testify falsely on behalf of VELORIA, VELORIA found a

new witness, Darryl Wisneski, to testify on her behalf. VELORIA

is unjustifiably relying on complete immunity from the use of her

September 3, 2001 statements to law enforcement. However, the

proffer agreement only provided limited immunity. Specifically,

the proffer stated:

       2.    Should there be a trial in the above-captioned
       matter against VELORIA, the prosecution will not offer
       in evidence in its case-in-chief or against the
       Defendant at her sentencing following a judgment of
       guilt after trial or pursuant to plea, any statements
       made by VELORIA at said meetings, except in a
       prosecution for false statements, obstruction of
       justice, or perjury, where such prosecution arises from
       VELORIA's conduct during said meetings. The parties
       understand that Section 1B1.8 of the Sentencing
       Guidelines prohibits the use of information given in
       the proffer to be used against the defendant;

       3.    Notwithstanding paragraph (2) above, the
       prosecution may use information derived directly or
       indirectly from said meetings for the purpose of

obtaining and pursuing leads to other evidence,
furthermore such other evidence may be used by the
prosecution in its case-in-chief and in rebuttal at a
trial of any charges in this case;

4.     Notwithstanding paragraph (2) above, the
**prosecution may use statements made by VELORIA at said
meetings**, and all evidence obtained directly or
indirectly from those statements, **for the purpose of
cross-examination should VELORIA testify in
contradiction to information given during said
meetings, or to rebut any evidence offered by or on
behalf of VELORIA in connection with the trial** of the
above-captioned matter or at his sentencing following
trial, **should such evidence be contrary to the
information given by VELORIA during said meetings;**

See Government's Exhibit A, emphasis added.

        The terms of the proffer agreement make clear that the
government can use the information gained during the proffer
session in almost any way except by offering VELORIA's statement
as evidence in the government's case-in-chief.

        In Chiu, the Ninth Circuit Court of Appeals found that
the government's proffer letter to the defendant clearly stated
that it would not "offer in evidence in its case-in-chief ... any
statements made by the defendant."  However, the proffer
agreement also expressly stated that the government could use the
information in other circumstances.  There, the government used
the defendant's proffered statement to prepare government
witnesses for trial.  The Ninth Circuit Court found that there
was no breach of proffer agreement.  United States v. Chiu, 109
F.3d 624, 626 (9th Cir. 1997).  Courts in other jurisdictions

have also addressed government's use of defendant's proffered statements at trial.

In <u>United States v. Krilich</u>, Sr., 163 F. Supp.2d 943 (N.D. Ill. 2001), the defendant entered into a "standard proffer agreement" with the government.  Much like this case, the agreement included language that the proffer could not and would not be used against the defendant in the government's case-in-chief or in aggravation of the defendant's sentence.  However, the agreement warned that the proffer statements could be used by the government for impeachment or in rebuttal if the defendant should subsequently testify contrary to the substance of the proffer or otherwise present a position inconsistent with the proffer.  <u>Id.</u> at 943.

At trial, the defendant did not testify nor did the defense put on a witness who testified directly contrary to the proffer.  However, the defense's cross-examination of the government's witnesses presented a position which was inconsistent with the proffer.  The district court found a "genuine inconsistency" between the proffer and the evidence presented and allowed the government to introduced evidence of the proffer.  <u>Id.</u> at 945.  The Seventh Circuit addressed the issue of the use of proffered statements as well.

In <u>Goodapple</u>, the Seventh Circuit Court of Appeals approved of the government's use of the defendant's proffered

10

statements during cross-examination of the defendant after the
defendant's testimony differed in substance to his proffer.
United States v. Goodapple, 958 F.2d 1402, 1408 (7th Cir. 1992).
There, the defendant argued that the use of the substance of the
proffer for impeachment forced him to choose between entering
into plea negotiations, going to trial and his right to counsel.
The Seventh Circuit disagreed and stated that the defendant was
"only "forced" to choose if he wants to be untruthful in his
proffer or his testimony.  We do not believe such a desire
deserves protection."  Id. at 1408.

        In this case, the government has no intention of
introducing VELORIA's proffered statements in its case-in-chief.
Nor does the government anticipate introducing the proffered
statements in rebuttal in the event that VELORIA does not present
evidence which is inconsistent to VELORIA's proffer.  If however,
VELORIA presents a witness that clearly contradicts VELORIA's
prior statements in which VELORIA acknowledges the drugs found in
either her residence or vehicle, the government will seek
permission from this Court to introduce evidence of VELORIA's
proffered statement made on September 3, 2001.

V.    CONCLUSION

        The rationale underlying the basis of the defendant's
motion here is inconsistent with the Ninth Circuit Court's

11

decision in <u>Chiu</u>.  For the foregoing reasons, the government

submits that defendant's motion to suppress statements be denied.

DATED:  November 19, 2002, at Honolulu, Hawaii.

Respectfully submitted,

EDWARD H. KUBO, JR.
United States Attorney
District of Hawaii

By _____
   THOMAS J. BRADY
   Assistant U.S. Attorney

12



U.S. Department of Justice

United States Attorney
District of Hawaii

| | |
|---|---|
| PJKK Federal Building | (808) 541-2850 |
| 300 Ala Moana Blvd., Room 6-100 | FAX (808) 541-2958 |
| Honolulu, Hawaii 96850 | |

September 3, 2001

Alexander M. Silvert,
First Assistant Federal Public Defender
300 Ala Moana Blvd., Room 7-104
Honolulu, HI 96850

    Re: United States vs. Alicia Veloria
       Cr. No. 00-0145 SOM
       Terms and Conditions for Proffer of
       Information by Defendant Alicia Veloria

Dear Mr. Silvert:

    This letter is to confirm the terms under which your
client, defendant ALICIA VELORIA, (hereinafter "VELORIA"), will
provide a proffer of information pertaining to drug and related
criminal activities to the United States Attorney's Office for the
District of Hawaii in connection with the above-referenced matter.
VELORIA's proffer of information shall be conducted pursuant to
the following terms and conditions, hereby agreed to by and
between VELORIA, her attorney, and the United States Attorney for
the District of Hawaii, as reflected by their respective
signatures below:

    1. With her attorney present, VELORIA will respond
truthfully and completely to any and all questions or inquiries
that may be put to her at any meetings conducted pursuant to this
Agreement with any Government agents, including Assistant United
States Attorney Thomas Brady;

    2. Should there be a trial in the above-captioned
matter against VELORIA, the prosecution will not offer in evidence
in its case-in-chief or against the Defendant at her sentencing
following a judgment of guilt after trial or pursuant to plea, any
statements made by VELORIA at said meetings, except in a
prosecution for false statements, obstruction of justice, or
perjury, where such prosecution arises from VELORIA's conduct
during said meetings. The parties understand that Section 1B1.8
of the Sentencing Guidelines prohibits the use of information
given in the proffer to be used against the defendant;

# EXHIBIT  A



Alexander Silvert
September 3, 2001
Page 2

    3.    Notwithstanding paragraph (2) above, the
prosecution may use information derived directly or indirectly
from said meetings for the purpose of obtaining and pursuing
leads to other evidence, furthermore such other evidence may be
used by the prosecution in its case-in-chief and in rebuttal at a
trial of any charges in this case;

    4.    Notwithstanding paragraph (2) above, the
prosecution may use statements made by VELORIA at said meetings,
and all evidence obtained directly or indirectly from those
statements, for the purpose of cross-examination should VELORIA
testify in contradiction to information given during said
meetings, or to rebut any evidence offered by or on behalf of
VELORIA in connection with the trial of the above-captioned
matter or at his sentencing following trial, should such evidence
be contrary to the information given by VELORIA during said
meetings;

    5.    This Agreement is limited to the statements made
by VELORIA at the meetings referred to herein, and does not apply
to any statements made by VELORIA at any other time, whether oral
written or recorded;

    6.    No understanding, promises, agreements and/or
conditions have been entered into with respect to this case other
than those expressly set forth in this Agreement and none will be
entered into unless in writing and signed by all parties.

    7.    No understanding, promises, agreements and/or
conditions have been entered into with respect to this case other
than those expressly set forth in this Agreement and none

    By their respective signatures below, the parties to the
Agreement expressed in this letter attest to their knowing and
intelligent agreement to be bound by the terms and conditions
contained herein.

                    Very truly yours,

                    ELLIOT ENOKI
                    United States Attorney
                    District of Hawaii

                    By THOMAS J. BRADY
                    Assistant U.S. Attorney



Alexander Silvert
September 3, 2001
Page 3

I understand the terms and conditions of this letter and agree to be
bound by them.


_____          _____
ALEXANDER M. SILVERT                          DATE
Attorney for Defendant


_____          _____
ALICIA VELORIA                                DATE
Defendant

Internal Revenue Service
Criminal Investigation Division

Memorandum of Interview



---

| | | |
|---|---|---|
| **In Re:** | Alicia Veloria | **Location:** |
| **Investigation #:** | 919730196 | |
| **Date:** | September 3, 2001 | |
| **Time:** | 11:00 a.m. | |

**Location:** IRS CID Room 2-183
300 Ala Moana Blvd.
Honolulu, HI
96813

**Participant(s):** Alicia Veloria, Interviewee
Alex Silvert, Attorney, Federal Public Defender
Thomas Brady, Assistant United States Attorney
Jason K. Pa & Bernadette Reghi, IRS CID Special Agents

### SYNOPSIS

1.    That on the above date, time and place, AUSA Thomas Brady and IRS CID
      Special Agents Jason Pa and Bernadette Reghi met with Federal Public
      Defender Alex Silvert and his client Alicia Veloria.

2.    That AUSA Brady explained to Veloria that the purpose of this meeting was to
      interview Veloria about her involvement and knowledge in drug trafficking and
      money laundering.

3.    That AUSA Brady explained to Veloria that she needed to be truthful and that
      the interview would end if she provided false information.  That Veloria said she
      understood.

4.    That AUSA Brady and Agent Pa gave a proffer letter to Veloria and Mr. Silvert.
      That Veloria and Mr. Silvert read and signed the proffer letter.


EXHIBIT  B

DETAILS

5.    That in 1996, Veloria was unemployed. That in 1997, Veloria worked for Gary
      Matsuo at Big Island Tours. That Mr. Matsuo was the former owner of
      Laupahoehoe Transportation.


6.    That in 1998, Veloria worked at Aloha Veterinary Clinic on a part time basis.
      That in 2001, Veloria's mother and father were divorced. That Veloria's mother
      and father live on the Big Island of Hawaii.


7.    That from February 1996 to November 1996, Veloria and Jessica Delima sold
      cocaine and crack cocaine (drugs) in Hilo. That the average sales price for a ½
      gram of cocaine was $100.


8.    That from February 1996 to November 1996, Ms. Delima's boyfriend was the
      source of supply (SOS) for the drugs. That the SOS delivered two ounces of
      drugs every month to Veloria and Ms. Delima. That the average weekly
      delivery was a ½ ounce.


9.    That Mr. Silvert explained that Veloria was not able to provide the name of the
      SOS. That this was because the SOS was a close member of Veloria's family.


10.   That from February 1996 to November 1996, Veloria and Ms. Delima collected
      an average of $5,000 a month in drug proceeds. That sometimes, Veloria and
      Ms. Delima gave the drug proceeds directly to the SOS. That sometimes,

Veloria and Ms. Delima sent the drug proceeds to the SOS via Western Union wires, Federal Express mail service, or couriers.

11.    That sometimes, Ms. Delima sent Western Union wires to the SOS from the Hilo Safeway Supermarket.  That the Hilo Safeway Supermarket was somewhere near the Prince Kuhio Mall.

12.    That sometimes, Ms. Delima sent Western Union wires to the SOS from a Hilo check cashing business.  That the Hilo check cashing business was near the Puainako Sack & Save Supermarket.  That the Puainako Sack & Save Supermarket was across the street from the Prince Kuhio Mall.

13.    That once in 1996, Ms. Delima flew from Hilo to Honolulu and delivered $7,000 in drug proceeds to the SOS.

14.    That twice in 1996, the SOS sent a courier named "Juan" to deliver drugs to Veloria and Ms. Delima.  That Juan collected a total of $10,000 in drug proceeds from Veloria and Ms. Delima.

15.    That in 1996, a local Hawaiian/Portuguese male named "Kyle" sold crystal methamphetamine for the SOS.  That Kyle lived behind the Prince Kuhio Mall on Railroad Avenue.

16.    That in once in 1996, Zachary Smith delivered drug proceeds to the SOS in Los

Angeles, California.  That the drug proceeds were from Kyle.

17.     That Mr. Smith and the SOS were friends.  That in 1996, the SOS told Veloria

to ask Mr. Smith to deliver Kyle's drug proceeds to the SOS in Los Angeles.

18.     That in 1996, Mr. Smith sold drugs, used crack cocaine, and purchased crack

cocaine from Veloria.

19.     That in 1996, Mr. Smith owned his own roofing business, owned real property,

and was married but separated from his wife, Jesse Smith.

20.     That in 1996, Mr. Smith was Veloria's boyfriend, that Mr. Smith planned to

divorce Mrs. Smith, and that Mr. Smith needed a place to live when his divorce

became final.

21.     That in 1996, Mrs. Smith kicked Mr. Smith out of the house, that Mr. Smith

moved in with Veloria, and that Veloria and Mr. Smith lived in a house on

Mauna Loa Street in Hilo.  That Veloria had rented the house on Mauna Loa

Street.

22.     That in July 1996, the Hawaii County Police Department executed a search

warrant at Veloria and Mr. Smith's Mauna Loa Street home and recovered

crack cocaine.

23.    That in July 1996, Veloria and Mr. Smith were at home when the search warrant was executed, that Veloria and Mr. Smith were arrested, and that Veloria and Mr. Smith were released on bail.

24.    That at the time of their arrest, Mr. Smith was trying to stop Veloria from selling drugs and Veloria was trying to stop Mr. Smith from using drugs.

25.    That Veloria and Mr. Smith tried to straighten out their lives after they were released on bail.  That Veloria and Mr. Smith attended church.  That Veloria and Mr. Smith graduated from drug rehabilitation programs.

26.    That after July 1996, Veloria needed a place for her and her mother to live. That Veloria and Mr. Smith talked about buying a house together.

27.    That Mr. Smith told Veloria that Veloria could not own a house in her name because Veloria's drug dealing activity made any house that Veloria owned subject to seizure.

29.    That Veloria and Mr. Smith agreed to buy a house together, that Veloria and her mother would live in that house for one year, and that Veloria and Mr. Smith would sell the house after one year.

29.    That Veloria and Mr. Smith agreed that the ownership of the house would be recorded in the names of Mr. Smith and someone that Veloria trusted.

30.     That in 1996, Veloria borrowed $6,000 in cash from Aaron Peres, that Veloria

        borrowed $7,000 in cash from Celeste McDermott, and that Veloria borrowed

        $7,000 in cash from Frances West.


31.     That Ms. McDermott and Ms. West lived in Alaska.  That Ms. McDermott and

        Veloria's mother were sisters and that Ms. West was their mother.  That Ms.

        McDermott was Veloria's aunt and that Ms. West was Veloria's grandmother.


32.     That Veloria told Ms. McDermott and Ms. West that Veloria was buying a house

        for Veloria and her mother.  That Veloria never told Ms. McDermott and Ms.

        West that Veloria was buying the house with Mr. Smith.


33.     That Veloria told Ms. McDermott and Ms. West that Veloria would repay them

        after Veloria sold the house in a year.


34.     That in Alaska, Veloria's brother collected $14,000 in cash from Ms. McDermott

        and Ms. West.  That Veloria's brother flew to Hilo from Alaska.  That Veloria's

        brother gave Veloria $14,000 in cash, mostly in $20 bills.


35.     That Mr. Peres was Veloria's boyfriend.  That Veloria told Mr. Peres that Veloria

        was buying a house with Mr. Smith.  That Veloria told Mr. Peres that she

        wanted Mr. Smith and Mr. Peres to be on the title to the house.

36.    That Mr. Peres lived with his parents behind the Bamboo Restaurant in Hawi, in the District of Kohala, on the Big Island of Hawaii. That Mr. Peres worked at the Bamboo Restaurant. That Mr. Peres sold marijuana. That Mr. Peres and the SOS were friends.

37.    That in September 1996, Mr. Smith found a single story house at Hule'ia Road in Mountain View, on the Big Island of Hawaii that was for sale. That Veloria and Mr. Smith inspected the house with Lori Ferry Realty. That Lori Ferry Realty represented the seller. That Lori Ferry Realty was in located in Hilo.

38.    That Veloria and Mr. Smith offered to buy the house for $40,000. That Veloria had $20,000 cash to pay for the house. That Mr. Smith had $25,000 cash to pay for the house. That Title Guaranty Escrow Service was the Escrow Company (TGES). That TGES did not accept cash payments.

39.    That Mr. Smith had a friend named Mark Swann who prepared Mr. Smith's tax returns. That Mr. Smith asked Mr. Swann to explain how a person could deposit cash into banks without the cash deposits being reported to the IRS.

40.    That Mr. Swann told Mr. Smith that banks notified the IRS when someone made cash deposits of $10,000 or more. That Mr. Swann told Mr. Smith to open bank accounts at different banks. That Mr. Swann told Mr. Smith to deposit cash in amounts less than $10,000 at different banks.

41.    That in October 1996, Mr. Smith opened bank accounts at several Hilo banks. That Mr. Smith opened these bank accounts in his name. That Veloria went with Mr. Smith to these banks. That Veloria waited in the car when Mr. Smith went into the banks. That Mr. Smith made cash deposits into his bank accounts. That Mr. Smith deposited $40,000 cash into his bank accounts.

42.    That Veloria gave Mr. Smith $15,000 cash. That Mr. Smith deposited Veloria's $15,000 into his Hilo bank accounts. That Mr. Smith had $25,000 cash. That Mr. Smith deposited the $25,000 into his Hilo bank accounts. That Veloria did not know if the $25,000 was drug proceeds.

43.    That in October 1996, Mr. Smith paid for a single story house at Hule'ia Road in Mountain View, on the Big Island of Hawaii with $40,000 worth of cashiers checks.

44.    That in October 1996, Mr. Smith withdrew $40,000 from his Hilo bank accounts. That Mr. Smith purchased cashier's checks. That Mr. Smith made the cashier's checks payable to Title Guaranty Escrow Services (TGES). That the cashier's checks were in amounts of $10,000 or less.

45.    That in October 1996, Veloria and Mr. Smith went to the TGES Hilo office. That Mr. Smith gave the cashier's checks to TGES. That TGES recorded Mr. Smith and Mr. Peres as the owners of a single story house at Hule'ia Road in Mountain View, on the Big Island of Hawaii.

46.     That Veloria made repairs to the single story house at Hule'ia Road in Mountain View, on the Big Island of Hawaii. That the repairs were made after the house was purchased. That Veloria paid for the repairs with $5,000 of the money that Veloria had borrowed from Mr. Peres.

47.     That in 1996, Veloria used Sear's Gift Certificates to purchase a refrigerator and an oven range. That Veloria had the refrigerator and oven range delivered to the single story house at Hule'ia Road in Mountain View, on the Big Island of Hawaii. That the Sear's Gift Certificates came from Ann Barcena.

48.     That in 1996, Ms. Barcena used and bought crack cocaine directly from Veloria at Veloria's Mauna Loa Street home. That Ms. Barcena paid for crack cocaine with cash, jewelry and Sears Gift Certificates. That Ms. Barcena asked Veloria if Ms. Barcena could pay for the crack cocaine with Sears Gift Certificates. That Veloria agreed to accept the Sears Gift Certificates.

49.     That in November 1996, the Hawaii County Police Department executed a search warrant on Veloria's truck. That in Veloria's truck, the police found approximately one pound of cocaine. That in Veloria's truck, the police found records for the purchase of a single story house at Hule'ia Road in Mountain View, on the Big Island of Hawaii.

50.     That the cocaine found in Veloria's truck belonged to the SOS. That the SOS

hid the cocaine in Kulani Forest.  That Veloria knew where the cocaine was

hidden.  That the SOS told Veloria to get the cocaine from Kulani Forest and

deliver it to the SOS at the Hilo Naniloa Hotel.

51.     That Wallace Iaukea and the SOS were friends.  That Mr. Iaukea had provided

"strong arm" services for the SOS in the past.  That Veloria did not trust Mr.

Iaukea.  That for Veloria's protection, the SOS made Veloria take Mr. Iaukea

with her when Veloria went to retrieve the cocaine from Kulani Forest.

52.     That in November 1996, Veloria and Mr. Iuakea went to Kulani Forest in

Veloria's truck.  That Veloria got the cocaine and returned to the truck.  That

Veloria planned to deliver to cocaine to the SOS by herself.

53.     That Veloria and Mr. Iaukea left Kulani Forest for Hilo in Veloria's truck.  That

Veloria and Mr. Iuakea stopped at Mountain View Park.  That this was because

Veloria had to put water into her truck's radiator.  That Mr. Iaukea phoned his

wife to pick him up at the park.  That Veloria exited her truck and went to the

bathroom.  That Mr. Iaukea waited in Veloria's truck for his wife to arrive.

54.     That Veloria returned to her truck.  That Veloria saw Mr. Iaukea with a scale.

That Veloria saw Mr. Iaukea "tapping" (stealing) cocaine from its container.

That Mrs. Iaukea arrived at the park.  That the police came several minutes

later.

56.    That Veloria and Mr. Iaukea exited Veloria's truck as the police approached the truck. That the police had a drug dog. That the drug dog alerted to the cocaine in Veloria's truck. That the police seized Veloria's truck.

57.    That the police did not arrest Veloria and Mr. Iaukea. That Mr. and Mrs. Iaukea left the park in Mrs. Iaukea's car. That Veloria left the park on foot.

58.    That Veloria called the SOS right away. That Veloria told the SOS that the police had his cocaine. That Veloria and the SOS knew that Veloria would be arrested for having the cocaine. That Veloria decided to stop selling drugs for the SOS.

60.    That in November 1996, Veloria told Mr. Smith that the police found approximately one pound of cocaine in Veloria's truck along with the documents for Mr. Peres and Mr. Smith's single story house at Hule'ia Road in Mountain View, on the Big Island of Hawaii.

61.    That Mr. Smith got angry with Veloria. That Mr. Smith no longer wanted anything to do with Veloria or the single story house at Hule'ia Road in Mountain View, on the Big Island of Hawaii. That Mr. Smith went back to his wife.

62.    That In 1996, 1997 and 1998, Veloria and her mother lived at the single story house at Hule'ia Road in Mountain View, on the Big Island of Hawaii. That in

1997, Ms. McDermott and her husband visited Veloria and Veloria's mother at the single story house at Hule'ia Road in Mountain View, on the Big Island of Hawaii. That Ms. McDermott gave Veloria $3,000 in cash for house repairs.

63.  That in 1999, Veloria was living alone at the single story house at Hule'ia Road in Mountain View, on the Big Island of Hawaii. That Veloria had already repaid Mr. Peres $3,000 of the $6,000 that Mr. Peres had loaned Veloria.

64.  That in 1999, Veloria found out that Mr. Peres was delinquent on his child support payments. That Veloria became afraid that a lien would be filed against Mr. Peres and his ownership in a single story house at Hule'ia Road in Mountain View, on the Big Island of Hawaii.

65.  That in 1999, Veloria knew that Mr. Peres owed the SOS $3,000 for drugs. That Veloria knew that the SOS was a close member of Veloria's family. That Veloria told Mr. Peres that the SOS would forgive the $3,000 drug debt if Mr. Peres released his ownership in the single story house at Hule'ia Road in Mountain View, on the Big Island of Hawaii to Veloria's uncle, Bill Wilkinson.

66.  That in 1999, Mr. Peres transferred his ownership in a single story house at Hule'ia Road in Mountain View, on the Big Island of Hawaii to Mr. Wilkinson. That Mr. Peres used an attorney in Kona to help with the transfer. That Mr. Peres no longer owed $3,000 to the SOS.

67.    That in 1999, Veloria did not have Mr. Peres transfer his ownership in the single

        story house at Hule'ia Road in Mountain View, on the Big Island of Hawaii to

        Ms. West because Ms. West was in poor health.


68.    That in February 2000, Ms. West died in Alaska.  That Mr. Wilkinson was the

        executor of the estate for Ms. West.  That documents for the single story house

        at Hule'ia Road in Mountain View, on the Big Island of Hawaii might be

        somewhere in Ms. West's home in Alaska.


69.    That in 2000 and 2001, Veloria rented out the single story house at Hule'ia

        Road in Mountain View, on the Big Island of Hawaii to other people, without Mr.

        Smith's permission.  That Veloria used the rent money to pay for home

        insurance, property taxes and home repairs.  That in 2001, Gary Matsuo

        collected the rent payments for Veloria.



                                            Jason K. Pa
                                            Jason K. Pa
                                            Special Agent



I prepared this memorandum on September 3, 2001, after refreshing my memory from notes
made during and immediately after the interview with Alicia Veloria.

                                            Jason K. Pa
                                            Jason K. Pa
                                            Special Agent

Wallace,

I'm glad that I was able to get in touch with you, even though I found you in prison. I am sending you the discovery for the case. I wanted you to know what they have written down as your statements. There are a couple of important things that have to be straight on. First of all, we did not exit the vehicle on our own. The 3 officers approached the vehicle and ordered us to get out and "assume the position". The officers then patted us down. I never agreed to allow the search or the canine screening. The canine never barked, scratched or attempted to bite anything on the truck. It was around 5:30 when they first approached us, and they detained us for 20 minutes. It is important for you to only answer the questions they ask. They will ask everything. So be sure to have a reasonable answer for any possible answer. For the unimportant things, it is OK to tell them that you don't recall because it has been so long. They are of course going to ask you how you know the defendant, and how long you have known her. We should say that we have known each other for about 5 months or so prior to the truck incident. . They are going to ask how much contact we have had with each other since then. Remember that you and I bred our dogs. I had a red nose colby female that I wanted to breed with your red male. Because of this, I owed you one of the puppies. But It had been two months since they were born and I still hadn't given you one. So you wanted either the puppy or $250 which is about how much each puppy would be sold for. A female dog is usually pregnant for around 63 days, so about two months. So then we had known each other for around one month before my female went into heat. I stopped by your house( the one by panaewa, across from pay and save) to tell you that my female was in heat and I asked if I could bring her ever tomorrow and see if they would breed. The next day, I brought her over and they got "stuck" twice. So, you were expecting a puppy. I know that you think that it is better to stick with the original straight version. I am asking you this because it looks better, that way you can testify that the only thing you remember seeing in the truck was a black metal file box that was on the seat in between the drivers and passengers. It was a bench seat with blue interior. I have tried to help you out over the years. I need the jury to doubt that it was there, and if they believe it was there, because the cops will testify to it. Then I need them to doubt that it was mine. You are not the one on trial. You will never be found guilty of this, but I might, if they believe that it was there, and it was my truck, so who else could it have belonged to? I need them to doubt that it could have been mine. Can you see what I mean? I really need your help. You are risking nothing, it can only benefit me. I swear that I am not trying to get you to take the fall. I just need someone who can testify and say "yeah I was in the truck cause she was giving me a ride, and no there were not any bags on the floor or any drugs sitting in the open". That way it looks less like we were attempting to have an exchange, cause I know the prosecutor will try to argue that. It just doesn't sound right, argueing in a truck over a dog. It's better that I was giving you a ride from Volcano, and L was supposed to pick you up there at 5:30. When she pulled up we had starting arguing about the puppy because I told you that I had already sold a couple of them and you were mad because you were suppose to get the pick o the litter. Just then, the white bronco pulled up on the drivers side of the truck and it all happened. I just need the jury to have doubt that it was mine. How else can I give them doubt? If they believe the cops, I am screwed, and if I lose, I go to federal prison for 10 years. I need doubt, I

# EXHIBIT C

ask you as a friend to help me give then doubt. You are not on trial, no one thinks its yours. They wont charge you with it if you tell them that you were getting a ride with me since I was already in Volcano and was going to Keaau, you figured you would save L some driving time by catching a ride to Keaau. It sounds possible, and It gives me a witness that will say "I did not see any kind of drugs in that truck on the floor or on the seat at all" I need you to say that because I do not want to have to take the stand. I do not want to answer all of their questions. If they tear me up on the stand, the jury will for sure convict me. Prosecutors are very tricky with the way they ask questions. I cannot risk them making me look bad in any way. That's why you have to take the stand and tell them that you did not see any thing in the truck, just a black metal file box that was on the seat. And you are not too sure, maybe you remember seeing a purse, but you're not positive. What you do remember is that there were no drugs or plastic bags out I plain view. If they ask you if there was anything behind the seat you will tell them that you don't know what was behind the seat, you were just catching a ride and it looked like there was nothing else in the vehicle, other than the black file box on the seat. Can you help me out, I need someone who can take the stand and tell them how they treated us that day. If you can somehow think of a better way, then please let me know, this is all I can think of that looks the best. Try not to say so much on the phone cause I don't know if they are listening on my side or not. This case might not even go that far because it will probably be dismissed on illegal search and seizure, I have other witnesses that were at the park besides you and L. Please help me out, I beg you. Let me know what you think as soon as possible. Love and Aloha -me

She used L. as Lisa My wife

Dear W

This letter will be short do that I can get it mailed today. I told my friend about the phone problem and she called in to check to see what the problem was. I guess there was some kind of confusion and so now it is corrected. You can call on Monday or Tuesday night or Thursday of Friday. Just not Wednesday night because she will not be home. Maybe after I talk to you for the first time, I will have you call the Keaau place and then the wonderphone if they are home. The cost is a lot different. Usually each all costs around 10 or more dollars. Which adds up. If they wonderphone me, it is only 10 cents per minute. I guess they were not there last night. Monday ( you were supposed to call). I am worried about this situation because our friend says that you and she have been in contact for the past 4 years and everything is solid, but you are acting funny. Is it that you don't believe that she is solid? I know that she is not trying to point any fingers, just like you aren't  She says the important thing is the suppression issue. Now, after all of that time, you forgot about the most important thing. She said that the lawyer is working on another issue that has nothing to do with the above. Later on she will tell you. You should write to her because she wonders if you are mad, and for what? Over the past 4 years She has tried to keep in contact, be a good friend, take pictures of kids and send whatever she can. You could at least write to tell her where you stand. And be honest. She doesn't trust the phone cause they could be on the other end recording. Write if you can. Laterr on I will write again, I have to go to work now.    Aloha............Keahi

Wally,

Just wanted to drop you a line and tell you that everything is OK over here. I have been working very hard and hardly have time to relax. Things look better for me now because the whole situation at the vehicle was illegal. I am sure they are trying to meet with you to do something sneaky, you know them. I just hope they don't try to play games and tell you lies, which you know that they will do. Just remember that I have never lied to you and that I need you to be sloid and tell them to forget it cause you have already told them you have nothing to say. If you say anything, then they will try to use it and twist it, you know that is how they interview people. I know that you are from the old school, and you know all of this, but I just wonder what they want from you. They better not lie and tell you some bullshit. I have never made a statement, not a word. I will call my friend to see if I can talk to L to see if they tried to see her. I just bought film yesterday, but now my battery in my camera is dead, so I can't take pictures just yet. My sister in law mentioned something about a comforter? I heard it is very cold over there right now. Although there is no way that it can be as cold as it is here. I will send another letter tomorrow or the next day with some copies in it, I'll talk to you later take care.

Aloha,

Keaki

Dear Wallace,

Well, it's been a long time. I wish we never got out of contact, but I guess we both had our own lives. I'm real sorry to hear that you are in there.again! I really wish that you would just stay away from the trouble. Look at how long I have stayed away, it seems to have done me no good cuz they are dragging me into court once again. I don't know what to do or say. I wonder who is going to testify in court, I just hope it is none of my friends. Over the years I have kinda learned that those are the worst ones. This is not from me, very important. To be perfectly honest, I can't even hardly remember what the hell happened four years ago. But then I wonder, if they had a solid rat, why would it take them four years? It really doesn't matter though, because I am going all the way with this one too. I don't even care anymore, I have tried so hard for so long to do things the right way. I wish they had taken care of this then, I would be through with it by now. That rat bastard Delima sure did nothing to help. I just hope that you havn't turned on me as well, and if you have, please tell me so I know what to expect. I know you don't have anything to do with all of this. From the bottom of my heart, I have never once given any info on anyone, and to my dieing day never will. All of these years everyone thought that I had squealed, well believe me, if I had I wouldn't be going to court in Honolulu.

I have my dog Kumba up here with me, Kumba is Paco and Jasmine's son. Both of those dogs are dead now, buried them at the house I used to live in. Their grave has a little white wicker fence around it with two white crosses. I'm sure I have told you about it already.

They have also advised the attorney that they intend on charging drug money laundering I think they are just fishing for what they think I will tell them. I am so disgusted with everything, but I rather die than throw in the towel. Well moving on to better things.lets see, I currently have a 3.8 gpa. I have four years of college completed, and have been on the deans list for 3 of those years. Did I tell you that they came to my class at college in the mainland to get me? Three older looking men, when I heard them call my name I knew something was wrong cuz they did not look like college students. I stayed in a holding jail, and then was transferred to a prison. Both seemed nicer than the accomodations over there, both at the cell block and at the main, although I have never spent but an hour at the main, prior to being bailed out. The reason they released me prior to trial was because I agreed to buy my own ticket back to Hawaii. If not, then they would have had to send two officers up to the mainland to fly me back there in custody, they didn't want to spend the money cause they know they might lose this case. So long as they don't have a bullshitter get up and testify at trial, as I mentioned before, I think the only witness they might have would be someone that who would have to admit that he;(1) was once a user and that he (2) was receiving consideration in return for his testimony. I know they read these things so I will not write too much, I would like to talk to you, but I also know they listen on the phones. Please write me back with any advice you

can give. As I mentioned before the date was set, I believe for
dec 18, but I don't anticipate it going on that date. Part of me
wants to just get rid of it and then the other wants to take my
time to make sure everything is in order. Dale was out for a
while, long enough to get himself into a whole lot of trouble.
When I asked him if he had seen you he pretended not to know who
I was talking about. He caused me problems in May when I was
there. The clear has really screwed his mind. For the first
time I was actually afraid that he was going to kill me.
Supposedly he is in hiding, but I imagine by now he has been
caught, he has never been very good at being out of the action
and inconspicuous. I think he may even get to take a trip to
Texas or where ever Hawaii is sending their prisoners. Well, I'm
going to close for now, if you need money just let me know. I
don't have much, but I can send you 20. You can call me at 333-
4005, The area code is 907, please call me, I need to talk to
someone, before I go crazy. They will want to know why people
would be inside a truck with the windows up, argueing about a
dog. It would be better if someone was getting a ride to there
and having L pick him up. The conversation turned into an
arguement because the guy had breeded his male with the girls
female and she was supposed to give him the pick of the litter
and hadn't yet, so he was mad. You can see how that is possible.
The bottom line is that there was nothing in there before they
took it, neither the girl or guys fingerprints were on it, so
they must have put it there. The only thing in there was a black
file box on the floor of the passenger side. The guy never left
the door open and the girl never agreed to a search or to allow
the dog. The girl and the guy asked why they were holding them
and if they could go and the liars said no, stand right over
here. They held them for twenty minutes before they let um go.
When the truth comes out all will be ok. I know that the man
getting a ride sounds fishy, but they are trying to show the girl
did it, not the guy so he doesn't have to worry. Call me and
tell me what you think. Be solid and don't talk to anyone about
this. If the bad people try to communicate, just be like last
time. I know you solid. If you know about any thing else, let
me know. I only got to talk to L breifly, here are the pictures
I took, she said she was going to send you some school pictures.
You know actually, the youngest does look like you. Your second
to the youngest didn't want to take pictures so he is hiding his
face. They all are healthy and look good. Please forgive me for
the phone call, I just needed to talk to you and didn't know how
else to get in touch with you. I don't think they can get a
conviction, we all know that it was illegal what they did.
Approach them for no reason and then demand they get out, pat
them both down, lie about the guy leaving the door open, cuz it
was shut. Then say that the girl agreed to let them bring out
the dog. She said no no no because they were not doing anything
wrong, why was they harassing and asking all kinds of questions
threatening to arrest if they didn't answer. 20 minutes of that.
It's going to the end, they are the ones who broke the law.
Maybe they are just fishing, to see if I'm scared. No way.
Please write or call. Everything needs to be worked out  Get
back to me soon

*Keahi*

In response to the truck case, there are also several things that I believe deserve attention.  As I have mentioned before, the "confidential informant" for this case was either fabricated or had outright lied to officers regarding me being in possession of "large quantities" of cocaine which I (for some reason) was driving around with and attempting to sell out of my truck.  The reason I state this is because the truck had not moved from its place for around 9 days prior to that incident.  As I have mentioned before, you can verify this by speaking with Michael Hughes who on several occasions during the 9 day period, attempted to help me find a way to jack up the truck to remove the



tire. It should be noted that this truck was very high, and needed a 2-ton jack and additional blocks just to reach the bracket, which needed to be lifted to get the tire off of the ground. Because there was no air pressure within the tire, the bead around the tire would not adhere to the rim and needed to be taken to a shop with the right equipment to fill it.

I believe their "receiving information" regarding this truck to be fabricated in order for them to obtain a search warrant. A search warrant for the contents of a truck, which Officer Marshall Kanehailua had already quickly rifled through at the Keaau Ballpark. Although, they do not admit to this, Wallace Iaukea, Lisa Iaukea, Kainoa Huihui, (Keau) Howland Miles, and myself witnessed it and could testify to its occurrence.

Upon the Officers approach of the truck, they state that Wallace and I exited the vehicle on our own. This is untrue. We were both commanded out of the truck, and "frisked". I shut my door before placing my hands against it to "assume the position". I can positively tell you that before the canine screen, the passenger door was shut. I also wanted to let you know that I did not agree at any time to allow the canine to "screen" the truck. I refused their search, and would not participate in an interrogation of questions about my older brother. Upon Officer Kanehailua's request to allow the canine to screen the truck, I promptly answered "NO" and asked him if I could leave, to which he replied "NO". He then grabbed me by my arm and instructed me to stand aside with the other two officers at the rear end of the truck.

I observed as the canine approached the driver side of the truck. Officer Marshall Kanehailua tapped on the lower panel of the outside of the door and the dog jumped up and placed his paws on the chrome "nerf" bar (3 or 4 inch pipe often used as a step to enter a high vehicle). Immediately after jumping up, the dog returned on all fours and appeared to be very interested in smelling the front drivers tire. This seemed strange at first, but in retrospect, both of my male dogs would take turns "marking" those tires when given the opportunity.

Officer Marshall Kanehailua repeatedly tapped on the truck, and the dog would jump up, and then return to the ground and continue to smell the tire. I was standing at the rear of the vehicle, with Officers Mitchell Kanehailua and Manuel Bega standing in front of me. At this time, although they made it difficult, I was trying to keep an eye on Officer Marshall Kanehailua. I heard the "click" of the door handle and upon looking around Officer Mitchell Kanehailua, who was directly in my way, I saw that Officer Marshall Kanehailua had opened the passenger door and appeared to be searching through the trucks contents. The canine was again preoccupied with smelling the front passenger tire. As I approached Officer Marshall Kanehailua, I asked what he was doing and why he had opened



the door.  He stopped what he was doing and quickly stepped away from the door area.  I then shut the passenger door. Officer Marshall Kanehailua then stated to his brother Mitchell Kanehailua that I would not consent to the search so "we'll just call it a dog alert".  I immediately objected stating that I was doing nothing wrong and they had no business harassing me.  Officer Marshall Kanehailua then advised me that I was now free to go, but that he was confiscating the truck.

As far as the alleged "dog alert", it did not happen. I understand that I am not trained to recognize such an alert, but I at no time heard any barking or saw any scratching or biting.  In fact, the only thing the canine "Malia" showed an interest in smelling, was the lower portion of all four tires. Lisa Iaukea was sitting in the blue bug right there on the passenger side.  Therefore, she can tell you positively what actions were taken by both Officer Marshall Kanehailua, and canine "Malia".  I am positive that there will not be any bite or scratch marks on the interior of the truck door, unless inflicted by Officers themselves in order to support their "story".  Off of the top of my head, I cannot give you an exact height of the truck.  However, I doubt their "Malia" could have even reached up high enough to "scratch and bite" the panel, she is not ]a large canine.  Although I cannot guarantee it, I suspect it could be shown that Officer Marshall Kanehailua's version of events is highly unlikely.

I would also like to point out that "Malia's" bi-annual certification had expired in July of 1996, and she was not re-certified until October 29, 1996.  I would like to explore the possibility that maybe she failed certification during the lapse, and was unable to pass for the four months in between.  Are there any requirements or legal guidelines for canines in the police force?

I can understand why someone may be inclined to believe the Officer's version of events that day.  However, I would like to point out to you that two of these officers are brothers, Marshall and Mitchell Kanehailua.  I see this as a possible conflict of interest because although Marshall's actions were overzealous, Mitchell will support him undoubtedly because they are brothers.  We are no longer talking about loyalty to a friend or a fellow officer, but to a brother whom he would normally protect.

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document

was duly served upon the following person on November 19, 2002:

> WINSTON D.M. LING, ESQ.            **MAILED**
> P. O. Box 700406
> Kapolei, Hawaii   96709-0406

DATED:  November 19, 2002, at Honolulu, Hawaii.