Westlaw.

Not Reported in F.Supp.2d                                                    Page 1

Not Reported in F.Supp.2d, 2000 WL 1693538 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

▷
U.S. v. Lauersen
S.D.N.Y.,2000.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
UNITED STATES of America
v.
Niels LAUERSEN and Magda Binion, Defendants.
**No. 98CR1134(WHP).**

Nov. 13, 2000.

Christine H. Chung, Esq., James G. Cavoli, Esq., Assistant United States Attorneys, United States Attorneys Office, New York.
Gerald L. Shargel, Esq., Sarita Kedia, Esq., New York.
Nicholas Gravante, Esq., Harlan A. Levy, Esq., Boies, Schiller & Flexner LP, New York.

MEMORANDUM AND ORDER
PAULEY, District J.
*1 A "Queen for a Day" agreement is a limited use immunity agreement where the suspect agrees to provide information in exchange for a promise from the Government that any statements made during the proffer will not be used against the proffer or. Where plea negotiations break down or an immunity deal is rejected, the standard form Queen for a Day used in the Southern District of New York permits a prosecutor to use the proffered statements in a number of circumstances, including to pursue leads, to cross-examine the defendant if she testifies, and for purposes of rebuttal. Presently before this Court is defendant Madga Binion's motion *in limine* to preclude the Government from introducing at trial statements she allegedly made to the Government under terms of a Queen for a Day agreement. Binion argues that her proffer statements are not admissible because the Queen for a Day agreement governing the use of her statements is vague, overreaching and improperly interferes with her Sixth Amendment rights.[FN1]

FN1. The Court will direct the Clerk of the Court to docket and file as part of the record in this matter the following letters submitted by the parties: Letter from Harlan A. Levy dated June 15, 2000; Letter from Christine H. Chung and James G. Cavoli dated June 29, 2000; Letter from Harlan A. Levy dated August 4, 2000; Letter from Harlan A. Levy dated September 8, 2000; Letter from Harlan A. Levy dated October 23, 2000; Letter from Christine H. Chung and James G. Cavoli dated November 1, 2000; Letter from Harlan A. Levy dated November 2, 2000; Letter from Christine H. Chung and James A. Cavoli dated November 4, 2000; Letter from Harlan A. Levy dated November 6, 2000.

For the reasons set forth below, Binion's motion is granted in part and denied in part. This Court finds that Binion's waiver of rights is invalid to the extent that the Government seeks to use her statements for purposes other than to impeach Binion if she were to testify. However, absent a good-faith basis, Binion's counsel may not present evidence or arguments on Binion's behalf that directly contradict specific factual assertions summarized in the Form FD-302 prepared by the Government.

*Background*

The facts giving rise to Binion's motion developed over a period of almost eleven months and are worth describing in moderate detail to give sufficient context to the legal arguments presented.

A. *The May 12, 1998 Proffer Session*

On May 12, 1998, Binion, a board certified anesthesiologist, and her attorney, Arthur Viviani, met with Government representatives in connection

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT B

Not Reported in F.Supp.2d                                                                                                                                        Page 2

Not Reported in F.Supp.2d, 2000 WL 1693538 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

with the criminal investigation of the medical practice of Dr. Niels Lauersen, also a defendant in this matter. In attendance for the Government were Assistant United States Attorneys ("AUSAs") Treby McL. Williams and Richard Albert along with Special Agent Michael Porzio of the FBI. Days earlier, Binion had been informed that Dr. Neil Ratner, an anesthesiologist for whom Binion worked and who assisted Lauersen in his practice, had entered into a cooperation agreement with the Government and pled guilty.

The meeting among Binion, her attorney and the Government representatives was governed by the Queen for a Day agreement used in the Southern District of New York.[FN2] As a condition to this meeting, Binion and her attorney, as well as AUSA Williams and Special Agent Porzio, signed a Proffer Agreement dated May 12, 1998 (the " Proffer Agreement"). (*See* Exhibit A to Letter from Harlan A. Levy dated October 23, 2000.)

> FN2. This Court notes that the Queen for a Day executed by Binion contained some recent innovations. *See* Joel Cohen, *Has The Federal Government Made It Harder For One's Client To Cooperate?*, N.Y. L.J., Feb. 10, 1998, at 1 (discussing the " new version" of the Queen for a Day).

Paragraph 1 of the Proffer Agreement states, in relevant part, that "[s]hould any prosecutions be brought against Client by this Office, the Government will not offer in evidence on its case-in-chief ... any statements made by Client at the meeting."

**\*2** Paragraph 2 of the Proffer Agreement enumerates two exceptions to the Government's promise in Paragraph 1 not to use statements made during the proffer in its case-in-chief. Paragraph 2(a) permits the Government to "use information derived directly or indirectly from the meeting for the purpose of obtaining leads to other evidence, which evidence may be used in any prosecution of Client by the Government." Paragraph 2(b) provides:

Notwithstanding item (1) above: ... (b) the

Government may use statements made by Client at the meeting and all evidence obtained directly or indirectly therefrom for the purpose of cross-examination should Client testify, or to rebut any evidence or arguments offered by or on behalf of Client (including arguments made or issues raised *sua sponte* by the District Court) at any stage of the criminal prosecution (including bail, trial, and sentencing), should any prosecution of Client be undertaken ....

In addition, Paragraph 2(c) contains a waiver of the exclusionary rules for plea statements set forth in Rule 11(e)(6) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence. The last line of Paragraph 2 reads: "It is the intent of this Agreement to waive all rights in the foregoing respects."

The subject of Binion's motion relates to the second clause of Paragraph 2(b) that describes the circumstances under which the Government may use her proffer statement to "rebut" evidence and arguments she presents at trial.

### B. *Binion's Understanding Of The Terms Of Her Proffer*

In advance of the proffer session, Viviani, an experienced criminal defense attorney, explained to Binion what he believed to be the terms under which the session would take place. The Government did not provide the Proffer Agreement to Viviani in advance of the meeting. (Affirmation of Arthur Viviani dated October 29, 2000 ("Viviani Aff.") ¶ 6, attached as Exhibit B to Letter from Harlan A. Levy dated October 23, 2000.) Thus, without the benefit of seeing the Proffer Agreement prior to the meeting, Viviani told Binion that she must be "truthful," that "she would not have what is known as derivative use immunity," and that "what she said could not be used against her unless she were to testify to a different version of the facts, at which time the government could use the statement to impeach her." (Viviani Aff. ¶ 4.) Viviani did not recall "specifically" whether he informed Binion " that there might be a sentence in the agreement regarding the rebuttal of evidence or arguments,"

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 3

Not Reported in F.Supp.2d, 2000 WL 1693538 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

but his "gut instinct" is that he did not. (Viviani Aff. ¶ 5.)

At the proffer session, when first presented with the Proffer Agreement, Viviani told Binion "that this is what we discussed about the Queen," and then she signed it. (Viviani Aff. ¶ 7.) Viviani informs the Court that he did not have the understanding, nor did he explain to Binion, that the terms of the Proffer Agreement regarding rebuttal applied to " openings, cross-examination, and summation." (Viviani Aff. ¶ 8.) Viviani further informs the Court that "[i]f the government has used those words (opening, cross, summations), I would have stepped out of the room with Dr. Binion and discussed whether we should go forward." (Viviani Aff. ¶ 10.)

**\*3** Binion, in an affidavit submitted to this Court, detailed an understanding of the Proffer Agreement consistent with Viviani's recollection. Binion states that, in her understanding of the Proffer Agreement, "whatever I said to the government at the proffer session could be used against me at a trial if I testified and said something different." (Affirmation of Magda Binion sworn to November 2, 2000 (" Binion Aff.") ¶ 2, attached to Letter from Harlan A. Levy dated November 2, 2000.) Binion also states: "[Viviani] did not tell me that the agreement could restrict in any way any rights I might have at a trial to have my attorney make openings or summations, engage in cross-examination or call witnesses on my behalf. Nor did the government lawyers say that to me. Nor did I understand the proffer agreement that way." (Binion Aff. ¶ 3.)

Special Agent Porzio, who attended the proffer session and prepared the Form FD-302 ("FBI-302") that purports to summarize what Binion related at the meeting, confirms the version of the facts set forth by Binion and Viviani. First, Porzio does not contradict Viviani's recollection that the Government did not provide the Proffer Agreement in advance of the meeting. Second, Porzio confirms that AUSA Williams, the lead prosecutor on the investigation, failed to discuss with Binion and Viviani the part of the Proffer Agreement that relates to the Government's use of her statements for rebuttal purposes. Specifically, Porzio recalled that

Williams explained to Binion that if she testified contrary to her proffer statements, her statements could be used against her and that, in any event, the statements could be used to develop leads to other evidence that could be used against her. (Affirmation of Michael N. Porzio dated November 4, 2000 ("Porzio Aff.") ¶ 4, attached to Letter from Christine H. Chung and James G. Cavoli dated November 4, 2000.) However, consistent with the recollections of both Binion and Viviani, Porzio states that "AUSA Williams did not address the portion of the proffer agreement relating to the use of proffer statements to rebut arguments and evidence presented by Binion at trial." (Porzio Aff. ¶ 4.) Porzio adds that after Williams finished her partial explanation of the Proffer Agreement, Binion and her attorney "indicated that they understood the agreement and signed it." (Porzio Aff. ¶ 4.)

### C. *The Use Of The Proffer At The First Trial*

The first trial of this action commenced on January 24, 2000 and ended in a mistrial on March 6, 2000 due to the jury's inability to arrive at an unanimous verdict. Shortly after opening statements in the first trial, the Government wrote to Binion's trial counsel, advising that the Government may seek to introduce "the confession" made by Binion during the proffer session, "in light of the wholly contradictory arguments that you advanced in your opening statement on behalf of defendant Binion." (Letter from Christine H. Chung and James G. Cavoli to Nicholas Gravante and Harlan Levy dated January 30, 2000.) In this letter, the Government set out its position with respect to the admissibility of the proffer statement. The Government maintained that "Binion and her counsel knowingly and voluntarily gave up the ability to argue (falsely) her affirmative innocence or that someone else committed the criminal acts that she admitted committing herself." According to the Government, the only arguments Binion could advance in her defense were "that of reasonable doubt or pointing out failures in the Government's proof."

**\*4** Later in the trial and immediately before the planned cross-examination of one of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4

Not Reported in F.Supp.2d, 2000 WL 1693538 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Government's main witnesses, a Government attorney "warned" Binion's counsel that she "might" seek admission of the proffer statement based on the upcoming cross-examination. (Trial Transcript ( "Tr.") at 2097.) Binion's counsel submits that this warning "chilled" his cross-examination of the witness, and compelled him to substantially curtail his questioning of the witness. (*See* Tr. at 2788.) The Government never moved to admit the proffer statement.

D. *The Issue Re-Emerges Prior To The Second Trial*

In anticipation of the start of the second trial, Binion moved on June 15, 2000 to preclude the Government from introducing the statements made by Binion during the May 12, 1998 proffer session. Prompted by the chilling effect of the Government's position in the first trial, Binion sought a ruling from this Court clarifying "the specific range of cross-examination and argument that will and will not trigger admissibility of the proffer statements." To this end, Binion provided this Court with an expansive listing of proposed subject matters that counsel could properly address during the re-trial that would not trigger the Proffer Agreement.

In its initial opposition to Binion's motion, the Government set forth its position in more stark terms than its previous January 30 letter to Binion's counsel. The Government contended that "Dr. Binion and her counsel knowingly and voluntarily gave up the ability to argue, or to present evidence (through direct testimony or cross-examination), that she is factually innocent, that she lacks the requisite criminal intent, that someone else committed the crimes charged, or that such crimes never occurred." The Government contends further that "any statements by Binion's counsel (*including* opening and closing remarks), or any evidence offered by Dr. Binion (through cross- or direct examination, or by way of documentary evidence), that is contradictory to her proffer statements, triggers the Government's right to admit such statements ." (Letter from Christine H. Chung and James G. Cavoli dated June 29, 2000 at 5 (emphasis in original).)

On September 6, 2000, this Court heard oral argument on a number of *in limine* motions, including the admissibility of the Binion proffer statements. During this argument, Binion's counsel, for the first time, asserted that the Proffer Agreement was unenforceable due to invalidity of the waiver and its overbreadth. Counsel indicated that "this focus on the constitutionality ... of the agreement entirely is a matter that we have only begun to focus on." (Transcript of Oral Argument dated September 6, 2000 at 48-49.) Thereafter, in responding to a specific request from this Court at a subsequent argument, the parties submitted supplemental briefing on the enforceability of Binion's waiver in the Proffer Agreement.

Binion argues that the Proffer Agreement is vague, overreaching, and improperly interferes with her rights secured by the Sixth Amendment. Binion asserts principally that, given the ambiguities attendant to the scope of Paragraph 2(b), her waiver as to the exclusionary rules for plea statements was not knowing and voluntary under controlling Supreme Court and Second Circuit precedent. In addition, Binion asserts that her waiver, if effective, is not enforceable because it is tantamount to a waiver of the Sixth Amendment right to trial, as she will be forced to relinquish rights to cross-examination, to assertions of innocence by counsel during opening and summation, and to call witnesses on her behalf.

**\*5** The Government takes issue with Binion's arguments, but challenges them from a different perspective. As expected, the Government argues that Binion's waiver was valid and enforceable. However, setting those issues aside, the Government submits that Binion's attorneys are precluded from adducing evidence of Binion's " actual innocence" by operation of the relevant rules governing attorney conduct. The Government contends that based on the substance of Binion's proffer statements, there is no good-faith basis to argue that Binion is factually innocent. The Government posits that "in return for the opportunity to explore cooperation, Binion bargained away the option she had of presenting an 'actual innocence' defense." (Letter from Christine H. Chung and James G. Cavoli dated November 1,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                           Page 5

Not Reported in F.Supp.2d, 2000 WL 1693538 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

2000 at 13.) From this, the Government maintains that Binion's attorneys should be precluded from arguing that there was no fraud, that Binion did not engage in any fraudulent conduct, or that Binion lacked the requisite criminal intent. Still, the Government submits that Binion has available to her viable defenses at trial that do not trigger the Proffer Agreement. According to the Government, Binion may argue reasonable doubt, claim that the Government did not satisfy its burden of proof, and establish propositions not contradicted by her proffer statements.

E. The Accuracy Of The Government's Recording
*Of The Statements Made During The Proffer*

The Court held oral argument on November 2, 2000 with respect to the validity of the Proffer Agreement, when events took yet another turn. In support of his contention that he has a good-faith basis to advance the innocence of his client, Binion's counsel informed the Court that Binion believed that the FBI-302 summarizing her proffer statements contained a number of inaccuracies and omissions and excluded exculpatory material. (*See* Transcript of Oral Argument dated November 2, 2000 at 95-97.)

In a letter received by this Court on November 5, 2000, the Government, through affidavits submitted by Special Agent Porzio and former AUSA Albert, admitted that the FBI-302 statement was not comprehensive, confirming Binion's assertions that the FBI-302 omitted statements made by her during the proffer session. (*See* Porzio Aff. ¶ 6 ("Because neither my notes nor the FBI-302 is a verbatim transcript of the interview, the FBI-302 does not contain every statement that Binion made."); Affirmation of Richard F. Albert dated November 4, 2000 ("Albert Aff.") ¶ 4 ("I recall statements that are not recorded in the FBI-302."), attached to Letter from Christine H. Chung and James G. Cavoli dated November 4, 2000.)

With admirable candor, Porzio detailed several statements omitted from the FBI-302, one of which potentially may be exculpatory and consistent with Binion's defense raised at the first trial. (*See* Porzio

Aff. ¶ 6 ("The FBI-302 also does not include a statement of Binion's (recorded in my handwritten notes) that she glanced at but did not read OR records.").) In tacit recognition of this fact, Porzio attempted to offer an explanation for the omission by noting that "nothing said during the proffer undermined the accuracy of the statements reported in the FBI-302." (Porzio Aff. ¶ 7.) Moreover, Albert recalled that Binion "made efforts to minimize her culpability," another fact not described in the FBI-302. (Albert Aff. ¶ 4.) Albert apparently determined not to correct a draft of the FBI-302 that was presented to him for approval because he had satisfied himself that "there was no question ... that Binion had made factual admissions sufficient to establish her guilt." (Albert Aff. ¶¶ 4, 5.)

*Discussion*

**\*6** Rule 11(e)(6) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence contain substantively identical provisions that exclude from admission into evidence statements made by a criminal defendant during plea discussions. In *United States v. Mezzanatto,* the Supreme Court held that "absent some affirmative indication that the agreement was entered into unknowingly or involuntarily, an agreement to waive the exclusionary provisions of the plea statements Rules is valid and enforceable." 513 U.S. 196, 210, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995). The waiver at issue in *Mezzanatto* extended only to the use of the defendant's plea statements " to impeach any contradictory testimony he might give at trial if the case proceeded that far." 513 U.S. at 198.

In applying a "knowing and voluntary" standard in determining whether a defendant has waived his rights under exclusionary rules for plea statements, the Supreme Court adopted the heightened standard reserved for waiver of rights essential to a fair trial and the reliability of the adjudicative process. *See United States v. Fronk,* 173 F.R.D. 59, 70 (W.D.N.Y.); *see also Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) ( "Waivers of constitutional rights not only

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 6

Not Reported in F.Supp.2d, 2000 WL 1693538 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences."); *United States v. Ready,* 82 F.3d 551, 556-58 (2d Cir.1996) (applying "knowing and voluntary" standard to waiver of right to appeal in plea agreement).

In this regard, the Second Circuit has held that a waiver of such essential rights should be enforced only "if the record 'clearly demonstrates' that the waiver was both knowing (in the sense that the defendant fully understood the potential consequences of his waiver) and voluntary." *Ready,* 82 F.3d at 557; *see also United States v. Bradbury,* 189 F.3d 200, 206-07 (2d Cir.1999) (vacating sentence where Government "insufficiently warned" defendant that post-plea statements could be used in guideline calculations after signing second plea agreement); *United States v.. Padilla,* 186 F.3d 136, 141 (2d Cir.1999) (vacating district court's decision to permit withdrawal of Section 5K1.1 letter where Government "failed to enumerate specifically the right to withdraw the motion [and] the several specific and serious consequences that would follow if [defendant] committed further crimes or otherwise violated the agreement").

Apart from applying the knowing and voluntary standard, the Second Circuit has held that agreements containing waivers of essential rights, such as plea agreements, are to be construed narrowly because they "are unique contracts in which special due process concerns for fairness and the adequacy of procedural safeguards obtain." *Ready,* 82 F.3d at 556, 558-59 (internal citations and quotations omitted). In *Ready,* the Second Circuit articulated three points that inform this rule of construction. First, courts are to construe such agreements "strictly against the Government," for the primary reason that the Government typically drafts the agreement and "the fact that the Government ordinarily has certain awesome advantages in bargaining power." *Ready,* 82 F.3d at 559; *see also Padilla,* 186 F.3d at 141. Second, the agreements are to be construed "against a background understanding of legality." *Ready,* 82 F.3d at 559. Third, courts may apply "general fairness principles" to invalidate particular terms of such agreements.

*7 In this case, the Government has not demonstrated that Binion knowingly waived her rights as to the admissibility of statements made during her proffer for purposes beyond impeachment. Consequently, this Court holds that Binion's waiver is valid only to the extent it permits the Government to use her proffer statements for impeachment purposes should she testify. For all other purposes, Binion's waiver is invalid.

The basic facts in the record before this Court, which do not appear to be in dispute, amply support this conclusion. Preliminarily, Binion does not appear to argue that her proffer statements cannot be admitted for impeachment purposes if she were to testify at trial. Binion clearly understood, as she and her attorney affirmed, that her statements made at the proffer session could be admitted at trial if she testified in a manner that contradicted them.

However, the facts strongly suggest that Binion did not fully understand the potential consequences of the extent to which the Government could use her statements to "rebut" evidence or arguments presented on her behalf. The facts establish that her attorney did not have the Proffer Agreement prior to the May 12, 1998 meeting; that prior to the meeting, her attorney only advised her that the statements could be used to pursue leads and to impeach her if she testified; that after receiving the Proffer Agreement at the meeting, her attorney did not supplement his incomplete explanation of the consequences of the Proffer Agreement, particularly the consequences of the second clause of Paragraph 2(b); and that AUSA Williams only partially described the terms of the Proffer Agreement to Binion, omitting any explanation of the portion of Paragraph 2(b) regarding the ability of the Government to use her statements to "rebut" positions she might adopt at trial. In light of these undisputed facts, the fact that Binion signified her assent to the Proffer Agreement does not translate into the conclusion that she was sufficiently warned or fully understood the consequences of her assent.

The Government's argument that "Binion did not make any claim that the terms of the waiver were wrongly explained to her" does not meet the substance of Binion's argument. (*See* Letter from

Not Reported in F.Supp.2d                                                    Page 7

Not Reported in F.Supp.2d, 2000 WL 1693538 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Christine H. Chung and James G. Cavoli dated November 1, 2000 at 12-13 n.5.) While the Proffer Agreement was not wrongfully explained, it was incompletely explained. And what was not explained to Binion was that the exception contained in Paragraph 2(b) of the Proffer Agreement had the potential-and, given the Government's argument here, the ineluctable-consequence of engulfing the Government's promise in Paragraph 1 that her statements would not be offered in evidence during the Government's case-in-chief. The effect of Paragraph 2(b) renders Paragraph 1 superfluous. No one ever explained to Binion that the Proffer Agreement might be triggered by the exercise of her Sixth Amendment rights to cross-examination, *Davis v. Alaska,* 415 U.S. 308, 316-17, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), to make closing arguments, *Herring v. New York,* 422 U.S. 853, 860, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975), or to call witnesses on her behalf, *Taylor v. Illinois,* 484 U.S. 400, 408, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988). Similarly, no one explained that the term " arguments," as used in Paragraph 2(b), referred to opening statements and that statements made in that context might trigger the Proffer Agreement. *Cf. United States v. Dinitz,* 424 U.S. 600, 613, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976) (Burger, C.J.concurring) (openings are "not an occasion for argument").

*8 Limiting Binion's waiver to allow her proffer statements to be used for impeachment purposes only affords the Government no more than what Supreme Court precedent permits. *See Mezzanatto,* 513 U .S. at 210. This Court notes, without deciding the issue, that a groundswell of doubt has been expressed in this Circuit concerning the enforceability of the waiver contained in the Proffer Agreement, "at least when the waiver extends beyond the use of the statements to impeach the defendant." *United States v. Doe,* No. 96 Cr. 749, 1999 WL 243627 at *9 (E.D.N.Y. Apr.1, 1999) (Gleeson, J.); *Fronk,* 173 F.R.D. at 71 n. 10 ("it certainly is not clear whether a majority of the Supreme Court would uphold the type of waiver at issue here, one that is not limited to impeachment purposes"); *see also Mezzanatto,* 513 U.S. at 211 (Ginsburg, J. concurring) ("It may be, however, that

a waiver to use such statements in the case in chief would more severely undermine a defendant's incentive to negotiate, and thereby inhibit plea bargaining."). *But see United States v. Krilich,* 159 F.3d 1020, 1024-26 (7th Cir.1998) (upholding waiver that permitted use of proffer statements to rebut inconsistent evidence elicited from government witness on cross-examination); *United States v. Burch,* 156 F.3d 1315, 1319-22 (D.C.Cir.1998) (upholding waiver that permitted prosecutor to use defendant's proffer statements in case-in-chief).

The decision to invalidate Binion's waiver for purposes other than impeachment does not settle the matter. This Court is duty bound to protect the integrity of the proceeding and to ensure that matters presented to the jury are grounded in good faith. *See, e.g .,* N.Y. Comp.Codes R. & Regs. tit. 22, § 1200.33 [DR 7-102] (2000). Consequently, based on the substance of the statements made by Binion during the proffer session held on May 12, 1998, this Court will not permit Binion's counsel to elicit substantive (non-impeachment) testimony, either on cross-examination of witnesses called by the Government or from witnesses called to testify on her behalf, or to present arguments to the jury at any stage of the proceeding, including opening statements, that directly contradict specific factual statements made by Binion in the FBI-302 statement.

*Conclusion*

This Court holds that Binion's waiver is valid only to the extent it permits the Government to use her proffer statements for impeachment purposes should she testify. However, absent a good-faith basis, Binion's counsel may not present evidence or arguments on Binion's behalf that directly contradict specific factual assertions summarized in the FBI-302.

SO ORDERED:

S.D.N.Y.,2000.
U.S. v. Lauersen
Not Reported in F.Supp.2d, 2000 WL 1693538

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

173 F.R.D. 59                                                                                    Page 1

173 F.R.D. 59
**(Cite as: 173 F.R.D. 59)**

**H**
U.S. v. Fronk
W.D.N.Y.,1997.

United States District Court,W.D. New York.
UNITED STATES of America,
v.
James A. **FRONK**, Defendant.
**No. 96-CR-6020.**

April 9, 1997.

Defendant was charged with various drug offenses and moved to dismiss indictment or to suppress evidence. Adopting the report and recommendation of Jonathan Feldman, United States Magistrate Judge, the District Court, Michael A. Telesca, J., held that: (1) protection of rule governing inadmissibility of plea and related statements is limited to statements made by defendant and does not encompass evidence derived from use of such statements; (2) defendant was not conferred with formal or informal derivative use immunity with respect to his plea agreement discussions with prosecution; and (3) seizure of items from defendant's residence beyond package which was subject of search warrant, was not outside scope of warrant.

So ordered.
West Headnotes
**[1] Criminal Law 110 ☜══394.1(3)**

110 Criminal Law
 110XVII Evidence
  110XVII(I) Competency in General
   110k394 Evidence Wrongfully Obtained
    110k394.1 In General
     110k394.1(3) k. Effect of Illegal
Conduct on Other Evidence. Most Cited Cases

**Criminal Law 110 ☜══408**

110 Criminal Law

 110XVII Evidence
  110XVII(L) Admissions
   110k405 Admissions by Accused
    110k408 k. Negotiations for
Compromise. Most Cited Cases
Protection of rule governing inadmissibility of plea and related statements is limited to statements made by defendant and does not encompass evidence derived from use of such statements. Fed.Rules Cr.Proc.Rule 11(e)(6), 18 U.S.C.A.

**[2] Criminal Law 110 ☜══42.5(1)**

110 Criminal Law
 110II Defenses in General
  110k42 Immunity to One Furnishing
Information or Evidence
   110k42.5 Agreements Granting Immunity
    110k42.5(1) k. In General. Most Cited
Cases
  (Formerly 110k42)
Defendant was not conferred with formal or informal derivative use immunity with respect to his plea agreement discussions with prosecution, despite his argument that he subjectively believed that he had derivative use immunity, as his testimony regarding his beliefs did not comport with finding of formal or informal derivative use immunity and at most confirmed that he believed that his statements would not be used against him.

**[3] Searches and Seizures 349 ☜══148**

349 Searches and Seizures
 349III Execution and Return of Warrants
  349k147 Scope of Search
   349k148 k. Places, Persons, and Things
Within Scope of Warrant. Most Cited Cases
Seizure of items from defendant's residence beyond package which was subject of search warrant, was not outside scope of warrant, where affidavit in support of warrant sought permission to search for cocaine, currency, packaging materials, personal telephone books, envelopes, receipts, and other

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

173 F.R.D. 59 .

Page 2

173 F.R.D. 59
**(Cite as: 173 F.R.D. 59)**

items evidencing violations of federal controlled substance offenses.

**\*60** Herbert L. Greenman, Buffalo, NY, for plaintiff.
Joseph M. Guerra, III, Buffalo NY, for defendant.

## DECISION and ORDER

TELESCA, District Judge.

In a March 28, 1996 indictment, defendant Fronk was charged with participating in a conspiracy to distribute and possess cocaine with intent to distribute in violation of 21 U.S.C. § 846, distribution and possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and use of a communication facility to commit a drug felony in violation of 21 U.S.C. § 843(b). On May 23, 1996, defendant filed an omnibus motion for (1) pretrial discovery; (2) pre-trial disclosure of all *Brady* material; (3) disclosure of impeachment information; (4) search of personnel files of government agent witnesses; (5) identity of informants; (6) bill of particulars; (7) pretrial disclosure of evidence proffered under Rule 404(b) in the exclusion of any such evidence found to be inadmissible; (8) dismissal of the indictment on the basis that all counts are time barred by the statute of limitations; (9) renewal of the suppression motion; and (10) renewal of the prior motion for dismissal of indictment with prejudice. Subsequently, defendant moved to suppress evidence seized during execution of two search warrants. The motions were referred to Magistrate Judge Jonathan Feldman for hearings and a Report and Recommendation. Oral argument was heard and evidentiary hearings were conducted. On February 21, 1997, Magistrate Judge Feldman issued a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) in which he granted defendant's motion to suppress his statements made to law enforcement on the evening of his arrest and denied defendant's motion to suppress any evidence derived from inadmissible plea discussions, defendant's motion to dismiss the indictment and defendant's motion to suppress evidence seized during the execution of two search warrants. (Docket # 24) The motions relative to discovery were resolved, determined to be moot or decided from the bench.

On March 10, 1997, defendant filed an Objection to Magistrate Judge Feldman's Report and Recommendation. (Docket # 25) **\*61** By letter dated April 7, 1997, the United States Attorney informed the Court that it supported Magistrate Judge Feldman's Report and relied upon its previous filings in the case in opposition to the defendants objections. (Docket # 26) For the reasons set forth below, and after a de novo review of the hearing transcript and those portions of the Report and Recommendation to which the defendant objects, Magistrate Judge Feldman's February 21, 1997 Report and Recommendation is adopted in all respects.

### STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 636(b)(1), after the filing of a Report and Recommendation, any party may serve and file written objections to such proposed findings and recommendations. After such filing, [a] judge of the court shall make a de novo determination of those portions of the report or specified proposed finding or recommendations to which objection is made. A judge of the court may accept, reject, or modify in whole or in part, the findings or recommendations made by the magistrate.

I apply this standard of review to each of the matters to which the defendants have objected.

### DEFENDANT'S OBJECTIONS

Defendant Fronk objects as follows:

(1) Defendant objects to the Magistrate's Recommendation that Rule 11(e)(6) did not prevent the introduction of evidence derived from otherwise inadmissible plea negotiations;

(2) Defendant objects to the Magistrate's Recommendation that the 1992 indictment should not be dismissed with prejudice;

(3) Defendant objects to the Magistrate's Recommendation that all items seized during

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.


173 F.R.D. 59                                                                          Page 3

173 F.R.D. 59
**(Cite as: 173 F.R.D. 59)**

execution of two search warrants on September 4, 1990 not be suppressed.

Each of these objections will be addressed below. Familiarity with both Magistrate Judge Feldman's Report and the underlying record is presumed.

*DISCUSSION*

I. *Suppression of Evidence Derived from Plea Discussions*

Magistrate Judge Feldman found that statements made on September 4, 1990 by defendant to DEA agents were protected by Rule 11(e)(6) of the Federal Rules of Criminal Procedure. However, he denied defendant's motion to suppress evidence derived from the inadmissible plea discussions because he concluded that the protective reach of Rule 11(e)(6) is limited to statements made by defendants. In making this determination, the Magistrate relied upon two cases from the Eighth and Eleventh Circuit which hold that the "fruits" of plea negotiation statements are not inadmissible under Rule 11(e)(6). *United States v. Ware,* 890 F.2d 1008, 1012 (8th Cir.1989); *United States v. Cusack,* 827 F.2d 696, 698 (11th Cir.1987).

[1] Defendant argues that these cases are not controlling in the Second Circuit where this is an issue of first impression. Fronk points out that although the rule is silent with regard to derivative evidence, the purpose of Rule 11, to facilitate and encourage frank and candid plea discussions, would only be served by including derivative evidence within its scope. Defendant does not dispute that the express language of the statute only proscribes the use of a defendant's statement and does not prohibit the use of derivative evidence. He argues, however, that the overall spirit of the statute would be better served by excluding all evidence obtained either directly or indirectly from plea negotiations. Defendant suggests that the Second Circuit would adopt this interpretation based on the following language found in the Second Circuit's decision in *United States v. Hinton,* 703 F.2d 672 (2d Cir.), *cert. denied,* 462 U.S. 1121, 103 S.Ct. 3091, 77

L.Ed.2d 1351 (1983):

As the trial judge aptly stated in the proceeding below:
Rule 11(e) was [not] intended to bar anything so ephemeral as the exploitation of weakness real or imagined concerning strategy, such as occurred here. Rule 11 ... [is] designed to [be] applied to statements that are to be used in evidence, *or \*62 evidence obtained through the use or exploitation of the statements.* Nothing of that sort happened here.

*Hinton,* 703 F.2d at 679 (emphasis added). However, this excerpt is mere dicta in a decision which affirmed the trial court's finding that Rule 11(e)(6)(D) does not bar the prosecution's use of evidence derived from plea negotiations to add further charges to the indictment and it does not apply to statements made by defense counsel. The Second Circuit has not specifically reviewed the issue of whether Rule 11(e)(6) protects evidence derived from statements made during plea negotiations. I find that Magistrate Judge Feldman properly determined that Rule 11 protection is limited to statements made by defendant and does not encompass evidence derived from the use of such statements.

[2] In the alternative, defendant argues that even if Rule 11 does not protect the derivative evidence, Fronk was conferred with formal or informal derivative use immunity. I agree with the Magistrate's Recommendation that the record does not support this position. Defendant does not dispute the Magistrate's finding that there was no evidence that Fronk's attorney discussed derivative use immunity with the government. Rather, defendant argues that the testimony of Fronk reveals that he subjectively believed that he had derivative use immunity based on communications from his lawyer. In support of this position, defendant directs the Court to page 214 of Fronk's testimony which provides:

Q: What was your own personal belief as to what you said to the agents, prospectively? What was your own personal belief as to whether those statements could be used against you?

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

173 F.R.D. 59                                                                                   Page 4

173 F.R.D. 59
**(Cite as: 173 F.R.D. 59)**

A: Well, I believed, according to (my attorney), he had a promise from A.U.S.A. that it would not be used against me and I, generally, remembered and knew even in my state then, that if you're discussing matters with an assistant U.S. Attorney as part of a disposition and the disposition we wanted was no charges or something like that, that those matters are, it's almost like having an immunity for what you're talking about at that time. I mean, I had a general recollection that it would be safe. It would be safe, inadmissible conversation.
April 3, 1992 Transcript, p. 214.

Fronk's testimony does not comport with a finding of formal or informal derivative use immunity. At most, defendant's testimony confirms that he believed that his statements would not be used against him.

I have carefully reviewed the hearing transcripts and the submissions by the parties and conclude that Magistrate Judge Feldman applied the proper analysis and correctly determined that the discussions with agents the night of April 4, 1997 constituted plea negotiations within the meaning of Federal Rule of Criminal Procedure 11(e)(6) but that Rule 11(e)(6) does not protect the use of derivative evidence. Moreover, Magistrate Judge Feldman correctly determined that the record does not support a finding of formal or informal derivative use immunity.

## II. *Speedy Trial Objections*

Defendant argues that Magistrate Judge Feldman should have reconsidered Judge Elfvin's order dismissing the indictment without prejudice and dismissed the indictment with prejudice for violations of the Speedy Trial Act. 18 U.S.C. § 3162 . I adopt Magistrate Judge Feldman's recommendation that Fronk's motion to dismiss the indictment with prejudice be denied. The determination of whether to dismiss an indictment with or without prejudice rests within the discretion of the district court based on "the seriousness of the offense, the facts and circumstances of the case which led to the dismissal and the impact of a reprosecution on the administration of [the Speedy Trial Act] and on the administration of justice." 18

U.S.C. § 3162(a)(2); *United States v. Wilson*, 11 F.3d 346, 353 (2d Cir.1993), *cert. denied*, 511 U.S. 1025, 114 S.Ct. 1415, 128 L.Ed.2d 86 (1994). Judge Elfvin considered these factors and determined that dismissal without prejudice was appropriate, anticipating that the government may choose to reindict defendant. Defendant now claims that reconsideration of Judge Elfvin's decision is necessary because he has been prejudiced by the additional time **\*63** elapsed as a result of the reindictment and additional hearings. Defendant does not raise any issues which would warrant review of Judge Elfvin's decision. A review of Judge Elfvin's decision is appropriately preserved for appellate review.

## III. *Evidence Seized In Execution of Search Warrant*

[3] Defendant objects to the Magistrate's finding that the seizure of certain evidence, namely all items seized from his residence beyond the package which was the subject of the search warrant, was not beyond the scope of the search warrant. The Magistrate found that the warrant application contained probable cause to seize the items that included drug paraphernalia and records. He concluded that "a common sense reading of both the warrant and the application permitted the agents to legitimately seize not only drugs but also drug paraphernalia and records." Report and Recommendation, p. 29. I agree. Although the warrant itself only reads "Quantity of Controlled Substance, Cocaine" to describe the items to be seized, the same DEA agent who submitted the affidavit in support of the warrant which sought permission to search for cocaine, currency, packaging materials, personal telephone books, envelopes, receipts, and other items evidencing violations of federal controlled substance offenses, participated in the execution of the warrant. Under these circumstances, incorporation and attachment of the affidavit is not required to incorporate the affidavit by reference into the warrant. *United States v. Bianco*, 998 F.2d 1112, 1116-1117 (2d Cir.1993), *cert. denied*, 511 U.S. 1069, 114 S.Ct. 1644, 128 L.Ed.2d 364 (1994).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

173 F.R.D. 59                                                                  Page 5

173 F.R.D. 59
**(Cite as: 173 F.R.D. 59)**

*CONCLUSION*

I have carefully reviewed the balance of Magistrate Judge Feldman's Report and Recommendation, and have found it to be in accord with both the record before me and the law.

WHEREFORE, for the reasons set forth above, the findings in Magistrate Judge Feldman's February 21, 1997 Report and Recommendation are adopted in all respects.

ALL OF THE ABOVE IS SO ORDERED.

**REPORT AND RECOMMENDATION**

By Order dated April 1, 1996, the Honorable Michael A. Telesca referred to the undersigned "all pre-trial matters that a Magistrate Judge may hear and determine pursuant to 28 U.S.C. § 636(b)(1)(A)" as well as all matters "which a Magistrate Judge may hear and thereafter file a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B)." (Docket # 2). Thereafter, omnibus pre-trial motions were filed by the defendant and the government responded. Oral argument was heard by this Court and, where appropriate, evidentiary hearings were conducted. As set forth below, the following is my Report and Recommendation for all matters referred to me pursuant to § 636(b)(1)(B) (Docket # 8).[FN1]

> FN1. Fronk also filed motions seeking, *inter alia,* discovery, *Brady* material, Bill of Particulars, informant disclosure and Rule 404(b) materials. (Docket # 8). These motions were orally argued on July 10, 1996 and were either resolved, determined to be moot or decided from the bench.

*REPORT AND RECOMMENDATIONS*

**A. DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**

***Relevant Facts:*** At 7:30 p.m. on September 4, 1990 seven law enforcement agents [FN2] entered the Buffalo residence of James Fronk ("Fronk") to execute a federal search warrant that had been signed by United States Magistrate Judge Edmund Maxwell earlier that day. Upon allowing the agents into his home, Fronk was informed of the existence of the warrant and then advised of his *Miranda* rights by Agent Mark Peterson of the DEA. Fronk interrupted Peterson's reading of his rights and requested that he be permitted to contact his attorney, Michael Blotnick (Blotnick) of Buffalo. Agent Peterson finished reading Fronk his rights and **\*64** told Fronk he could use the telephone to call Blotnick. Fronk was apparently unable to reach Blotnick from his home. During the ninety minute search of Fronk's residence a small amount of cocaine was found.

> FN2. The seven were DEA Agents Mark Peterson, Richard Inscor and Fred Larson, Postal Inspectors Molly McMinn and Ronald Snyder, and Buffalo Police Detectives Robert Grisanti and Patrick Judge. (SH at 5-6).

After the agents were finished searching, Fronk was taken into custody and transported in handcuffs to DEA headquarters for fingerprinting and processing. Upon arrival at the DEA office, Fronk again tried calling his lawyer. Blotnick was still not available and Fronk was placed into a holding cell. Sometime thereafter, Blotnick called the DEA office looking for his client. Agent Peterson told Blotnick that Fronk's home had been searched and Fronk had been arrested. Blotnick informed Agent Peterson that he was immediately coming down to the DEA office to meet with his client.

Blotnick arrived at the DEA offices at around 10:00 p.m. After Blotnick arrived, and before he had a chance to meet with his client, Agent Peterson told Blotnick that DEA was seeking Fronk's cooperation in their investigation. Peterson informed Blotnick that the agents "were interested in interviewing Mr. Fronk and obtaining whatever information he would give us related to his source of supply [for drugs] and that we would like to know whether he [Fronk]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

173 F.R.D. 59 .

173 F.R.D. 59
**(Cite as: 173 F.R.D. 59)**

would be interested in discussing these matters with us." (SH at 12).[FN3] Peterson also told Blotnick that Magistrate Judge Maxwell was aware that Fronk had been taken into custody and was willing to do an initial appearance that evening if necessary. [FN4] Agent Peterson then allowed Blotnick to see his client in the detention cell.

> FN3. Suppression Hearing (SH) Transcript at page 12.

> FN4. James Fronk is an attorney and former Assistant United States Attorney for the Western District of New York.

Blotnick spoke with Fronk for about twenty minutes. While Blotnick and Fronk were meeting, Agent Peterson called Assistant United States Attorney Susan Barbour (AUSA Barbour) to inform her of the situation. When Blotnick emerged from speaking to his client, he had a second conversation with Agent Peterson. According to Agent Peterson, Blotnick asked "what would be in it for his guy" if Fronk cooperated. Peterson testified that he told Blotnick that he "had spoken with Assistant United States Attorney Susan Barbour regarding the possibility of that [cooperation] occurring and that it was our position that if he [Fronk] was forthright and truthful that we would be willing to recommend to the United States Attorneys office that he be released that evening and formal charges not be filed immediately to give everyone an opportunity to work this thing out in the future." (SH at 13-14). Blotnick was not satisfied with the representations of the agent and asked if he could speak to the AUSA in charge of the prosecution. Peterson immediately called AUSA Barbour at her home, spoke to her briefly and handed the phone to Blotnick.

As to the substance of the conversation between AUSA Barbour and Blotnick, the testimony could not be more divergent. Blotnick testified that he asked Barbour for a promise that if Fronk cooperated he would not be prosecuted and the prosecutor refused. Blotnick testified he then asked Barbour for a promise that if Fronk cooperated he would be given a "favorable

disposition", but again AUSA Barbour declined to make this commitment. According to Blotnick, AUSA Barbour stated that "before she could make any commitment as to what concessions the government would grant on his [Fronk's] case, if any, they wanted to evaluate what he had to offer." (SH at 283). Blotnick replied that if he was willing to go forward on those terms AUSA Barbour would have to agree "that anything we disclosed during these conversations would not be used against him in the event they decided not to offer him anything." (SH at 284). Blotnick testified that Barbour " agreed".

AUSA Barbour, who had recently joined the United States Attorneys Office after serving as a prosecutor in the Erie County District Attorney's Office, recalled the conversation differently. Barbour stated that Blotnick wanted to know what kind of disposition he could expect for his client. Barbour replied by telling Blotnick that it was "premature" to make any commitments as to the **\*65** ultimate disposition of Fronk's case. Barbour stated she told Blotnick that the government "was in the drivers seat" and it "was time for the defendant to come clean". According to Barbour, Blotnick then stated: "Well, your're not going to use anything that he might tell you tonight against him", to which Barbour replied that Fronk "would certainly be held liable for the statements he made that night." (SH 163-164). Barbour testified that if Fronk would " come clean" (SH 195), show some "good faith" (SH 209) and cooperate, she would "assess it and then later on make a determination as to what [she] was going to give him or offer him". (SH at 221-222). AUSA Barbour repeatedly insisted that her conversation with Blotnick that evening was not a form of plea negotiation. (SH 194, 198, 222). Indeed, Barbour claimed that she did not even know why Blotnick wanted to speak to a prosecutor that night. (SH 217). According to AUSA Barbour, aside from a promise that Fronk would be able to go home that evening, there was "no benefit at all" to Fronk in return for his complete and truthful cooperation in the DEA's investigation of him. (SH at 190).

After completing his conversation with AUSA Barbour, Blotnick handed the phone back to Agent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

173 F.R.D. 59
**(Cite as: 173 F.R.D. 59)**

Peterson. According to Agent Peterson, AUSA Barbour told him that if Fronk gave truthful cooperation, no charges were to be filed "that night" and they "would see down the road" what the ultimate disposition would be. (SH at 60-61). Agent Peterson testified that AUSA Barbour never told him of her decision that any statements Fronk made that evening *could be used* against Fronk. (SH at 60). Agent Peterson, who has been a law enforcement officer for over 20 years, testified that in virtually every case he had been involved in where counsel was present during a post-arrest cooperation interview, defense counsel "wanted representations that statements that a defendant was going to make on the night of his arrest would not be used to incriminate him at a later time." (SH at 51).

After Agent Peterson ended his conversation with AUSA Barbour, Blotnick was escorted back to the holding cell to see his client again. Blotnick told Fronk of his conversation with AUSA Barbour and the need to make a decision on whether to cooperate with the investigation. Blotnick testified that Fronk was initially against meeting with the agents and cooperating with them. Blotnick told Fronk that "there was no down-side to our giving them the information, because in the event they decided to go forward with this prosecution they agreed not to use any information provided." (SH at 287-288).

After Blotnick and Fronk had been conferring for a short period of time, Agent Peterson began pressuring them for a decision. Peterson testified he interrupted their meeting and told them "a decision had to be made quickly", that they were " waiting for a decision". (SH at 62-63).[FN5] Blotnick replied that he needed more time with his client. A "few moments" later Detective Grisanti interrupted Blotnick's meeting with Fronk and, like Agent Peterson, told Blotnick they had to have a decision "at that point". Grisanti told Blotnick and Fronk that if there was going to be a deal it had to be now "or the deal was going to be off". (SH 64-65). Blotnick testified that the agents "kept pressing" for a decision and that he "had less than two minutes" to confer with his client before Fronk had to decide whether to cooperate. (SH at

288-289). Agent Peterson estimated that Blotnick met with Fronk for ten or fifteen minutes. (SH 17).

> FN5. Peterson conceded that part of the reason he was hurrying Blotnick and Fronk for a decision was for personal reasons in that he had travel plans the next day. (SH 63).

Blotnick emerged from the meeting with Fronk and notified the agents that his client was willing to sit down with them and answer their questions. Frank was then interviewed by Agent Peterson, Detective Grisanti and Postal Inspector Molly McMinn. Blotnick was present for the entire interview, which, according to Agent Peterson lasted about an hour. (SH 74). Agent Peterson testified that Fronk was occasionally "hesitant" *in* providing the agents information and, as a result, Blotnick had to " encourage Mr. Fronk to answer my questions." (SH at 67). Blotnick testified that in encouraging his client to answer the agents' questions he "repeatedly recited to him [Fronk] that none of this *66 information would ever be utilized against him in the event the case was not disposed of favorably". (SH 291-292). Fronk was never asked to write or sign a confession nor was any portion of the interview recorded by either audio or video recording mechanisms.

At the conclusion of the interview, Agent Peterson gave Fronk a "Waiver of Speedy Arraignment" form. (Government exhibit 3). Blotnick looked at the form and approved his client signing it. Fronk signed the form and returned it to Agent Peterson. Fronk and Blotnick claim that the form they signed was a single page form which did nothing more than waive an arrested defendant's right to a speedy arraignment. Peterson, Grisanti and McMinn testified that the form had an attached cover page that contained a waiver of *Miranda* rights. In any event, both government and defense counsel stipulated at the suppression hearing that nothing Fronk said *after* the waiver form was signed will be introduced at trial. After the form was signed, Blotnick and Fronk left the DEA offices.

Sometime thereafter AUSA Barbour called Blotnick

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

173 F.R.D. 59                                                                                                         Page 8

173 F.R.D. 59
**(Cite as: 173 F.R.D. 59)**

to request that Fronk appear at her offices for another meeting. The second meeting occurred on October 3, 1990. According to Ms. Barbour, the purpose of the second meeting "was to follow through with any cooperation that the defendant might be giving." (ESH at 371).[FN6] The meeting was held in the United States Attorneys Office and was attended by AUSA Barbour as well as members of the Buffalo Police Department, the DEA and the Postal Inspection Service. Blotnick also attended the meeting. AUSA Barbour testified that during the second meeting there was a discussion with Fronk "relative to him [Fronk] taking what we call proactive work". (ESH at 371). This "proactive work" would involve Fronk soliciting his source of supply for cocaine to mail controlled substances to Fronk in Buffalo. As far as Ms. Barbour was concerned, the government was still considering the information Fronk was providing and she was going to "assess his cooperation to make a determination later on what plea would be available". (ESH at 375).

> FN6. Transcript of suppression hearing before the Hon. John T. Elfvin (ESH) at page 371. By stipulation, the parties have submitted to this Court relevant portions of the suppression hearing held before Judge Elfvin for purposes of resolving the instant suppression motions.

The parties were never able to agree on a mutually acceptable disposition of the matter and Fronk was eventually indicted for narcotics related offenses. In this prosecution, the government has notified Fronk that it intends on offering into evidence the substance of what he told law enforcement agents during their meeting on September 4, 1990. The defendant moves to suppress the statements he made on the night of his arrest as any evidence derived as any "fruits" of those statements.

### DISCUSSION

The gist of Fronk's motion to suppress is that any and all statements he made to law enforcement during the meeting on September 4, 1990 were

made "in the course of plea discussions" and hence are inadmissible pursuant to Federal Rule of Criminal Procedure 11(e)(6) and Federal Rule of Evidence 410(3). Both counsel have submitted extensive post-hearing briefs. These briefs refer the court to numerous cases addressing the issue now confronting this Court; that is, under what circumstances are discussions between an accused and law enforcement plea negotiations? I have reviewed and considered the cases cited by counsel as well as many others uncovered in my own research. The common denominator among all of these cases is that the determination as to whether a conversation between a defendant and law enforcement is an inadmissible plea discussion or an inculpatory confession is a decision driven by the specific facts and circumstances surrounding the interchange at issue. *United States v. Serna,* 799 F.2d 842, 849 (2d Cir.1986), ("Whether a party is engaged in plea negotiations is a factual question that must be determined on a case-by-case basis."), *cert. denied, Cinnante v. United States,* 481 U.S. 1013, 107 S.Ct. 1887, 95 L.Ed.2d 494 (1987). Indeed, the varying results of the cases pay homage to the conclusion that such determinations are not amenable**\*67** to bright line rules or easy to apply legal litmus tests.[FN7]

> FN7. *Compare United States v. Ross,* 493 F.2d 771 (5th Cir.1974) (discussions were plea negotiations); *United States v. Melina,* 868 F.Supp. 1178 (D.Minn.1994) (discussions were plea negotiations); *United States v. Swidan,* 689 F.Supp. 726 (E.D.Mich.1988) (discussions were plea negotiations); *United States v. Boltz,* 663 F.Supp. 956 (D.Alaska 1987) (discussions were plea negotiations); *United States v. Washington,* 614 F.Supp. 144 (E.D.Pa.1985), (discussions were plea negotiations), *aff'd,* 791 F.2d 923 (3rd Cir.) , *table, cert. denied,* 479 U.S. 841, 107 S.Ct. 150, 93 L.Ed.2d 90 (1986), *with United States v. Morgan,* 91 F.3d 1193 (8th Cir.1996) (discussions were not plea negotiations) *cert. denied, sub nom. Walker LaBrunerie v. United States,* 519 U.S. 1118, 117 S.Ct. 965, 136 L.Ed.2d

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

173 F.R.D. 59                                                                          Page 9

173 F.R.D. 59
**(Cite as: 173 F.R.D. 59)**

850 (1997); *United States v. Penta,* 898 F.2d 815 (1st Cir.1990) (discussions were not plea negotiations); *United States v. Cusack,* 827 F.2d 696 (11th Cir.1987) (discussions were not plea negotiations); *United States v. Lau,* 711 F.Supp. 40 (D.Me.1989) (discussions were not plea negotiations).

As fact driven as these determinations necessarily are, many courts have utilized a two tiered approach in analyzing whether a particular set of facts constitutes plea discussions. This framework, first adopted by the Fifth Circuit in *United States v. Robertson,* 582 F.2d 1356 (5th Cir.1978), measures the admissibility issue pursuant the following framework:

The trial court must apply a two-tiered analysis and determine, first, whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion, and, second, whether the accused's expectation was reasonable given the totality of the objective circumstances.

*Id.* at 1366. *See also United States v. Penta,* 898 F.2d 815, 817-818 (1st Cir.1990)(utilizing *Robertson* framework); *United States v. Leon Guerrero,* 847 F.2d 1363, 1367 (9th Cir.1988) (same) *United States v. Melina,* 868 F.Supp. 1178, 1181 (D.Minn.1994) (same) *United States v. Mannino,* 551 F.Supp. 13, 18 (S.D.N.Y.1982) (same) I believe the Robertson two-tiered analysis to be the appropriate vehicle for analyzing Frank's suppression claims.

**1. *The Subjective Component:*** Given the facts presented, I have little difficulty finding that Frank subjectively believed that his conversations with law enforcement on the night of his arrest were discussions in furtherance of the plea bargaining process and thus inadmissible. Even assuming arguendo that AUSA Barbour did, in fact, inform defense counsel Blotnick that the defendant's "cooperation" would be used against him, there is no evidence that Blotnick repeated any such warning to Frank. Indeed, Blotnick testified that he told Frank the opposite-that there was no "downside" to Frank's full cooperation because the government needed the information to determine what ultimate

disposition was going to be offered and hence would not use what Frank said against him. (SH 287-288).

The government decided to forego its opportunity to have this Court make its own determination as to Frank's credibility and instead agreed to stipulate into evidence the transcript of Frank's previous testimony before Judge Elfvin. (SH 352-353) [FN8]. In that hearing, Fronk testified that Blotnick told him that he had spoken to AUSA Barbour and an agreement had been worked out. Fronk testified that it was his understanding, based on his hurried meetings with his attorney on the night of his arrest, that his cooperation would be evaluated "as part of an *ongoing discussion for disposition* between Mike Blotnick and Ms. Barbour." (ESH at 213) (emphasis supplied). Fronk also testified that Blotnick related to him the fact that AUSA Barbour had "told [Blotnick] that what I said would not be used against me in any fashion." (ESH at 212-213). Moreover, both Blotnick and Agent Peterson testified that during the cooperation session Fronk would, on occasion, hesitate in answering the agents' questions and had to be encouraged by Blotnick to be completely forthright. Such circumstantial conduct supports Fronk and Blotnick's claim that Fronk was certainly under the impression that his admissions would be inadmissible against him should the "ongoing discussion for disposition" between Blotnick and Barbour fail. For these reasons,**\*68** I find that Fronk did have a subjective expectation that his statements to law enforcement on the evening of September 4, 1990 were part of post-arrest plea negotiations that had been initiated by his attorney through direct communication with AUSA Barbour.

FN8. In accepting the stipulation, I made clear to counsel that by agreeing to proceed without the live testimony of the defendant, the Court would have to rely on the cold transcript and would not be able to make it's own determination as to Mr. Fronk's credibility. (SH at 353).

**2. *The Objective Component:*** Pursuant to the *Robertson* analysis, I must also consider whether

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

173 F.R.D. 59
**(Cite as: 173 F.R.D. 59)**

Fronk's subjective beliefs were "reasonable given the totality of the objective circumstances". *United States v. Robertson*, 582 F.2d at 1366. The government contends that the events of September 4, 1990 were nothing more than an "offer to cooperate" by Fronk and "an offer to cooperate by a defendant does not equate to a plea discussion." Government's Memorandum in Opposition at page 25.

The government's claim that at issue here is nothing more than an "offer to cooperate" is not only a cramped view of the facts developed at the suppression hearing, but also represents an overly restrictive view of the practical realities and pressures of plea negotiations. Regardless of how one labels the discussions between the government and the defendant on September 4, 1990, one fact is clear. Fronk did not come to the DEA offices with the intention of making an "offer to cooperate" in the government's investigation. To the contrary, he refused to make any statements to law enforcement, inculpatory or otherwise, without the benefit of counsel. When counsel did arrive, he did not "offer " the cooperation of his client. Indeed, before Blotnick even had a chance to meet with Fronk, Agent Peterson told Blotnick that although Magistrate Maxwell was standing by for Fronk to appear, the *government* wanted Fronk to agree to an interview so they could identify Fronk's source of supply of drugs. (SH at 12). The record is clear that the agents thereafter pressured Blotnick and Frank into making a quick cooperation decision by interrupting their attempts to discuss the issue with admonitions to hurry up and by telling them that cooperation had to be that evening "or the deal was off". (SH 62-65). Further, before agreeing to anything, Fronk sought the participation and advice of his attorney in the negotiations. *Compare United States v. Levy*, 578 F.2d 896, 900-901 (2d Cir.1978) (no plea discussions where uncounseled defendant, without any request from the agents and without any expectation that a reduced punishment would come to pass, "spontaneously" offered to cooperate and makes admissions).

There is, of course, nothing improper about the government seeking the cooperation of an arrestee. Such overtures further legitimate law enforcement interests. Absent improper police conduct, the fruits of those cooperation efforts are properly admitted against a defendant. Where, however, the government's efforts to secure the cooperation of an arrestee progress to the point where both the government and the defendant are negotiating through counsel and those negotiations involve the potential resolution or withdrawal of criminal charges in exchange for the defendant's cooperation, the provisions of Rule 11(e)(6)(D) must properly be considered.

Once government counsel and defense counsel agree that cooperation of a defendant potentially would be advantageous to both the interests of law enforcement and the defendant, the plea negotiation process that results is often routine, if not predictable. Defense counsel ordinarily demands to know "what's in it for the client" should he or she agree to cooperate. Government counsel, typically unwilling to "buy a pig in a poke", seeks a full proffer of what the defendant knows before committing to a specific plea or other disposition. Sometimes this drama plays out over weeks and months, with counsel exchanging letters confirming discussions or executing proffer agreements before the debriefing session occurs. Often, however, the luxury of reasoned reflection is not available and cooperation decisions must be made quickly, under enormous pressure and without the benefit of written agreements or letters of mutual understanding. In these circumstances, both government counsel and defense counsel rely on each others' good faith to uphold the "deal". Regardless of whether these discussions occur over weeks and months or are so truncated by circumstances that they last only a few minutes, they are a necessary part of plea discussions. **\*69** Indeed, such negotiations "set the table" for specific dispositional offers and counter-offers once both sides have the opportunity to consider the value of the defendant's proffer.

The discussions between AUSA Barbour and defense attorney Blotnick on the evening of Fronk's arrest were, in my view, consistent with the preliminary plea *negotiations* which logically presage either side committing to a particular and specific plea *bargain*. Faced with agents anxious

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

173 F.R.D. 59
**(Cite as: 173 F.R.D. 59)**

to obtain his client's cooperation and knowing that the agents lacked authority to negotiate, Blotnick asked to speak to the prosecutor who was "in charge of the case". (SH at 281). AUSA Barbour testified that she told Blotnick that if Fronk would "come clean" (SH 195), show some "good faith" (SH 209) and cooperate, she would "assess it and later on make a determination as to what [she] was going to give him or offer him". (SH at 196-197; 221-222). After Fronk disclosed self-incriminating information, AUSA Barbour arranged a further meeting with Fronk, Blotnick and the agents, this time at her offices. According to AUSA Barbour, this second meeting was controlled by the same verbal agreement she had with Blotnick on the night of Fronk's arrest-- that she was going "to assess his cooperation to make a determination later on what plea would be available". (ESH at 374-375). Such discussions and negotiations should be within the ambit of Rule 11(e)(6).

In their brief, the government's espouses the position that because "the defendant never agreed or offered to plead to anything" that evening, the discussions between Fronk and the agents could have never qualified as plea discussions within the meaning of Rule 11(e)(6)(D). (Government's Response at page 24). Under this rigid view, only those negotiations that specifically mention a defendant's willingness to plead guilty to a particular criminal offense meet the requirements of Rule 11(e)(6). This view is inconsistent with both the practical realities of plea negotiations and Second Circuit precedent. In *United States v. Serna,* 799 F.2d 842 (2d Cir.1986), the Court considered whether discussions preliminary to an actual offer to plead were inadmissible plea negotiations. In *Serna,* the defendant and his retained counsel met with an AUSA "to discuss *the possibility* of Serna's cooperation". *Id.* at 848. (emphasis supplied) To "determine Serna's sincerity in cooperating", a DEA agent interviewed him in the presence of his attorney. Based on the government's belief that Serna had been "less than forthcoming" in his proffer, plea negotiations fell through. *Id.* Despite the lack of a specific plea offer, the Second Circuit had "little difficulty in concluding that Serna had entered into plea negotiations with the Government". *Id.* The Court

held: "In light of the initial meeting with the AUSA, this preliminary [de-briefing] discussion must be considered part of the overall plea bargaining process. A requirement that such negotiations be more formal would contravene Rule 11(e)(6)." *Id.* at 849. *See United States v. Washington,* 614 F.Supp. 144, 149-151 (E.D.Pa.1985) (meeting between defendant, his counsel and AUSA wherein defendant attempted to convince government not to prosecute him or to prosecute him for a lesser offense were discussions within ambit of Rule 11(e)(6); "all statements at a meeting where the possibility of a plea is mentioned should be considered to have been made in the course of plea discussions"). *See also United States v. Boltz,* 663 F.Supp. 956 (D.Alaska.1987) (the phrase "plea discussions" in Rule 11(e)(6) includes offers of immunity, dismissal of all charges or no prosecution as well as offers to pleas of lesser or related offenses). Simply stated, I am not persuaded by the government's claim that a specific offer to plea to a criminal offense is the *sine qua non* of plea discussions as contemplated by Rule 11(e)(6) of the Federal Rules of Criminal Procedure.

There are other facts that support a finding that the September 4th discussions between Fronk and the agents were undertaken as part of plea discussions. Agent Peterson, who telephonically spoke to AUSA Barbour at least twice after the arrest of Fronk, testified that the parties were "contemplating the possibility of a plea in this case with his [Fronk's] cooperation" and that a decision as to what was going to be offered was going to be made after the agents and AUSA Barbour evaluated Fronk's cooperation. (SH 55-56). Moreover, the circumstances surrounding **\*70** the questioning of Fronk are far more consistent with an inadmissible plea proffer than with a confession intended to be used at trial. The agents never sought to record, either by video or audio tape, the incriminating statements made by Fronk. The agents never asked Fronk to write out a statement or even sign a statement that could later be used at trial as an admission or confession. I also take into consideration the implausibility of an experienced defense attorney demanding to speak with a federal prosecutor so that he could negotiate an opportunity to witness his client confessing to federal drug

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

173 F.R.D. 59                                                                                  Page 12

173 F.R.D. 59
**(Cite as: 173 F.R.D. 59)**

charges in exchange for a "benefit" (the post arrest release of his client) that appeared assured even without the client being required to make a full confession. [FN9]

> FN9. Given the testimony at the suppression hearing that Magistrate Maxwell insisted that Fronk be afforded an initial appearance no matter what the hour, the "benefit" to Fronk of being released that evening seemed illusory. Agent Peterson testified that he believed that Fronk was going to be released by Magistrate Maxwell after the initial appearance. (SH at 50). Postal Inspector Molly McMinn testified that Magistrate Maxwell was making himself available that evening "[s]o that Mr. Fronk would not have to spend the night in jail". (SH at 119). Mr. Blotnick testified that based on his knowledge of Magistrate Maxwell he was "extremely confident" that Fronk would be released that evening. (SH at 283). Only AUSA Barbour insisted that despite Magistrate Maxwell's specific instructions to her that Fronk's arrest not be a "subterfuge" for holding him in jail overnight (SH 180), she nevertheless had " no sense" of what kind of bail the Magistrate was going to set. AUSA Barbour testified that "it never occurred to her" that Magistrate Maxwell would release Fronk on his own recognizance and that she "could not have predicted what the Magistrate was going to do" with respect to Fronk's bail. AUSA Barbour stated that she had not even thought about what kind of bail she was going to ask for upon Fronk's initial appearance before the Magistrate. (SH 176-184).

In sum, I find that Fronk's expectation that he was engaged in plea discussions "was reasonable given the totality of the objective circumstances" evident on September 4, 1990. *United States v. Robertson,* 582 F.2d at 1366. Accordingly, the proffer Fronk made to law enforcement agents pursuant to the advice of his counsel on the night of his arrest is inadmissible.

**3. *Waiver:*** Having found that the discussions between Frank and the government were within scope of Rule 11(e)(6), I now turn to the issue of whether Blotnick waived the protections of the Rule during his telephone conversation with AUSA Barbour on the evening of Fronk's arrest.

The issue of whether a defendant could waive the protections of Rule 11(e)(6) was recently addressed by the United States Supreme Court in *United States v. Mezzanatto,* 513 U.S. 196, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995). In *Mezzanatto,* the Court held that "absent some affirmative indication that the agreement was entered into unknowingly or involuntarily, an agreement to waive the exclusionary provisions of the plea-statement Rules is valid and enforceable." *Id.* at 210, 115 S.Ct. at 806.[FN10] By adopting a "knowing and voluntary" standard in determining whether a defendant has waived his rights under Rule 11(e)(6), the Court appears to have opted for utilizing the stringent standard reserved for waiver of rights essential to a fair trial and the reliability of the truth-determining process. That is, waiver will be found only where the record demonstrates "an intentional relinquishment or abandonment*71 of a known right." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) *See generally Schneckloth v. Bustamonte,* 412 U.S. 218, 235-247, 93 S.Ct. 2041, 2051-2058, 36 L.Ed.2d 854 (1973) (distinguishing between a **knowing** waiver and a voluntary waiver). Thus, the government bears the heavy burden of establishing a knowing and voluntary waiver. *United States v. Mannino,* 551 F.Supp. 13, 20-22 (S.D.N.Y.1982) (government failed to meet its burden of demonstrating that a defendant knowingly and intelligently waived his right to inadmissibility of plea bargaining statements).

> FN10. The Supreme Court's opinion in *Mezzanatto* reflects a significant split in the Court as to whether a defendant could ever waive the *full* protections of Rule 11(e)(6). Justice Thomas wrote the opinion for the Court in which he opined

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

173 F.R.D. 59
**(Cite as: 173 F.R.D. 59)**

that defendants could waive the full protections of the rule. Justice Souter, joined by Justice Stevens dissented, finding that Congress intended to make the protections afforded plea discussions non-waivable. It is significant that Justice Ginsburg, joined by Justice O'Connor and Justice Breyer wrote a concurring opinion specifically limiting their holding to the particular waiver at issue in *Mezzanatto;* a waiver allowing the government to use plea discussion statements to *impeach* the defendant if he testified at trial. "It may be, however, that a waiver to use such statements in the *case-in-chief* would more severely undermine a defendant's incentive to negotiate, and thereby inhibit plea bargaining." *United States v. Mezzanatto,* 513 U.S. at 211, 115 S.Ct. at 806. (Ginsburg, J., concurring) (emphasis supplied). Thus, it certainly is not clear whether a majority of the Supreme Court would uphold the type of waiver at issue here, one that is not limited to impeachment purposes.

In the instant case, the evidence as to waiver was clearly in conflict. Blotnick testified that AUSA Barbour specifically represented to him that Fronk's proffer that evening would not be used against him. (SH 283-284). AUSA Barbour testified that she told Blotnick that Fronk would "certainly be held liable for the statements he made that night". (SH at 163). There are few things more disturbing to this Court than two respected members of the bar testifying so differently as to the substance of a crucial conversation. Blotnick and Barbour's sworn testimony of their phone conversation are not just discrepant, they are irreconcilable.

The fact remains, however, that unless the government meets its burden, waiver can not be established. Here, not only does the testimony between Blotnick and Barbour differ as to whether a waiver was agreed upon, but, as set forth earlier in this Report and Recommendation, there are other objective facts that support Fronk's position that he did not intend to waive the protections of Rule 11(e)(6). For these reasons, and based on the

record before me, I am not persuaded that the government has proven that Fronk knowingly and voluntarily waived his right to the inadmissibility of plea negotiation statements. Accordingly, it is my Report and Recommendation that the statements Fronk made to law enforcement agents on the evening of his arrest be suppressed pursuant to Rule 11(e)(6) of the Federal Rules of Criminal Procedure.

**4. *Derivative Use:*** The defendant also seeks to suppress any and all evidence derived from inadmissible plea discussions under the theory that such evidence would be suppressible as "fruit of the poisonous tree". It is my Report and Recommendation that the "derivative use" aspect of Fronk's suppression motion be denied. *See United States v. Ware,* 890 F.2d 1008, 1012 (8th Cir.1989) (defendant's disclosure of a potential witness during plea negotiations not within ambit of Rule 11(e)(6)); *United States v. Cusack,* 827 F.2d 696, 697-699 (11th Cir.1987) (Rule 11(e)(6) does not prevent government from introducing evidence derived from otherwise inadmissable plea negotiations). [FN11]

FN11. I reject Frank's argument that he was granted some type of "informal" derivative use immunity by the government on the night of his arrest. The record does not support such an argument. Blotnick never testified that he was negotiating derivative use immunity for his client. Indeed, my review of Blotnick's testimony reveals that he never even mentioned the term "immunity". Blotnick was trying to work out a negotiated disposition for his client and agreed that his client would make a proffer in furtherance of those discussions. Fronk was never conferred with formal or informal derivative use immunity and his statements to law enforcement were sheltered only by the protections afforded plea discussions pursuant to Rule 11(e)(6) of the Federal Rules of Criminal Procedure.

**B. *MOTIONS TO DISMISS INDICTMENT***

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

173 F.R.D. 59

173 F.R.D. 59
**(Cite as: 173 F.R.D. 59)**

Page 14

**1.** *Statute of Limitations:* Fronk moves to dismiss the current indictment on the ground that all counts are barred by the five year statute of limitations period found in 18 U.S.C. § 3282. The first three counts of the current indictment are identical to the first three counts of Indictment Number 91-CR-70-E, (hereinafter the "1992 Indictment") which indictment was returned by the federal grand jury on July 30, 1992. On November 15, 1995, Judge Elfvin dismissed the 1992 Indictment without prejudice for violations of the Speedy Trial Act. Approximately four months later, on March 28, 1996, the instant indictment (96-CR-6020-T) was returned. The new indictment contains one additional count (Count 4) which charges Fronk with using a communication device to commit a drug felony in violation of 21 U.S.C. § 843(b).

**\*72** Fronk's argument that counts one through three of the new indictment must be dismissed because they charge conduct outside the limitations period is without merit. 18 U.S.C. § 3288 provides a six month tolling period whenever an indictment is dismissed "*for any reason* " after the statute of limitations period has otherwise expired. Thus, a new indictment returned within six months of the date of dismissal of the original indictment is *not* time-barred. The statutory language "for any reason" was added by Congress in 1988 specifically to overrule a literal interpretation given by some courts [FN12] to the statute which did not permit the refiling of criminal charges dismissed on speedy trial grounds. *See,* 134 Cong.Rec. § 7446-01 (1988), 1988 WL 171875.

> FN12. *See e.g. United States v. Peloquin,* 810 F.2d 911, 912-913 (9th Cir.1987).

Fronk's argument as to Count 4 of the new indictment is more problematic. Count 4 is brand new and was not alleged as part of the 1992 Indictment. Nevertheless, where the conduct alleged in the new indictment does not materially broaden or substantially amend the conduct alleged in the dismissed indictment, new charges based on those "old" facts are given the benefit of § 3288. *United States v. Italiano,* 894 F.2d 1280 (11th Cir.), *cert. denied,* 498 U.S. 896, 111 S.Ct. 246, 112

L.Ed.2d 205 (1990). "If the allegations and charges are substantially the same in the old and new indictments, the assumption is that the defendant has been placed on notice of the charges against him. That is, he knows that he will be called to account for certain activities and should prepare a defense." *United States v. Schmick,* 904 F.2d 936, 940 (5th Cir.1990), *quoting United States v. Italiano,* 894 F.2d at 1283, *cert. denied, sub nom., Brewer v. United States,* 498 U.S. 1067, 111 S.Ct. 782, 112 L.Ed.2d 845 (1991),. The fact that the new and old indictment do not charge identical crimes is not dispositive. The similarity of the indictments is not measured by simply comparing the statutory violations alleged, "but also by the factual allegations that the government relies on to show a violation of the statute." *United States v. Italiano,* 894 F.2d at 1282.

I agree with the government that although the new indictment adds an additional charge (using the mail to commit a drug felony), the *conduct* upon which both the new and old indictments are. based is identical. Count 4 of the new indictment concerns the delivery of two express mail packages to the defendant, both of which allegedly contained narcotics. These deliveries were clearly at issue in the 1992 indictment, discovery was provided with respect to both of them and there can be no doubt that Fronk was on notice as to the specific conduct for which he needed to prepare his defense. It is my Report and Recommendation that Fronk's motion to dismiss one or more counts of the current indictment on the ground that such charges were filed outside the statute of limitations period be denied.

**2.** *Speedy Trial:* As stated earlier, the 1992 indictment against Fronk was dismissed **without prejudice** by Judge Elfvin for violations of the Speedy Trial Act. *See* 18 U.S.C. § 3162. In the instant motion, Fronk renews his request to dismiss the 1992 indictment *with* prejudice, thus barring the current prosecution.

It is my Report and Recommendation that Fronk's motion to dismiss the 1992 indictment with prejudice be denied. This motion was heard by Judge Elfvin, and, after consideration of the factors

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

173 F.R.D. 59

Page 15

173 F.R.D. 59
**(Cite as: 173 F.R.D. 59)**

set forth in 18 U.S.C. § 3162(a)(1), he determined that dismissal without prejudice was appropriate. The government agrees that Judge Elfvin's decision to dismiss the 1992 indictment without prejudice has been preserved for appeal should Fronk be convicted of the current charges. There is no legitimate reason for this Court to recommend reversing Judge Elfvin's prior decision and, accordingly, I decline to do so.

### C. *MOTION TO SUPPRESS FRUITS OF SEARCH WARRANTS*

Fronk moves to suppress various items of evidence seized when law enforcement officials executed two search warrants issued by Magistrate Judge Maxwell on September 4, 1990. The first warrant sought permission to search an Express Mail package addressed to Fronk's residence. The warrant was supported by the affidavit of Postal Inspector**\*73** Molly McMinn. McMinn's affidavit not only sets forth various facts that led her to believe the package contained controlled substances, but also represented to the Court that a trained canine had positively alerted to the package for the presence of narcotics. I find Judge Maxwell had ample probable cause to support the warrant for searching the package. *See United States v. Williams,* 69 F.3d 27, 28 (5th Cir.1995) (positive dog alert creates probable cause to search), *cert. denied,* 516 U.S. 1182, 116 S.Ct. 1284, 134 L.Ed.2d 229 (1996); *United States v. Lingenfelter,* 997 F.2d 632, 639 (9th Cir.1993) (canine sniff alone can supply probable cause); *United States v. Waltzer,* 682 F.2d 370, 372 (2d Cir.1982) (trained canine's alert to luggage provided probable cause), *cert. denied,* 463 U.S. 1210, 103 S.Ct. 3543, 77 L.Ed.2d 1392 (1983).

The Express Mail package was searched and approximately one ounce of cocaine was found wrapped in duct tape inside. Based on this first search, the agents sought a second search warrant from Judge Maxwell. This warrant sought to make a controlled delivery of the package to Fronk's residence and then search the home. The warrant application was supported by the affidavit of DEA Agent Peterson and sought permission to search for

cocaine, currency, packaging materials, personal telephone books, envelopes, receipts and other items evidencing violations of federal controlled substance offenses. Judge Maxwell approved the application and signed the warrant. However, the portion of the warrant which is intended to describe the items to be seized contained only the typewritten phrase: "QUANTITY OF CONTROLLED SUBSTANCE, COCAINE". Judge Maxwell signed the warrant as presented. Fronk moves to suppress any and all items seized from his residence aside from the package which contained the cocaine. Fronk argues that because the warrant itself only authorizes the agents to seize controlled substances, other items seized by the agents executing the warrant were seized in contravention of the warrant and must be suppressed.

Having reviewed the warrant application, I have little difficulty in finding that it contains probable cause to seize the items that were in fact seized. Warrants to search for drug paraphernalia and records based on controlled deliveries of drugs have been upheld in numerous cases. *See United States v. Rey,* 923 F.2d 1217, 1220-1221 (6th Cir.1991) (collecting cases). The issue here is not one of probable cause, but rather whether the description of the items to be seized in the warrant application can supplement the description in the warrant itself.

Under the facts presented here, I am convinced that a common sense reading of both the warrant and the application permitted the agents to legitimately seize not only drugs but also drug paraphernalia and records. Agent Peterson's affidavit was submitted to and signed by Judge Maxwell. Although the warrant does not specifically incorporate by reference Agent Peterson's supporting affidavit, see *United States v. Towne,* 997 F.2d 537 (9th Cir.1993) , Agent Peterson did participate in the execution of the warrant and was well aware of the scope of the intended search. *See United States v. Bianco,* 998 F.2d 1112, 1116-1117 (2d Cir.1993) (formal requirements of incorporation and attachment not required where the involved parties were aware of the scope of and limitations on the search), *cert. denied,* 511 U.S. 1069, 114 S.Ct. 1644, 128 L.Ed.2d 364, (1994). Moreover, even if the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

173 F.R.D. 59

173 F.R.D. 59
**(Cite as: 173 F.R.D. 59)**

non-contraband items seized were outside the authority of the warrant, the agents executing the search were permitted to seize incriminating evidence (i.e. scales, drug cutting agents, etc.) found while executing a warrant to search for narcotics. *See Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). Finally, nothing in the record indicates that the agents executing the search of Fronk's residence lacked a good faith belief that the warrant permitted them to seize all of the items listed in the application and affidavit that had been signed by Judge Maxwell. *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984). For these reasons, it is my Report and Recommendation that Fronk's motion to suppress evidence seized from the two search warrants signed by Judge Maxwell be denied.

### *74 CONCLUSION

It is my Report and Recommendation that (1) Fronk's motion to suppress statements he made to law enforcement on the evening of his arrest be **granted;** (2) Fronk's motion to suppress any evidence derived from inadmissible plea discussions be **denied;** (3) Fronk's motions to dismiss the indictment on speedy trial and statute of limitations grounds be **denied** and (4) Fronk's motion to suppress evidence seized during the execution of two search warrants on September 4, 1990 be **denied.**

W.D.N.Y.,1997.
U.S. v. Fronk
173 F.R.D. 59

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.