Testimony could have been elicited to show he decided the dog had "alerted" only after the defendant refused him further entry into the vehicle and that the incident occurred after other officers attempted to distract defendant while the unauthorized search took place. Instead, Ms. Veloria was portrayed as a bully who only wanted the search stopped because the dog was alerting; clearly, this was not the case.

Ms. Veloria was prejudiced by her defense counsel's failure to file a timely Suppression Motion because she was tried on a two count indictment rather than only one, which would have been the case if the suppression arguments had been advanced and granted. (See exhibit 8)

If is reasonable to believe that if Ms. Veloria had been tried only on the count relating to the search of the residence, she would have been acquitted. The record clearly demonstrates that even in the absence of the defense presenting witnesses or evidence, the jury deliberated for four days, and on the second day, indicated that they had "voted on all counts and could not come to a verdict, that is unanimous". [91] Therefore, three days before the verdict, Ms. Veloria's jury was reportedly deadlocked. It cannot be said with certainty that if Ms. Veloria has proceeded to trial with only one count rather than two, her jury would have arrived at the same verdict.

Ms. Veloria is not the party responsible for the failure to raise this issue on direct appeal, as she prepared a pro se appeal brief (See Exhibit 35) containing this very issue therein.[92] Ms. Veloria asserts that during the preparation of her appeal, she repeatedly insisted, both verbally and in writing, that her court appointed appellate attorney preserve all of her appellant issues that are contained within her pro se brief.[93] Furthermore, Ms. Veloria's instance of specific issues being raised on direct appeal is documented in attorney Samuel P. King, Jr.'s motion to withdraw

---

[91] Dkt 133, Note from jury, filed 6/10/03
[92] See Exhibit 35, Veloria pro se appeal brief, p. 64
[93] Ms. Veloria mailed a copy of her pro se opening brief on 12/27/04 to appellate counsel. This brief was comprehensive and in compliance with court rules. Appellate counsel also received a copy of said brief on disk well in advance of Ms. Veloria's opening brief deadline of 2/23/2005.

as counsel on appeal filed in the Ninth Circuit Court of Appeals,[94] as well as Ms. Veloria's pro se response to said motion (See Exhibit 33).[95]

In *Ratliff v. United States*,[96] cause was shown for purposes of a motion under 28 U.S.C. § 2255 because counsel rebuffed petitioner's request to raise issue on direct appeal. Also, it should be noted that in October of 2004, Ms. Veloria was served with an order from a Ninth Circuit Court of Appeals Appellate Commissioner bearing the words "Appellant is advised that counsel is vested with the authority to decide which issues should be raised on appeal."[97]  As such, Ms. Veloria should not be held accountable for her counsel's failure to raise the issues contained within written communications to counsel, as well as those within her pro se appeal brief.

Ms. Veloria requests reversal.

## CLAIM NUMBER 6

### MS. VELORIA'S WAIVER OF HER FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION WAS UNKNOWING, AS COUNSEL INCORRECTLY INFORMED HER OF THE STATEMENTS USE TO THE GOVERNMENT AT TRIAL

First Assistant Federal Public Defender Alexander Silvert represented Ms. Veloria at a hearing on his Motion to Suppress Evidence[98] which the Court construed as a Motion for a Frank's Hearing.  Before arguing the motion, Mr. Silvert, determined to convince Ms. Veloria that she would be "throwing [her] life away" by proceeding to trial and that it would be in her best interest to cooperate with the government, arranged for Ms. Veloria to meet with Judge Kurren.  Mr. Silvert's reasoning behind this, as he communicated to Ms. Veloria, was something

---

[94] 03-10626 *USA v. Veloria*, filed 10/8/04
[95] 03-10626 *USA v. Veloria*, filed 10/15/04
[96] *Ratliff v. US* , 999 f2D 1023, 1026 (6TH Cir. 1993)
[97] 03-10626 *USA v. Veloria*, filed 10/18/04
[98] Dkt. 30 8/30/01

to the effect of, "You are not considering my advice; you are not willing to consider the advice of my colleagues at the Federal Defender's Office, so I have set up a meeting with a magistrate judge in hopes that you will have a better understanding of what you're up against."[99]

At the subsequent meeting, Judge Kurren and Ms. Veloria discussed the fact that Ms. Veloria faced two counts of drug distribution that occurred four months apart, and the fact that an acquittal on both counts was unlikely. Judge Kurren also articulated the overwhelming odds against a criminal defendant in Federal District Court. He further advised Ms. Veloria something to the effect of, "Mr. Silvert is a good attorney and he's been around a long time, so if he is advising you to plea bargain and cooperate, then that is what would be in your best interest."

After the hearing on the Motion to Suppress,[100] and hours of attorney-client discussions, Ms. Veloria agreed to participate in a debriefing, provided she wouldn't be required to name the source of the cocaine seized, as she was not willing to implicate a close family member. Mr. Silvert, an experienced criminal defense attorney of seventeen years explained what he believed to be the terms under which the session would take place. Mr. Silvert gave his assurance that pursuant to the discussions within his meeting, Ms. Veloria would not be subjected to additional charges unless she committed perjury.

On September 3, 2001, Labor Day,[101] Ms. Veloria, along with Mr. Silvert, met with Assistant U. S. Attorney Brady and I.R.S. Agents Jason Pa and Bernadette Reghi. In advance of the "debriefing," Ms. Veloria understood, through Mr. Silvert, this to be a meeting for her benefit; the only drawback being that she could not, in the future, testify to a different version of facts without repercussions. After quickly reviewing a three-page proffer agreement, Mr. Silvert

---

[99] Ms. Veloria did not request this meeting, rather, she viewed it as a requirement of her pretrial release; Mr. Silvert was the nexus by which she received her court dates and conditions of release.
[100] Dkt. 35, Denied, 8/30/01.
[101] As Ms. Veloria's flight returning to Anchorage was scheduled that evening.

reiterated to Ms. Veloria, in layman's terms, that nothing she said in the meeting would be used against her unless she testified at trial and committed perjury. The proffer was signed by all parties and, after giving a brief cautionary speech,[102] the Assistant U.S. Attorney vacated the room. Agent Pa proceeded to inquire into alleged activity, primarily dealing with monetary transactions.[103]

At some point after this debriefing, Mr. Silvert informed Ms. Veloria that he had received a proposed plea agreement from Assistant U. S. Attorney Brady. Said plea agreement would require her to waive indictment and plead guilty to an additional charge of conspiracy to commit money laundering.[104] This came as a shock to Ms. Veloria as her understanding was that the government was precluded from using information obtained directly from her to secure additional convictions against her. Mr. Silvert further advised Ms. Veloria that there were several clauses of the plea agreement that he felt should be removed, but that when requested to do so, Assistant U.S. Attorney Brady refused. Under the circumstances, Mr. Silvert advised Ms. Veloria to plead to the two count indictment without a plea agreement relying on safety valve, acceptance of responsibility, pre-indictment delay, and significant post-offense rehabilitation to minimize her prison sentence.

On January 23, 2002, Mr. Silvert withdrew as counsel and Attorney Emmanuel Guerrero was appointed to represent Ms. Veloria. On July 5, 2002, Attorney Guerrero withdrew as counsel and Winston Ling was appointed to represent Ms. Veloria. At some time after Winston Ling was court appointed to represent Ms. Veloria, she requested of him a copy of the report written pursuant to her 9/03/01 debriefing. Upon receiving I.R.S. Agent Pa's debriefing report,

---

[102] Saying "I can be your best friend or your worst enemy"
[103] It was only after Mr. Silvert's urging that Agent Pa inquired into Ms. Veloria's actions. It appears this was done to qualify Ms. Veloria for safety valve at sentencing, which she was not granted.
[104] See Exhibit 16, Information (Variation of Original Indictment) and Waiver of Indictment for Conspiracy to Commit Drug Money Laundering

via facsimile, Ms. Veloria was shocked and appalled at the overwhelming amount of inaccuracies, misstatements, conflicting information, and exaggerations contained in the report. It was at this point that Ms. Veloria phoned her attorney Ling and informed him that she would not be considering any additional plea negotiations on account of the inaccurate debriefing report.

With respect to the above-mentioned facts and case law, Ms. Veloria was prejudiced in her subsequent trial due to the prosecution's misconduct and her attorney's ineffective assistance in seeking a remedy for the failure to comply with the order to compel the original notes. Counsel for Ms. Veloria was forced to restrict his cross-examination to those questions which he knew could not possibly elicit a response contradictory to the alleged statements within Agent Pa's memorandum, although the issue of discrepancies had previously been raised.

Because of the Government's failure to comply with the order to compel discovery, counsel for Ms. Veloria should have put forth a motion to the Court requesting a remedy of suppression; the above-mentioned claims coupled with the argument that the statement was given "unknowing" of its use to the Government at trial should have resulted in pretrial suppression of said statement.[105] Instead, the contents of Agent Pa's memorandum loomed over Ms. Veloria throughout her entire trial, as the transcripts show. Mr. Ling communicated this to the Court on several occasions by comparing it to being handcuffed: "I feel like I'm bound." "I have one arm tied behind my back, or maybe two arms."[106] Defense Counsel communicated that he could not call witnesses for the defense[107] and could not effectively examine the Government's witnesses[108] because of the contents of Agent's Pa's memorandum (Proffer

---

[105] See Exhibit 14, p. 2
[106] TR 6/4/03, p. 150, l. 1-6; p. 155, l. 10-14
[107] TR 6/4/03, p. 194, l. 11-12
[108] TR 6/4/03, p. 29-32; TR 6/4/03, p. 194-200

Statement). Counsel for Ms. Veloria stated that with respect to questioning of witnesses, he was "holding back"[109] to which the Court replied, "It was designed to hold you back."[110] Defense counsel explained that he didn't know what the "boundaries"[111] were.

Ms. Veloria's trial was permeated with discussions centered around this issue, and although Agent Pa's memorandum was not introduced at trial, it is clear that its existence played a major role in hampering the defense. Ms. Veloria attempted to persuade her counsel, Mr. Ling, to bring this issue before the Court (see Exhibits 12, 13 and 14). In fact, this issue was brought before the Court, albeit brief, and the Court granted Mr. Ling's Motion to Compel. However, Mr. Ling was subsequently ineffective when he failed to follow up by seeking a remedy for what amounted to a clear violation of Ninth Circuit holdings as discussed above, although Ms. Veloria expressly requested him to do so (see Exhibit 14, p. 2).

Upon informing Attorney Ling that she wished to proceed to trial, Ms. Veloria was, for the first time, advised that her debriefing statement could be used against her even if she did not testify at trial. Ms. Veloria encouraged Attorney Ling to contact her previous counsel to verify her understanding of the terms under which her statement was given.

With respect to this issue Ms. Veloria herein affirms the following facts:

1. Federal Public defender Alexander Silvert advised me to participate in a "debriefing" with the government to reduce my sentencing range.

2. Mr. Silvert advised me that my statements would be used against me at trial if, and only if, I testified to facts different from those offered during the debriefing session.

---

[109] TR 6/4/03, p. 32., L. 8-16
[110] TR 6/4/03, p. 34, L. 16-21
[111] TR 6/4/03, p. 34, L. 22-25

3. Mr. Silvert did not inform me that this debriefing statement could restrict in any way any rights I might have at trial to have my attorney make openings, summations, engage in cross examination or call witnesses on my behalf; AUSA Brady did not inform me of this, nor did I understand the proffer agreement to affect these rights.

Rule 11 (e) (6) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence contain substantively identical provisions that exclude from admission into evidence statements made by a criminal defendant during pleas discussions. In *United States v Mazzanotto*, the Supreme Court held that "absent some affirmative indication that the agreement was entered in to unknowingly or involuntarily, and agreement to waive the exclusionary provisions of the plea statement Rules is valid and enforceable."[112]  The waiver at issue in Mezzanatto extended only to the use of the defendant's pleas statements" to impeach any contradictory testimony he might give at trial if the case preceded that far"[113]

In applying a "knowing and voluntary" standard in determining whether a defendant has waived his rights under exclusionary rules for plea statements, the Supreme Court adopted the heightened standard reserved for waiver of rights essential to a fair trial and the reliability of the adjudicative process.[114]

"Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences".[115]

---

[112] 513 U.S. 196, 210, 115 S. Ct.797, 130 L.Ed.2d 697 (1995)
[113] 513 U.S. at 198
[114] *United States v Fronk*, 173 F.R.D. 59, 70 (W.D.N.Y.); See also Brady vs. United States, 397 U.S. 742, 748, 90 S.CT. 1463, 25 L.Ed. 2d 747 (1970)
[115] *United States v Ready*, 82 F.3d 551, 556-58 (2d CIR. 1996)

The second Circuit has held that a waiver of such essential rights should be enforced only "if the record of "clearly demonstrates" that the waiver was both knowing (in the sense that the defendant fully understood the fully potential consequences of his waiver) and voluntary[116]

In addition to applying the knowing and voluntary standard, the second circuit has held that agreements containing waivers of essential rights, such as pleas agreements, are to be construed narrowly because they "are unique contracts in which special due process concerns for fairness and the adequacy of procedural safeguards obtain."[117]

At a hearing to suppress Ms. Veloria's statement on 11/26/02, her prior attorney, Mr. Silvert appeared before the court and admitted that, in fact, it was the position of the Defender's Office that a proffered statement could only be used to impeach a testifying defendant. A discussion went as follows:

> MR. SILVERT: Which is, number one, the government cannot use it in their case in chief. The government can use it to impeach the defendant if she takes the stand and says something different. I do not believe the government can use it against a non- testifying defendant. In other words, I don't believe they can use her statement to impeach a defense witness.

> THE COURT: Can you take a look that paragraph four, where, four lines from the bottom, it says, "to rebut any evidence offered by or on behalf of Ms. Veloria in connection with the trial of the above captioned matter."

> MR. SILVERT: Right. Your honor, we've read that I did inform the lawyer if she took the stand and testified that they could use her own statement against her. We've never interpreted that to mean that they could use her statement against anyone else, and that's what we informed our client. I'll just tell you what our interpretation has been and what I informed Ms. Veloria, and it may not be correct, but this is what it has been, that   we have taken that to mean that the government cannot and will not use her statement in any way except if she takes the witness stand and testifies differently from what she said.
>     We have never thought about the fact that the government would take the position it could use those statements in rebuttal if the defense offered any evidence whatsoever from any source. We've never – I can tell you, in the

---

[116] Ready, 82 F.3d at 557
[117] Ready, 82 F.3d at 556, 558-59 (internal citations in quotations omitted)

office we've never discussed that possibility. We never interpreted this to mean that. And I certainly I did not inform Ms Veloria before going into the debriefing. What I informed her that any statement she made could be used against her if she took the stand in any motion or anywhere and testified differently.[118]

The Proffer Agreement was wrongfully explained and it was incompletely explained. And what was not explained to Ms. Veloria was that the exception contained in paragraph 4 of the Proffer Agreement had the potential of engulfing the Government's promise in Paragraph 1 that her statements would not be offered in evidence during the government's case-in-chief. The effect of Paragraph 4 renders Paragraph 1 superfluous. No one ever explained to Ms. Veloria that the Proffer Agreement might be triggered by the exercise of her Sixth Amended Right to cross-examination, [119]

Given the testimony of Ms. Veloria's Counsel confirming that he misinformed her as to the terms under which her statement would be given, it is clear that said statement should have been excluded from being used against her at trial, except for impeachment purposed should she testify.

The issue of whether could waive the protections of Rule 11 (e)(6) was recently addressed by the United States Supreme Court in *United States v Mezzanatto*.[120] In Mezzanatto, the court held that "absent some affirmative indication that the agreement was entered into unknowingly or involuntarily, an agreement to waive the exclusionary provisions of the plea-statement Rules is valid and enforceable."[121]

By adopting a "knowing and voluntary" standard in determining whether a defendant has waived his right under Rule 11(e)(6), the Court appears to have opted for utilizing

---

[118] (Tr. 11-26-02, P..13-16)
[119] *Davis v Alaska*, 415 U.S. 308, 316-17, 94 S.Ct 1105, 39 L.Ed.2d 347 (1974), *Herring v New York*, 422U.S. 853, 860, 95 S.Ct. 2550, 45 L.Ed.2d 593 (975). *Taylor v Illinois*, 484 U.S. 400, 408, 108 S.Ct. 646, 98 L.Ed. 98 (1988)
[120] 513 U.S. 196, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995).
[121] Id. At 210, 115 S.Ct. at 806

the stringent standard reserved for waiver of right essential to a fair trial and the reliability of the truth-determining process. That is, waiver will be found only where the record demonstrates "an intentional relinquishment or abandonment of a known right." [122]

The record clearly reflects that Ms. Veloria's waiver was unknowing.

Ms. Veloria requests reversal.

## CLAIM NUMBER 7

**MS. VELORIA'S SIXTH AMENDMENT CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED WHEN HER FEDERAL PUBLIC DEFENDER WAS INEFFECTIVE IN HIS UNDERSTANDING AND ADVICE REGARDING A PROFFERED STATEMENT AND ITS LIMITATION AT TRIAL.**

On October 21, 2002, court appointed defense counsel Ling filed a Motion to Suppress Statements. [123] The motion sought to suppress "statements from Defendant obtained during an interview on September 3, 2001 at the IRS CID Room 2-183, 300 Ala Moana Blvd., Honolulu, Hawaii 96813." The motion was supported by a declaration of defense counsel Ling which stated, in part, that the Assistant U.S. Attorney (Mr. Brady) intended to use Ms. Veloria's prior cooperation statement against her at trial "if Defendant calls witness Darryl Wisneski or any other witness who testifies contrary to evidence provided during the interview." The declaration of counsel went on to state:

> 2. I spoke to Defendant regarding Mr. Brady's intentions and she informed me that she was informed by her then counsel Alex Silvert prior to the interview that the statements she provided will not be used against her at trial.
> 3. I conferred with Federal Public Defender Alex Silvert who informed me that it was his understanding that Thomas Brady could not use the statements that were made by Defendant during the interview on September 3, 2001.

---

[122] Johnson v Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)
[123] (Dkt. 80, filed 10/21/02)

It should also be noted that pursuant to defense counsel's Motion to Compel Discovery, the Court ordered the government to turn over the agents' notes "if such notes exist."[124]  Neither of the agents' notes were given to the defense.  On November 26, 2002 the Court denied defense counsel's Motion to Suppress.  Ms. Veloria's assertions regarding the falsities of Agent Pa's debriefing report, although made clear to defense counsel, were not raised.

The district court filed its Order Denying Motion to Suppress Statements.[125]  Relevant portions of the Court's order stated:

> On September 3, 2001, Veloria, then represented by someone other than her present attorney, met with that attorney, special agents from the Internal Revenue Service, and an Assistant United States Attorney.  Veloria and the attorney then representing her signed a proffer letter offered by the government.  At the interview, Veloria allegedly made numerous self-incriminating statements, including details regarding Veloria's drug distribution activities. Veloria allegedly stated that the drugs recovered from her house were hers, and that she intended to deliver the drugs recovered from her truck to a drug supplier.
>
> The proffer letter laid out the terms under which Veloria provided information to the government.  The agreement stated that Veloria would answer the government's questions truthfully and completely and that the prosecution would not offer Veloria's statements as part of its case-in-chief at trial or against Veloria at sentencing.  Paragraph four of the proffer agreement contained an exception to the bar on the government's use of her statement:
>
> [T]he prosecution may use statements made by VELORIA at said meetings, and all evidence obtained directly and indirectly from those statements, for the purpose of cross-examination should VELORIA testify in contradictions to information given during said meetings, or to rebut any evidence offered by or on behalf of VELORIA in connection with the trial of the above-captioned matter or at [her] sentencing following trial, should such evidence be contrary to the information given by VELORIA during said meetings[.]
>
> On the present motion, Veloria argues that the government may use her statements only to rebut any contrary testimony given by her at trial should she choose to testify, but that the government may not use her statements to rebut testimony given by other witnesses testifying on her behalf.  The government agrees that it may not use Veloria's statements in its case-in-chief, but it contends that the proffer agreement allows

---

[124] (Dkt. 89, 11/13/02)
[125] (Dkt. 94, 11/27/02)

the government to use Veloria's statements not only to rebut testimony by Veloria but also to rebut contrary testimony given by another witness.

(Order, *id.*, pp. 2-3)

The Court's opinion notes that defense counsel Ling raised two reasons at the hearing why Ms. Veloria's statements should be suppressed. First, defense counsel Ling argued that the proffer letter was ambiguous. The Court rejected this argument. Second, defense counsel Ling argued that Ms. Veloria's "counsel at the time was ineffective because he advised her that her statements could only be used to rebut contradicting testimony she herself gave at trial." On this second argument, the Court ruled as follows:

> Veloria's second argument also fails because she does not offer, nor has this court found, any authority supporting the proposition that suppression of her statements is the proper remedy for the alleged ineffective assistance of the attorney who represented her at the time of the proffer. At the court's request, that former attorney attended the hearing on Veloria's motion. He informed this court that, at the time of the interview, he had told Veloria that, under the proffer agreement, her statements could only be used against her in the event she testified on her own behalf at trial. He said he had not told Veloria that her statements could be used to rebut the testimony of other witnesses; in fact, the attorneys' understanding of the proffer agreement was that Veloria's statements could be used only to rebut her own testimony. The court expresses no opinion as to whether the failure to inform Veloria that her statement could be used to rebut testimony by others would constitute ineffective assistance of counsel in the event Veloria is convicted and challenges her sentence on that ground. Regardless of what Veloria's prior counsel did or did not tell her, this court is not persuaded that the government should be punished for an alleged failure by defense counsel.

With respect to the above-mentioned facts and case law, Ms. Veloria was prejudiced in her subsequent trial due to the prosecution's misconduct and her attorney's ineffective assistance in seeking a remedy for the failure to comply with the order to compel the original notes. Counsel for Ms. Veloria was forced to restrict his cross-examination to those questions which he knew could not possibly elicit a response contradictory to the alleged statements within Agent Pa's memorandum, although the issue of discrepancies had previously been raised.

Because of the Government's failure to comply with the order to compel discovery, counsel for Ms. Veloria should have put forth a motion to the Court requesting a remedy of suppression; the above-mentioned claims coupled with the argument that the statement was given "unknowing" of its use to the Government at trial should have resulted in pretrial suppression of said statement.[126]  Instead, the contents of Agent Pa's memorandum loomed over Ms. Veloria throughout her entire trial, as the transcripts show.  Mr. Ling communicated this to the Court on several occasions by comparing it to being handcuffed: "I feel like I'm bound." "I have one arm tied behind my back, or maybe two arms."[127]  Defense Counsel communicated that he could not call witnesses for the defense[128] and could not effectively examine the Government's witnesses[129] because of the contents of Agent's Pa's memorandum (Proffer Statement). Counsel for Ms. Veloria stated that with respect to questioning of witnesses, he was "holding back"[130] to which the Court replied, "It was designed to hold you back."[131]  Defense counsel explained that he didn't know what the "boundaries"[132] were.

Ms. Veloria's trial was permeated with discussions centered around this issue, and although Agent Pa's memorandum was not introduced at trial, it is clear that its existence played a major role in hampering the defense. Ms. Veloria attempted to persuade her counsel, Mr. Ling, to bring this issue before the Court (see Exhibits 12, 13 and 14).  In fact, this issue was brought before the Court, albeit brief, and the Court granted Mr. Ling's Motion to Compel.  However, Mr. Ling was subsequently ineffective when he failed to follow up by seeking a remedy for what

---

[126] See Exhibit 14, p. 2
[127] TR 6/4/03, p. 150, l. 1-6; p. 155, l. 10-14
[128] TR 6/4/03, p. 194, l. 11-12
[129] TR 6/4/03, p. 29-32; TR 6/4/03, p. 194-200
[130] TR 6/4/03, p. 32., L. 8-16
[131] TR 6/4/03, p. 34, L. 16-21
[132] TR 6/4/03, p. 34, L. 22-25

amounted to a clear violation of Ninth Circuit holdings as discussed above, although Ms. Veloria

expressly requested him to do so (see Exhibit 14, p. 2).

      Ms. Veloria requests reversal.

(Opinion, *id.*, pp. 6-7)

## CLAIM NUMBER 8

**MS. VELORIA'S FIFTH AMENDMENT RIGHT AGAINST SELF INCRIMINATION
AND HER SIXTH AMENDMENT TO EFFECTIVE ASSISTANCE OF COUNSEL
WERE VIOLATED WHEN DEFENSE COUNSEL WAS INEFFECTIVE IN RAISING
MS. VELORIA'S UNKNOWING WAIVER ISSUE**

      At the Suppression hearing on November 26, 2002, prior to hearing defense counsel's

argument, the Court stated:

> ...I will confess that in reading your motion I wasn't really sure, because it was so
> brief, what you were getting at. Your motion consisted of your declaration – citing Mr.
> Silvert as saying that some statement should not be used, and that was the extent of the
> motion....[133]

      After Mr. Silvert informed the Court that Ms. Veloria agreed to this debriefing with the

understanding that her statement could not be used against her unless she testified and committed

perjury,[134] further discussions went as follows:

> THE COURT: Well, let me say this. What is the – why is suppression the
> remedy for what you are claiming? If I'm correct in how I read this proffer letter, which
> is different from how Mr. Silvert had conceived of it, why is suppression the remedy?
>     I mean, when you think that a lawyer said something or should have said more,
> what's the law that says the evidence should be suppressed?
>     I mean, typically, evidence is suppressed because we say the government or a
> government agent did something wrong or failed to do something it had a duty to do. But
> in this case you're saying, gee, she didn't understand that the court would read this
> document differently from Mr. Silvert and she relied on how Mr. Silvert read it, which in
> fact may be wrong, and she proceeded. Why is the remedy suppression? Give me some
> law that says the remedy then is suppression. Because I don't think that is the typical
> procedural way.
>     MR. LING: You know, I had that problem there. I wasn't sure. But in order to
> meet the deadline of things, I had to submit it right away. I knew the trial was coming

---

[133] TR 11/26/03, pp. 3-4.
[134] TR 11/26/02, Mr. Silvert, pp. 16-17

up. I wasn't sure whether or not that was the proper vehicle myself. That's why it was not as lengthy as it should be.

THE COURT: Because otherwise you're penalizing the government for something the government did not do wrong. That doesn't seem – fair.

MR. LING: You see, if we were to go to trial – then what happens? Then we go to trial and then it goes on appeal.

THE COURT: No. So, first, if she gets acquitted then there's no problem. If she gets convicted, then you certainly can raise the ineffective assistance of counsel issue at the time of sentencing, it seems to me. But I don't know why suppression is the remedy. I mean, suppression – you now, I haven't been on this bench that long but long enough to have had dozens of motions to suppress that I've had to rule on, and I don't know of one where someone argued for suppression based on something other than what the government's wrongdoing was alleged to have been.

MR. LING: You see, the thing is, though, I don't want to waste the court's time, everybody's time by just going to trial and getting this overturned and coming back again for trial again based upon something that went wrong really early. I'm trying to avoid all of this. I'm trying to fix it, you know, and I'm trying to get – I don't know. I was thinking maybe interlocutory appeal maybe, before trial, or something, to settle this matter. …

THE COURT: I think this statement comes in and gets used against her to rebut even another witness that may come in. That's how I'm reading this agreement.

Now, you know, you'd have to take that into account. But in addition, I'm a little concerned about what's the legal basis for suppression in this case. So give me some authority that, even if you're right, would justify suppression.

MR. LING: Can we further this hearing, Your Honor, so I can go ahead and –

THE COURT: No, we cannot because I will say this; this was set long in advance. I had a hard time giving you a slot. I have told you before that – I'm sure I told this to you specifically before.

MR. LING: Right.

THE COURT: That my schedule is very full right now, very full. So you have to treat my hearing date that you have with me as golden. You can't just give it up and think that I can find another slot.

MR. LING: Right.

THE COURT: I am very, very, very busy, more so than I have ever been, and I cannot just freely move these things around. So it seems to be why would I continue it? Are you going to give me something new?

MR. LING: You know what?

THE COURT: I mean, you knew this was coming up.

MR. LING: I don't think there actually is an authority for it. I don't know if this is the proper vehicle myself, and I kind of doubt it because there is no government illegal – anything done illegally by the government as far as I can see. They were forthright in the proffer letter, it's just that her counsel might have advised her incorrectly or had not advised her sufficiently for her to do the interview. And that's the only basis I can see right now. And the court is correct, you know, it might be an appealable issue at the end of a matter for sentencing purposes or maybe for appellate purposes, but not for a pretrial motion probably. I don't know. That might not be valid. But the thing is that was my

- 65 -

concern, I wanted to raise it to the court before the trial, if there is going to be a trial, because it's so important for this matter to be resolved. ... but, you know, Your Honor, I think it's clear that there was no agreement of the minds regarding this contract between the government and Ms. Veloria. Obviously, her attorney is thinking otherwise than the letter. That's what I'm saying.[135]

It is clear from reading the above discussion that court appointed defense counsel had not researched this issue, and in fact, was not even sure what he wanted the Court to do about it. This hearing took place more than six months before Ms. Veloria's trial. Although defense counsel realized that there was no "agreement of the minds,"[136] he chose to take no further action seeking a remedy for Ms. Veloria; a decision which had ominous consequences.

Counsel's failure to pursue a remedy at this point demonstrates his ineffectiveness. It is objectively reasonable to expect that an attorney would investigate and attempt to seek relief for a defendant in a situation such as this; instead, court appointed defense counsel did nothing. This issue monopolized and set the tone for Ms. Veloria's entire trial. This prejudiced Ms. Veloria because the defense couldn't call any witnesses and were wary of impeaching the government's witnesses for fear that it would "open the door" for the government to introduce Agent Pa's misstatements that were not knowingly given in the first place.

Had Ms. Veloria's counsel competently pursued relief on this issue pretrial, this statement would have been excluded from use against her except for impeachment if she took the stand. During trial, the Court brought up the analogous cases in discussions with *United States v. Lauersen*[137], and *United States v. Fronk*[138]. This demonstrates that these cases were available to counsel had he attempted to advocate for his client and pursue relief in a timely manner after the

---

[135] TR 11/26/02, pp. 19-24
[136] TR 11/26/02, Mr. Ling, p. 24
[137] 2000 Westlaw 169 3538 (S.D.N.Y. 2000)
[138] 173 F.R.D. 59 (W.D.N.Y. 1997)

November 26, 2002 decision but before the commencement of trial on June 3, 2003.  In arguing

against the defense, Assistant U. S. Attorney Brady said:

> Judge, if counsel is now categorizing this as an extension of a motion to suppress, it's obviously untimely, it should be waived.  And we have commenced with the trial.  He had an opportunity – this same issue was litigated back in November last year.  He could have taken it up on appeal.  He chose not to.  Again, whether or not that triggers other remedies for the defendant in this case is not before the Court.  But what is before the Court is an untimely motion to suppress.  It should be waived.  Let's go forward with the trial…[139]

With respect to the above-mentioned facts and case law, Ms. Veloria was prejudiced in

her subsequent trial due to the prosecution's misconduct and her attorney's ineffective assistance

in seeking a remedy for the failure to comply with the order to compel the original notes.

Counsel for Ms. Veloria was forced to restrict his cross-examination to those questions which he

knew could not possibly elicit a response contradictory to the alleged statements within Agent

Pa's memorandum, although the issue of discrepancies had previously been raised.

Because of the Government's failure to comply with the order to compel discovery,

counsel for Ms. Veloria should have put forth a motion to the Court requesting a remedy of

suppression; the above-mentioned claims coupled with the argument that the statement was

given "unknowing" of its use to the Government at trial should have resulted in pretrial

suppression of said statement.[140]  Instead, the contents of Agent Pa's memorandum loomed over

Ms. Veloria throughout her entire trial, as the transcripts show.  Mr. Ling communicated this to

the Court on several occasions by comparing it to being handcuffed:  "I feel like I'm bound."  "I

have one arm tied behind my back, or maybe two arms."[141]  Defense Counsel communicated that

he could not call witnesses for the defense[142] and could not effectively examine the

---

[139] TR 6/5/03, p. 11
[140] See Exhibit 14, p. 2
[141] TR 6/4/03, p. 150, l. 1-6; p. 155, l. 10-14
[142] TR 6/4/03, p. 194, l. 11-12

Government's witnesses[143] because of the contents of Agent's Pa's memorandum (Proffer Statement). Counsel for Ms. Veloria stated that with respect to questioning of witnesses, he was "holding back"[144] to which the Court replied, "It was designed to hold you back."[145] Defense counsel explained that he didn't know what the "boundaries"[146] were.

Ms. Veloria's trial was permeated with discussions centered around this issue, and although Agent Pa's memorandum was not introduced at trial, it is clear that its existence played a major role in hampering the defense. Ms. Veloria attempted to persuade her counsel, Mr. Ling, to bring this issue before the Court (see Exhibits 12, 13 and 14). In fact, this issue was brought before the Court, albeit brief, and the Court granted Mr. Ling's Motion to Compel. However, Mr. Ling was subsequently ineffective when he failed to follow up by seeking a remedy for what amounted to a clear violation of Ninth Circuit holdings as discussed above, although Ms. Veloria expressly requested him to do so (see Exhibit 14, p. 2).

Court appointed defense attorney's errors throughout Ms. Veloria's trial, in relation to this issue; seriously undermine any confidence in the outcome of the trial. The fact that this issue has been waiting to be revisited for more than four and a half years is another injustice in itself.

Ms. Veloria request reversal..

---

[143] TR 6/4/03, p. 29-32; TR 6/4/03, p. 194-200
[144] TR 6/4/03, p. 32., L. 8-16
[145] TR 6/4/03, p. 34, L. 16-21
[146] TR 6/4/03, p. 34, L. 22-25

## CLAIM NUMBER 9

**THE COURT FAILED TO REMEDY MS. VELORIA'S UNKNOWING WAIVER OF HER FIFTH AMENDMENT RIGHT BEFORE TRIAL THERBY RESULTING IN THE VIOLATION OF MS. VELORIA'S SIXTH AMENDMENT RIGHT TO CONFRONTATION**

During trial, the issue of the potential use of Ms. Veloria's alleged statement came up when defense counsel filed Ms. Veloria's Emergency Motion to Rescind Involuntary Waivers.[147] The reason this issue came up again was that it became clear that Ms. Veloria's alleged statement could be introduced by the government even to rebut matters raised by cross-examination of the government's witnesses. Previously, the defense had thought that the proffer would only come into evidence to rebut testimony by Ms. Veloria herself or by witnesses called by the defense.[148]

On the second day of trial, in an attempt to further demonstrate that her waiver was "unknowing" in regards to the debriefing, Ms. Veloria took the stand and was sworn in. Before any real testimony was given, the following discussion took place between court appointed defense counsel and the court.

> THE COURT: …So what is the law that allows her to waive the privilege in this selective manner? So before we get into this, think about it and tell me what your position is.
> MR. LING: Well, Your Honor, I believe that she can testify as to what was – she can waive her – what was, I guess, the amount that you can waive – what you're saying is – I think what the court is concerned about is whether or not she waives everything.
> THE COURT: Right. That's exactly right. Because she's on the stand. You want her to say things that were said to her that, if she discloses, she thinks will help her. But suppose when Mr. Brady gets up on cross-examination he asks her about the context in which those things were said between her and Mr. Silvert and part of that context has to do with things that she said to him that implicates her? Do you want her to do that? And if not, what is the law that would bar Mr. Brady from getting that kind of information?
> I don't know that there is any that let's somebody waive the privilege in this selective manner. So before she does it, I think we ought to consider that.

---

[147] (Dkts. 121-124; TR 6/3/03, pp. 192-200; TR 6/4/03, pp. 6-52, 144-171; TR 6/5/03, pp. 5-76) This motion was prepared by a paralegal in Alaska and emailed to Defense Counsel Ling on behalf of Ms. Veloria because it was apparent that counsel's intentions were to do nothing regarding the issue.

[148] TR 6/3/03, pp. 194-200; TR 6/4/03, p. 21

MR. LING: Well, I would try to be as succinct and as specific as possible as to what was her conversation between her and Mr. Silvert. And if Mr. Brady goes into other matters, then I would say that that's going beyond the scope of my direct.

THE COURT: I don't think so. How can that be if it happened in the same conversation that it is beyond the scope of the direct? I mean, you know, you understand my problem here? I mean, I want to be vigilant in making sure that all of Ms. Veloria's rights are protected but I need to be fair. And I don't know that that's an appropriate thing for you to do. It may be. It may be. There may be law that says you can do it in this way. I don't know that. And so unless you give me that law, I have this big concern about –

MR. LING: Well, Your Honor, you put this little trip wire in front of me.

THE COURT: It is not a trip wire. I didn't know you were going to put her on the stand, quite frankly.

MR. LING: I did not know you were going to ask that question. I informed the court I was willing to have my client testify and Mr. Silvert testify, then I didn't need it.

THE COURT: Well, I think when Mr. Silvert came in and testified there was little difference, okay. But because Mr. Silvert was basically saying, look, this was my understanding and this is how I operate all of the time with this understanding in my head, and that was probably not a confidential communication between him and his client because he's giving his interpretation of a legal document. This is his work product. He's free to waive how he interprets a document. And I'm talking about something different when it's coming from Ms. Veloria. I think I'm talking about the possibility of privileged communication and –

MR. LING: Okay.

THE COURT: And, you know, you got no wilting violet over here in opposition. I'm thinking he is sitting there rubbing his hands together in glee thinking, oh, boy, now I've got open season. That's my guess on how he's reacting here. And keep that in mind, where you're going. Think about the consequence of where you're going to put your next step before you do that.

MR. LING: Well, Your Honor, do you want to – if you want to do this later, and I can go ahead and do some research on this. Because if you don't know, you know, I would –

THE COURT: It's okay with me, if, knowing the risks, she wants to waive her privilege. I just want to make sure it's a knowing waiver. Because a knowing waiver is exactly what we're discussing now. So if there's going to be another waiver of rights, I want to make darn sure it is knowing and voluntarily then. But, guess what? I think Mr. Brady is sitting here listening with his ears wide open, and then we'll address that later when it comes up.

MR. LING: Okay. What I can do basically is ask her what is her understanding of the conditions.

THE COURT: You can do that. You understand that even an attorney who doesn't have as much experience as Mr. Brady does would get up and say, okay, what's the basis of your understanding? Oh. You heard it from your attorney. Tell me exactly what your attorney said and why were you talking about this. And, you know, did you ask him – you know, what about this and what about this, and so forth. I mean, I think that would probably be fair cross-examination. So that's why I'm asking: Does she have

a right to selectively waive? And if you don't know, then tell me whether you want to go forward with her on the witness stand. It is up to you. I have no business telling her she should nor should not waive the privilege, and I am not telling her whether she should or not. She's got to rely on you. You're her attorney.

      MR. LING: Can we take a time out? Can I have a few minutes to confer with my client? And maybe we should continue this hearing to another day.

      THE COURT: When? Because you're telling me you're ham strung in your cross-examination until all of these issues, which you are raising, are resolved, and yet come –

      MR. LING: Tomorrow.

      THE COURT: You came this morning not prepared, and we took a lunch break after some testimony. First of all, we talked about it for two hours, then we had two hours of testimony, then there was, you know, an hour and a half of break, then you figure out what to do but you don't have comfort, I guess, in the law. And now you want to take another break. And I'm kind of concerned because I've got this jury and breathing down my neck are the attorneys in the case that's supposed to start on Friday. And it will start on Friday. Okay. So I don't know what to do.[149]

On account of the Court's refusal to limit the scope of Ms. Veloria's attorney-client testimony and the fact that she was in the middle of trial with an ineffective attorney who was unprepared, Ms. Veloria was forced to make a decision preserving her constitutional rights. Defense counsel addressed the Court with the following statement at Ms. Veloria's insistence:

      "Again, I did speak to my client. We are invoking that privilege and we believe the Court has adequate information at this time…I just want to express what Ms. Veloria has informed me is that she feels the Court is forcing her to give up one right in order to obtain another right."[150]

The court placed Ms. Veloria in an untenable position of being forced to forfeit on right in order to exercise another,[151] and indicated the court's concern for the government's rights over those of the defendant's.[152] The court stated:

      "Poor little Ms. Veloria. The judge is making me trade one right against the other. That's the law. You have to be fair to the government. A defendant is not the only one with rights in this court room. And you have to give up that right."[153]

---

[149] TR 6/4/03, pp 154-158.

[150] TR 6/5/03, p. 67-68

[151] Tr. 6/5/03 pp 67-68 ; p. 70 , l 3-13 ; vol. 2, pp 50-61.

[152] Tr. 6/5/03 p 69 ; L 9-15

[153] Tr. 6/5/03 pp 67-68; p 70, L 3-15.

If I rule in your favor, it would greatly prejudice the government, because it can't take the kind of appeal that it could have taken if it was before trial.[154]

The court declined to let Ms. Veloria make the argument on her motion to rescind the involuntary waivers, because she would not waive her attorney client privilege,[155] disregarded, and would not consider prior counsel's statements on the record during a prior proceeding.[156] The court seemed to indicate that either the attorney-client privilege was waived during the prior proceeding, and could not be rescinded, or that it wasn't waived and she could not rely upon the statements from her former counsel that appeared in the record,[157] and appeared to rely upon this basis to deny the motion to rescind the involuntary waivers.[158] The court declined to accept an affidavit from Ms Veloria and declined to accept an affidavit from former counsel. "So – if you don't want to carry your burden which is to waive the privilege, I'm going to deny this motion."[159]

The trial court also appeared to deny the motion because the government could not take an immediate appeal if she ruled in Ms. Veloria's favor; since the government had called it's first witness and she had already been placed in jeopardy, the jury could not be dismissed and the defendant retried because of double jeopardy, the jury could not be kept waiting during the time it would take for an appeal, and it appeared the government could not take an immediate appeal after the defendant was placed in jeopardy. [160]

---

[154] Tr. 6/5/03 p 69, L 9-15.
[155] Tr. 6/5/03 p 71.
[156] Tr. 6/5/03 p 71.
[157] Tr. 6/5/03 pp 71-76.
[158] Tr. 6/5/03 p 76.
[159] Tr. 6/5/03 p 70, L 12-15.
[160] Tr. 6/5/03 pp 54-57

This issue alone deprived Ms. Veloria of her Fifth Amendment due process right to a fundamentally fair trial and of her Sixth Amendment right to counsel. The Court allowed this trial to continue, having appointed Ms. Veloria an attorney who was unprepared and unqualified to argue the merits of this particular claim of ineffective assistance of counsel.

With respect to the above-mentioned facts and case law, Ms. Veloria was prejudiced in her subsequent trial due to the prosecution's misconduct and her attorney's ineffective assistance in seeking a remedy for the failure to comply with the order to compel the original notes. Counsel for Ms. Veloria was forced to restrict his cross-examination to those questions which he knew could not possibly elicit a response contradictory to the alleged statements within Agent Pa's memorandum, although the issue of discrepancies had previously been raised.

Because of the Government's failure to comply with the order to compel discovery, counsel for Ms. Veloria should have put forth a motion to the Court requesting a remedy of suppression; the above-mentioned claims coupled with the argument that the statement was given "unknowing" of its use to the Government at trial should have resulted in pretrial suppression of said statement.[161] Instead, the contents of Agent Pa's memorandum loomed over Ms. Veloria throughout her entire trial, as the transcripts show. Mr. Ling communicated this to the Court on several occasions by comparing it to being handcuffed: "I feel like I'm bound." "I have one arm tied behind my back, or maybe two arms."[162] Defense Counsel communicated that he could not call witnesses for the defense[163] and could not effectively examine the Government's witnesses[164] because of the contents of Agent's Pa's memorandum (Proffer Statement). Counsel for Ms. Veloria stated that with respect to questioning of witnesses, he was

---

[161] See Exhibit 14, p. 2
[162] TR 6/4/03, p. 150, l. 1-6; p. 155, l. 10-14
[163] TR 6/4/03, p. 194, l. 11-12
[164] TR 6/4/03, p. 29-32; TR 6/4/03, p. 194-200

"holding back"[165] to which the Court replied, "It was designed to hold you back."[166] Defense counsel explained that he didn't know what the "boundaries"[167] were.

Ms. Veloria's trial was permeated with discussions centered around this issue, and although Agent Pa's memorandum was not introduced at trial, it is clear that its existence played a major role in hampering the defense. Ms. Veloria attempted to persuade her counsel, Mr. Ling, to bring this issue before the Court (see Exhibits 12, 13 and 14). In fact, this issue was brought before the Court, albeit brief, and the Court granted Mr. Ling's Motion to Compel. However, Mr. Ling was subsequently ineffective when he failed to follow up by seeking a remedy for what amounted to a clear violation of Ninth Circuit holdings as discussed above, although Ms. Veloria expressly requested him to do so (see Exhibit 14, p. 2).

Ms. Veloria asserts by and through this 28 U.S.C.§ 2255 the following facts: 1) Public defender Mr. Silvert incorrectly interpreted the proffer agreement and Ms. Veloria relied on his advice; her waiver was unknowing and much was waived; 2) Ms. Veloria made her trial counsel aware that IRS Agent Pa misstated critical parts of the debriefing report; notes were withheld and Ms. Veloria's claim was ignored; 3) The Court had the opportunity to correct this injustice, but because the government wouldn't have any recourse, on account of yet another ineffective counsel issue,[168] Ms. Veloria's constitutional rights had to wait until this motion under 28 U.S.C. § 2255.

Ms. Veloria requests reversal.

---

[165] TR 6/4/03, p. 32., L. 8-16
[166] TR 6/4/03, p. 34, L. 16-21
[167] TR 6/4/03, p. 34, L. 22-25
[168] "We, in fact, litigated this in November of 2002. The facts haven't changed." TR 6/5/03, p. 56

## CLAIM NUMBER 10

**MS. VELORIA'S FIFTH AMENDMENT RIGHTS TO DUE PROCESS OF LAW AND FUNDAMENTAL FAIRNESS, AND HER SIXTH AMENDMENT RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL AND TO CONFRONT WITNESSES AGAINST HER WERE VIOLATED WHEN THE COURT REFUSED TO RULE ON MS. VELORIA'S UNKNOWING WAIVER ISSUE UNTIL THE END OF HER TRIAL THEREBY PREJUDICING ALL OF THE DEFENSES CROSS EXAMINATIONS**

The United States Constitution embodies a fundamental "right to present the defendant's version of the facts." *Washington v. Texas*, 388 U.S. 14, 19 (1967).

The transcripts of Ms. Veloria's trial demonstrates how her entire defense was prejudiced by the court's refusal to rule on the unknowing waiver issue. As a District Judge, the court was well aware of her obligation to uphold the constitutional rights of defendant's who face a loss of liberty resulting from proceedings before her.

Throughout Ms. Veloria's trial, defense counsel appointed to represent her repeatedly informed the court how the defense was being hampered due to her refusal to issue a fair ruling on the circumstances of Ms. Veloria's waiver of her Fifth Amendment right.

The following arguments advanced by defense counsel throughout the trial clearly demonstrate the existence that of ongoing prejudice to Ms. Veloria's defense strategy:

> MR. LING: I don't want to violate that letter. I really don't. Now I want to make sure that I stay within the bounds of that letter, so I want to put on the record what my thoughts are....

> MR. LING: Judge, I don't know about that. That's what I'm worried about. O Judge [you] can't do that.
> (TR. 6/3/03, p. 194)

> MR. LING: But, you know, that doesn't make sense, Your Honor. That means I can't even cross-examine them.

> THE COURT: You can cross-examine them.

MR. LING: Yeah, but what if they say, well, okay – I say, well, that's not true is it, or actually this is what happened, or something, and then they finally say, yeah, okay, you're right, I would be violating an agreement; wouldn't that be?

THE COURT: But you see, this is what I think. If a witness, on cross-examination, the government witness, let's say, is on the stand, and in cross-examination that witness says: You know, Ms. Veloria wasn't the one that I was trying to buy crack cocaine from.

MR. LING: That's why I'm saying, that proffer letter is filled with ambiguity that, you know, anybody could have a difficulty understanding.

(TR 6/3/03 p. 197)

MR. LING: I can't even cross-examine the witnesses.

THE COURT: You can cross-examine them.

MR. LING: But what if, during cross-examination, they say something other than what they had originally said and that's in favor of Alicia Veloria? Then they will be violating that agreement.

(TR 6/3/03 p. 199)

MR. LING: …. But what I'm saying is I'm put in a rock and a hard place. I've got a lot of thins that I have right now that I want to present to the court. I'm trying to – I have a lot of stuff right here that I was going to file today to the court … There are various reasons why I'm trying to decide what I should do with this.

(TR. 6/4/03 p.27)

MR. LING: --- I think what's important right now is [to] determine who has the burden…. To show, you know, that the defendant did make a knowing or unknowing decision in waiving her rights…if the court says, okay, the defendant has made that knowing or unknowing decision, that affects the trial in all aspects, basically … if she did not make a knowing decision to waive her rights, then … the government can not use that against her, what she had said, … because of Rule 11, … they cannot use whatever she said against her. That's why it affects the entire trial. We can't wait until about four o'clock to decide. Because basically is, like I said, it affects the whole trial, how we can conduct this trial.

(TR. 6/4/03, p. 44-45)

MR. LING: … The only reason I hesitate is that what I question Samuel Thomas about and what could come out, that's the only thing I would be worried about.

THE COURT: I can't see how it will. It will be beyond the scope. And you're the one who wants to keep those things out, so, presumably, you're going to stay within –

MR. LING: Well, at the same time I don't want to be bound by having to worry about what I'm going to ask this captain.

(TR. 6/4/04, P. 53-53)

MR. LING: … Because the reason why you have to do this now rather than wait until the door is opened is because I want to be able to – you know, because I don't want to be running the risk of violating something that might not be correct.

THE COURT: Okay, So, it's what you're limited to right now. You want me to rule as to whether the proffer letter was signed knowingly and voluntarily but not as to whether they can then get the evidence in? Because whether they can get the evidence in, I won't know until I look at the evidence that the government says has opened the door.

MR. LING: No. It's more than that, Your Honor. If the court rules that she did not knowingly –

THE COURT: Then the waiver is ineffective then.

MR. LING: That's right. Then, therefore, all bets are off. I can put all of my evidence in and, you know, I have a witness, and stuff like that, and I can put that witness on and I won't have to worry about this. But that's just a point – that's why I want to hear it now, you make a decision now, then I can go ahead and present a full and fair representation and defense. Now I feel like I'm bound. I have one arm tied behind by back or maybe two arms. I can't –

THE COURT: Why do I have to decide it now? Are you going to cross-examine anybody in a way that you think – so far that hasn't happened.

MR. LING: I know, but I'm holding back you know, I'm watching myself but I'm just trying to keep careful not to violate what the court has, you know outlined so far.

(TR 6/4/03, P. 148-150)

The defendant has a constitutional right to cross-examine prosecution witnesses.

The right of cross-examination is more than a desirable rule of trial procedure. It is implicit in

the constitutional right of confrontation, and helps assure the "accuracy of the truth-determining

process," It is, indeed, "an essential and fundamental requirement for the kid of fair trial which is

this country's constitutional goal."

- 77 -

*Chambers v. Mississippi*, 410 U.S. 284, 295 (1973) (citations omitted). *Davis  v. Alaska*, 415

U.S. 308, 316 (1974), emphasized the importance of cross-examination, calling it "the principal

means by which the believability of a witness and the truth of his testimony are tested."  Indeed,

cross-examination is so essential that its denial without waiver is "constitutional error of the first

magnitude and no amount of showing of want of prejudice [can] cure it."  *Brookhart vs. Hanis*,

384 U.S. 1, 3 (19666).  *See Davis* 415 U.S. at 318; *Smith v. Illinois*, 390 U.S. 129, 131 (1968)

     The trial transcript demonstrates how Ms. Veloria's constitutional right to confrontation

was infringed upon.  Defense Counsel's courtroom declarations regarding his inability to cross-

examine the government's witnesses clearly screams prejudice.

     Ms. Veloria requests reversal.


## CLAIM NUMBER 11

### MS. VELORIA'S FIFTH AMENDMENT RIGHT TO DUE PROCESS OF LAW WAS VIOLATED WHEN THE GOVERNMENT FAILED TO PROVIDE DISCOVERY AFTER BEING ORDERED BY THE COURT TO DO SO

     On 11/13/2002, Mr. Ling's MOTION TO COMPEL DISCOVERY, was heard before

Magistrate Judge Kurren.  Mr. Ling specifically requested the notes that were used to prepare the

"summarization of the interview," on 9/3/2001, written by IRS CID Special Agent Jason K. Pa.

At the hearing, Mr. Ling informed the Court that these notes were needed because Ms. Veloria

had informed him of "discrepancies"[169] contained within the summarization, and the importance

of these original notes to the defense for trial.

     AUSA Mr. Brady's response was, "Judge, originally I was going to object, but I think it's

going to facilitate everything if I turn them over.  There's two – two special agents that

---

[169] TR 11/13/02, p. 2, L. 19

conducted the interview. I will contact both of them. If they have their notes, I will turn those notes over to counsel by the end of the week, hopefully."[170]

The Court ruled "…I'll grant the Motion by agreement to the extent they have the notes, though, Mr. Ling."[171]

At some point following this hearing, Ms. Veloria was informed by Mr. Ling that the government relayed that there "weren't any notes" in support of the statements the agent is claiming Ms. Veloria made on 9/3/2001. At that point, it was brought to Mr. Ling's attention that the memorandum itself bears a statement at the end reading as follows: "I prepared this memorandum on September 3, 2001, after refreshing my memory from notes made during and immediately after the interview with Alicia Veloria."[172] (See exhibit 30C) Although Mr. Ling acknowledged the contradiction between Mr. Brady's representations and the statement at the end of the memorandum, he took no further action in an attempt to discover these notes.

The Ninth Circuit Court of Appeals ruled in *United States v. Harris*[173] that the FBI must preserve the original notes taken by FBI agents during interviews with prospective government witnesses "since the routine disposal of potentially producible materials by the FBI amounts to a usurpation of the judicial function of determining what evidence must be produced in a criminal case…" Ms. Veloria was a "prospective government witness" and the interview was conducted by a known government agent, therefore, the original notes were required to have been preserved.

Ms. Veloria requests reversal.

---

[170] TR 11/13/02, p. 3, L. 2
[171] TR 11/13/02, p. 2, L. 10
[172] IRS CID Memorandum of Interview, Investigation #919730196
[173] 543 F 2d. 1247 (9th Cir. 1976)

## CLAIM NUMBER 12

**MS. VELORIA'S FIFTH AMENDMENT RIGHT TO DUE PROCESS OF LAW WAS VIOLATED BY MEMORANDUM OF INTERVIEW CONTAINING BLATANTLY FALSE STATEMENTS**

Upon receipt of IRS Agent Jason Pa's Memorandum of Interview, Ms. Veloria immediately contacted

her attorney and informed him of the inaccuracies and misstatements contained therein. Notwithstanding the many distortions and misrepresentations regarding Ms. .Veloria's involvement with drug related activities, there were many blatantly incorrect statements contained within said memorandum.

Without addressing the falsities of Ms. Veloria's reported admissions, some of the more obvious and easily disproved claims within the Memorandum of Interview are as follows:

Entry #6: "That in 2001, Veloria's mother and father were divorced."

Fact: Ms. Veloria's parents were divorced in 1986; this can be verified by accessing the State of Hawaii Family Court records.

Entry #23: "That in July 1996, Veloria and Mr. Smith...were arrested...and released on bail."

Fact: When Ms. Veloria and Mr. Smith were arrested in July of 1996, they were released "pending further investigation." (See Exhibit 14).

Entry #53 and #54: "That Veloria and Mr. Iaukea stopped at Mountain View Park...That the police came several minutes later."

Fact: Ms. Veloria and Mr. Iaukea were at Keaau Park when the police arrived and seized Ms. Veloria's truck, as evidenced by all police reports and statements relating to this incident.

Entry #21: "That Veloria had rented the house on Mauna Loa Street."

Fact: Rental records show that Marlene Anduha was renting the house at 69 Mauna Loa Street,

as did the rent receipt recovered by H.P.D. on 7/10/1996 (See Exhibit 2, evidence log, item #23).

CONTRADICTORY ENTRY #20 AND #35: "That in 1996 Mr. Smith was Veloria's

boyfriend" AND "That Mr. Peres was Veloria's boyfriend."

REASON:  In light of the entirety of the claims and allegations by the government contained

within the Memorandum of Interview, these representations are highly unlikely.

The above-mentioned entries can be proven false by the various documents mentioned.

With respect to these statements, the Court can clearly see that there is no possible incentive for

Ms. Veloria to lie regarding these issues.  When a defendant participates in a debriefing to

qualify for "safety valve," it is required that they are "truthful and accurate."  Therefore, logic

would indicate that Ms. Veloria would not have made theses statements as they were written,

because in most instances the Government was in possession of information disproving them.

Furthermore, Ms. Veloria would not have had any reason to fabricate, embellish or otherwise lie

to the Government with respect to those trivial entries.

Ms. Veloria made clear to her attorney the nature of the discrepancies she was alleging,

both factual and those which were distortions of her actual statements.  In turn, Mr. Ling

informed the Court and AUSA Brady of this situation during the hearing on his Motion to

Compel[174].  The Court granted the motion "to the extent they have the notes."[175]  IRS CID Agent

Pa's memorandum clearly refers to the presence of handwritten notes. Counsel for Ms. Veloria

took no further action in attempt to pursue a remedy for this violation.  The discrepancies Ms.

Veloria has identified and offered are "material" under Bagley[176] and cannot be considered

---

[174] TR 11/13/02, p. 2, l. 19
[175] TR 11/13/02, Judge Kurren
[176] *U.S. v. Bagley*, 473 U.S. 667.

minor.  Due to the conduct of the Government, Ms. Veloria has no way to challenge the

inaccuracy of the additional misrepresentations within Agent Pa's memorandum.[177]

      Rule 16 (a)(1)(A) of the Federal Rules of Criminal Procedure provides in pertinent part:

> "Statement of Defendant:  Upon request of a defendant, the Government shall permit the defendant to inspect…the substance of any oral statement which the Government intends to offer in evidence at the trial made by the defendant, whether before or after arrest in response to interrogation by any person then known to the defendant to be a Government agent."

      In *Brady v. Maryland*,[178] the Supreme Court held:  "…that the suppression by the

prosecution of evidence favorable to an accused upon request violates due process where the

evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of

the prosecution."

      *United States v. Harris*, *Supra*,[179] held "the original notes, especially relating to an FBI

agent's interview with the accused, must be preserved."  The danger inherent in permitting the

routine destruction of original notes was first recognized in this Circuit in *United States v.*

*Carrasco*,[180] where the Court noted that:  "It may be that the agent…who adapts a final report

from preliminary memoranda will tailor his observations to fit his conclusions…"[181]

      Additionally, the Advisory Committee's Notes to Rule 16 of the Federal Rules of

Criminal Procedure reveal that a majority of the American Bar Association's Committee on

Standards Relating to Discovery and Procedure Before Trial adopted the following:

> "…the view that the defendant ought to be able to see his statement in whatever form it may have been preserved, in fairness to the defendant and to discourage the practice, where it exists, of destroying original notes, after transforming them into

---

[177] By denying the existence of handwritten notes or destroying them to prevent Ms. Veloria from exposing their untruths.
[178] 373 U.S. 83, 87  83 S. Ct. 1194, 1197, 10 L.Ed.2d 215 (1963).
[179] 543 F. 2d 1247, 1253 (1976)
[180] 537 F. 2d 373
[181] Ibid, p. 377

secondary transcriptions, in order to avoid cross-examination based on the original notes."[182]

With respect to the above-mentioned facts and case law, Ms. Veloria was prejudiced in her subsequent trial due to the prosecution's misconduct and her attorney's ineffective assistance in seeking a remedy for the failure to comply with the order to compel the original notes. Counsel for Ms. Veloria was forced to restrict his cross-examination to those questions which he knew could not possibly elicit a response contradictory to the alleged statements within Agent Pa's memorandum, although the issue of discrepancies had previously been raised.

Because of the Government's failure to comply with the order to compel discovery, counsel for Ms. Veloria should have put forth a motion to the Court requesting a remedy of suppression; the above-mentioned claims coupled with the argument that the statement was given "unknowing" of its use to the Government at trial should have resulted in pretrial suppression of said statement.[183]  Instead, the contents of Agent Pa's memorandum loomed over Ms. Veloria throughout her entire trial, as the transcripts show.  Mr. Ling communicated this to the Court on several occasions by comparing it to being handcuffed:  "I feel like I'm bound."  "I have one arm tied behind my back, or maybe two arms."[184]  Defense Counsel communicated that he could not call witnesses for the defense[185] and could not effectively examine the Government's witnesses[186] because of the contents of Agent's Pa's memorandum (Proffer Statement). Counsel for Ms. Veloria stated that with respect to questioning of witnesses, he was

---

[182] Notes of Advisory Committee, Fed. R. Crim. P. 16
[183] See Exhibit 14, p. 2
[184] TR 6/4/03, p. 150, l. 1-6; p. 155, l. 10-14
[185] TR 6/4/03, p. 194, l. 11-12
[186] TR 6/4/03, p. 29-32; TR 6/4/03, p. 194-200

"holding back"[187] to which the Court replied, "It was designed to hold you back."[188] Defense counsel explained that he didn't know what the "boundaries"[189] were.

Ms. Veloria's trial was permeated with discussions centered around this issue, and although Agent Pa's memorandum was not introduced at trial, it is clear that its existence played a major role in hampering the defense. Ms. Veloria attempted to persuade her counsel, Mr. Ling, to bring this issue before the Court (see Exhibits 12, 13 and 14). In fact, this issue was brought before the Court, albeit brief, and the Court granted Mr. Ling's Motion to Compel. However, Mr. Ling was subsequently ineffective when he failed to follow up by seeking a remedy for what amounted to a clear violation of Ninth Circuit holdings as discussed above, although Ms. Veloria expressly requested him to do so (see Exhibit 14, p. 2).

Ms. Veloria made clear to her attorney that she disputed the contents of Agent Pa's 13-page "debriefing report." Ms. Veloria attempted to bring light to this violation by insisting that her attorney obtain the notes by which Agent Pa claims to have used to "refresh" his memory.[190] Although the Court ordered the government to turn over such notes, if such notes exist,[191] the notes were withheld and the subject was not raised again until Ms. Veloria herself made the Court aware of the situation by making the following statement:

> I provided the government with truthful information. I elected to proceed with trial because the debriefing report contained an overwhelming amount of inaccuracies and false statements, which I have not incentive to make. It says that I stated my parents were divorced in 2001. My parents were divorced in 1986. It states I reported Zachary Smith and I were released on bail following the July 10th arrest. We were both released pending further investigation without being required to post bail. It states that I reported the incident when my truck was seized happened at Mountain View Park rather than Kea'au Ballpark. And there are many more examples of misrepresentations in that

---

[187] TR 6/4/03, p. 32., L. 8-16
[188] TR 6/4/03, p. 34, L. 16-21
[189] TR 6/4/03, p. 34, L. 22-25
[190] Dkt. 89, Motion to Compel Discovery
[191] TR 11/13/02, Judge Kurren

debriefing report.  Short of finding that I'm a pathological liar, you must see that I have no reason to lie about those items.

Prior to trial I repeatedly asked counsel to obtain the agent's notes of the debriefing.  On November 13th, 2002, the court ordered the government to turn over the notes; although, I don't believe they were ever given to Mr. Ling.

Throughout my entire trial the debriefing report was held over my head.  I did not put up any defense.  Mr. Ling had to be very careful during questioning of the government's witnesses in fear that a response would be elicited that opened the door and would allow the debriefing report to be admitted against me as evidence.  Even though Mr. Silvert incorrectly advised me of the weight of the debriefing statement, had I chosen to proceed to trial because he told me that it would only be used against me if I chose to testify on my own behalf at trial and I committed perjury.[192]

It was a violation of Ms. Veloria's constitutional right to due process under the Fifth Amendment when the government failed to provide the defense with Agent Pa's notes which he admits to using to "refresh his memory"[193] to write the memorandum of interview containing statements Ms. Veloria disputed. (See exhibit 30C)  In *United States v. Harris*, the Court ruled that original notes taken by FBI agents must be preserved "since the routine disposal of potentially producible materials by the FBI amounts to usurpation of the judicial function of determining what evidence must be produced in a criminal case…"[194]

Had the government produced Agent Pa's notes, which he was required to preserve, Ms. Veloria would have been able to put forth, for the Court's consideration, that not only was her debriefing statement given unknowingly, but also that Agent Pa conveniently added and took away from it where he felt it advantageous to the government and its agenda.

With respect to the above-mentioned facts and case law, Ms. Veloria was prejudiced in her subsequent trial due to the prosecution's misconduct and her attorney's ineffective assistance in seeking a remedy for the failure to comply with the order to compel the original notes.

---

[192] TR 11/03/03, pp. 27-28

[193] "I prepared this memorandum on September 3, 2001, after refreshing my memory from notes made during and immediately after the interview with Alicia Veloria." P. 13
[194] *U.S. v. Harris*, 543 F.2d 1247 (9th cir. 1976).

Counsel for Ms. Veloria was forced to restrict his cross-examination to those questions which he knew could not possibly elicit a response contradictory to the alleged statements within Agent Pa's memorandum, although the issue of discrepancies had previously been raised.

Because of the Government's failure to comply with the order to compel discovery, counsel for Ms. Veloria should have put forth a motion to the Court requesting a remedy of suppression; the above-mentioned claims coupled with the argument that the statement was given "unknowing" of its use to the Government at trial should have resulted in pretrial suppression of said statement.[195]  Instead, the contents of Agent Pa's memorandum loomed over Ms. Veloria throughout her entire trial, as the transcripts show.  Mr. Ling communicated this to the Court on several occasions by comparing it to being handcuffed:  "I feel like I'm bound."  "I have one arm tied behind my back, or maybe two arms."[196]  Defense Counsel communicated that he could not call witnesses for the defense[197] and could not effectively examine the Government's witnesses[198] because of the contents of Agent's Pa's memorandum (Proffer Statement). Counsel for Ms. Veloria stated that with respect to questioning of witnesses, he was "holding back"[199] to which the Court replied, "It was designed to hold you back."[200]  Defense counsel explained that he didn't know what the "boundaries"[201] were.

Ms. Veloria's trial was permeated with discussions centered around this issue, and although Agent Pa's memorandum was not introduced at trial, it is clear that its existence played a major role in hampering the defense.  Ms. Veloria attempted to persuade her counsel, Mr. Ling, to bring this issue before the Court (see Exhibits 12, 13 and 14).  In fact, this issue was brought

---

[195] See Exhibit 14, p. 2
[196] TR 6/4/03, p. 150, l. 1-6; p. 155, l. 10-14
[197] TR 6/4/03, p. 194, l. 11-12
[198] TR 6/4/03, p. 29-32; TR 6/4/03, p. 194-200
[199] TR 6/4/03, p. 32., L. 8-16
[200] TR 6/4/03, p. 34, L. 16-21
[201] TR 6/4/03, p. 34, L. 22-25

before the Court, albeit brief, and the Court granted Mr. Ling's Motion to Compel. However,

Mr. Ling was subsequently ineffective when he failed to follow up by seeking a remedy for what

amounted to a clear violation of Ninth Circuit holdings as discussed above, although Ms. Veloria

expressly requested him to do so (see Exhibit 14, p. 2).

Ms. Veloria requests reversal.

## CLAIM NUMBER 13

### MS. VELORIA'S FIFTH AMENDMENT DUE PROCESS RIGHTS UNDER *BRADY* WERE VIOLATED WHEN THE GOVERNMENT FAILED TO PRODUCE DISCOVERY WHICH FORMED BASIS OF INTRICATE DIAGRAM

At some point neat Ms. Veloria's 2003 trial date, a diagram drawn by HPD Detective

Benton Bolos was received by defense counsel and passed on to her (See Exhibit 7). This

diagram depicts a connection between more than 20 people and includes the names of Ms.

Veloria's parents and brother. Also indicated on the diagram are page numbers, what appears to

be license plate numbers and the words: "Bank accounts," "safety deposit," "yacht," and

"Seattle."

This diagram depicts information that must have resulted from some form of surveillance

or documented investigation. The considerable amount of information and its detailed and

private nature lends credibility to the notion that it transpired from an ongoing investigation; an

investigation which was not disclosed prior to or uncovered at any point during Ms. Veloria's

trial.

Upon having been shown the diagram at trial and asked if he was its author, Benton

Bolos responded by saying, "You mean this latent drawing regarding the drug dealers?"[202] Bolos

---

[202] TR 6/5/03, p. 93

further testified that he made the drawing in June of 1996, prior to the search warrant.[203]  When asked whether he had made the drawing pursuant to electronic surveillance Bolos responded with a, "No."[204]  No further questions were asked in regards to this diagram or the obvious implications of discovery being withheld.

In light of the author's testimony denying electronic surveillance, it must be inferred that this diagram was drawn utilizing information that was gathered from undoubtedly many different sources.  It was admitted that this diagram was drawn in June of 1996, the month preceding the July 10th search warrant.  This clearly establishes that an investigation was underway, involving Ms. Veloria and her brother "Rick" at least a month prior to the application for a search warrant for the house at 69 Mauna Loa Street.

If such detailed information was somehow discovered without sense enhancing equipment, why is there absolutely no documentation as to any of the sources that assisted in the collection of this information?

In his affidavit in support of application for search warrant, Samuel Thomas states that he received information on July 9, 1996, from a "confidential informant who related that a person named Alicia Veloria was involved in cocaine dealing from a residence located at 69 Mauna Loa Street in Hilo, Hawaii."[205]  This reference is the only documented information disclosed by the H. P.D. or the government indicating that Ms. Veloria was suspected of cocaine distribution prior to the search warrant, with the exception of Benton Bolos' "latent drawing regarding the drug dealers."[206]

---

[203] TR 6/5/03, p. 93
[204] TR 6/5/03, p. 94
[205] Search warrant application, Attachment p. 1
[206] TR 6/5/03, p. 93

If the 22 names listed on the diagram were "drug dealers," as Bolos testified, then surely there are volumes of discovery establishing this.  The government's intentional withholding of this evidence violated Ms. Veloria's due process rights to discovery under *Brady*.  The evidence this diagram alleges to be in existence is incorrect, as there are several names which are represented as being directly attached to Ms. Veloria of whom Ms. Veloria asserts she has no knowledge.  Therefore, had the government disclosed this discovery prior to Ms. Veloria's trial, she would have been afforded the opportunity to investigate the diagram's alleged connections, possibly producing exculpatory information for her use at trial.

In addition, Ms. Veloria's mother, father, and brother are also depicted in this diagram.  If the government or its various arms of law enforcement were aware of inculpatory information of Ms. Veloria's close family members, as this diagram depicts, then it cannot be said with certainty that the withholding of said information did not result in the denial of Ms. Veloria's right to have access to potentially exculpatory evidence for her use at trial.  Discover relating to Benton Bolos' diagram is relevant, comprehensive and could have potentially led Ms. Veloria to exculpatory witnesses for her use at trial.  The discovery was not available to Ms. Veloria through other sources and the government was or should have been in possession of the background information which culminated in the diagram's creation.  In *Kyles v. Whitley*, the Supreme Court ruled that the prosecutor has a duty to learn of any favorable evidence known to other governmental agents, including the police.[207]

Under *United States v. Frady*,[208] in order for Ms. Veloria to obtain relief on this claim, she must show cause for failure to assert the claim in earlier proceedings, and actual prejudice from the error.  Ms. Veloria asserts herein that she attempted to persuade her court appointed

---

[207] *Kyles v. Whitley*, 514 us 419, at 437 (1995)
[208] *U.S. v. Frady*, 456 US 152, 162-166 (1982)

defense counsel to pursue additional discovery in relation to this diagram, in light of the possibility of finding exculpatory information.  However, the record reflects that defense counsel failed to exercise due diligence with respect to the obvious implications of discovery being withheld.  In an attempt to protect her interests, Ms. Veloria requested that a paralegal e-mail several motions to trial counsel regarding this issue.  Upon the commencement of trial, three emergency motions and three memorandums of law were e-mailed directly to trial counsel to be filed on behalf of Ms. Veloria.[209]  Although defense counsel entered a date and signed several of these documents (See Exhibits 20 and 21), he failed to file the motions and memoranda as Ms. Veloria specifically requested, without any indication as to why.

It also should be noted that when the government called Bolos to the stand during Ms. Veloria's trial, the ONLY reason defense counsel asked him about the drawing[210] is because Ms. Veloria was actively insisting on it from the defense table.  In fact, Ms. Veloria specifically requested that additional questions be asked in relation to the diagram; without indicating why, defense counsel ignored Ms. Veloria's request.

Ms. Veloria is not the party responsible for the failure to raise this issue on direct appeal, as she prepared a pro se appeal brief (See Exhibit 35) containing this very issue therein.[211]  Ms. Veloria asserts that during the preparation of her appeal, she repeatedly insisted, both verbally and in writing, that her court appointed appellate attorney preserve all of her appellant issues that

---

[209] See Exhibit 17, cover letter; Exhibit 18, Emergency Motion to Rescind Involuntary Waivers Memorandum in Support of Alicia Veloria's Emergency Renewed Motion to Suppress Statements Based Upon the Motion to Rescind Involuntary Waivers; Exhibit 19, Emergency Motion in Limine, for Disclosure of Intent for a Hearing Outside the Presence of the Jury and to Exclude Certain Evidence; Exhibit 20, Emergency Motion to Disclose Identity of Confidential Informant Memorandum of Points and Authorities in Support of Veloria's Emergency Motion to Disclose Identity of Confidential Informant; Exhibit 21, Defendant's Memorandum of Law in Support of Request fo an Order of Court Requiring the Government to Admit or Deny Whether They Violated Any Local, State or Federal Law in the Investigation and Prosecution of this Case.
[210] TR 6/5/03, p. 93
[211] See Exhibit 35, Veloria pro se appeal brief, p. 64

are contained within her pro se brief.[212]  Furthermore, Ms. Veloria's instance of specific issues being raised on direct appeal is documented in attorney Samuel P. King, Jr.'s motion to withdraw as counsel on appeal filed in the Ninth Circuit Court of Appeals,[213] as well as Ms. Veloria's pro se response to said motion (See Exhibit 33).[214]

In *Ratliff v. United States*,[215] cause was shown for purposes of a motion under 28 U.S.C. § 2255 because counsel rebuffed petitioner's request to raise issue on direct appeal. Also, it should be noted that in October of 2004, Ms. Veloria was served with an order from a Ninth Circuit Court of Appeals Appellate Commissioner bearing the words "Appellant is advised that counsel is vested with the authority to decide which issues should be raised on appeal."[216] As such, Ms. Veloria should not be held accountable for her counsel's failure to raise the issues contained within written communications to counsel, as well as those within her pro se appeal brief.

The verdict in Ms. Veloria's trial is unworthy of confidence in light of the fact that discovery, which was potentially favorable to defendant, was withheld, in violation of *Brady*. Ms. Veloria was prejudiced by the intentional withholding of this discovery by the effect of nondisclosure of evidence.[217]  As previously stated, it cannot be said with certainty that discovery tending to be inculpatory for close family members of Ms. Veloria would not therefore be exculpatory and of use to her at trial.

---

[212] Ms. Veloria mailed a copy of her pro se opening brief on 12/27/04 to appellate counsel.  This brief was comprehensive and in compliance with court rules.  Appellate counsel also received a copy of said brief on disk well in advance of Ms. Veloria's opening brief deadline of 2/23/2005.
[213] 03-10626 *USA v. Veloria*, filed 10/8/04
[214] 03-10626 *USA v. Veloria*, filed 10/15/04
[215] *Ratliff v. US* , 999 f2D 1023, 1026 (6TH Cir. 1993)
[216] 03-10626 *USA v. Veloria*, filed 10/18/04
[217] *U.S. v. Pelullo*, 105 F.3d 117, 123 (3rd 1997)

In *Smith v. Secretary of Department of Corrections*,[218] the Court ruled that a *Brady*
violation occurred because disclosure of suppressed evidence taken cumulatively might have led
to a different result, even if some evidence was trivial when standing alone. Ms. Veloria submits
herein that the *Brady* violations which permeated her trial and conviction, although they would
not individually be considered trivial, if taken cumulatively, disclosure of said discovery would
have led to a different outcome. Ms. Veloria's trial was a close one for the jury. Although the
defense did not present any evidence, call any witnesses or discredit any of the testimony offered
by the government, the jury still deliberated for four days and sent out eight separate
communications containing various unanswered questions. In fact, three days BEFORE they
returned with a verdict of guilty on Count 1, Ms. Veloria's jury sent out a communication
indicating they were deadlocked.

Ms. Veloria requests reversal.

## CLAIM NUMBER 14

### MS. VELORIA'S CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN DEFENSE COUNSEL WAS INEFFECTIVE BY FAILING TO CONFRONT THE GOVERNMENT REGARDING A DIAGRAM THAT WAS LIKELY A RESULT OF AN ILLEGAL WIRETAP OR UNAUTORIZED SURVEILLANCE PERPETRATED ON MS. VELORIA THEREBY VIOLATING HER PRIVACY RIGHTS

At some time prior to the start of Ms. Veloria's criminal trial, the Government provided
an additional document to the defense. Included among these materials was a one-page hand
drawn diagram with the words: Bank accounts, safety deposit, yacht and Seattle. Additionally
there were 22 names and various license plate numbers on it. (See exhibit 7).

Shortly before the start of Ms. Veloria's trial, the above mentioned documents were
provided to Ms. Veloria. Upon receiving this hand drawn diagram, Ms Veloria inquired of her
court appointed trial counsel as to whether he intended on submitting a motion demanding the

---

[218] 50 F.3d 801, 834 (10th Cir. 1995)

discovery that contributed to the creation of the diagram.  Counsel for Ms. Veloria responded with an "I'll check on that," and the issue of the withholding of discover obviously in existence was never raised.

In an effort to protect her constitutional rights, Ms. Veloria requested that a paralegal prepare a memorandum of law regarding Benton Bolos' diagram which was dated nearly a month before the execution of the  search warrant on 69 Mauna Loa Street (See exhibit 17).  On the first day of trial, 6/3/03, defense counsel received, via e-mail, a five page document titled Defendant's Memorandum of Law in Support of Request For an Order of Court Requiring the Government to Admit or Deny Whether They Violated any Local, State or Federal Law in the Investigation and Prosecution of This Case. (See exhibit 21).  Counsel for Ms. Veloria printed out said memorandum of law, brought it to court with him, signed it in front of Ms. Veloria, assured her he would file it, and then never did.

The record in Ms. Veloria's case shows that no action was taken what so-ever with respect to this diagram and its obvious implications of unauthorized, unconstitutional, and therefore illegal surveillance being conducted on Ms Veloria, having contributed to the preparation of the case against her.  In fact, the only action Ms. Veloria was able to persuade her attorney to partake in furtherance of this issue was to have Bolos confirm that he was the author of the drawing[219] and then to suggest "Yeah, you made this drawing pursuant to electronic surveillance?"[220] To which Bolos simply responded with a "no," that was further clarified with a "No, it wasn't done."[221]

---

[219] Tr. 6/5/03, P. 93
[220] Tr. 6/5/03, P. 94
[221] Tr. 6/5/03, P. 94

Bolos was only one of several officers involved in the criminal case against Ms. Veloria. The inquiry into the means by which this diagram came to exist should have been initiated prior to Ms. Veloria's trial by way of formal proceedings.

The Constitution of the United States and States in which the defendant resides provide protection against unreasonable searches and seizures, and against compelling someone to be a witness against themselves, such as the interception of conversations, and the use of those conversations in evidence.

To protect those rights the United States and the States in which the defendant reside have enacted certain legislation prohibiting those actions with the limited exceptions provided by those statutes.

Title 18 USCS § 2515 (1993) states as follows:

**Prohibition of use as evidence of intercepted wire or oral communications.**

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived there from may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of the chapter [ 18 USCS § 2510 et seq.].

The United States Code, Congressional and Administrative News, 90th Congress, Second Session (1968), Vol. 2.Legislative History, p. 2187, in speaking of the proposed 18 U.S.C.

§ 2516 (2), states:

"No application [for wiretap or electronic surveillance orders] may be authorized unless a specific State statute permits it. The Sate statute must meet the minimum standards reflected as a whole in the proposed chapter. The proposed provision envisions that States would be free to adopt more restrictive legislation, or no legislation at all, but not less restrictive legislation. State legislation enacted in conformity with this chapter should specifically designate the principal prosecuting attorneys empowered to authorize interceptions."

18 U.S.C. § 2516 provides in pertinent part:

"The principal prosecution attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that State to make

application to a State court judge of competent jurisdiction for an order authorizing or approving the interception of wire or oral communications…"

In addition, the government knew, or by due diligence should have known, that they were prohibited from making an application for a search warrant for the interception of private communications by state and federal law, without specific authorization from the Attorney General of the State of Hawaii, or a person designated in writing or by law to act for the attorney general , prior to making the application, and that he was prohibited from making an application for a search warrant to authorize the interception of private communications.

Ms. Veloria was an aggrieved party and counsel should have moved for an order of the Court to require the government to admit or deny whether they violated any local, state or federal law in the investigation and prosecution of this case under 28 U.S.C. § 3504 which states in relevant part as follows:

"(a) in any trial, hearing or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, or other authority of the United States-
(1) Upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act,"

The defendant discovered this diagram that indicated she was subjected to electronic surveillance and surveillance with the use of sense enhancing equipment. A discovery motion specifically requesting production of that information and evidence should have been filed for the Court's consideration. The defense was entitled to know whether any electronic surveillance equipment was used in the investigation of Ms. Veloria's case.

Therefore, if the evidence was illegally obtained it should have been suppressed. The application for issuance of the search warrant, withheld from the issuing Judge that Ms. Veloria had been subjected to interception of wire and/or oral communications without a warrant, in violation of Ms. Veloria's right to privacy in Hawaii, and in violation of

state and federal statutes, and this provided sufficient grounds for the defendant as an aggrieved party to submit the 18 U.S.C. § 3504 motion requiring the government to admit or deny whether they violated any local, state or federal law in the investigation and prosecution of this case.

The limited discovery disclosed to the defendant, and the statements of former defense counsel, indicate an undercover operation covering many months may have been conducted against the defendant.  There was an indication that some state agencies were involved in the undercover operation, and may have been participating with federal agents or their agencies. Therefore, there may have been violation of federal as well as state statutes and ordinances in developing evidence.

The legislature has spoken in words which are clear and requirements which are mandatory that the interception of conversations and use thereof, or any evidence derived there from, in violation of that chapter is prohibited,  18 USC § 2515.  In addition the Constitution of the United States, the State of Hawaii, and certain State and Federal Statutes prohibit the warrantless acquisition and use of certain evidence.

Ms Veloria suffered prejudiced by her attorney's failure to make a timely discovery request and/or submit a suppression motion due to the government's use of illegally obtained evidence.  Potentially exculpatory discovery was withheld from the defense.  The defense was unable to call witnesses to counter the allegations being made by the government because of the limited discovery provided to the defendant.

Evidence demonstrating prejudice to Ms. Veloria's case is shown by viewing Jury communication number one, filed on 6/10/03, which contains seven separate questions. Most importantly, question number six is written as follows: "What was the foundation for the 1st search warrant?"  The Court's response to this question was:

"...the court instructs you that these are not matters on which evidence was presented. You may not consider these matters in determining whether Alicia Veloria is not guilty.[222]

In *United States v Cronic*, the Supreme Court ruled "Counsel ...has a duty to bring to bear such skill and knowledge s will render the trial a reliable adversarial testing process." 466 US, at 688.

Ms. Veloria's trial record demonstrates clearly that with respect to discovery withheld from the defendant, counsel failed to confront the prosecution during pre-trial, trial and on appeal.

In *Kimmelman v. Morrison*, the Supreme Court ruled that an attorney's failure to conduct pre-trial discovery is reviewable on appeal. "At the time [defendant's] lawyer decided not to request any discovery, he did not - and, because he did not ask, could not - know what the State's case would be"[223]

Ms. Veloria attempted to raise this issue on direct appeal by mailing a copy of her pro se appeal brief approximately two months before the filing deadline. Additionally, in order to allow counsel the option of editing Ms. Veloria's brief, a copy of the pro se brief on disk was mailed to counsel by Ms. Veloria's paralegal friends. Appellate counsel received said disk at least a month and a half before Ms. Veloria's deadline of 2/23/05. However, appellate attorney failed to raise this issue (See Exhibit 35, P. 64) and all others on behalf of Ms. Veloria.

This was a pre-trial issue. Counsel was aware of the fact that discovery relating to the diagram was being withheld. Upon receiving the diagram before trial, counsel should have filed a pre-trial motion requesting the specific discovery which resulted in the diagram's creation. Additionally, in light of the information contained within the Bolos diagram, and the great possibility that it was obtained in violation of the privacy rights guaranteed to Ms. Veloria by the

---

[222] Dkt # 150 Response to Note # 1, filed  6/10/03
[223] *Kimmelman v. Morrison*, 91 L Ed 2d 327

constitution, Counsel should have filed a motion and Memorandum[224] sometime in May, before

Ms. Veloria's trial.

 At the very least, counsel should have filed exhibit 21, as he signed the Memorandum of

Law in front of Ms. Veloria and assured her he would file it.  This issue should have been raised

on appeal, but appellate counsel disregarded Veloria's request without affording her the

opportunity to file the pro se brief herself.

 Ms. Veloria requests reversal.

## CLAIM NUMBER 15

### MS. VELORIA WAS DENIED DUE PROCESS OF LAW WHEN HER PROSECUTOR INTENTIONALLY MISLED THE COURT IN RELATION TO ADMISSION OF PREJUDICIAL "PRIOR BAD ACTS" EVIDENCE

 Upon the commencement of trial on 6/3/2003, Prosecutor Brady made false

representations regarding testimony of his witness to mislead the Court in her decision regarding

the admission of 404 (b) "prior bad act" evidence.  In arguing for admission, Brady stated that

his witness would testify that "she actually bought cocaine from Ms. Veloria,"[225]  within a week

of the execution of the search warrant.  The government failed to give the required advance

notice of their intention to use 404 (b) evidence[226] and in an attempt to nullify a remoteness of

time argument from the defense, the government intentionally misled the court by arguing that

the prior bad acts testimony was related to the 7/10/1996 search, and occurred "within a week."

 AUSA Brady made the proffer:

> "We have the witness and we've interviewed the witness and she can testify that it was during that same period, within a week, when Ms. Veloria's house was raided, that she was buying crack cocaine from her." (TR 06/03/03,  p.142, L. 22)

---

[224] Containing the same information found in Exhibit 21, Ms. Veloria's motion
[225] TR 6/3/03, p. 138, l. 10; p. 142, l. 23
[226] TR 6/3/03, p. 135, l. 20

Neither of the civilian government witnesses called gave testimony referring to the 7/10/1996 search or even testimony remotely related to 7/10/1996. In fact, witness Barcena admitted that she did not even know when Ms. Veloria was arrested.[227]

Upon review of the witnesses' prior statement, it is evident that Prosecutor Brady's statement was not grounded in fact; therefore, Brady intentionally misled the Court in order to have prejudicial prior bad acts admitted against Ms. Veloria, after he failed to give advance notice. The closest his witness came to fulfilling the proffered obligation was when the prosecutor asked Barcena what her "relationship" was with Ms. Veloria "during the summer months of 1996" to which Barcena replied, "I was just picking up drugs from her."[228]

Therefore, Mr. Brady intentionally misled the Court, knowing he had no possible testimony to substantiate his "within a week" claim. Mr. Brady repeatedly made misstatements of fact regarding his witness' potential testimony. Courts have ruled that this behavior is improper and prejudicial.[229]

Defense counsel failed to object to prosecutorial misconduct after Mr. Brady clearly misled the Court. Testimony should have been stricken and cautionary instruction given to the jury regarding this issue.

Ms. Veloria requests reversal.

[227] TR 6/3/03, p. 116, l. 2
[228] TR 6/5/03, pp. 99-100
[229] *U. S. v. Forlorma,* 94 F3d 91, 96 (2nd Cir. 1996); *Marshall v. Hendricks,* 307 F3d 36, 65 (3rd Cir. 2002); *Macia v. Makowski,* 291 F3d 447, 453 (6th Cir 2002).

## CLAIM NUMBER 16

### DEFENSE COUNSEL WAS INEFFECTIVE IN RELATION TO GOVERNMENT'S INTRODUCTION OF 404 (b) EVIDENCE IN VIOLATION OF MS. VELORIA'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL

The government failed to give the required advance notice of its intent to use prior bad acts against Ms. Veloria at trial. The record demonstrates that all parties were aware of this due process violation. On the first day of trial a discussion regarding the government's failure to give notice insued.[230] However, no remedy was sought or granted on Ms. Veloria's behalf.

The problem with the government's failure to give notice is that it is wholly inadequate to provide the defendants with the kind of timely notice required to enable the defense to investigate and prepare to defend against the allegations in advance of trial. Nor did the government's disclosure provide sufficiently specific notice to enable the defendants to identify that evidence which it will seek to exclude by motion in *limine*, pursuant to Rules 404(b) and 403 of the Federal Rules of Evidence. The government essentially provided generalities of the evidence rather than a comprehensive list, which identifies the dates and places of the specific alleged criminal conduct.

In his concurring opinion in *U.S. v. Williams*, 985 F.2d 634, 640, 37 Fed. R. Evid. Serv. 1111 (1st Cir. 1993), Circuit Judge Torruella wrote a separate opinion to highlight his "exasperation at the repeated abuse of Rule 404(b) by government prosecutors." Coomplete and meaningful notice of evidence of other crimes, wrongs or acts the government intends to offer at trial is necessary to safeguard against such abuses. If the government is not held to the full breadth of the notice requirement, it will be able to proceed by "trial by ambush." The express purpose of the notice requirement of Rule 404(b), which was added by a 1991 amendment, was to reduce the surprise experienced by defendants by the introduction of 404(b) evidence at trial

---

[230] TR 6/3/03, P. 138;P. 142