and to protect the accused from "trial by ambush." *U.S. v. Perez-Tosta,* 36 F.3d 1552, 1561, 41

Fed. R. Evid. Serv. 639 (11th Cir. 1994)

As noted above, it is impossible for the defendants to challenge the admissibility of this

evidence, either under Rule 404(b) or Fed.R.Evid. 403, without proper notice. It is obviously

equally impossible for the Court to evaluate these same issues. As importantly, the defendants

are left without any meaningful opportunity to prepare to meet the mystery evidence the

government proposes to introduce, inevitably leading to the types of delays and prejudice Rule

404(b) was designed to prevent.

These concerns are precisely what led the Judiciary Committee to amend Rule 404(b) in

1991 to include a notice requirement. As set forth in the Advisory Committee's Note

{t}he amendment to Rule 404(b) adds a pretrial notice requirement to criminal cases and is intended to reduce surprise and promote early resolution on the issue of admissibility. The notice requirement thus places Rule 404(b) in the mainstream with notice and disclosure provisions in other rules of evidence...the rule expects that counsel for both the defense and the prosecution will submit the necessary requests and information in a reasonable and timely manner...the amendment requires the prosecution to provide notice regardless of how it intends to use the extrinsic act evidence at trial, i.e., during its case in chief, for impeachment, or for possible rebuttal.

Defense counsel Mr. Ling was aware of the government's intention of calling Barcena

and Iaukea as witnesses. The Jencks material given to him on 4/17/03 should have motivated

him to attempt to interview these two and, at the least, submit a motion to exclude prior bad acts

at trial. The trial record reflects that Mr. Ling did not attempt independent interviews with these

witnesses prior to trial. On the first day of trial, upon discussions of 404 (b) evidence,

discussions went as follows:

MR. LING: Well, what I do need from him is the time, the place, more specifically a time, and was there any other people present at that time. More specifics as to those buys and sells. ... I'd like to be able to talk to Ann Barcena myself.
THE COURT: Wasn't she listed as a witness? I mean, nobody's –

MR. LING: I don't know where she is. I don't know her location, her address, her phone numbers. I don't know that.

MR. BRADY: Judge, again, the Court gave us a period of time in which to submit a witness list. The government did that, gave it to Mr. Ling. I've never received a call from Mr. Ling to interview any of the government's witnesses…[231]

Mr. Ling's failure to attempt contact with and interview either of the government's key witnesses was unreasonable. The courts have previously ruled that a defense counsel's failure to interview witnesses[232] and conduct pretrial investigation[233] can be reviewed on a 2255. In addition, courts have ruled that counsel's failure to object to clear misconduct by a prosecutor amounts to ineffective assistance of counsel: "One of defense counsel's most important roles is to ensure that the prosecutor does not transgress the[e] bounds [of proper conduct.]"[234]

Furthermore, on the first day of trial, Mr. Ling received, via email (See Exhibit 17, cover letter) a completed EMERGENCY MOTION IN LIMINE FOR DISCLOSURE OF INTENT, FOR A HEARING OUTSIDE THE PRESENCE OF THE JURY, AND TO EXCLUDE CERTAIN EVIDENCE (See Exhibit 19). This motion was prepared by a paralegal at Ms. Veloria's request in anticipation of this situation. Mr. Ling brought said motion to court with him that day and indicated that he intended to file it, although he failed to do so. Under these circumstances, what more could Ms. Veloria do to ensure this issue was properly placed before the Court?

Ms. Veloria requests reversal.

---

[231] TR 6/3/03, pp. 142-143
[232] *Williams v. Washington*, 59 F3d 673 (7th Cir 1995).
[233] *U.S. v. Gray*, 878 F.2d 702 (3rd Cir. 1989).
[234] *Washington v. Hofbauer*, 288 F3d 689 (6th Cir. 2000).

**CLAIM NUMBER 17**

**MS. VELORIA'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS DENIED WHEN COURT APPOINTED[235] COUNSEL FAILED TO SUBMIT A MOTION REQUESTING CERTAIN EVIDENCE BE EXCLUDED FROM USE AGAINST HER AT TRIAL.**

Prior to Ms. Veloria's criminal trial in Federal District Court, she made several specific requests to her attorneys regarding the filing of pre trial motions. Ms. Veloria attempted to persuade said attorneys to submit a motion seeking to exclude certain evidence from being introduced at trial. (See exhibits 11, 12 and 14)

Far from Ms. Veloria stating that she verbally requested her attorneys to move the court to exclude prior bad acts, Ms. Veloria prides proof herein that these requests were made well in advance of trial. The record reflects that no such motion was ever filed on behalf of Ms. Veloria.

After speaking with her trial counsel and learning of his failure to protect her interests, Ms Veloria arranged for a paralegal to prepare a motion, See exhibit 19, EMERGENCY MOTION IN LIMINE, FOR DISCLOSURE OF INTENT, FOR A HEARING OUTSIDE THE PRESENCE OF THE JURY AND TO EXCLUDE CERTAIN EVIDENCE. Although this motion was received by Attorney Ling at the start of jury selection in Ms. Veloria's trial (See cover letter, Exhibit 17) he failed to file it, although he indicated verbally that he would.

Defense Counsel Ling was ineffective for failing to move the Court to exclude certain evidence from being used against Ms. Veloria. The government introduced testimony of uncharged wrongs against Ms. Veloria and the court allowed into evidence a two page typed

---

[235] Attorney Alexander Silvert; Attorney Emmanuel Guerrero; and Attorney Winston Ling.

letter[236] Supporting the government's allegation that Ms. Veloria attempted to obstruct justice.[237] Although said letter was signed by someone other than Alicia Katrina Lynn Veloria

Ms. Veloria's conviction was the result of testimony and arguments of uncharged offenses, conspiracy to obstruct justice,[238] conspiracy to suborn perjury,[239] money laundering,[240] and prior drug sales.[241] This permitted the government to launch and evidentiary harpoon which could not be overcome by the defense.

The ambush of uncharged offenses created a presumption of guilt of the uncharged offenses. Once introduced, Ms. Veloria was placed in the untenable position of being forced to forfeit one right in order to exercise another.

Ms. Veloria was under the threat of additional charges being filed against her if she took the stand to deny the testimony and evidence of uncharged offenses. The jury was left to believe the uncharged offenses because Ms. Veloria did not take the stand to deny them. This forced Ms. Veloria to choose between leaving the jury to convict her on other uncharged offenses or forfeiting her right not to be compelled to testify, and take stand and risk additional criminal charges.

The government went too far in shifting the burden to prove each essential element of the offenses charged in the indictment form the government, to the defendant to disprove the uncharged offenses. The Due Process Clause prohibits shifting the burden of proof to the defendant.[242]

---

[236] Governments exhibit No. 27; Tr 6/4/03, P.78-79; P. 87-103
[237] Although said letter was signed by someone other that Alicia Kartrina Lynn Veloria.
[238] Tr. 6/3/03, P178-179; Tr. 6/4/03, P 97-104
[239] government's exhibit No. 27, letter received by Wallace Iaukea; Tr. 6/4/03, P 78-79; P. 86, L 23-25; P. 87-103.
[240] Sears gift certificates, jewelry, and money; Tr. 6/5/03, P. 101, L 19-25; P. 102, L 1-7
[241] Tr. 6/4/03, P. 80-81; Tr. 6/5/03, P. 101
[242] *Morrison v California*, 291 US 82, 78 L Ed 664, 54 S Ct 281 (1934)

In Ms. Veloria's case none of the uncharged offenses were in the indictment. The defense did not have notice before trial that the government intended to introduce uncharged offenses against Ms. Veloria during trial,[243] and the testimony and evidence of uncharged offenses was introduced during trial over the objection of defense counsel.[244]

The government argued to the court that the witness could testify to purchases of drugs within the same week of execution of the search warrant.[245] However, the government's witness to which they refer testified during trial that she could not even remember whether she had purchased drugs during 1996 or 1997, could not remember when Ms. Veloria was arrested, or even whether it was early or late during the year of 1996.[246]

Circuit Courts have found that convictions obtained by association of other crimes where evidence was weak (and in the defendant's case uncharged) must be reversed and remanded for a new trial.[247] It is as much a duty to refrain from improper methods calculated to produce wrongful convictions as it is to use every legitimate means to bring about a just one.[248]

Counsel for Ms. Veloria was ineffective when he took no action to prevent the introduction of evidence of "other wrongs, crimes, or acts" in an ambush of uncharged crimes,[249] which permitted the jury to convict the defendant based upon the uncharged offenses, instead of the two offenses charged in the indictment. This denied Ms. Veloria her right to be tried only on an indictment returned by a grand jury and her right to a unanimous jury verdict.

Ms. Veloria was clearly prejudiced by her attorney's failure to make any attempt to exclude ANY of the uncharged bad acts introduced during trial.

---

[243] Tr. 6/3/03, P 139-149
[244] Tr. 6/3/03, P 139-149; Tr. 6/4/03, P 91-92; Tr. 6/5/03, P 100
[245] Tr. 6/3/03, P 142, L 15-25.
[246] Tr. 6/5/03, P 115-116
[247] *United States vs. Valasquez, Dominues, Olamendi, and Gomez*, 772 F. 2d 1240 (7th Cir., 1985).
[248] *Berger vs. United States*, 295 U.S. 78, 88 (1935).
[249] *United States vs. Blankenship*, 775 F. 2d 735 (6th Cir. 1985).

If, at trial, defense counsel had submitted a pre-trial motion to exclude admission of the letter Wallace Iaukea allegedly received from Ms. Veloria on the grounds that it was fabricated, signed by someone other that Ms. Veloria, and could not be authenticated, Ms. Veloria's jury may have arrived at a different verdict.

The probative value of government's exhibit 27 did not out weigh the prejudicial nature of it's contents. The only foundation for admission for the letter was Wallace Iaukea's testimony. At the time of his testimony against Ms. Veloria, Iaukea had a total of 34 prior convictions, many of which are for offenses tainted with dishonesty, showing Iaukea's propensity towards behavior which should be viewed as suspect.

Ms. Veloria's trial record reflects that the jury acquitted on Count 2. Iaukeas's testimony focused on the offense charged in count 2 and the jury acquitted, which demonstrates they considered Iaukea's testimony and allegations suspect and possibly motivated by self interest.

Ms. Veloria was denied her right to effective assistance of counsel with respect to the government's use of alleged prior bad acts against during trial. Counsel for Ms. Veloria maximized his ineffectiveness when he failed to file the motion prepared on behalf of Ms. Veloria when he indicated he would do so. Counsel for Ms. Veloria was negligent when he failed to prepare his own motion to exclude certain evidence on Ms. Veloria's behalf, but he should have honored Ms. Veloria's wishes and filed exhibit 19 on her behalf, if nothing more, at least to preserve her record on appeal.

Ms. Veloria is not the party responsible for the failure to raise this issue on direct appeal, as she prepared a pro se appeal brief (See Exhibit 35) containing this very issue therein.[250] Ms. Veloria asserts that during the preparation of her appeal, she repeatedly insisted, both verbally and in writing, that her court appointed appellate attorney preserve all of her appellant issues that

---

[250] See Exhibit 35, Veloria pro se appeal brief, p. 64

are contained within her pro se brief.[251]  Furthermore, Ms. Veloria's instance of specific issues

being raised on direct appeal is documented in attorney Samuel P. King, Jr.'s motion to withdraw

as counsel on appeal filed in the Ninth Circuit Court of Appeals.[252] as well as Ms. Veloria's pro

se response to said motion (See Exhibit 33).[253]

        In *Ratliff v. United States*,[254] cause was shown for purposes of a motion under

28 U.S.C. § 2255 because counsel rebuffed petitioner's request to raise issue on direct appeal.

Also, it should be noted that in October of 2004, Ms. Veloria was served with an order from a

Ninth Circuit Court of Appeals Appellate Commissioner bearing the words "Appellant is advised

that counsel is vested with the authority to decide which issues should be raised on appeal."[255]

As such, Ms. Veloria should not be held accountable for her counsel's failure to raise the issues

contained within written communications to counsel, as well as those within her pro se appeal

brief.

        Ms. Veloria requests reversal.

## CLAIM NUMBER 18

### MS. VELORIA'S FIFTH AMENDMENT RIGHT TO DUE PROCESS AND SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED WHEN EXCULPATORY RENT RECEIPT SEIZED DURING SEARCH WAS NOT INTRODUCED AT TRIAL

        The Constitution embodies a fundamental "right to present a defense, the right to present

the defendant's version of the facts." *Washington v. Texas*, 388 U.S. 14, 19 (1967).

        The evidence presented at trial demonstrated that on the morning of July 10, 1996,

H.P.D. officers entered an unlocked door and found Ms. Veloria asleep on the floor of the living

---

[251] Ms. Veloria mailed a copy of her pro se opening brief on 12/27/04 to appellate counsel.  This brief was comprehensive and in compliance with court rules.  Appellate counsel also received a copy of said brief on disk well in advance of Ms. Veloria's opening brief deadline of 2/23/2005.
[252] 03-10626 *USA v. Veloria*, filed 10/8/04
[253] 03-10626 *USA v. Veloria*, filed 10/15/04
[254] *Ratliff v. US* , 999 f2D 1023, 1026 (6TH Cir. 1993)
[255] 03-10626 *USA v. Veloria*, filed 10/18/04

room, along with a male. H.P.D. officers located the cocaine base in an unlocked bedroom[256] which contained a bed. The trial testimony of H.P.D. officers showed that two other people were arrested that morning at 69 Mauna Loa Street: Zachary Smith[257] and Ignacio Andres.[258] In addition to those two males, H.P.D. police report indicates that a third male was arrested on the morning of July 10, 1996 at the house on 69 Mauna Loa Street (See Exhibit 1). Unfortunately for Ms. Veloria, due to her counsel's ineffectiveness, evidence of Myles Kurashige's arrest was not elicited from Detective Sam Thomas' testimony at trial.

Both H.P.D. reports and the trial testimony of H.P.D. officers show that items of personal property belonging to at least five other people were seized from 69 Mauna Loa Street in connection with this case.[259] Had defense counsel viewed these seized items, along with the rent receipt, and familiarized himself with their potential use at trial, it is likely that there would have been a different outcome in Ms. Veloria's trial.

Ms. Veloria's Constitutional rights under the Fifth Amendment Due Process Clause and the Sixth Amendment's guarantee to effective assistance of counsel were violated when her court appointed counsel failed to inspect prior to trial, and introduce into evidence at her trial, a critical piece of evidence, namely a paid rent receipt for the month the search was conducted in the name of Marlene Anduha. Ms. Veloria was tried in United States District Court without offering any evidence on her behalf. Although the government did not disclose the exculpatory nature of the rent receipt, Ms. Veloria, on many occasions insisted on its existence and suggested that court appointed trial counsel should view the seized evidence before trial to determine its potential value.

---

[256] TR 6/5/03, p. 94
[257] TR 6/3/03, p. 215
[258] TR 6/3/03, pp. 221-222
[259] TR 6/3/0/, p. 223; 6/4/03, p. 66, p. 68; 6/5/03 p. 80, p. 93

It was a violation of Ms. Veloria's due process rights under the Fifth Amendment when she was deprived of her liberty without having been afforded the opportunity to introduce the rent receipt into evidence in her trial. The government failed to disclose the exculpatory nature of the rent receipt, which then made it easier for defense counsel to ignore Ms. Veloria's claim that it should be introduced at trial.

Ms. Veloria's right to effective assistance of counsel was violated when defense counsel ignored Ms. Veloria's repeated urging that the rent receipt would be useful in her defense establishing to her jury that she was not THE RENTER or listed anywhere as an occupant on the rental agreement. Ms. Veloria was subsequently convicted of possession with the intent to distribute cocaine base that was recovered pursuant to a search of the house the rent receipt was seized from and established payment for.

Ms. Veloria attempted to bring forth this issue on direct appeal through her pro se appeal brief[260] (See Exhibit 35) but appellate counsel exercised his "authority"[261] and chose to file only two trial issues in relation to Ms. Veloria's direct appeal, without even attempting to contact her Under *Ratliff*, Supra, Ms. Veloria believes that cause has been shown because her appellate counsel ignored her request to raise this issue on direct appeal, although the pro se brief Ms. Veloria prepared clearly raised it for potential review by Ninth Circuit Court of Appeals.

Ms. Veloria was prejudiced when the rent receipt for the month of July in the name of Marlene Anduah was not introduced at trial because the first of her jury's eight communications presented the question, "Was there proof of rental responsibility at the house?"[262] Had there been conclusive evidence of the rental receipt's existence presented at trial, there may have been a different verdict.

---

[260] Veloria pro se direct appeal brief p. 59
[261] Ninth Circuit Appellate Commissioner Order 10/18/04
[262] Dkt. 129 Note from the Jury #1, question #3

Ms. Veloria requests reversal.

## CLAIM NUMBER 19

## MS. VELORIA WAS DENIED HER SIXTH AMENDMENT RIGHT TO OFFER THE TESTIMONY OF FAVORABLE WITNESSES AT TRIAL

The Sixth Amendment also guarantees the accused "compulsory process for obtaining witnesses in his favor." This right, "fundamental and essential to a fair trial," applies in state as well as federal courts. *Washington*, 388 U.S. at 17-18. The right to present a defense combines with the Sixth Amendment right to confront adverse witnesses, thus constitutionalizing "the right to a defense as we know it." *California v. Green*, 399 U.S. 149, 176 (1970) (Harlan, J., concurring).

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right ot present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury to it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. The right is a fundamental element of due process of law.[263]

On many occasions, Ms. Veloria informed her attorneys that her older brother, Richard Marble, should be interviewed in relation to this case (See Exhibits 13, 14, 22 and 30). Initially, Assistant Public Defender Mr. Silvert expressed concern about Mr. Marble's Fifth Amendment right against self-incrimination. Additionally, there were concerns about conspiratorial implications in relation to Mr. Marble's potential testimony about the offenses Ms. Veloria was charged with.

The Supreme Court has recognized a legal entitlement to investigative assistance since *Powell v. Alabama*, 287 U.S. 45 (1932), reversed the convictions of the Scottsboro defendants. Powell held that an accused is entitled to the effective assistance of counsel "during

---

[263] *Washington vs. Texas*, 388 U.S. at 19

perhaps the most critical period of the proceedings...from the time of...arraignment until the beginning of...trial, when consultation, thorough on going investigation and preparation [are] vitally important." Id. T 57. The American Bar Association has specifically identified the duty of thorough investigation was an essential ethical obligation. See ABA Standards for Criminal Justice 4-4.1 (1980). Because it is counsel's admissions or statements to the lawyer of facts constituting guilt of the accused's stated desire to plead guilty." Id. The system, after all, is designed to free those whom the government cannot prove guilty beyond a reasonable doubt.

Counsel has a constitutional duty to make reasonable investigations or to make reasonable decisions that make particular investigation unnecessary. *Strickland v. Washington*, 466 U.S. 668, 691 (1984). The Sixth Amendment requires investigation and preparation, not only to exonerate, but also to secure and protect the rights of the accused. Such constitutional rights are granted to the innocent and guilty alike, and failure to investigate and file appropriate motions is ineffectiveness. See, e.g., *Kimmelman v. Morrison*, 477 U.S. 365 (1986)(failure to investigate and present Fourth Amendment claim was constitutionally ineffective).

Although Ms. Veloria specifically requested that court appointed defense counsel Ling interview her brother, Mr. Marble, (See Exhibits 13 and 14) the failed to do so without indicating why. Attorney Ling effectively denied Ms. Veloria's constitutional right to have compulsory process in her defense when he completely disregarded her verbal and written pleas for him to speak with and subpoena Mr. Marble for use at trial. Exhibit 14 attached establishes that Ms. Veloria made this request of Mr. Ling well in advance of trial;[264] after having requested previous counsel to interview Mr. Marble as well (See Exhibit 30), defense counsel Ling was ineffective

---

[264] This letter was copied from Ms. Veloria's email account and printed out for her records. Although it is not dated, Ms. Veloria believes it was emailed, faxed and mailed through the U.S. Postal Service sometime towards the end of 2002. Verification of this could be accomplished by viewing the various copies Mr. Ling undoubtedly received and should have preserved in the files.

for not contacting and subpoenaing the ONE witness Ms. Veloria had specifically requested him to.

Approximately six months prior to Ms. Veloria's trial, Mr. Marble was incarcerated in a county jail in the state of Washington. Although the subpoenaing of an out-of-state witness who is in custody can be cumbersome, it is possible. Ms. Veloria looked up the procedure and informed her counsel of it well in advance of her trial and the advance notice requirement. Ms. Veloria should have been afforded the right to call Mr. Marble as the sole witness in her defense. The attached exhibits demonstrate that court appointed defense counsel impeded Ms. Veloria's constitution right to have compulsory process in her defense without even giving an indication as to why.[265]

Ms. Veloria attempted to raise this issue on appeal (See Exhibit 35, Veloria pro se appeal brief, p. 75); however, appellate counsel disregarded her request and neglected to include it in his brief. Ms. Veloria was prejudiced by the denial of her constitutional right to have compulsory process in her defense when her jury was left to consider only the allegations of the government. If Mr. Marble had testified at Ms. Veloria's trial, many of the questions submitted by the jury would have been answered. The record reflects that Ms. Veloria's jury submitted eight communications during the four days of deliberations, one of which indicated they were deadlocked.[266] A total of twenty separate questions were contained within the eight communications.

If Ms. Veloria's older brother, Mr. Marble, had testified, providing an explanation for the items seized from the house on 69 Mauna Loa Street, it is likely that Ms. Veloria's jury would not have returned with a guilty verdict. Exhibit 22 establishes support for Ms. Veloria's claim

---

[265] See Exhibits 13, 14, 22 and 30.
[266] Dkt. 133 Note from Jury, filed 6/10/03

that it was her intent to call Mr. Marble as a witness. Additionally, Exhibit 22 provides proof that Mr. Marble had every intention to testify in Ms. Veloria's defense.

Ms. Veloria's counsel was ineffective for not interviewing and subpoenaing the one witness Ms. Veloria insisted on having for her defense. This failure resulted in the denial of a constitutional right. Through this 2255, Ms. Veloria has established that she attempted to raise this issue pretrial and on appeal. Ms. Veloria was severely prejudiced. Cause and prejudice standard has been met under *Frady*.[267]

Ms. Veloria requests reversal.

## CLAIM NUMBER 20

## MS. VELORIA'S FIFTH AMENDMENT RIGHT TO DUE PROCESS AND HER SIXTH AMENDMENT RIGHTS TO CONFRONTATION AND TO HAVE EFFECTUVE ASSISTANCE OF COUNSEL WERE VIOLATED WHEN COURT APPOINTED COUNSEL FAILED TO MOVE THE COURT FOR DISCLOSURE OF THE IDENTITY OF THE CONFIDENTIAL INFORMANT AGAINST HER

Ms. Veloria was entitled to the identity of the confidential informants referred to in the application for the search warrants and the police reports. The state admitted to at least one or more confidential informants. Ms. Veloria was entitled to the identity of the informants, where informants were the only witness to certain rebuttal evidence in this case, other than Ms. Veloria. Ms. Veloria had the right to call the informant as an essential defense witness.

Under *Roviaro v. United States*,[268] the "disclosure [of an informant's identity] is not automatic," and, "[c]onsequently, it has previously been determined it is the defendants' duty to move for disclosure of otherwise privileged information."

Ms. Veloria insisted on several occasions, that her court appointed attorney submit a motion requesting disclosure of the identity of the confidential informants who claimed to be

---

[267] Supra
[268] *Roviaro v. United States*, 353 U. S. 53 (1957).

witnesses and/or participants for offenses that Ms. Veloria was charged with. Exhibits 17 & 20

prove that counsel received, at the start of Ms. Veloria's trial a completed EMERGENCY

MOTION TO DISCLOSE IDENTITY OF CONFIDENTIAL INFORMANT AND

MEMORANDUM IN SUPPORT (see exhibit 20). In an attempt to exercise her constitutional

rights Ms. Veloria requested a paralegal to prepare this motion and email it to counsel (see

exhibit 17).

Court appointed trial counsel assured Ms. Veloria that he would file her Motion to

Disclose Identity of Confidential Informant, and even signed the documents in front of her.

However, the record reflects that no such motion or memorandum was ever filed in Ms.

Veloria's case.

The State appeared to urge, in effect, that "the prosecution can lie and conceal and the

defendants still have the burden to ... discover the evidence," so long as the "potential existence"

of a prosecutorial misconduct claim might have been detected. A rule thus declaring "prosecutor

may hide, defendant must seek," is not tenable in a system constitutionally bound to accord

defendants due process.

"Ordinarily, the courts presume that public officials have properly discharged their

official duties." [269]  Courts have several times underscored the "special role played by the

American prosecutor in the search for truth in criminal trials.[270]

The government concealed from the defendant that they knew the house at 69 Mauna Loa

had been rented to Marlene Anduha;[271] they knew the house was under electronic surveillance

---

[269]  *Bracy v. Gramley,* 520 U. S. 899, 909 (1997) (quoting *United States v. Chemical Foundation, Inc.,* 272 U. S. 1, 14-15 (1926)).

[270] Stickler v. Greene, 527 U.S. 263, at 281; accord of, Kyles v. Whitley, 514 U.S. 419, at 439-440 (1995); United States v. Bagley,  473 U.S. 667, 675, n. 6 (1985); Berger v. United States, 295 U.S.,
[271]  TR. 6/4/03 P. 68.

because Marlene Anduha was a protected witness;[272] the diagram prepared by Detective Benton

Bolos[273] contained information which could only have come from electronic surveillance,

although electronic surveillance was denied by Detective Bolos,[274] and the date it was

prepared[275] was long before application for the search warrant,[276] officers knew when applying

for the search warrant that Ms. Veloria was in the house on Mauna Loa street;[277] the officer went

straight down the hallway to the room where he knew the drugs to be;[278] the government knew

H.P.D. had seized a rent receipt for $190 the day of the search, and also knew that the letter "A"

belonged to Marlene Anduha;[279] the government knew that Mr. Iaukea had become an informant

working for the Hilo Police Department; the government knew that his telephone calls to Ms.

Veloria were monitored and recorded by law enforcement officers, that also provided money and

a scale to Mr. Iaukea; Mr. Iaukea jumped out of the vehicle as the officers arrived,  left the door

of the vehicle open as he exited, and demanded to be searched, so officers would know

immediately that Mr. Iaukea still had all the money he had been given. Ms. Veloria was targeted

by the same law enforcement officers that Mr. Iaukea was working with.

---

[272]  TR 6/5/03, P 93, L 17-25; P 93, L 1-12.

[273]  TR 6/5/03, P 93, L 17-25.

[274]  TR 6/5/03. P 94, L 1-12.

[275]  TR 6/5/03, P 93, L 20-25.

[276]  TR 6/5/03, P 93-94.

[277]  TR 6/3/03. P 205-206; TR 6/4/03 P 70; TR 6/6/03 P 123, L 11-18.

[278]  TR 6/3/03, P 205-206; TR 6/6/03 P 123, L 11-18.

[279]  TR. 6/6/03 P 88.

Counsel representing Ms. Veloria on direct appeal refused to raise this issue, although Ms. Veloria specifically requested him to do so (see Exhibit 35, Pgs. 60-65)

Ms. Veloria was prejudiced by counsel's failures because the confidential informants were Ms. Veloria's only available witnesses to rebut evidence offered by the government. As shown by the trial transcripts, Ms. Veloria did not present any evidence. With the identities of the confidential informants, Ms. Veloria would have placed the government's case-in-chief in further doubt and she would have been acquitted on both counts.

Ms. Veloria was entitled to the identity of the informants, so they could be called as essential defense witnesses, with the only rebuttal evidence other than Ms. Veloria herself.

Ms. Veloria requests reversal.

## CLAIM NUMBER 21

### MS. VELORIA'S FIFTH AMENDMENT RIGHT TO DUE PROCESS AND SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WERE VIOLATED WHEN PROSECUTOR FAILED TO CORRECT GOVERNMENT WITNESS TESTIMONY KNOWN TO BE FALSE

On 6/4/03, B. Bolos testified on behalf of the government regarding the execution of the search warrant. On direct examination, AUSA Brady posed to Bolos the following question: "Now once you got into this residence, what did you do?"[280] Bolos responded with

> "I walked passed the two persons straight down the hallway. I was making cursory checks of the other rooms for anyone else in the residence for security reasons, and I looked to my left, in the last bedroom I saw somebody on the floor."
> (Tr. 6/4/03, p. 135. L. 4)

This testimony is directly contradicted by the master police report written by S. Thomas in relation to the search warrant. (See Exhibit 1) Page two of exhibit 1 shows that Ignacio

---

[280] Tr. 6/4/03, p. 135, L.2

Andres was found asleep on the floor of the bottom unit forty-five minutes after the initial entry into the house.

Realizing that Bolos' testimony was inaccurately placing a third person within the upstairs unit upon H.P.D.'s entry into the house, AUSA Brady changed the subject with: "Now your responsibility then was to collect evidence; is that correct?"[281]

S. Thomas' master police report regarding the search of the house (See Exhibit 1) indicates that the "third person" located in the house was observed approximately 45 minutes later in the downstairs unit by Officer Mitchell Kanehailua. Therefore, Bolos' testimony that he walked past the two persons (Ms. Veloria and Mr. Smith) and found someone "in the last bedroom [ ] on the floor" was false.

AUSA Brady knew this testimony to be false, yet he failed to correct the misrepresentations of his witness. Although this false testimony admittedly could not have affected the verdict against Ms. Veloria, it should cast a shadow on the integrity of the prosecutor.

It would have taken minimal effort for AUSA Brady to correct Bolos' testimony of his own accord. A prosecutor has a duty to correct testimony that he knows to be false.[282] Testimony regarding occupants of the house and those who were accessible to the cocaine base was critical to the government. When Bolos wrongfully declared that he "saw somebody on the floor" after entering the upstairs unit and walking past Ms. Veloria and Mr. Smith, AUSA Brady was well aware that it was false. Simply changing the subject cannot relieve him of his duty to correct false testimony.

---

[281] Tr. 6/4/03, p. 135, L. 9
[282] Mastracchio v. Vose, 274 T 3d 590, 602 (1st Cir. 2001)

If trial counsel for Ms. Veloria had been effective, this false testimony would have been objected to and corrected. The fact that it was not even noticed, or addressed by defense counsel should be of concern to this court.

The Supreme Court ruled in *United States v. Cronic* that if counsel "entirely fails to subject the prosecutions case to meaningful adversarial testing" the adversarial process itself becomes presumptively unreliable.[283] With respect to this issue, defense counsel for Ms. Veloria clearly failed to subject the prosecutions case to meaningful adversarial testing.

First of all, Detective Bolos should not have been testifying falsely; second, AUSA Brady should have corrected it; third, Attorney Ling should have objected to the presentation of false testimony.

Ms. Veloria requests reversal.

## CLAIM NUMBER 22

### MS. VELORIA'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AND TO CONFRONT THE WITNESSES AGAINST HER WERE DENIED WHEN HER ATTORNEY FAILED TO RECOGNIZE AND ARGUE THE APPROPRIATE HEARSAY EXCEPTION TO QUESTION A WITNESS ABOUT HIS PRIOR STATEMENT

Wallace Iaukea was an occupant of the Ford Ranger that was seized by H.P.D. on November 22, 1996. Iaukea was listed as a "suspect" by H.P.D.[284] and did not provide a statement implicating Ms. Veloria until July 17, 2002.[285] Iaukea did, however, speak to Kristine Pagan, an investigator with the Federal Public Defender's Office, regarding this very issue. Soon after Ms. Veloria was arrested on a federal indictment in relation to this incident, Investigator Pagan spoke with Iaukea at Kulani Prison (See Exhibit 15). On November 22, 2000,

---

[283] United States v. Cronic, 466 U.S. at 659
[284] H.P.D. police report F-12443, Mitchell Kanehailua
[285] H.P.D. police report  Marshall Kanehailua

exactly four years after the incident, Investigator Pagan reported Iaukea's statement as being markedly different from the one H.P.D. would eventually record, allegedly given on July 17, 2002.[286]

On the second day of trial Iaukea was called as a witness by the government. Upon cross-examination, trial counsel attempted to expose Iaukea's bias and self-interest for testifying by referring to the above-mentioned previous statement.[287] However, when the government made a hearsay objection in response to this line of questions, Ms. Veloria's counsel was unable to effectively respond. The colloquy went as follows:

> MR. BRADY: Objection, Your Honor. I believe what he's testifying to is hearsay and I believe counsel is testifying to it.
> THE COURT: What hearsay rule do you think this falls under in terms of an exception? Give me the number.
> MR. LING: Well, Your Honor, I believe that it basically goes to –
> THE COURT: Just the number. I only need the number. I don't need an explanation. Go get your rule book and tell me the number that you think it falls under.
> MR. LING: I don't think it falls under any particular number, Your Honor, in this particular case.
> THE COURT: Okay. Well, then, the objection is sustained.[288]

Ms. Veloria asserts that while she was sitting at the defense table witnessing this exchange, Mr. Ling glanced at the "rule book" on the government's table, and because he didn't have a copy of the Federal Rules of Evidence, he proceeded to argue that it didn't "fall under any particular number." This is very clear example of an attorney's ineffectiveness.

Questions regarding a testifying witness' prior recorded statements are admissible under Federal Rules of Evidence 803 (5). Counsel effectively denied Ms. Veloria of her Sixth

---

[286] Compare Exhibit 15 with Iaukea''s trial testimony
[287] TR 6/4/03, p. 111, l. 17
[288] TR 6/4/03, p. 112-113

Amendment right to confront witnesses against her when he demonstrated his ineffectiveness by failing to argue the correct (or any) exception to the hearsay rule.

Ms. Veloria has a constitutional right through the Sixth Amendment to confront her accusers. Iaukea should have been confronted with his prior statement denying any knowledge of wrongdoing, and claiming that he had no personal knowledge of Ms. Veloria's involvement in cocaine distribution. In addition, it should be noted that during the interview with Investigator Pagan, Iaukea indicated "he did not want to talk about this matter without an attorney present."[289]  However, surprisingly enough, no such concern was noted from Iaukea in relation to his statement to Officer Kanehailua one year and seven months later, even though he was actually admitting to conduct which could trigger criminal charges.[290]  Specifically, Ms. Veloria highlights herein how she was prejudiced by her trial counsel's ineffectiveness in relation to Iaukea's prior statement.

Ms. Veloria's requests to raise this issue on direct appeal were rebuffed by her attorneys. The Ninth Circuit Court of Appeals' docket sheet for Ms. Veloria's appeal (03-10626 *USA v. VELORIA*) reflects the considerable amount of disagreement between Ms. Veloria and her counsel as to which issues should be raised in her direct appeal brief.[291]  Ms. Veloria believes she has met her burden for cause under *Frady* in light of her appellate counsel's refusal to raise these issues on direct appeal.  (See *Ratliff*, supra).

Ms. Veloria was clearly prejudiced by not being able to impeach Iaukea with his prior statement.  Iaukea gave testimony regarding the count Ms. Veloria was convicted of.  Had

---

[289] See Exhibit 15, Memorandum of Interview
[290] Providing a false statement to an officer, involvement in illegal drug transactions, possessing of illegal drugs, use of illegal drugs.
[291] See Attorney King's motion to withdraw as counsel, filed 10/08/04, Exhibit 33; Defendant/Appellant's pro se motion, filed 10/15/04; Appellate Commissioner Order, filed 10/18/04.

Iaukea's testimony been impeached, Ms. Veloria's jury may have arrived at a different outcome and acquitted her.

Ms. Veloria requests reversal.

## CLAIM NUMBER 23

### MS. VELORIA'S CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED WHEN COURT APPOINTED DEFENSE COUNSEL FAILED TO ASSERT 609 (A)(2) FEDERAL RULES OF EVIDENCE TO INTRODUCE CONVICTIONS FOR CRIMES OF DISHONESTY FOR BOTH GOVERNMENT WITNESSES WHO TESTIFIED AGAINST HER AT TRIAL THEREBY DENYING MS. VELORIA'S RIGHT TO CONFRONTATION

**GOVERNMENT WITNESS WALLACE IAUKEA**
**It was a violation of Ms. Veloria's Constitutional right to effective assistance of counsel when court appointed defense counsel failed to cite 609 (a)(2) Federal Rules of Evidence as a vehicle to introduce Wallace Iaukea's convictions for crimes of dishonesty, which included three THEFT 2, one BURGLARY 2, one LARCENY-THEFT 5-50, and one BURGLARY – NO FORCE. Defense counsel's incorrect belief and representation to the Court that Iaukea was currently serving a sentence for "drugs" further illustrates his ineffectiveness, as Iaukea was, at the time of his testimony, serving a sentence for SEXUAL ASSUALT 3 and VIOLATION OF PAROLE.[292]**

On June 4, 2003, the Assistant United States Attorney Mr. Brady called Wallace Iaukea as a witness in their case in chief. After brief background questions, the United States Attorney posed to Iaukea, "Sir, you're currently incarcerated; is that correct?" To which Iaukea replied, "Yes."[293] Iaukea testified that while incarcerated he spoke to a Hawaii Police detective on July 17, 2002 about his recollection of events in 1996. Iaukea further testified that he purchased "coke" from Ms. Veloria at the "top floor" of the Mauna Loa Street house sometime during the "summer months" of 1996.[294] Then Iaukea testified to his memory of what occurred on

---

[292] H.P.D. report No. F 83529; Parole revoked 9/15/1999 (as reflected in Iaukea's OBTS conviction report given to the defense on the day of Iaukea's testimony).
[293] TR 6/4/03, p. 78
[294] TR 6/4/03, p. 80-81

November 22, 1996. During his cross-examination, Iaukea testified that he retrieved cocaine on one occasion at the Mauna Loa house in the summer and one time "at a bar".[295]

Court appointed counsel Mr. Ling then requested to approach the bench and informed the Court that he wanted to "go into the area of why he's in jail at this time is for drugs, I believe. So I just wanted to get that out of him."[296]  The United States Attorney replied by saying "It is my understanding that a prior felony can come in if it goes to truth or veracity not drugs. So I would object unless the crime is for truth or veracity."[297]  The Court responded by asking defense counsel's purpose for wanting to get this evidence in.  Defense Counsel Mr. Ling responded by saying "His knowledge of drugs." An exchange then began as follows:

> THE COURT:  His knowledge of drugs.  Okay.  But this says for the purpose of attacking credibility of a witness.  To impeach evidence of conviction is not admissible. These don't apply.  I guess I need you to tell me under what rule this comes in.  If you're attacking the credibility, then you can get it in.  But I need to understand the relationship of his drug conviction to his credibility, in which case it seems like it could come in.
>
> MR. LING:  Well, Your Honor basically is I know what the Court is saying about credibility-wise.  It just goes to whether or not he has any knowledge about doing drugs. That goes to, I guess, to whether or not he knew that Alicia Veloria was dealing with drugs.
>
> THE COURT:  Okay.  But it says specific instances of the conduct of a witness for the purpose of attacking or supporting the witness's credibility other than conviction as provided in 609 may not be proved by extrinsic evidence.  They may, however, if probative of truthfulness or untruthfulness be inquired into concerning the witness's character for truthfulness.  I guess I don't see how this fits in.  Certainly some things can't come in, so you have to tell me how they fit in, otherwise, so far, I don't see it.  I mean, I understand what you're trying to do but I don't think it goes to credibility, which is the 609 exception.  And 608 says unless it goes to a 609 exception, it can't come in because 608 says it may not come in
>
> MR. LING:  I understand what you're saying.
> (TR. 6/4/03, p. 119-120)

---

[295] TR 6/4/03, p. 116
[296] TR 6/4/03, p. 117
[297] TR 6/4/03, p. 118

The Court then ruled that Defense Counsel could not "go into this area absent of laying a better foundation as to how it fits in under --" Defense Counsel interrupted and responded with, "Okay, I'll try, Your Honor."[298]

Defense counsel's performance fell below an objectively reasonable standard when he demonstrated his unfamiliarity with the rules governing impeachment, as well as his inability to decipher, by looking at an OBTS conviction report,[299] the charge for which a witness is currently incarcerated. Although the Court attempted to guide defense counsel down the correct path by stating clearly the avenues available to him, defense counsel failed to articulate an argument or even demonstrate he was cognizant of the importance of introducing the witness's convictions for crimes of dishonesty. A defense attorney who represents a client in a federal criminal trial for drug related charges should be prepared to expose government witnesses for their previous dishonest activities by way of introducing their convictions which reflect on the credibility of their testimony. It cannot be assumed that defense counsel's lack of familiarity and failure to introduce previous convictions was part of his strategy.

Ms. Veloria was prejudiced by defense counsel's errors in that had Iaukea's propensity towards repeated falsehoods been revealed to the jury, his credibility would have been found wanting. The jury would have known that Iaukea is less likely than the average trustworthy citizen to be truthful in his testimony. It cannot be said with certainty how much weight Ms. Veloria's jury gave to Iaukea's testimony, especially in light of the NOT GUILTY verdict on the count relating to the November 22, 1996 incident. Had defense counsel introduced these convictions, for which there is an automatic admissibility, there is a possibility of a different outcome in Ms. Veloria's trial.

---

[298] TR 6/4/03, p. 120
[299] Public access rap sheet; CJIS Hawaii

Ms. Veloria requests reversal.

## CLAIM NUMBER 24

**MS. VELORIA'S CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED WHEN COURT APPOINTED DEFENSE COUNSEL FAILED TO ASSERT 609 (A)(2) FEDERAL RULES OF EVIDENCE TO INTRODUCE CONVICTIONS FOR CRIMES OF DISHONESTY FOR BOTH GOVERNMENT WITNESSES WHO TESTIFIED AGAINST HER AT TRIAL THEREBY DENYING MS. VELORIA'S RIGHT TO CONFRONTATION**

### GOVERNMENT WITNESS ANN BARCENA-PACHECO

**It was a violation of Ms. Veloria's constitutional right to effective assistance of counsel when defense counsel failed to cite 609 (a)(2) of Federal Rules of Evidence to introduce Ann Barcena's convictions for crimes of dishonesty, which included one FORGERY 2, two THEFT 4, one BURGLARY 1, one UNAUTHORIZED ENTRY MOTOR VEHICLE, and one SHOPLIFTING (See Exhibit 23). Exposure of those convictions would have shed light on Barcena's well-established pattern of dishonesty as they all reflect on her veracity, and thus, propensity towards untruthfulness when it suits her.**

On June 5, 2003, the United States Attorney called Ann Barcena (who testified under the married name of Pacheco) in their case in chief. The Assistant United States Attorney asked what Barcena's "relationship" was with Ms. Veloria during the summer months of 1996, to which Barcena replied, "I was picking up drugs from her....crack cocaine....I was buying. I was using. She was a dealer."[300]

Before cross-examination, defense counsel, at Ms. Veloria's insistence, asked to approach the bench. When Ms. Veloria attempted to approach with him, the Court asked defense counsel if Ms. Veloria wanted to participate at the conference, to which defense counsel replied, "I believe she wants to."[301] Prior to this, Ms. Veloria had been striving to persuade defense counsel Ling of the importance of discrediting Barcena with her dishonest past. At the subsequent bench conference, after the jury had been dismissed, defense counsel began addressing his concern:

---

[300] TR 6/5/03, p. 99-100
[301] TR 6/5/03, p. 102

- 124 -

MR. LING: Well, Your Honor, basically is that, as I understand, Ms. Barcena had during that time frame of this – I guess during the search warrant and time frame of the pending case that's in 1997, she was found – she had pled out to several felony charges. And during the pendency of this trial, she met with the prosecutor's office, basically is she was still – her case was still pending. And we believe that – I believe that basically is that there's a possibility that she has a motivation and that she probably decided to help the government because she wants to incur favor, favorable results for her pending cases.

THE COURT: So what's the problem? Go ahead and ask her.

MR. LING: That's why I wanted to – before I – I wanted to let the Court know that's what I intend to do.

THE COURT: I will say this. You don't have to ask for a bench conference. Questions about whether a witness might have some self-interest, and therefore, may be biased in her testimony or may somehow be testifying out of self-interest are always allowed. Now, things that are irrelevant to that self-interest are not allowed. So if you want to ask her, for example: What are you charged with? I think that's not relevant. For example, suppose she's charged with bank robbery, okay, let's just take that hypothetical. I don't know why it matters that she was charged with bank robbery. Suppose she' charged with kidnapping. I don't know why that matters what the charge is. What matters for your purposes is that she may be testifying falsely for her own benefit, hoping that if she says something helpful to the government, the government will reward he cooperation by reporting it to whoever the sentencing judge is, whatever her cooperation is, so she can get a more lenient sentencing in that other matter. That, you definitely can go into. So, go ahead.

MR. LING: Basically is, during that time frame – what happened was she came up for another charge, some burglary. And what happened was it got mended down to a lesser charge of just trespassing…. And I asked her – can I name the charge at that point?

THE COURT: Wait a minute. You want to show that that was a reward already for her present cooperation?

MR. LING: Yes.

THE COURT: Again, what does it matter what the charge was? You can say, you were charged with another crime, and in fact, you got some consideration and ultimately were sentenced for a lesser charge….You can use that. Again, I don't see what the relevance is of what the charge was. But the fact that it went from a felony to a misdemeanor, yes. You can tie it up. If you want to suggest to her that it was because of her ongoing cooperation, so, gee, you know, if you kept cooperating, you would get further consideration. [302]

Defense counsel Ling failed to enunciate the proper avenue by which he could squarely place Barcena's convictions before the jury for their consideration. Instead, Ms. Veloria's jury was left in the dark with respect to Barcena's varying convictions weighing heavily on her veracity.

---

[302] TR 6/5/03, p. 107

Defense counsel's performance fell below an objective standard of reasonableness when he failed to acknowledge Barcena's chronic dishonesty and cite Federal Rules of Evidence 609 (a)(2) as the vehicle by which he could introduce Barcena's array of convictions so the jury, the triers of fact, could effectively weigh her testimony against her proven propensity to be dishonest. It is reasonable to expect that a defense attorney would familiarize himself with the ways in which to attack witness credibility. It is painfully evident that defense counsel was unaware, or at worst, unconcerned with his option of using these prior convictions to impeach Barcena's testimony. It cannot be presumed that this was a choice resulting from defense counsel's trial strategy.

These errors prejudiced the outcome in Ms. Veloria's trial because Barcena's testimony was essential to the government, as they had no direct evidence of Ms. Veloria's connection to the drugs recovered from the unlocked house on Mauna Loa Street. Hawaii Police Department testimony admitted that they entered an unlocked front door and found Ms. Veloria asleep on the floor in the living room, immediately upon entering the house.[303] There were no fingerprints found on the evidence introduced, nor did the Assistant United States Attorney produce testimony implicating Ms. Veloria from any one of the three others arrested at the Mauna Loa Street house that day.

In the absence of direct evidence, the jury was asked to consider circumstantial evidence linking Ms. Veloria to the cocaine base found in a bedroom of a house that was accessible by anyone walking through the unlocked front door. Barcena's testimony was not relevant to the July 10, 1996 search. Instead, she testified that she had purchased cocaine from Ms. Veloria "sometime in the summer of 1996."[304] This was not evidence linking Ms. Veloria to what the

---

[303] TR 6/3/03, p. 220-221
[304] TR 6/5/03, p. 99

Hawaii Police Department seized from a bedroom on the morning of July 10, 1996, but simply testimony given with the intention of misleading the jury. It would have taken minimal effort and experience for defense counsel to discredit Barcena, had he chosen to do so.

If government witness Barcena's propensity towards dishonesty had been revealed during trial, it cannot be said with certainty that the jury would have arrived at the same conclusion. Barcena's was the key testimony the government offered contributing to the jury making a finding that Ms. Veloria, rather than the three others arrested that day, was the individual in possession of the cocaine. The allowing of such an extremely dishonest witness, such as Barcena, to testify unchecked, undermined the fundamental fairness of Ms. Veloria's trial and the subsequent guilty verdict.

Ms. Veloria requests reversal.

## CLAIM NUMBER 25

### MS. VELORIA'S FIFTH AMENDMENT RIGHT TO DUE PROCESS AND HER SIXTH AMENDMENT RIGHTS TO CONFRONTATION AND EFFECTIVE ASSISTANCE OF COUNSEL WERE VIOLATED WHEN THE GOVERNMENT FAILED TO DISCLOSE THE FACT THAT THEIR WITNESS' (BARCENA) RECEIPT OF AN UNLIKELY DEFERRED ACCEPTANCE PLEA WAS A RESULT OF HER COOPERATION AGAINST MS VELORIA

On 5/22/1997, Barcena was arrested on a two-count indictment for BURGLARY in the FIRST DEGREE and THEFT in the FIRST DEGREE.[305] On 9/30/1997 a superseding indictment was issued with two counts:  BURGLARY in the FIRST DEGREE and UNAUTHORIZED ENTRY INTO MOTOR VEHICLE.  Barcena was subsequently granted a Deferred Acceptance of No Contest (DANC) for the charges listed in the superseding indictment (See Exhibit 23, Charges 14 and 15).

---

[305] State of Hawaii, 3PC 97-0-000137

A DANC plea is a special type of sentence authorized by Hawaii Revised Statutes 853 when it appears to the Court that the defendant is not likely to be a repeat offender, and where the ends of justice do not require imposition of the penalty for the offense charged.[306] At the time Barcena was facing these charges, she had already established a pattern of criminal behavior, including four convictions.[307] This leads one to believe that she, in fact, will re-offend.

Given the seriousness of the charges listed under 3PC97-0-000137, and the fact that there were multiple victims and reported property damage, it is unlikely that the Court would deem Barcena worthy of a DANC plea, absent some extraneous influence.  Barcena did not meet the general criteria set forth which would warrant granting a DANC plea.  Ms. Veloria believes further inquiry into this issue would uncover the fact that this plea was negotiated in light of Barcena's assistance to the Hawaii Police Department regarding drug distribution activities. Hilo is a very small community and it would not have been impossible for the authorities to secure certain considerations for Barcena by way of verbal agreement.

Additionally, the granting of these DANC pleas to Barcena initially benefited the state in its prosecution against Ms. Veloria, as the interpretation of laws governing impeachment in Hawaii would preclude defense counsel from using Barcena's DANC pleas against her in the event she testified against Ms. Veloria.[308]

During the time frame in which Barcena was initially arrested, then later charged and subsequently granted two DANC pleas in the above-mentioned case, Ms. Veloria, too, was facing proceedings at the hands of the same departments.  Barcena's DANC pleas were granted in the Circuit Court for the Third Judicial Court, the same court in which, at that time, Ms.

---

[306] Hawaii Revised Statutes  853 (2) and (3)
[307] SHOPLIFTING, RECKLESS DRIVING, TRAFFIC LANE MARKS VIOLATION and LIQUOR POSSESSION
[308] 62 H. 259, 614 p. 2d 386

Veloria's would be held. Coincidently, when the authorities[309] became aware of Barcena's obvious and well-documented probation violating behavior,[310] acknowledging the fact that in her current status of habitual criminal behavior and drug-induced state, Barcena would not make a reliable witness, the charges against Ms. Veloria were dismissed for the second time in state court (See Exhibit 6). The Hawaii Police Department never took a written statement from Barcena because they had her under their thumb the entire time charges were pending against Ms. Veloria in state court.

Barcena, while facing the possibility that her DANC pleas would be revoked, signed a two-page, typed statement on 6/20/98, containing allegations of Ms. Veloria and drug distribution. Included in the statement are the words, "At this time, I do not use drugs."[311] A little more than two weeks later, Barcena testified at a federal grand jury hearing. Once again being invited to lie, she was asked, "When is the last time you used drugs?" To which She responded, "Long time ago. I've been in treatment every day."[312] Under no circumstances would five weeks be considered a "long time."

The various arms of law enforcement working together in Ms. Veloria's case knew, or should have known, that their critical witness was actively engaging in conduct that would seriously undermine her credibility. The documented facts present themselves as follows: 1) At the earliest recorded date of 1/17/98, Barcena was in violation of the DANC pleas granted to her a mere two months earlier; 2) H.P.D. was notified, who in turn, was required to notify the Probation Department; 3) The decision to once again dismiss the charges against Ms. Veloria was directly related to the fact that Barcena would not have made a credible witness in Ms.

---

[309] H.P.D., Hawaii Probation Office, State Prosecutor
[310] Admission into Hilo Hospital on 1/17/98 for drug overdose, testing positive for cocaine, marijuana, opiates, benzodiazepines and antidepressant medications; 6/1/98 testing positive for cocaine and opiates
[311] Prepared by Special Agent Jason Pa
[312] Federal Grand Jury transcript, 7/8/98, ..5,L.16

Veloria's imminent state trial; 4) the federal government seized the prosecution against Ms. Veloria because they could (as they have) effectively deny any direct knowledge of Barcena's repeated drug-induced state, as well as all of the considerations the state authorities clearly granted her for the cooperation leading up to the signing of the statement on 6/20/1998.

Impeachment evidence challenging the witness' credibility generally falls within the *Brady* rule.[313] The importance of impeachment evidence was noted in *Pennsylvania v. Ritchie*,[314] holding, "…impeachment evidence is precisely the type of information that might be deemed to be material only well into the trial, as, for example, after the key witness has testified."

Information that a government witness may have a bias in favor of the government or against the defendant is *Brady* material.[315] The most commonly litigated bias pursuant to *Brady* is a witness' potential "liberty interest" bias – that the witness has a criminal case pending in court at the time of trial, or is on probation or parole, any of which might favorably be affected by government action.[316]

Even before *Brady*, the Supreme Court created a broad duty for the prosecutor to disclose perjured testimony. Due process is violated anytime perjured testimony is produced by the prosecutor's;[317] solicitation of the testimony is not required. Even when the perjury comes completely on the whim of the witness, if the prosecutor knows it is false, there is a duty to disclose.[318] Additionally, the prosecutor has a duty to disclose perjury going to the credibility of the witness as well.[319] In *Napue v. Illinois*, the Supreme Court found that the prosecutor's failure

---

[313] *Giglio v. U.S.*, 405 U.S. 154 (1972)
[314] 480 U.s. 39 at 65 (1987)
[315] *U.S. v. Bagley*, 473 U.S. 667, at 676 (1985); *U.S. v. Giglio*, 405 U.S. at 155
[316] *U.S. v. Giglio*, 405 U.S. 150; *U.S. v. Smith*, 77 F. 3d 511, (D.C. Cir. 1996)
[317] *Mooney v. Holohan*, 294 U.S. 103 (1935)
[318] *Alcorta v. Texas*, 355 U.S. 28 (1957)
[319] *Napue v. Illinois*, 360 U.S. 264 (1959)

to correct or disclose a witness' false statement that he had not been promised lenient treatment in another matter in exchange for his testimony against the defendant violated due process.[320]

Whether the defendant has requested any *Brady* material or not, the prosecutor must disclose known perjury if "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."[321]

In the matter of Ms. Veloria's federal trial, the finding of guilt proved to be a difficult one for her jury to reach. If the true circumstances surrounding the charges, initially reflected in *State v. Barcena*, 3PC97-0-000137, had been disclosed to the jury, the triers of fact may have arrived at a different conclusion. In light of Barcena's "liberty interest" during the time she was providing information about Ms. Veloria, the jury may have deemed her testimony suspect and acquitted Ms. Veloria. Barcena was the Government's key witness linking Ms. Veloria, rather than the three others arrested at 69 Mauna Loa Street, to the cocaine seized on July 10, 1996.

It was a violation of Ms. Veloria's constitutional right to effective assistance of counsel when defense counsel failed to impeach Ann Barcena with the above mentioned circumstances. Exposure of testimony under these conditions have shed light on Barcena's well established pattern of dishonesty as they all reflect on her veracity, and thus, propensity towards untruthfulness when it suits her.

Defense counsel's performance fell below an objective standard of reasonableness when he failed to acknowledge Barcena's self interest so the jury, the triers of fact, could effectively weigh her testimony against her proven propensity to be dishonest. It is reasonable to expect that a defense attorney would familiarize himself with the ways in which to attack witness credibility. It is painfully evident that defense counsel was unaware, or at worst, unconcerned with his

---

[320] Id. at 264
[321] *U.S. v. Agurs*, 427 U.S. 97, at 103 (1976)

responsibility to investigate and uncover bias and self interest of a testifying Witness.. It cannot be presumed that this was a choice resulting from defense counsel's trial strategy.

These errors prejudiced the outcome in Ms. Veloria's trial because Barcena's testimony was essential to the government, as they had no direct evidence of Ms. Veloria's connection to the drugs recovered from the unlocked house on Mauna Loa Street. Hawaii Police Department's testimony admitted that they entered an unlocked front door and found Ms. Veloria asleep on the floor in the living room, immediately upon entering the house.[322] There were no fingerprints found on the evidence introduced, nor did the Assistant United States Attorney produce testimony implicating Ms. Veloria from any one of the three others arrested at the Mauna Loa Street house that day.

In the absence of direct evidence, the jury was asked to consider circumstantial evidence linking Ms. Veloria to the cocaine base found in a bedroom of a house that was accessible by anyone walking through the unlocked front door. Barcena's testimony was not relevant to the July 10, 1996 search. Instead, she testified that she had purchased cocaine from Ms. Veloria "sometime in the summer of 1996."[323] This was not evidence linking Ms. Veloria to what the Hawaii Police Department seized from a bedroom on the morning of July 10, 1996, but simply testimony given with the intention of misleading the jury. It would have taken minimal effort and experience for defense counsel to discredit Barcena, had he chosen to do so.

If government witness Barcena's propensity towards dishonesty had been revealed during trial, it cannot be said with certainty that the jury would have arrived at the same conclusion. Barcena's was the key testimony the government offered contributing to the jury making a finding that Ms. Veloria, rather than the three others arrested that day, was the individual in

---

[322] TR 6/3/03, p. 220-221
[323] TR 6/5/03, p. 99

possession of the cocaine. The allowing of such an extremely dishonest witness, such as Barcena, to testify unchecked, undermined the fundamental fairness of Ms. Veloria's trial and the subsequent guilty verdict.

In *McClesky v. Zant*,[324] the Supreme Court ruled that a reasonable, even if as yet unconfirmed, belief that a meritorious fact based claim exists may oblige the prisoner to raise the claim and pursue it via court-funded investigation, discovery, an evidentiary hearing, or other fact-developing procedures of the sort that are often not fully available to prisoners until they file a habeas corpus petition. Thus, as Justice O'Connor has stated, referring to *McClesky*, the Court's "carefully crafted doctrines of waiver and abuse of the writ make it especially important that the first petition adequately set forth all of a [ ] prisoner's colorable grounds for relief."[325]

With respect to this issue, Ms. Veloria believes that she has presented a demonstrable need for further factual development to prove facts necessary for the Court to grant relief. This request is pursuant to Habeas Rule 6(a) and Federal Rules of Civil Procedure 26(a). Ms. Veloria asserts that the allegations and other factual contentions contained herein are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

Ms. Veloria requests reversal.

## CLAIM NUMBER 26

### MS. VELORIA'S FIFTH AMENDMENT RIGHT TO DUE PROCESS AND SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WERE VIOLATED WHEN SUSPICIOUS DATES REPORTED ON BARCENA'S "RAP SHEET" WERE NOT INQUIRED INTO DURING TRIAL THEREBY VIOLATING MS. VELORIA'S RIGHT TO CONFRONTATION

While Barcena was testifying for the Government on direct examination, Ms. Veloria reviewed the "rap sheet" given to the defense. Ms. Veloria first noticed that Barcena was

---

[324] 499 U.s. 467, 113 Led 2d 517
[325] *McFarland v. Scott*, 512 U.S. 849, 860 (1994) (citing McClesky)

reportedly arrested for HARRASSMENT on 2/21/02,[326] but somehow she had been sentenced

for said offense eleven months earlier. Defense counsel Ling dismissed the discrepancy by

saying it was "probably a typo." However, upon closer inspection of other dates reported by

Criminal Justice Information System Hawaii, one can see that the above-mentioned discrepancy

is not the only suspicious entry. In addition to the mystery of the HARRASSMENT charge, two

THEFT 4 sentencing dates are recorded as having taken place days before initial arrest.[327]

It is unlikely that all three entries are "typos." These entries are suspicious and warranted

further inquiry in support of the defense's theory that Barcena had been getting consideration

through the Hawaii Police Department for some time in relation to her continued cooperation.

Counsel for Ms. Veloria should have noticed these suspicious entries and addressed them outside

the presence of the jury. In fact, defense counsel could have attempted inquiry into Barcena's

criminal record prior to trial via the Hawaii State Judiciary web site,[328] which would have given

him adequate time to review and address these issues. Instead, counsel waited for the mandatory

disclosure by the prosecutor and then failed to adequately review its contents, thus allowing

Barcena's status of ongoing cooperation, repeatedly being the recipient of charge bargaining, and

the Hawaii Police Department's "doctoring" of information to go unexposed.

The suspicious entries in Barcena's "rap sheet" should have been explored. Ms. Veloria

should have been afforded the opportunity, through effective assistance of counsel, to expose

Barcena's denial of benefit for her cooperation in the prosecution against Ms. Veloria. On cross-

examination, Barcena blurted out, "I never get no deals, no favors, no nothing. I am here on

subpoena, and I was made no promises,"[329] when Ling suggested that she wanted to help the

---

[326] See Exhibit 23, Charge 4
[327] See Exhibit 23, Charges, 4, 12 and 13
[328] Allows inquiry into State of Hawaii Judicial records free of charge
[329] TR 6/5/03, p. 112, l. 17

police. The Government allowed this untruthful testimony, although the "rap sheet" itself, on its face, reflects a number of discrepancies and unlikely occurrences, all pointing toward the receipt of benefit. Any benefit was required to have been disclosed, pursuant to *Giglio*.[330]

Ms. Veloria was denied the right to a fair trial on account of the conspiracy between the Hawaii Police Department, Ann Barcena, and the Government covering up the continuing benefit received by Barcena over a number of years during the arrest and prosecution of Ms. Veloria. Barcena was the Government's key witness. But for her, there would not have been a prosecution. In *United States v. Abel*[331] the Court stated, "A successful showing of bias on the part of a witness would have a tendency to make the facts to which he testified less probable in the eyes of the jury than it would be without such testimony."[332]

It was a violation of Ms. Veloria's constitutional right to effective assistance of counsel when defense counsel failed to impeach Ann Barcena with the above mentioned circumstances. Exposure of testimony under these conditions have shed light on Barcena's well established pattern of dishonesty as they all reflect on her veracity, and thus, propensity towards untruthfulness when it suits her.

Defense counsel's performance fell below an objective standard of reasonableness when he failed to acknowledge Barcena's self interest so the jury, the triers of fact, could effectively weigh her testimony against her proven propensity to be dishonest. It is reasonable to expect that a defense attorney would familiarize himself with the ways in which to attack witness credibility. It is painfully evident that defense counsel was unaware, or at worst, unconcerned with his responsibility to investigate and uncover bias and self interest of a testifying Witness.. It cannot be presumed that this was a choice resulting from defense counsel's trial strategy.

---

[330] *Giglio v. United States*, 405 U.S. 150 (1972)
[331] 469 U. S. 45
[332] Ibid, at 51

These errors prejudiced the outcome in Ms. Veloria's trial because Barcena's testimony was essential to the government, as they had no direct evidence of Ms. Veloria's connection to the drugs recovered from the unlocked house on Mauna Loa Street. Hawaii Police Department's testimony admitted that they entered an unlocked front door and found Ms. Veloria asleep on the floor in the living room, immediately upon entering the house.[333] There were no fingerprints found on the evidence introduced, nor did the Assistant United States Attorney produce testimony implicating Ms. Veloria from any one of the three others arrested at the Mauna Loa Street house that day.

In the absence of direct evidence, the jury was asked to consider circumstantial evidence linking Ms. Veloria to the cocaine base found in a bedroom of a house that was accessible by anyone walking through the unlocked front door. Barcena's testimony was not relevant to the July 10, 1996 search. Instead, she testified that she had purchased cocaine from Ms. Veloria "sometime in the summer of 1996."[334] This was not evidence linking Ms. Veloria to what the Hawaii Police Department seized from a bedroom on the morning of July 10, 1996, but simply testimony given with the intention of misleading the jury. It would have taken minimal effort and experience for defense counsel to discredit Bardena, had he chosen to do so.

If government witness Barcena's propensity towards dishonesty had been revealed during trial, it cannot be said with certainty that the jury would have arrived at the same conclusion. Barcena's was the key testimony the government offered contributing to the jury making a finding that Ms. Veloria, rather than the three others arrested that day, was the individual in possession of the cocaine. The allowing of such an extremely dishonest witness, such as

---

[333] TR 6/3/03, p. 220-221
[334] TR 6/5/03, p. 99

- 136 -

Barcena, to testify unchecked, undermined the fundamental fairness of Ms. Veloria's trial and the subsequent guilty verdict.

If the Government continues holding their position that Barcena did not receive anything in exchange for her cooperation, then they should, at least, agree that the abundance of discrepancies in Barcena's criminal record establish the probability that the Hawaii Police Department, Hawaii Probation Department, and the Hawaii judicial system were engaged in favorable treatment with regard to Barcena's repeated law breaking and probation violating activities.[335]

Ms. Veloria requests reversal.

## CLAIM NUMBER 27

**MS. VELORIA'S FIFTH AMENDMENT RIGHT TO DUE PROCESS AND HER SIXTH AMENDMENT RIGHTS TO CONFRONTATION AND EFFECTIVE ASSISTANCE OF COUNSEL WERE VIOLATED WHEN KEY GOVERNMENT WITNESS COMMITTED PERJURY DURING HER GRAND JURY TESTIMONY**

On July 8, 1998, Ann Barcena appeared before a federal grand jury and gave testimony regarding "Ms. Veloria and others" relative to drug distribution activities.[336] During her testimony, Barcena was asked, "When is the last time you used drugs?" to which she replied, "Long time ago. I've been in treatment every day."[337]

Barcena's testimony regarding the length of time since she last "used drugs" was an outright lie. According to documents found within the files of the Circuit Court of the Third Circuit, Probation Officer Ruth Mizuba reported that Barcena "tested positive for cocaine and opiates" on 6/1/98. At the time of Barcena's signed statement, 6/20/1998, and her grand jury testimony relative to the case against Ms. Veloria, Barcena was and had been in violation of the

---

[335] This statement is made based on various documents obtained from the Hilo courthouse establishing Barcena's activities and the departmental reactions to them.
[336] Federal Grand Jury transcript, 7/8/98, p. 5, l. 5
[337] Ibid, p. 5, l. 16

terms and conditions of her DANC pleas.[338] The DANC pleas were granted on 11/19/1997 for the charges of BURGLARY in the FIRST DEGREE and UNAUTHORIZED ENTRY INTO A MOTOR VEHICLE.

It is unlikely that the Government was unaware of Barcena's noncompliant probationary status. In fact, the reason for Barcena becoming an informant was an attempt to negate the impending procedures against her. The Government's likely claim of ignorance regarding Barcena's status should be viewed with skepticism. At best, the Government should be considered negligent.

It was a violation of Ms. Veloria's constitutional right to effective assistance of counsel when defense counsel failed to impeach Ann Barcena with the above mentioned circumstances. Exposure of testimony under these conditions have shed light on Barcena's well established pattern of dishonesty as they all reflect on her veracity, and thus, propensity towards untruthfulness when it suits her.

Defense counsel's performance fell below an objective standard of reasonableness when he failed to acknowledge Barcena's self interest so the jury, the triers of fact, could effectively weigh her testimony against her proven propensity to be dishonest. It is reasonable to expect that a defense attorney would familiarize himself with the ways in which to attack witness credibility. It is painfully evident that defense counsel was unaware, or at worst, unconcerned with his responsibility to investigate and uncover bias and self interest of a testifying Witness.. It cannot be presumed that this was a choice resulting from defense counsel's trial strategy.

These errors prejudiced the outcome in Ms. Veloria's trial because Barcena's testimony was essential to the government, as they had no direct evidence of Ms. Veloria's connection to

---

[338] Barcena was admitted to Hilo Hospital on 1/17/98 for drug overdose. She tested positive for cocaine, marijuana, opiates, benzodiazepines and antidepressant medications.

the drugs recovered from the unlocked house on Mauna Loa Street. Hawaii Police Department's testimony admitted that they entered an unlocked front door and found Ms. Veloria asleep on the floor in the living room, immediately upon entering the house.[339]  There were no fingerprints found on the evidence introduced, nor did the Assistant United States Attorney produce testimony implicating Ms. Veloria from any one of the three others arrested at the Mauna Loa Street house that day.

 In the absence of direct evidence, the jury was asked to consider circumstantial evidence linking Ms. Veloria to the cocaine base found in a bedroom of a house that was accessible by anyone walking through the unlocked front door. Barcena's testimony was not relevant to the July 10, 1996 search. Instead, she testified that she had purchased cocaine from Ms. Veloria "sometime in the summer of 1996."[340]  This was not evidence linking Ms. Veloria to what the Hawaii Police Department seized from a bedroom on the morning of July 10, 1996, but simply testimony given with the intention of misleading the jury. It would have taken minimal effort and experience for defense counsel to discredit Barcena, had he chosen to do so.

 If government witness Barcena's propensity towards dishonesty had been revealed during trial, it cannot be said with certainty that the jury would have arrived at the same conclusion. Barcena's was the key testimony the government offered contributing to the jury making a finding that Ms. Veloria, rather than the three others arrested that day, was the individual in possession of the cocaine. The allowing of such an extremely dishonest witness, such as Barcena, to testify unchecked, undermined the fundamental fairness of Ms. Veloria's trial and the subsequent guilty verdict.

 Ms. Veloria request reversal.

---

[339] TR 6/3/03, p. 220-221
[340] TR 6/5/03, p. 99

<u>CLAIM NUMBER 28</u>

**PROSECUTOR ALLOWED GOVERNMENT WITNESS BARCENA TO TESTIFY FALSELY REGARDING CIRCUMSTANCES OF REDUCED CHARGE THEREBY VIOLATING MS. VELORIA'S RIGHT TO CONFRONT THE WITNESSES AGAINST HER WITH EFFECTIVE ASSISTANCE OF COUNSEL**

During cross-examination of Government witness Barcena, defense counsel Ling attempted to explore the significant reduction of charges received by Barcena in 1999.[341]  When specifically asked about the charge that she had in 1999 for which she was facing "up to ten years in jail, but then [ ] it [went] [ ] from a felony down to a misdemeanor,"[342] Barcena responded untruthfully.  Barcena testified that the reason her charge went from a Class B felony to a misdemeanor was because "…We proved it in court that wasn't a felony…When the witnesses we put on the stand, the truth was said and the charge was dropped to a lower charge."[343]  When the Court attempted to clarify who "changed" the charge, Barcena responded by saying, "The prosecutor and the judge, I guess."[344]

Further attempts by Mr. Ling to flush out the true circumstances surrounding Barcena's reduction of charges were met with hostility, as evidenced in the following exchange:

> MR. LING:  The judge changed it?  If I were to show you a copy of the record saying that it was amended, would that refresh your recollection?   So what I'm saying is the judge didn't say, Okay, you're found not guilty in the felony and it's a misdemeanor?

> BARCENA:  You can show me whatever you like.  What I'm saying here today is the truth and subpoenaed to tell the truth.  I'm not promised no deals.  I'm not doing this because this, this, this.  And I'm subpoenaed to tell the truth.  That's basically why I'm here."[345]

---

[341] TR 6/5/03, p. 112,L. 23; See Exhibit 23. Charge 11
[342] TR 6/5/03, p. 113, L. 1
[343] TR 6/5/03, p. 113, L. 9-23
[344] TR 6/5/03, p. 114, L. 8
[345] TR 6/5/03, p. 114, L. 9-19

According to documents filed in the State of Hawaii Third Circuit Court, as well as those found on Hooiki web site, indicate that Barcena's reduction of charge was a result of a change of plea[346] and not "witnesses" being "put on the stand" as she testified before the jury.[347]

The complaint filed in the Third Circuit Court for the State of Hawaii (See Exhibit 24), as well as the amended complaint (See Exhibit 25) both reflect the factual basis behind the charges. The court minutes for *State of Hawaii v. Barcena*, Cr. N. 99-002, indicate that on 5/24/99, the Court entered a change of plea with respect to these charges. Barcena's reduced charge was not the result of having "proved in court that it wasn't a felony" as she testified. Exhibit 26 shows that Barcena changed her plea to No Contest for a reduced charge of Criminal Trespass in the First Degree because she wanted "to take advantage of the plea agreement in this case."[348]

At the time of her testimony, the Government was aware of the basis for Barcena's reduction, yet they allowed Barcena to proceed with her perjurious misrepresentations in front of Ms. Veloria's jury. *Banks v. Dretke* [349] held that the Government was required to correct a witness' "misrepresent[ations] [of] his dealings with the police." Additionally, the Court found that "when police or prosecutors conceal significant exculpatory or impeachment material in the State's possession, it is ordinarily incumbent on the State to set the record straight."[350]

Barcena was the Government's key witness in its case against Ms. Veloria. If the Government had been forthright, doing so would have obligated Barcena to testify truthfully, and Ms. Veloria's jury may have arrived at a different verdict. The mere fact that the prosecution silently condoned the discussion during trial between Barcena and Mr. Ling demonstrates the Government's intent to support Barcena's perjurious testimony.

---

[346] See Exhibits 25A, 25B and 26
[347] TR 6/5/06, p. 113, L. 21
[348] Exhibit 26, Guilty Plea No Contest, entry #6.  ** It should be noted that two pages bear an incorrect CR. No.
[349] 540 U. S. 668 (2004)
[350] *Banks v. Dretke*, 540 U. S. 668 at ****

The docket sheet for CR. No. 99-002[351] establishes that with respect to Barcena's charges, witnesses had not been "put on the stand" resulting in a reduced charge. Exhibit 26 provides proof against Barcena's testimony. The reduced charge was a result of a lenient Rule 11 plea agreement (See Exhibit 26).

The Government, the Court, and counsel for Ms. Veloria were well aware of the unrealistic nature of the picture Barcena was attempting to paint with respect to a Class B felony having been reduced to a petty misdemeanor. Exhibits 25A, 25B, and 26 establish that Barcena was untruthful, and, in fact, gave an obviously impractical explanation for the reduction, which should have raised red flags for all parties involved. The Supreme Court has imposed upon the Government a duty to correct Barcena's misrepresentations.[352] Pursuant to *Davis v. Alaska*,[353] defense counsel was obligated to cross-examine Barcena and subject the Government to a "meaningful adversarial challenge." The Court had a duty to uphold the integrity of the proceedings and could have inquired further into Barcena's unlikely representations.

It was a violation of Ms. Veloria's constitutional right to effective assistance of counsel when defense counsel failed to impeach Ann Barcena with the above mentioned circumstances. Exposure of testimony under these conditions have shed light on Barcena's well established pattern of dishonesty as they all reflect on her veracity, and thus, propensity towards untruthfulness when it suits her.

Defense counsel's performance fell below an objective standard of reasonableness when he failed to acknowledge Barcena's self interest so the jury, the triers of fact, could effectively weigh her testimony against her proven propensity to be dishonest. It is reasonable to expect that a defense attorney would familiarize himself with the ways in which to attack witness credibility.

---

[351] Or variations of, including 99-2, 99-0002
[352] *Napue v. Illinois*, 360 U. S. 264 (1959)
[353] 415 U. S. 308 (1974)

It is painfully evident that defense counsel was unaware, or at worst, unconcerned with his responsibility to investigate and uncover bias and self interest of a testifying Witness.. It cannot be presumed that this was a choice resulting from defense counsel's trial strategy.

These errors prejudiced the outcome in Ms. Veloria's trial because Barcena's testimony was essential to the government, as they had no direct evidence of Ms. Veloria's connection to the drugs recovered from the unlocked house on Mauna Loa Street. Hawaii Police Department's testimony admitted that they entered an unlocked front door and found Ms. Veloria asleep on the floor in the living room, immediately upon entering the house.[354] There were no fingerprints found on the evidence introduced, nor did the Assistant United States Attorney produce testimony implicating Ms. Veloria from any one of the three others arrested at the Mauna Loa Street house that day.

In the absence of direct evidence, the jury was asked to consider circumstantial evidence linking Ms. Veloria to the cocaine base found in a bedroom of a house that was accessible by anyone walking through the unlocked front door. Barcena's testimony was not relevant to the July 10, 1996 search. Instead, she testified that she had purchased cocaine from Ms. Veloria "sometime in the summer of 1996."[355] This was not evidence linking Ms. Veloria to what the Hawaii Police Department seized from a bedroom on the morning of July 10, 1996, but simply testimony given with the intention of misleading the jury. It would have taken minimal effort and experience for defense counsel to discredit Barcena, had he chosen to do so.

If government witness Barcena's propensity towards dishonesty had been revealed during trial, it cannot be said with certainty that the jury would have arrived at the same conclusion. Barcena's was the key testimony the government offered contributing to the jury making a

---

[354] TR 6/3/03, p. 220-221
[355] TR 6/5/03, p. 99

finding that Ms. Veloria, rather than the three others arrested that day, was the individual in possession of the cocaine. The allowing of such an extremely dishonest witness, such as Barcena, to testify unchecked, undermined the fundamental fairness of Ms. Veloria's trial and the subsequent guilty verdict.

Barcena was the Government's key witness against Ms. Veloria. If Barcena had been effectively impeached, the jury may have acquitted Ms. Veloria.

Ms. Veloria requests reversal.

## CLAIM NUMBER 29

**MS. VELORIA'S FIFTH AMENDMENT RIGHT TO DUE PROCESS OF LAW AND HER SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WERE VIOLATED WHEN GOVERNMENT WITNESS BARCENA'S "RULE 35" DIRECTLY RELATED TO MS. VELORIA'S INDICTMENT TWO DAYS LATER WAS NOT DISCLOSED NOR DISCOVERED WITH REASONABLE INVESTIGATION THEREBY VIOLATING MS. VELORIA'S RIGHT TO CONFRONTATION**

Although Government witness Barcena testified under oath at Ms. Veloria's trial that she received or expected "no deals, no favors, no nothing,"[356] a correlation of events suggest otherwise.

On 4/11/00, Barcena appeared in Third Circuit Court for the State of Hawaii to be resentenced on three separate criminal cases,[357] as she had violated the terms and conditions imposed upon her and her probation had been revoked.[358]

For criminal case number 97-137, BURGLARY in the First Degree and UNAUTHORIZED ENTRY INTO MOTOR VEHICLE, this was to be the third time Barcena was sentenced. Initially she was granted a DANC plea with five years supervision. Upon the

---

[356] TR 6/5/03, p. 112, l. 17
[357] *State of Hawaii v. Barcena*, CR. Nos. 99-149, 99-2 and 97-137
[358] See Exhibit 23, Charges 5, 6 and 7

first revocation of this probation, she received six months jail time under a mutual agreement plan to run concurrent with the other case for which her probation was also revoked.[359]

As to criminal case number 99-149, FORGERY in the Second Degree, this was the second time Barcena was sentenced, the first time having been grouped under a mutual agreement plan and running concurrent with two others.

With respect to CR. No. 99-002, the case which was plea bargained from BURLGARY in the First Degree and THEFT in the Fourth Degree down to the petty misdemeanor CRIMINAL TRESPASS, Barcena previously had received one year of probation.

At the hearing on 4/11/00, Officer Ruth Mizuba noted, among many other things, that Barcena's "criminal behavior has been habitual."[360]  The state prosecutor added the following argument against leniency:

> "...The Court is very familiar with this case, having sentenced this Defendant on three separate cases...First of all, Barcena was given the BENEFIT of probation from the state in the original case...She subsequently got two other cases and she again was given probation.  She has been revoked, she has been given probation."[361] (Emphasis added.)

The Court added:
> "Well, actually ma'am, since 1997 we've seen each other kind of a lot, yeah? Right?  And since that time, you know, Miss Mizuba, she's a very hard worker and she's helped you a lot, too; right?  She's tried to work with you; right?  And actually, you know what, I have my notes from all those years that WE HAVE BEEN WORKING WITH YOU...But I guess my point is that she has been trying to help you in lots of different ways.  And so have I.  And actually, we gave you more chances than we normally give anybody.  It wasn't just one chance or two chances.  It was quite a few chances..."[362] (Emphasis added.)

Barcena ultimately received the following sentences to run concurrently:  Criminal Case No. 99-149, five years for the felony charge, one year for the misdemeanor charge; Criminal

---

[359] CR. Nos. 99-149 and 99-002, sentenced on 7/29/99
[360] *State of Hawaii v. Barcena*, TR 4/11/00, p. 5, l. 24
[361] *State of Hawaii v. Barcena*, TR 4/11/00, p. 9, l. 15
[362] *State of Hawaii v. Barcena*, TR 4/11/00, p. 16-17

Case No. 99-002, one year; Criminal Case No. 97-137, ten years for the Class B felony and five years for the Class C felony.

After the judge imposed these sentences upon Barcena, her defense counsel, Mr. Michael Ebesugawa, placed an Oral Rule 35 on the record (See Exhibit 27A). Surprisingly, after nearly four years of waiting, the federal government indicted Ms. Veloria a mere two days later, on 4/13/00. However, this is not the only coincidental date noted when comparing dates with respect to Barcena.

Pursuant to the Rule 35 placed on Barcena's "record," less than a year later, well before the "minimum sentence" date given by the Hawaii Paroling Authority,[363] all of Barcena's prison sentences were reduced to probation.[364] At the hearing in the Third Circuit Court on 4/5/01, Barcena was made aware of the "substantial break that she [was] receiving"[365] and then released that day.

Barcena's Rule 35 was directly related to her promise of cooperation against Ms. Veloria, if and when Ms. Veloria's case went to trial. Files and records within the Third Circuit Court for the State of Hawaii verify that Barcena's Rule 35 was not pursuant to (a) correction of sentence pursuant to (1) illegal sentence, or, (2) clear error.[366] There is an obvious correlation between Ms. Veloria's charges and the charges, revocation, and sentencing of Barcena over a period of years.

On 4/11/00, three sentences were handed down: One ten-year sentence and two five-year sentences. At that point, Barcena became aware that she needed to do something to mitigate her prison time. Counsel for Barcena placed an oral Rule 35 on the record and likely began contacts

---

[363] See Exhibit 27B, p. 2
[364] With one year in jail, stayed; *State of Hawaii v. Barcena*, TR. 4/5/01, p. 6, l. 13
[365] *State of Hawaii*, TR 4/5/01, p. 2, l. 20
[366] Hawaii Revised Statutes, Rule 35, correcting or reducing a sentence

to facilitate Barcena's future cooperation against Ms. Veloria. Having become aware that they now, once again had the essential, key witness in the case against Ms. Veloria in a corner, AUSA Brady submitted the case before the grand jury and an indictment was issued on 4/13/00.

So called "deals" with witnesses are a classic form of *Brady* material.[367] This is true even where there is a technical way in which the prosecution can pretend that no deal exists. The misconduct is even worse where there is an "apparent effort [on the part] of the prosecution to conceal the true nature of the dealings with its key witness..."[368] The Court has previously stated the position that they "will not tolerate prosecutorial participation in technically correct, yet seriously misleading testimony which serves to conceal the existence of a deal with material witnesses."[369] Where a witness likely expected a deal but the prosecution refused to put it in writing and disclose to the jury exactly what it was, this only increased the significance, for the purpose of assessing his credibility, of his expectation of favorable treatment. Since a tentative promise of leniency could be interpreted by the witness as being contingent on his testimony, there would be an even greater incentive for him to "make his testimony pleasing to the prosecutor."[370]

It was a violation of Ms. Veloria's constitutional right to effective assistance of counsel when defense counsel failed to impeach Ann Barcena with the above mentioned circumstances. Exposure of testimony under these conditions have shed light on Barcena's well established pattern of dishonesty as they all reflect on her veracity, and thus, propensity towards untruthfulness when it suits her.

---

[367] *Duboise v. LeFerve*, 619 F. 2d 973 (2nd Cir., 1980); *Skipper v. Wainwright*, 598 F. 2d 425, 427 (5th Cir.); *United States v. Butler*, 567 F. 2d 885 (9th Cir., 1978)
[368] *U.S. v. Butler*, 567 F. 2d 885, 888 (9th Cir., 1978)
[369] *Blankenship v. Estelle*, 545 F. 2d 510, 513 (5th 1997)
[370] *Porterfield v. State*, 17s S. 2d 882, 884 (Fla. DCA 1, 1985)

Defense counsel's performance fell below an objective standard of reasonableness when he failed to acknowledge Barcena's self interest so the jury, the triers of fact, could effectively weigh her testimony against her proven propensity to be dishonest. It is reasonable to expect that a defense attorney would familiarize himself with the ways in which to attack witness credibility. It is painfully evident that defense counsel was unaware, or at worst, unconcerned with his responsibility to investigate and uncover bias and self interest of a testifying Witness.. It cannot be presumed that this was a choice resulting from defense counsel's trial strategy.

These errors prejudiced the outcome in Ms. Veloria's trial because Barcena's testimony was essential to the government, as they had no direct evidence of Ms. Veloria's connection to the drugs recovered from the unlocked house on Mauna Loa Street. Hawaii Police Department's testimony admitted that they entered an unlocked front door and found Ms. Veloria asleep on the floor in the living room, immediately upon entering the house.[371] There were no fingerprints found on the evidence introduced, nor did the Assistant United States Attorney produce testimony implicating Ms. Veloria from any one of the three others arrested at the Mauna Loa Street house that day.

In the absence of direct evidence, the jury was asked to consider circumstantial evidence linking Ms. Veloria to the cocaine base found in a bedroom of a house that was accessible by anyone walking through the unlocked front door. Barcena's testimony was not relevant to the July 10, 1996 search. Instead, she testified that she had purchased cocaine from Ms. Veloria "sometime in the summer of 1996."[372] This was not evidence linking Ms. Veloria to what the Hawaii Police Department seized from a bedroom on the morning of July 10, 1996, but simply

---

[371] TR 6/3/03, p. 220-221
[372] TR 6/5/03, p. 99

testimony given with the intention of misleading the jury. It would have taken minimal effort and experience for defense counsel to discredit Barcena, had he chosen to do so.

If government witness Barcena's propensity towards dishonesty had been revealed during trial, it cannot be said with certainty that the jury would have arrived at the same conclusion. Barcena's was the key testimony the government offered contributing to the jury making a finding that Ms. Veloria, rather than the three others arrested that day, was the individual in possession of the cocaine. The allowing of such an extremely dishonest witness, such as Barcena, to testify unchecked, undermined the fundamental fairness of Ms. Veloria's trial and the subsequent guilty verdict.

With respect to the issue regarding police prosecutorial suppression of favorable treatment of Barcena, Ms. Veloria believes that she has established a demonstrable need for further factual development to prove facts necessary to pursue the claim.

*McClesky v. Zant*[373] held that a petitioner who is aware of a factual basis to support his claim but fails to raise it will be barred from pursuing relief at a later date. Therefore, Ms. Veloria herein raises a reasonable yet unconfirmed belief that a meritorious fact-based claim exists and request appointment of counsel, discovery,[374] and an evidentiary hearing under the Supreme Court's holing in *McCleskey*.[375] Ms. Veloria asserts that many of the allegations and other factual contentions already have evidentiary support, but further investigation and discovery would provide Ms. Veloria with a reasonable opportunity to prove her claim.

Ms. Veloria requests reversal.

---

[373] 499 U. S. 646
[374] Federal Rules of Civil Procedure, Rule 26 (a); Habeas Rule 6 (a)
[375] Supra

## CLAIM NUMBER 30

## MS. VELORIA'S FIFTH AMENDMENT RIGHT TO DUE PROCESS OF LAW AND SIXTH AMENDMENT RIGHT TO COUNSEL WERE VIOLATED WHEN COUNSEL FAILED TO EXPLORE GOVERNEMNT WITHNESS' MOTIVATION BEHIND THE INFORMATION PROVIDED TO LAW ENFORCEMENT OFFICERS, THREFORE DENYING MS. VELORIA HER RIGHT TO CONFRONTATION

Discovery provided to Ms. Veloria established that on 6/20/98, key government witness

Barcena signed a two page statement specifically relating to alleged drug dealing activities of

Ms. Veloria.  Said statement was typed up (in advance) by Jason Pa, IRS CID Special Agent.

The last sentence of the statement reads: "I gave this statement freely and voluntarily without

threats, coercion or promises."  Two weeks later, on 7/8/98, Barcena appeared at a grand jury

hearing, providing testimony under oath, against her own penal interest, alleging activities of Ms.

Veloria. Prior to any real testimony being given, AUSA Brady elicited the following responses

from Barcena:

AUSA BRADY:      Now, you  also understand that you have a right not to incriminate
yourself, and by that I mean, you don't have to say anything about yourself that may be an illegal
act or something that you've done that was wrong.
It's my understanding that you're waiving that right and you're coming before the grand jury and
you're telling them what you know about Alicia Veloria; is that correct?
BARACENA: Yes.
AUSA BRADY:You also understand the grand jury can use our testimony today to return
criminal charges against either yourself or other persons?
BARCENA:   Yes.
        (Tr. 07/08/1998, Grand jury transcript, p.4)

Common knowledge of criminal activity indicates that Barcena would not have, without

an intervening event or hope of benefit, elected herself to provide information against

Ms.Veloria, thereby placing her own liberty at risk, as demonstrated by the above colloquy.

There is an unknown factor that exists which caused Barcena to be in the presence of law

enforcement officers who would know to question her regarding Ms Veloria's case – a case that

was already two years old at that point.  This unknown factor was essential to the defense