power has been used countless times against executive officers. In fact, *McNabb* itself used the supervisory power to suppress evidence in order to deter unlawful conduct of executive officials. As one commentator has noted:

> *McNabb* cannot be confined within a definition of the supervisory power which does not transcend elementary notions of judicial housekeeping. The behavior which invoked exclusion was not that of judicial officers, but that of the police. Furthermore, it occurred at a time substantially prior to the trial itself.[121]

Space limitations do not allow a citation to every supervisory power case in which executive, rather than judicial, misconduct was being deterred.[122]

SAFEGUARDING THE RIGHTS OF CRIMINAL DEFENDANTS

Because "'the task of safeguarding the rights of criminal defendants ultimately rests with the experienced men and women

---

[121] Note, 76 Harv. L. Rev. at 1661; *see also* Hill, 69 Colum. L. Rev. at 203 ("It is disingenuous to assert that no infringement upon executive prerogatives is involved when the courts do no more than withhold the process that is invoked by the executive in a criminal prosecution.").

[122] *See e.g. United States v. Leslie*, 759 F.2d at 371 (several cases cited).

41

who preside in our district courts,'"[123] "'the district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses.'"[124] If "'the evidence preponderates sufficiently heavy against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.'"[125]

## REASONABLE DOUBT

There was reasonable doubt in Ms. Veloria's case.  The jury acquitted Ms. Veloria of one count of the indictment, and returned a verdict of guilt on the other.  It must be admitted that the case was a close one for the jury. The jury deliberated for 4 days, sending our 13 questions from the jury, made 5 requests for witness transcripts, through 8 communications.

---

[123] *United States v. Alston*, 974 F.2d 1206 (9th Cir. 1992) (quoting *United States v. Balough*, 820 F.2d 1485, 1491 (9th Cir. 1987) (Kozinski, J., concurring)).

[124] *United States v. Alston*, 974 F.2d 1206, at 1211 (9th Cir. 1992) (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980), cited with approval in *Tibbs v. Florida*, 457 U.S. 31, 38, n.11, 72 L. Ed. 2d 652, 102 S. Ct. 2211 (1982)).

[125] *United States v. Alston*, 974 F.2d 1206, at 1211-1212 (9th Cir. 1992).

Had the defendant not been prevented from calling defense witnesses, not been prevented from cross examining government's witnesses effectively, been free to take the stand and testify in her own behalf, been tried only on the charges in the indictment, rather than being ambushed with uncharged crimes (including drug sales, obstruction of justice, money laundering, and suborning perjury, by implication)[126] the jury may have acquitted Ms. Veloria of both counts.

The Supreme Court has held that the Due Process Clause requires proof beyond a reasonable doubt.[127] The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure. It is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence -- that bedrock "axiomatic and elementary" principle whose "enforcement lies at the

---

[126] Transcript Vol. 4, P 83-83; P 88; P 90-92; *United States v. Range*, 982 F.2d 196, (6th Cir. 1992).

[127] *In re Winship*, 397 U.S. 358, 364, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970).

43

foundation of the administration of our criminal law."[128]

The Supreme Court has acknowledged the centrality of the reasonable doubt charge: "Discussion of the concept is perhaps the most important aspect of the closing instruction to the jury in a criminal trial."[129]

Despite the importance of the reasonable doubt standard in safeguarding the rights of criminal defendants, the term has eluded clear definition. Judges and jurors repeatedly witness the truth of the Supreme Court's statement that "attempts to explain the term 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury." [130]

Most efforts at clarification result in further obfuscation of the concept. Many definitions reduce the burden of proof on the

---

[128] *In re Winship*, 397 U.S. 358, 363, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970) (quoting *Coffin v. United States*, 156 U.S. 432, 453, 39 L. Ed. 481, 15 S. Ct. 394 (1895)).

[129] *Dunn v. Perrin*, 570 F.2d 21, 25 (1st Cir.), *cert. denied*, 437 U.S. 910, 57 L. Ed. 2d 1141, 98 S. Ct. 3102 (1978).

[130] *Miles v. United States*, 103 U.S. (13 Otto 304) 304, 312, 26 L. Ed. 481 (1880). *Accord United States v. Gibson*, 726 F.2d 869, 874 (1st Cir.) ("It can be said beyond any doubt that the words 'reasonable doubt' do not lend themselves to accurate definition."), *cert. denied*, 466 U.S. 960, 104 S. Ct. 2174, 80 L. Ed. 2d 557 (1984).

government by expanding the degree of doubt permissible,[131] and

consequently such definitions result in increased appellate

litigation.[132]

### AMBUSH OF UNCHARGED OFFENSES
### CONSTRUCTIVE AMENDMENT OF INDICTMET

Ms. Veloria's Fifth Amendment right to be tried only on an

indictment in precisely the form issued by a grand jury was violated

by the introduction of uncharged offenses; Introduction of

uncharged offenses, over the objection of the defendant, was a

constructive amendment to the indictment or a fatal variance; It

was error for the trial court to permit improper opening and closing

argument by the government of uncharged offenses; It was error to

deny Ms. Veloria's motion for mistrial, Rule 29 motion, and motion

for a new trial.

The prosecutor stated he would not use "uncharged conduct"

during his opening statement, but confined the statement to "as it

---

[131] *United States v. MacDonald*, 455 F.2d 1259, 1263 (1st Cir.), *cert. denied*, 406 U.S. 962, 92 S. Ct. 2073, 32 L. Ed. 2d 350 (1972).

[132] *Id.; United States v. Gibson*, 726 F.2d at 874 ("Any attempt to define 'reasonable doubt' will probably trigger a constitutional challenge." (citing *United States v. Drake*, 673 F.2d 15, 20-21 (1st Cir. 1982)).

relates to count 1, July 10th and prior sales."[133]  The prosecutor did

refer to prior sales during his opening.[134]  Defense counsel objected

and moved for a mistrial.[135] The trial court denied the motion for

mistrial without prejudice.[136] Defense counsel asked for at least a

limiting instruction,[137] and the court agreed and gave the limiting

instruction over the objection of the prosecutor.[138]

The Court erred by admitting, over objection of Ms. Veloria,

uncharged offenses, conspiracy to obstruct justice,[139] conspiracy to

suborn perjury,[140] money laundering,[141] and prior drug sales,[142]

---

[133] Transcript Vol. 1, P 148, L 3-6.

[134] Transcript Vol. 1, P 170.
[135] Transcript Vol. 1, P 170-175.
[136] Transcript Vol. 1, P 175.

[137] Transcript Vol. 1, P 176-178.

[138] Transcript Vol. 1, P 178-179.

[139] Transcript Vol. 1, P 178-179; Transcript Vol. 2, P 97-104.

[140] government's exhibit No. 27, letter received by Wallace Iaukea; Transcript Vol. 2, P 78-79; P. 86, L 23-25; P. 87-103.

[141] Sears gift certificates, jewelry, and money; Transcript Vol. 3, P.101, L 19-25; P. 102  L. 1-7.

[142] Transcript Vol. 2, P. 80-81; Transcript Vol. 3, P.101.

permitted the government to launch an evidentiary harpoon which could not be overcome by the defense.

This ambush of uncharged offenses created a presumption of guilt of the uncharged offenses. Once introduced Ms. Veloria was placed in the untenable position of being forced to forfeit one right in order to exercise another.

Ms. Veloria was under the threat of additional charges being filed against her if she took the stand to deny the testimony and evidence of uncharged offenses. The jury was left to believe the uncharged offenses because Ms. Veloria did not take the stand to deny them. This forced Ms. Veloria to choose between leaving the jury to convict her on other uncharged offenses or forfeiting her right not to be compelled to testify, and take the stand and risk additional criminal charges.

This placed an untenable burden on the defendant to disprove the uncharged offenses or be convicted on them because she did not testify and risk additional charges.

The government went too far in shifting the burden to prove each essential element of the offenses charged in the indictment from the government, to the defendant to disprove the uncharged

47

offenses. The Due Process Clause prohibits shifting the burden of proof to the defendant.[143]

In Ms. Veloria's case none of the uncharged offenses were in the indictment. The defense did not have notice before trial that the government intended to introduce uncharged offenses against Ms. Veloria during trial,[144] and the testimony and evidence of uncharged offenses was introduced during trial over the objection of defense counsel.[145]

The government argued to the court that the witness could testify to purchases of drugs within the same week of execution of the search warrant.[146]  However, one of the government's witness testified during trial she could not even remember whether she had purchased drugs during 1996 or 1997, could not remember when Ms. Veloria was arrested, or even whether it was early or late during

---

[143] *Morrison v California*, 291 US 82, 78 L Ed 664, 54 S Ct 281 (1934).

[144] Transcript Vol. 1, P 139-149.

[145] Transcript Vol. 1, P 139-149; Vol. 2, P 91-92; Vol. 3, P 100.

[146] Transcript Vol. 1, P 142, L 15-25.

the year of 1996.[147]

The other government witness testified that he could not remember when he was supposed to have made a purchased at the Mauna Loa house.  He testified it was one time at the Mauna Loa house,[148] and upon coaching from the prosecutor,[149] testified that it was at sometime during the summer months.[150] He testified he could not remember what he spent.  First he testified "it was $40, $50, something like that",[151] then testified he could not remember but it was more than $20."[152]

The testimony and evidence introduced concerning two of the uncharged offenses, obstruction of justice and suborning perjury, indicate they occurred years after[153] the dates of the offenses

---

[147] Transcript Vol. 3, P 115-116.

[148] Transcript Vol. 2, P 80, L 10.

[149] Transcript Vol. 2, P 80, L 13-14.

[150] Transcript Vol. 2, P 80, L 15.

[151] Transcript Vol. 2, P 80, L 15.

[152] Transcript Vol. 2, P 80, L 21.

[153] Transcript Vol. 2, P 81, L 7-8.

charged in the indictment,[154] were not part of either of the two offenses charged in the indictment, does not appears to be intended to conceal the discovery of either offense in the indictment,[155] and was not in furtherance of either offense charged in the indictment. The admission of the testimony and evidence was fatal error for the following reasons:

1. The hearsay declaration attributed to the co-conspirator was not admissible on the ground that it was made in furtherance of the two offenses charged in the indictment.

2. Nor was it admissible on the ground that it was in furtherance of a continuing subsidiary phase of the two offenses charged in the indictment -- *i. e.*, an implied agreement to conceal the crime before the indictment was returned.

3. Since it cannot be said on the record in this case that the erroneous admission of the hearsay declaration and introduction of testimony and evidence of uncharged offenses may not have tipped the scales against Ms. Veloria, it cannot be considered a harmless

---

[154] Transcript Vol. 1, P 162.

[155] Transcript Vol. 2, P 97-104.

error.[156]

Circuit Courts have found that convictions obtained by association of other crimes where evidence was weak (and in the defendant's case uncharged) must be reversed and remanded for a new trial.[157]  It is as much a duty to refrain from improper methods calculated to produce wrongful convictions as it is to use every legitimate means to bring about a just one.[158]

Erroneous evidentiary ruling by the Court permitting the introduction of evidence of "other wrongs, crimes, or acts" in an ambush of uncharged crimes,[159] permitted the jury to convict the defendant based upon the uncharged offenses, instead of the two offenses charged in the indictment, denied Ms. Veloria her right to be tried only on an indictment returned by a grand jury, and her right to a unanimous jury verdict. In its zeal to obtain a conviction that is fatally flawed in these two constitutional respects, the

---

[156] Rule 52(a), Federal Rules of Criminal Procedure; *Krulewitch v. United States*, 336 U.S. 440 (1949).

[157] *United States vs. Valasquez, Dominques, Olamendi, and Gomez*, 772 F. 2d 1240 (7th Cir., 1985).

[158] *Berger vs. United States*, 295 U.S. 78, 88 (1935).

[159] *United States vs. Blankenship*, 775 F. 2d 735 (6th Cir. 1985).

government ambushed the defendant with uncharged offenses, and prevented Ms. Veloria from challenging the uncharged offenses by the threat of introduction of the proffer letter, and potential new felony charges against her if she did.

Such tactics have been condemned, and called for reversal in some cases. In the language of Judge Smith "The course of the government smacks too much of a trial by ambush, in violation of the spirit of the rules."[160]

The ambush of uncharged offenses violated Ms. Veloria's Due Process right to a fair trial.[161] The ambush of uncharged offenses has been condemned in the Ninth Circuit as well. In granting a new trial, the Ninth Circuit stated, "here, as in *United States v. Kelly,*[162] "(t)he course of the government smacks too much of a trial by ambush . . . ." Under these circumstances, the prosecutor's "lack

---

[160] *United States v. Kelly,* 420 F.2d 26, 29 (2d Cir. 1969); see also *United States v. Baum,* 482 F.2d 1325 (2d Cir. 1973).

[161] *Morgan v. United States,* 304 U.S. 1, 18, 82 L. Ed. 1129, 58 S. Ct. 773, 58 S. Ct. 999 (1938); *see also Lindsey v. Smith,* 820 F.2d 1137, 1151 (11th Cir. 1987); *United States v. Baum,* 482 F.2d 1325, 1331-32 (2d Cir. 1973).

[162] *United States v. Powell,* 587 F.2d 443 (9th Cir. 1978) citing United States v. Kelly, 420 F.2d 26, 29.

of candor (is) unworthy of a prosecutor."[163]

The uncharged offense should have been stricken from the record and Ms. Veloria should have been granted a mistrial.[164]   The substantial prejudice to Ms. Veloria is self evident, as shown herein, and the conviction must be reversed.

The introduction of the uncharged offenses over the objection of the defendant constructively amended the indictment with other uncharged offenses which were not presented to the Grand Jury. As the court in the Third Circuit previously explained, "when there is a variance between the indictment and the proof at trial and when that variance prejudices a substantial right of the defendant, we have held that the conviction must be vacated."[165]

Ms. Veloria bases her substantive argument on the Supreme

---

[163] *United States v. Powell*, 587 F.2d 443 (9th Cir. 1978) Citing *United States v. Baum*, (2d Cir. 1973) 482 F.2d 1325, 1332.

[164] *United States v. Baum*, 482 F.2d 1325, 1332 (2d Cir. 1973) (evidence not struck and defendants were unfairly surprised); *United States v. Kelly*, 420 F.2d 26, 29 (2d Cir. 1969) (same); *United States v. Powell*, 587 F.2d 443, 447 (9th Cir. 1978) (prosecutor's failure to disclose that important defense witness was out of the country smacked of trial by ambush).

[165] *United States v. Padilla*, 982 F.2d 110, 113 (3d Cir. 1992) (emphasis in original).

Court's statement in *Jackson v. Virginia*,[166] "that a conviction upon a charge not made . . . constitutes a denial of due process." This principle in turn rests on the "broader premise" that "a person cannot incur the loss of liberty for an offense without notice and a meaningful opportunity to defend." Id.; see *Stirone v. United States*, [167] (noting that a "court cannot permit a defendant to be tried on charges that are not made in the indictment against him"); *Cole v. Arkansas*,[168] (holding "that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal"); *Johnson v. Gibson*, [169] ("A charging instrument may violate the Sixth Amendment by failing to provide a defendant with adequate notice of the nature and cause of the accusations filed against him.");

---

[166] *Jackson v. Virginia*, 443 U.S. 307, 314, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979).

[167] *Stirone v. United States*, 361 U.S. 212, 217, 4 L. Ed. 2d 252, 80 S. Ct. 270 (1960).

[168] *Cole v. Arkansas*, 333 U.S. 196, 201, 92 L. Ed. 644, 68 S. Ct. 514 (1948).

[169] *Johnson v. Gibson*, 169 F.3d 1239, 1252 (10th Cir. 1999).

*Hunter v. State of New Mexico*,[170] (noting that the "specific inquiry" in deciding whether a constructive amendment of the indictment has occurred "is whether the jury was permitted to convict the defendant upon a set of facts distinctly different from that set forth in the indictment") (internal quotation omitted).

The Ninth Circuit reversed convictions under Rule 52(b),[171] where district court committed plain error when it constructively amended the indictment by instructing the jury on a work practice standard that the defendants were not charged with violating.[172]

The uncharged offenses prevented Ms. Veloria from being tried only on the charges in the indictment, and denied Ms. Veloria the right to a unanimous verdict of the jury on only the charges in the indictment, and the conviction must be reversed.

## FATAL VARIANCE

In determining whether there has been a fatal variance, courts ascertain whether the variance affects "the substantial rights of the

---

[170] *Hunter v. State of New Mexico*, 916 F.2d 595, 599 (10th Cir. 1990).

[171] Federal Rules of Criminal Procedure.

[172] *United States v. Dipentino*, 242 F.3d 1090 (9th Cir. 2001).

55

accused either (1) by insufficiently informing [the defendant] of the charges against him such that he is taken by surprise and prevented from presenting a proper defense, or (2) by affording him insufficient protection against re-prosecution for the same offense." [173] Here the variance clearly was prejudicial, where Ms. Veloria was prevented from presenting a defense to the uncharged offenses, by the threat of introduction of the proffer letter, and the threat of additional charges against her if she did. Ms. Veloria's conviction must be reversed.

## RIGHT TO CONFRONT – RIGHT TO CROSS EXAMINE

Ms. Veloria was denied her constitutional right to confront her accusers; Ms. Veloria was denied her constitutional right by limiting her ability to cross examine government witnesses; and It was an abuse of discretion for the trial court to deny Ms. Veloria's right to introduce prior "bad acts" to impeach government witness's general credibility.

Ms. Veloria's right to confront the government's witnesses and

---

[173] *United States v. Pierce*, 893 F.2d 669, 676 (5th Cir. 1990) (citation omitted).

right to cross examine them was limited by the threat the proffer letter could be introduced against her, and the threat of new additional charges. [174] The court limited cross examination of the government's witnesses,[175] limited the defendant's right to probe for prejudice and bias,[176] prevented the jury, as the triers of fact, from hearing evidence going to the credibility of both of the government's witnesses.[177]

The Supreme Court emphasized the policy favoring expansive witness cross-examination in criminal trials.[178] Similarly, this court has observed that "full disclosure of all relevant information concerning [adverse witnesses'] past record and activities through cross-examination and otherwise is indisputably in the interests of

---

[174] *United States v. Pierce*, 893 F.2d 669, 676 (5th Cir. 1990) (citation omitted).

[175] *Davis v. Alaska*, 415 U.S. 308, 316, 39 L. Ed. 2d 347, 94 S. Ct. 1105 (1974)

[176] *United States v. Pierce*, 893 F.2d 669, 676 (5th Cir. 1990) (citation omitted).

[177] *United States v. Pierce*, 893 F.2d 669, 676 (5th Cir. 1990) (citation omitted).

[178] *See Olden v. Kentucky*, 488 U.S. 227, 231, 102 L. Ed. 2d 513, 109 S. Ct. 480 (1988); *Davis v. Alaska*, 415 U.S. 308, 316, 39 L. Ed. 2d 347, 94 S. Ct. 1105 (1974).

justice." [179]  The confrontation clause, however, does not guarantee

unbounded scope in cross-examination. [180]  "The Confrontation

Clause guarantees an *opportunity* for effective cross-examination,

not cross-examination that is effective in whatever way, and to

whatever extent, the defense might wish." [181]  Rather, we review a

trial court's decision to limit the scope of cross-examination for

abuse of discretion, and will find a Confrontation Clause violation

only if the trial court's ruling "'limits relevant testimony[,] . . .

prejudices the defendant' . . . and denies the jury 'sufficient

information to appraise the biases and motivations of the

witness.'" [182]  The jury was denied essential information that was

necessary to the triers of fact to adequately determine the credibility

of the government's witnesses and their biases and motivation for

testifying.  Although both witnesses testified that they received no

---

[179]  *United States v. Brooke*, 4 F.3d 1480, 1489 (9th Cir. 1993).

[180]  *See Delaware v. Van Arsdall*, 475 U.S. 673, 679, 89 L. Ed. 2d
674, 106 S. Ct. 1431 (1986).

[181]  (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20, 88 L. Ed. 2d 15,
106 S. Ct. 292 (1985)).

[182]  *United States v. Bensimon*, 172 F.3d 1121, 1128 (9th Cir. 1999)
(internal citations omitted).

58

promises from the prosecution, the prosecutor said the government was being prejudiced because their witnesses wanted to get back to incarceration so they can be released on furlough.[183]  Both were incarcerated serving time, and neither were eligible for furlough.

Ms. Veloria's fundamental right under the Sixth Amendment's Confrontation Clause was violated because the district court restricted her ability to cross-examine the government's witnesses. The right to cross-examine a witness includes the ability to expose a witness's motivation for testifying.[184]

Denial of Ms. Veloria's Sixth Amendment right to confront and to fully cross examine the government's witnesses requires that her conviction be reversed.

## WITHHELD BRADY MATERIAL AND OTHER DISCOVERY

### It was error to withhold Brady material and other discovery.

The record in this case indicates the government withheld essential Brady material and other discovery from the defendant.

During trial, testimony concerning a rent receipt in the name

---

[183] Transcript Vol. 2, P 42, L 22-25.

[184] *Davis v. Alaska,* 415 U.S. 308, 316, 39 L. Ed. 2d 347, 94 S. Ct. 1105 (1974).

of Marlene Anduha in the amount of $190 was introduced,[185] and

there was testimony about a letter "A",[186] that it was presumed to

belong to "Alicia", Ms. Veloria's first name. Although defense

counsel's objection was sustained, and the jury was directed to

disregard the testimony about who the letter "A" belonged to,[187] the

prosecutor reintroduced the letter "A" during argument to the jury,

that it belonged to "Alicia," Ms. Veloria, in an attempt to reinforce

the argument that the house belonged to Ms. Veloria,[188] which the

government knew was untrue.

## DISCOVERY CONCEALED FROM THE DEFENDANT

Ms. Veloria was entitled to the identity of the confidential

informants referred to in the application for the search warrants

and the police reports.  The state admitted to at least one or more

confidential informants. Ms. Veloria was entitled to the identity of

the informants, where informants were the only witness to certain

rebuttal evidence in this case, other than Ms. Veloria.  Ms. Veloria

---

[185] Transcript Vol. 2, P 68.

[186] Transcript Vol. 3, P 85.

[187] Transcript Vol. 3, P 85.

[188] Transcript Vol.4, P 88.

60

had the right to call the informant as an essential defense witness.

## PROSECUTOR MAY HIDE - DEFENDANT MUST SEEK

Under *Roviaro v. United States*,[189] the "disclosure [of an informant's identity] is not automatic," and, "[c]onsequently, it has previously been determined it is the defendants' duty to move for disclosure of otherwise privileged information."

The State appeared to urge, in effect, that "the prosecution can lie and conceal and the defendants still have the burden to ... discover the evidence," so long as the "potential existence" of a prosecutorial misconduct claim might have been detected. A rule thus declaring "prosecutor may hide, defendant must seek," is not tenable in a system constitutionally bound to accord defendants due process.

"Ordinarily, the court's presume that public officials have properly discharged their official duties."[190] Courts have several times underscored the "special role played by the American

---

[189] *Roviaro v. United States*, 353 U. S. 53 (1957).

[190] *Bracy v. Gramley*, 520 U. S. 899, 909 (1997) (quoting *United States* v. *Chemical Foundation, Inc.*, 272 U. S. 1, 14-15 (1926)).

prosecutor in the search for truth in criminal trials."[191]  Courts,

litigants, and juries properly anticipate that "obligations [to refrain

from improper methods to secure a conviction] ... plainly rest[ing]

upon the prosecuting attorney, will be faithfully observed."[192]

Prosecutors' dishonest conduct or unwarranted concealment should

attract no judicial approbation.[193]

In August, 2000, the Oregon Supreme Court forbade all

lawyers in the state to lie, or encourage others to lie, cheat, or

misrepresent themselves. The U.S. attorney for the Oregon district,

Kristine Olson, informed the FBI and other federal investigative

agencies in 2000, that she cannot OK agents or informants to

assume false identities, wear body wires, or engage in undercover

---

[191] *Strickler v. Greene*, 527 U. S. 263, at 281; accord, *Kyles v. Whitley*, 514 U.S. 419, at 439-440 (1995); *United States* v. *Bagley*, 473 U. S. 667, 675, n. 6 (1985); *Berger v. United States*, 295 U. S., at 88. See also *Olmstead* v. *United States*, 277 U. S. 438, 484 (1928) (Brandeis, J., dissenting).

[192] *Berger*, 295 U. S., at 88.

[193] See *Kyles v. Whitley*, 514 U.S. 419, at 440 (1995) ("The prudence of the careful prosecutor should not ... be discouraged.").

activities.[194] Under the McDade-Murtha Law,[195] the ruling applied to all Federal Prosecutors.  In response to the McDade-Murtha Law, the Legislature in Oregon enacted a special law to exempt public prosecutors and other public attorneys from the requirement to comply with the rules of ethics, permit public prosecutors and other public attorneys to violate the rules of ethics.[196]

The Ninth Circuit used its inherent supervisory power to vacate the judgment in *Dixon v Commissioner of Internal Revenue*,[197] (where the judgment was the result of fraud perpetrated on the Court by an officer of the court). The court held:

> "Courts possess the inherent power to vacate or amend a judgment obtained by fraud on the court, *Toscano v. CIR*, 441 F.2d 930, 933 (9th Cir. 1971), but that power is narrowly construed, applying only to fraud that defiles

---

[194] See also, "Prosecutor Misconduct In Two Recent High-Profile Cases: Why It Happens, and How We Can Better Prevent It," by Elaine Cassel, Findlaw Legal Commentary, Feb. 12, 2004.

[195] The McDade-Murtha Law, codified at 28 U.S.C. § 530A, clarifies that federal prosecutors, like all other lawyers, are subject to state ethical rules governing attorney conduct.

[196] House Bill 3857, 71st OREGON LEGISLATIVE ASSEMBLY-- 2001 Regular Session.

[197] *Dixon v Commissioner of Internal Revenue*, 316 F.3d 1041 (9th Cir. 2003) (where the judgment was the result of fraud perpetrated on the Court by an officer of the court).

the court or is perpetrated by officers of the court. When we conclude that the integrity of the judicial process has been harmed, however, and the fraud rises to the level of "an unconscionable plan or scheme which is designed to improperly influence the court in its decisions," we not only can act, we should. *England*, 281 F.2d at 309; *Levander v. Prober*, 180 F.3d 1114, 1119 (9th Cir. 1999); *Intermagnetics Am., Inc. v. China Int'l Trust and Inv. Corp.*, 926 F.2d 912, 916-17 (9th Cir. 1991)."

The government concealed from the defendant that they knew the house at 69 Mauna Loa had been rented to Marlene Anduha;[198] they knew the house was under electronic surveillance because Marlene Anduha was a protected witness;[199] the diagram prepared by Detective Benton Bolos[200] contained information which could only have come from electronic surveillance, although electronic surveillance was denied by Detective Bolos,[201] and the date it was prepared[202] was long before application for the search warrant,[203] officers knew when applying for the search warrant that Ms. Veloria

---

[198] Transcript Vol. 2, P 68.

[199] Transcript Vol. 3, P 93, L 17-25; P 93, L 1-12.

[200] Transcript Vol. 3, P 93, L 17-25.

[201] Transcript Vol. 3, P 94, L 1-12.

[202] Transcript Vol.3, P 93, L 20-25.

[203] Transcript Vol. 3, P 93-94.

was in the house on Mauna Loa street;[204] the officer went straight down the hallway to the room where he knew the drugs to be;[205] the government knew H.P.D. had seized a rent receipt for $190 the day of the search, and also knew that the letter "A" belonged to Marlene Anduha;[206] the government knew that Mr. Iaukea had become an informant working for the Hilo Police Department; the government knew that his telephone calls to Ms. Veloria were monitored and recorded by law enforcement officers, that also provided money and a scale to Mr. Iaukea; Mr. Iaukea jumped out of the vehicle as the officers arrived, left the door of the vehicle open as he exited, and demanded to be searched, so officers would know immediately that Mr. Iaukea still had all the money he had been given. Ms. Veloria was targeted by the same law enforcement officers that Mr. Iaukea was working with.

Ms. Veloria was entitled to the identity of the informants, so they could be called as essential defense witnesses, with the only rebuttal evidence other than Ms. Veloria herself.

---

[204] Transcript Vol. 1, P 205-206; Vol. 2, P 70; Vol. 4, P 123, L 11-18.

[205] Transcript Vol. 1, P 205-206; Vol. 4, P 123, L 11-18.

[206] Transcript Vol. 4, P 88.

## BRADY-AGURS-BAGLEY VIOLATION

The prosecution's affirmative duty to disclose evidence favorable to a defendant can trace its origins to early 20th-century strictures against misrepresentation and is of course most prominently associated with this Court's decision in *Brady* v. *Maryland*.[207] *Brady* held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[208]

In *United States* v. *Agurs*,[209] however, it became clear that a defendant's failure to request favorable evidence did not leave the Government free of all obligation. There, the Court distinguished three situations in which a *Brady* claim might arise: first, where previously undisclosed evidence revealed that the prosecution

---

[207] *Brady* v. *Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). See *id.*, at 86 (relying on *Mooney* v. *Holohan*, 294 U.S. 103, 112, 79 L. Ed. 791, 55 S. Ct. 340 (1935), and *Pyle* v. *Kansas*, 317 U.S. 213, 215-216, 87 L. Ed. 214, 63 S. Ct. 177 (1942)).

[208] 373 U.S. at 87; see *Moore* v. *Illinois*, 408 U.S. 786, 794-795, 33 L. Ed. 2d 706, 92 S. Ct. 2562 (1972).

[209] *United States* v. *Agurs*, 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976).

introduced trial testimony that it knew or should have known was perjured,[210];[211] second, where the Government failed to accede to a defense request for disclosure of some specific kind of exculpatory evidence;[212] and third, where the Government failed to volunteer exculpatory evidence never requested, or requested only in a general way. The Court found a duty on the part of the Government even in this last situation, though only when suppression of the evidence would be "of sufficient significance to result in the denial of the defendant's right to a fair trial."[213]

    In the third prominent case on the way to current *Brady* law, *United States* v. *Bagley*,[214] the Court disavowed any difference between exculpatory and impeachment evidence for *Brady*

---

[210] *United States* v. *Agurs*, 427 U.S. at 103-104.

[211] The Court noted that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103 (footnote omitted).

[212] *United States* v. *Agurs*, 427 U.S. at 104-107.

[213] *United States* v. *Agurs*, 427 U.S. at 108.

[214] *United States* v. *Bagley*, 473 U.S. 667, 87 L. Ed. 2d 481, 105 S. Ct. 3375 (1985).

67

purposes, and it abandoned the distinction between the second and third *Agurs* circumstances, *i. e.*, the "specific-request" and "general- or no-request" situations. *Bagley* held that regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[215]

Four aspects of materiality under *Bagley* bear emphasis. Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant);[216] *Bagley, supra*;[217] see *id.*,[218]; cf.

---

[215] 473 U.S. at 682 (opinion of Blackmun, J.); *id.*, at 685 (White, J., concurring in part and concurring in judgment).

[216] 473 U.S. at 682 (opinion of Blackmun, J.) (adopting formulation announced in *Strickland* v. *Washington*, 466 U.S. 668, 694, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984)).

[217] 473 U.S. at 685 (White, J., concurring in part and concurring in

*Strickland, supra,*[219] ("We believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case"); *Nix* v. *Whiteside,*[220] ("[A] defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under *Strickland*"). *Bagley*'s touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." *Bagley.*[221]

---

judgment) (same).

[218] 473 U.S. at 680 (opinion of Blackmun, J.) (*Agurs* "rejected a standard that would require the defendant to demonstrate that the evidence if disclosed probably would have resulted in acquittal")

[219] at 693.
[220] *Nix* v. *Whiteside*, 475 U.S. 157, 175, 89 L. Ed. 2d 123, 106 S. Ct. 988 (1986).

[221] 473 U.S. at 678.

The second aspect of *Bagley* materiality bearing emphasis here is that it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.[222]

Once a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless-error review. Assuming, *arguendo*, that a harmless-error enquiry were to apply, a *Bagley* error could not be treated as harmless, since "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different,"[223]

---

[222] This rule is clear, and none of the *Brady* cases has ever suggested that sufficiency of evidence (or insufficiency) is the touchstone.

[223] 473 U.S. at 682 (opinion of Blackmun, J.); *id.*, at 685 (White, J.,

necessarily entails the conclusion that the suppression must have had "'substantial and injurious effect or influence in determining the jury's verdict.'"[224]  This is amply confirmed by the development of the respective governing standards. Although *Chapman* v. *California*,[225] held that a conviction tainted by constitutional error must be set aside unless the error complained of "was harmless beyond a reasonable doubt."

The Supreme Court recently reversed convictions where the government withheld essential impeachment evidence from the defense about the government witnesses.[226]

In Ms. Veloria's case there can be no question that evidence withheld from the defense was a Brady violation, exculpatory and impeachment evidence, and the error was not harmless beyond a reasonable doubt.

concurring in part and concurring in judgment).

[224] *Brecht* v. *Abrahamson*, 507 U.S. 619, 623, 123 L. Ed. 2d 353, 113 S. Ct. 1710 (1993), quoting *Kotteakos* v. *United States*, 328 U.S. 750, 776, 90 L. Ed. 1557, 66 S. Ct. 1239 (1946).

[225] *Chapman* v. *California*, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967).

[226] *Banks* v. *Dretke*, 540 U.S. 668 (2004); see also *Kyles* v. *Whitley*, 514 U.S. 419 (1995).

71

## CUMULATIVE EFFECT OF THE FATAL ERRORS

**The cumulative effect of the fatal errors was sufficient to deny Ms. Veloria her right to fundamental fairness during her jury trial?**

In some cases, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, a cumulative effect of multiple errors may still prejudice a defendant.[227]  Where, as here, there are a number of errors at trial, "a balkanized, issue-by-issue harmless error review" is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant.[228] In those cases where the government's case is weak, a defendant is more likely to be prejudiced by the effect of cumulative errors.[229] "This is simply the logical corollary of the harmless error doctrine which requires us to affirm a conviction if there is overwhelming evidence of guilt."[230]

---

[227] *See United States v. Green,* 648 F.2d 587 (9th Cir. 1981).

[228] *United States v. Wallace,* 848 F.2d 1464, 1476 (9th Cir. 1988).

[229] *United States v. Berry,* 627 F.2d 193 (9th Cir. 1980), *cert. denied,* 449 U.S. 1113, 66 L. Ed. 2d 843, 101 S. Ct. 925 (1981).

[230] *Id.* at 201; *see also United States v. Hibler,* 463 F.2d 455 (9th Cir. 1972).

Cumulative errors in Ms. Veloria's case require her conviction be reversed, particularly in light of the ambush of the uncharged offenses.[231]

### Ms. Veloria's pre-indictment delay was prejudicial.

The Supreme Court pointed out the "right to be free of prejudicial pre-indictment delay is based on the due process clauses of the state and federal constitutions"[232] "and not on the right to a speedy trial which does not attach until the commencement of formal proceedings."[233]

This was similar to the United States Supreme Court's finding in reversing the Ninth Circuit in *United States v. Valenzuela-Bernal,*[234] their decision was as follows: "Government's deportation of alien witnesses, held not violative of Fifth and Sixth Amendments absent

---

[231] *United States v. Frederick,* 78 F.3d 1370 (9th Cir. 1996).

[232] Fifth Amendment, United States Constitution.

[233] See, *United States v. Lovasco,* 431 U.S. 783, 788-89 (1977).

[234] *United States v. Valenzuela-Bernal,* 458 U.S. 858; 102 S. Ct. 3440; 73 L. Ed. 2d 1193; 1982 U.S. LEXIS 159; 50 U.S.L.W. 5108.

some showing evidence lost would be both material and favorable to defendant."

In <u>Valenzuela-Bernal</u> there were a number of witnesses. Valenzuela-Bernal could not make the showing that "evidence lost would be both material and favorable to defendant" because the government did not deport all of the witnesses and the witnesses that were deported could only have presented cumulative testimony to those that were not deported.

The doctrine of pre-indictment delay, like a host of other principles and policies of the law - e. g., entrapment, insanity, right to speedy trial, statute of limitations - operates to preclude the imposition of criminal liability on defendants, notwithstanding a showing that they committed criminal acts. Like these other doctrines, the question whether pre-indictment delay violates due process of law cannot ordinarily be considered apart from the factual development at trial since normally only the "˜[e]vents of the trial [can demonstrate] actual prejudice.'"[235]

---

[235] *United States v. Lovasco*, 431 U.S. 783, 789 (1977), quoting *United States v. Marion*, 404 U.S. 307, 326 (1971); see *United States v. MacDonald*, 435 U.S. 850, 858 , 858-859 (1978).

## PREJUDICIAL PRETRIAL DELAY WAS INTENTIONAL

Prejudicial pretrial delay was intentional, where the delay was intended to gain an unfair advantage over the defendant, place an essential defense witness outside the reach of the defendant and the Court, and prevent the defendant from locating and identifying essential defense witnesses for a period of more than four years.

Prejudicial pre-accusation delay of more than four years, during a period of time that at least several of the defense witnesses became unavailable to the defendant, and when located the chief witness the defense intended to call, was hospitalized, slipped into a coma and passed away.

The deceased witness would have been expected to take the stand and admit that the evidence found at 69 Mauna Loa belonged to him, and had agreed to take the stand and testify in 1997, when the state brought the charges against Ms. Veloria. Those charges were dismissed, not once, but twice, before having the opportunity to have the witness take the stand and testify.

The state knew who the evidence at 69 Mauna Loa belonged to, knew who the residents of the bedrooms were, and knew that

Ms. Veloria did not live in the bedroom where evidence was found.

The diagram prepared by Detective Bolos identified vehicle license plates, boats, bank accounts, account numbers, and other information which indicated electronic surveillance had been used, and included the names used by some of those under surveillance. The information was apparently provided to the federal government years before Ms. Veloria was indicted.

The unnecessary prejudicial pre-indictment delay prevented Ms. Veloria from presenting a complete defense to the jury that the cocaine, and other evidence, found at the 69 Mauna Loa address belonged to another person and not to Ms. Veloria.

It was error to waive Ms. Veloria's right to be present at all stages of the trial, including questions from the jury, and jury questioning.

The court expressed great concern for having Ms. Veloria tell the court personally whether she would waive her presence at each bench conference, even though her counsel waived her presence at the bench conferences. [236]

---

[236] Transcript Vol 3, P 42-43; P 103; P 104.

When the jurors sent out questions, the court inquired of Mr. Ling, Ms. Veloria's counsel whether Ms. Veloria should be provided an opportunity to be present or whether her presence would be waived. Mr. Ling waived his client's presence at each stage of the proceedings when notes were sent out from the jury with questions, and answered by the court, without Ms. Veloria's knowledge. At no time did the court inquire of Mr. Ling whether or not Mr. Ling had informed Ms. Veloria of Ms. Veloria's right to be present at every stage of all proceedings, including the stage of the proceedings when jurors had sent out questions, and whether with that knowledge and understanding, Ms. Veloria had indicated to Mr. Ling that she elected not to be present.

<u>Ms. Veloria's right to a unanimous verdict by a jury, after deliberation, was violated by the physical threats of intentional violence directed toward jury members from other jurors</u>.

Mr. Ling also advised the court that the juror or jurors that had been physically threatened with violence should be questioned by the court outside the presence of counsels and outside the

presence of the defendant, without Ms. Veloria's knowledge.

Ms. Veloria believes she had a constitutional right to be present at all phases of the proceedings, and would not have waived her right to be present during the question sessions and would not have consented to the court examining only one juror about being threatened with physical violence during deliberations. Ms. Veloria believes that each juror should have been asked whether they were witnesses to the physical threats of violence during deliberations, whether any others had been threatened or coerced into finding against their own personal will, and whether they felt their assigned duties to deliberate the evidence was compromised by the threats.

It was error for the trial court not to caution the jury not to discuss the case among themselves, or with anyone else, until it was given to them for deliberation, and caution the jury about news reports, each time the jury retired.

A review of the record indicates the jury may not have been cautioned when leaving the Court during recess, and during any

other time, except for once. [237]

Ms. Veloria believes the failure to caution the jurors each time they left on lunch breaks, recess, and over night, was a breakdown in the structure of preserving the integrity of the jury deliberations.

## UNCONSTITUTIONAL SENTENCE

Ms. Veloria's Fifth Amendment and Sixth Amendment rights were violated by imposition of an enhanced sentence under United States Sentencing Guidelines based on the sentencing judge's determination of a fact (other than a prior conviction) that was not found by the jury or admitted by the defendant; and, It was error to deny Ms. Veloria credit for acceptance of responsibility.

Ms. Veloria's Sixth Amendment right was violated by the imposition of an enhanced sentence under the United States Sentencing Guidelines based on the sentencing judge's determination of a fact (other than a prior conviction) that was not found by the jury or admitted by the defendant; and it was error to deny Ms. Veloria credit for acceptance of responsibility.

The imposition of Ms. Veloria's sentence violates the Sixth

---

[237] Transcripts, Vol. 4, P 140.

Amendment as recently interpreted by the Supreme Court in

*Blakely v. Washington*,[238]   159 L. Ed. 2d 403, 2004 U.S. LEXIS

4573, 124 S. Ct. 2531 (2004) because the facts underlying the

calculation of her base offense level and her sentence enhancement

were not found by a jury beyond a reasonable doubt.

The sentencing enhancement was imposed months after the

jury trial conviction of one count and acquittal of the other count.

The presentence report was prepared long after conviction, and the

prosecutor and the presentence investigator argued for sentence

enhancement based upon uncharged obstruction of justice,

uncharged suborning perjury, uncharged drug sales, uncharged

money laundering.

The jury trial was riddled with evidence of uncharged offenses,

but the jury was not asked to make a finding on the uncharged

offenses as part of the judgment.  The jury returned a conviction

only on Count 1, that it "was at least five grams".  The jury returned

an acquittal as to Count 2, finding Ms. Veloria did not possess the

539.8 grams of cocaine found in the truck.

_____

[238] Transcripts, Vol. 4, P 140.

The Presentence Investigator used both the amount the jury returned a conviction on, and the amount the jury acquitted Ms. Veloria on to find a Base Offense Level of 28. In addition, the Presentence Investigator added a two level adjustment for one of the uncharged offenses, "obstruction of Justice". No finding was made by the jury as to any of the uncharged offenses.

Ms. Veloria's sentence was based upon the information from the Presentence Investigation Report, that provided a Guideline level of 30.

The sentencing Judge made a finding by a preponderance of the evidence that Ms. Veloria was more probably than not guilty of the uncharged offenses, and denied Ms. Veloria credit for accepting responsibility.

Uncharged offense conduct was introduced during trial over the objection of defense counsel, the court inquired why sales were not made part of the charged offense, the prosecutor admitted it was uncharged offenses, and it cannot be said that the uncharged conduct did not permit the jury to convict based on uncharged conduct (look at jury questions). However, the uncharged conduct was not presented to the jury as a charge to be deliberated on, the

81

jury did not deliberate on any of the uncharged conduct as a separate charge, and after the conviction was entered on the record, the judge enhanced Ms. Veloria's sentence based upon uncharged conduct after making a preponderance finding that Ms. Veloria was more probably than not guilty of the uncharged conduct.

Therefore, under *Apprendi v. New Jersey*,[239] *Blakely v. Washington*,[240] and *United States v. Ameline*,[241] Ms. Veloria's sentence is unconstitutional and must be vacated, and remanded for re-sentencing.  Re-sentencing  must be without enhancement based on uncharged conduct, and without the acquitted Count, and Ms. Veloria must be given credit for acceptance of responsibility.

## CONCLUSION

Ms. Alicia Veloria respectfully prays this Court will vacate the conviction and remand with instructions to dismiss the indictment, or in the alternative, remand with instructions to grant the motion to rescind the involuntary waivers, suppress statements, and grant

---

[239] *Apprendi v. New Jersey*, 530 U.S. 466; 120 S. Ct. 2348; 147 L. Ed. 2d 435.

[240] *Blakely v. Washington*, 159 L. Ed. 2d 403, 124 S. Ct. 2531 (2004).

[241] *United States v. Ameline*, 376 F.3d 967 (9th Cir. 2004).

82

her a new trial.

DATED: _____, 2004.

_____

## CERTIFICATE OF COMPLIANCE

Pursuant to Ninth Circuit Rule 32(e)(3), I certify that the opening brief is proportionally spaced, has a typeface of 14 points or more, and contains _12067_ words.

DATED: _____, 2004.

_____

## STATEMENT OF RELATED CASES

Ms. Veloria is not aware of any cases directly related to this case that are presently pending. Ms. Veloria believes some of the issues she has presented herein may be presented in other cases pending before this Court, but she cannot identify any of them.

The Supreme Court has accepted briefing and concluded oral arguments in *United States v. Booker*, No. 04-104 and *United States v. FanFan*, No. 04-105. Similar constitutional questions have been presented in Booker and FanFan concerning enhanced sentencing based on issues not found by the jury.

Ms. Veloria believes that *Apprendi v. New Jersey*, 530 U.S. 466; 120 S. Ct. 2348; 147 L. Ed. 2d 435; *Blakely v. Washington*, 159 L. Ed. 2d 403, 124 S. Ct. 2531 (2004); and *United States v. Ameline*, 376 F.3d 967 (9th Cir. 2004), may provide similar issues to some of the issues presented herein.

DATED: _____, 2004.

_____

85