## AFFIDAVIT OF ALEXANDER SILVERT

STATE OF HAWAII            )
                           ) SS:
CITY AND COUNTY OF HONOLULU )

  I, Alexander Silvert, being first sworn under oath, deposes and says:

  1. I was Ms. Alicia Veloria's attorney from October, 2000, until November, 2002, when I withdrew as counsel due to actions by Ms. Veloria that placed me in conflict with my ethical obligations to the Court.

  2. That pursuant to Ms. Veloria's directions, this office's discovery and investigation files were turned over to her new court-appointed attorney, Emmanuel Guerrero, on January 23, 2002. As such, in preparing this affidavit, since I do not currently have access to many of these documents and because Kristine Pagan, the chief investigator in this case is deceased, I have had to rely mostly on my memory to answer Ms. Veloria's allegations of ineffectiveness.

  3. As to Claim #2, I have no direct recollection regarding our attempts, or lack thereof, to obtain the HPD investigation report of the arrest of Miles Kurashiga. I do know that this office spent many hours investigating this case, which included several trips to the Big Island to interview witnesses and to obtain all available reports. During our investigation, we interviewed many

individuals who either resided or frequented the apartment where the police alleged Ms. Veloria lived as well as the landlord of that apartment. This investigation confirmed that Ms. Veloria did, indeed, live at the residence where the drugs were found as charged by the government and was dealing drugs from that apartment. Thus, in light of our own investigation, the fact that Mr. Kurashiga, when he appeared at the apartment to purchase drugs, gave a description that somewhat fit that of Ms. Veloria but when asked if that is who he was looking for said "no," may have resulted in my office not aggressively pursuing this particular police report. Regardless, I was relieved as counsel on November 26, 2002, many months before the trial was held and long before this information could have been utilized at trial had trial counsel elected to present it to the jury.

    4.    As to Claims #4 an #5, after many days and hours of investigation, it was discovered that Mr. Keau Miles was deceased. Counsel, on several occasions, discussed with Ms. Veloria the possibility of filing a pre-indictment delay motion to dismiss. However, after researching the matter and after having located three other witnesses who claimed to have been present during the search of Ms. Veloria's truck by HPD, it was determined that such a motion would have no merit as no prejudice could be demonstrated as required by

case law. In addition, from discussions with Ms. Veloria, it was uncertain just how much of the search Mr. Miles may have witnessed. Moreover, Mr. Miles' untimely death had no impact as to the then possible money laundering charges or the drugs found in Ms. Veloria's apartment.

Nevertheless, counsel did advise Ms. Veloria that the unusual length of the pre-indictment delay, as well as the fact that there had been such a long delay between the alleged criminal events and the indictment, could be used to garner both a favorable plea bargain as well as used at sentencing to gain leniency with the Court.

Unfortunately, one of the witnesses to the search of the truck refused to testify and the witnesses who did testify at the suppression motion materially changed their testimony from what they had previously told our investigators in a manner that did not lead to a successful resolution of that matter in Ms. Veloria's favor. It should be noted, as well, that Ms. Veloria herself refused to take the witness stand at the motion to suppress to refute the testimony of the police officers.

Ms. Veloria also claims that counsel was derelict in his duties to investigate the scene and/or the accuracy of the drug sniffing dogs. First, an

investigation was conducted. Second, the factual question presented focused on whether or not the door was open or shut.

      5. As to Claims #6 and #7, counsel has already given sworn testimony regarding *some* of the advise given to Ms. Veloria relating to her being debriefed and the meaning of the proffer letter signed by her. Counsel does not herein alter what counsel has already testified to. However, as early as January, 2001, Ms. Veloria had seen and read another, but in all ways the same proffer letter as she would ultimately sign on September 3, 2001. In February of 2001, Ms. Veloria was debriefed by a Hawaii Detective related to information she had regarding a murder investigation on the Big Island. A proffer letter was prepared for that debriefing session. And, although it was agreed that Ms. Veloria would not be questioned regarding her activities in this case, the September 3, 2001, debriefing session was not the first time Ms. Veloria had seen and reviewed such a proffer letter.

      In addition, counsel had, for days and weeks prior to the debriefing session, discussed with Ms. Veloria the possibility of pleading guilty. During these discussions, counsel repeatedly advised Ms. Veloria that if she agreed to be debriefed, there would be, effectively, no possibility of proceeding to trial. Counsel repeatedly advised Ms. Veloria that should she choose to be debriefed,

she was making a decision to plead guilty and could not realistically proceed to trial under any circumstances. Ms. Veloria was well aware that if she elected to be debriefed and to cooperate with the government, that counsel was advising her that there would be no trial and that she was agreeing to enter a plea of guilty. Counsel advised Ms. Veloria that this was true for two reasons. First, she could not testify because her debriefing statement would be used against her and, because it appeared likely that she would have to testify on her own behalf if she wished to have any real possibility of winning this case, being debriefed effectively ended her ability to go to trial. Second, once she was debriefed and made inculpatory statements regarding her drug dealings as alleged in this case, counsel could not put her on the stand to proclaim her innocence because that would amount to putting on perjured testimony. Moreover, I informed Ms. Veloria that I could not put on other witnesses whose testimony would directly contradict statements/admissions made by her during her proffer because that also would amount to putting on perjured testimony. Ms. Veloria was well aware of the choice she was making when she agreed to be debriefed, despite counsel not fully informing her as to all of the ways her proffered statement could be used against her. It was for this very reason that Ms. Veloria chose not to testify at the suppression hearing - because she elected to keep her option to cooperate open

5

rather than to testify and, as informed by AUSA Brady, become useless to the government because she had lied under oath (in the government's eyes).

Ms. Veloria also claims that, to her "shock," she was confronted during or immediately after the debriefing session with the possibility of pleading guilty to money laundering charges. This is simply false. As early as October of 2000, her Alaska Federal Public Defender, Mary Geddes, had discussed with her the fact that AUSA Brady was going to charge her with money laundering counts. Ms. Geddes, in an email to this office, informed us that Ms. Veloria wanted to cooperate and asked Ms. Geddes to tell AUSA Brady of that possibility. In addition, besides other conversations regarding the possibility of money laundering charges being filed against her, on June 25, 2001, counsel sent Ms. Veloria a five-page letter detailing the government's plea offer and the pros and cons of accepting the offer, which included a discussion of the government filing money laundering charges against her and the nature of the evidence to support such a charge. Ms. Veloria's signature appears on this letter acknowledging both her receipt of the letter and her rejection of the plea offer. Ms. Veloria's claim, therefore, that she was "shocked" to learn of her having to plead guilty to money laundering charges at the debriefing session on September 3, 2001, is simply inaccurate.

FURTHER AFFIANT SAYETH NAUGHT.

DATED: Honolulu, Hawaii, March 12, 2008.

_____
ALEXANDER SILVERT

Subscribed and sworn to before me
this day of Wednesday, March 12, 2008.

_____
NOTARY PUBLIC - STATE OF HAWAII
My commission expires: _____