IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

UNITED STATES OF AMERICA, )
Plaintiff, ) CR. NO. 00-00145 SOM
vs. )
ALICIA VELORIA, ) VOLUME III
Defendant. ) (Pages 1 - 258)

# TRANSCRIPT OF PROCEEDINGS

The above-entitled matter came on for FURTHER JURY TRIAL commencing at 8:40 a.m. on Thursday, June 5, 2003, Honolulu, Hawaii,

BEFORE: HONORABLE SUSAN OKI MOLLWAY
United States District Judge
District of Hawaii

REPORTED BY: LISA J. GROULX, COURT REPORTER
Notary Public, State of Hawaii



EXHIBIT "C"

Honolulu, Hawaii; Thursday, June 5, 2003

-oOo-

THE CLERK: Criminal No. 00-145 SOM. United States of America vs. Alicia Veloria.

Counsel, please make your appearances for the record.

MR. BRADY: Good morning, Your Honor. Assistant United States Attorney Tom Brady on behalf of the United States, along with task force agent Damien Freitas.

THE COURT: Good morning.

MR. LING: Good morning, Your Honor. Winston Ling on behalf Alicia Veloria who is present. We also have, of course, Rhonda Marcy, the paralegal, who is also with us, but then she's not here right now.

THE COURT: Okay. Let me go forward with the hearing on Mr. Ling's motion. I'll give you folks some thoughts that I've had overnight. First, you know, after looking at some cases from New York -- I know yesterday Mr. Brady was referring to the Healy case by a judge in the southern district of New York, and it looks as if, actually, in the Second Circuit, there's a totally different approach from what was in the Seventh Circuit in Pilgrim. And there's a couple

second circuit cases, one is U.S. vs. Laursen, L-a-u-r-s-e-n, which I only have a Westlaw cite, 2000 Westlaw 169 3537. This is a 2000 case in the southern district of New York.

I also have United States vs. Fronk, F-r-o-n-k, at 137 FRD 159. This is a western district of New York '97 case. And both of these are pretty similar in terms of facts where there were proffer letters, proffer agreements and the defense agreed to speak to law enforcement and describe whatever the defendant's involvement in the alleged offenses had been and then later claimed not to have understood the extent of the waiver in the proffer letters. And, in fact, they're very similar to what we have here.

So in the Fronk case -- gee, I think it's Laursen that might be the most analogous. In the Laursen case, the defendant said that her understanding of the agreement was that she would make confessions, and so forth, about what she had done but whatever -- or "he" -- whatever the defendant said to the government at the proffer session could be used against the defendant if at trial the defendant testified and said something different. So it's very similar to the situation that we have here. And the district courts, in both of these cases, noted that

the government had the burden. It was similar to Miranda Rights kind of situations, the government having the situation of showing that the waiver of rights was knowing and voluntary. And in this Laursen case, the defendant was making exactly the argument made here that defense attorney appears to have given the same kind of explanation that Mr. Silvert gave which the district court said was not complete and the waiver was invalidated, except for purposes of direct impeachment if the defendant took the stand. Pretty similar to our case. And that's what happened in both of these second circuit cases.

So, anyway, that's one issue. The second thing I wanted to make sure that was understood is I do need to hear from Mr. Ling about the waiver of attorney-client privilege. And also I'm going to tell him that if Ms. Veloria gets back on the witness stand, as the questioning goes forward, there may be a need to have clear waiver of the possibility of self-incrimination rights, because I foresee that if she says: I thought they could only use my confession if I took the stand and testified differently, then I can see her being questioned about, well, what other situation did you think you might be able to present evidence in? Is she going to say something along the

lines of: I thought I could suborn perjury? I want to make sure she understands her Fifth Amendment right against self-incrimination before we get into that. So, there's that issue.

Also, I want Ms. Veloria to fully understand that if she is convicted that her guideline range might be effected. I'm not saying she will be convicted. It's not my decision. But if you are, then your guidelines calculations -- then, you know, the higher your guidelines are the higher the prison sentencing range is that may be effected by the additional points for obstruction of justice.

Now perhaps the government is going to argue that anyway with respect to the letter that came into evidence yesterday with Mr. Iaukea. But, you know, the situation probably gets worse for Ms. Veloria if she takes the stand and says: I was thinking I could get witnesses to come in and say things contrary to the government.

The alternative is she goes to take the stand and says: I told the government something untrue, all of these things raise inculpatory issues. I want to make sure she understands what rights she has and whether she is making a knowing waiver of those rights.

Finally, I do want to understand the procedure if I were to grant this motion. Now, Mr. Ling has styled this as a motion to rescind the agreement. And Mr. Brady had earlier suggested that this should be properly considered as a motion to suppress.

MR. LING: What I'm going to recommend to the court, Your Honor, is my motion to rescind -- on the basis of my motion to rescind and what I'm saying about it, I'm renewing my motion to suppress.

THE COURT: Okay. So then he's going to say, of course, normally we have motions to suppress long before trial. So he's going to say if I rule against the government, he's going to take an immediate appeal. And if we do that, what is the posture of the case where we've got this jury that's waiting downstairs to come back in the middle of trial?

MR. LING: I don't know what the time frame is for an immediate appeal. I don't know how long the Ninth Circuit is going to take to --

THE COURT: My guess is a year.

MR. LING: A year?

THE COURT: That's my guess.

MR. LING: What I would recommend is

clear understanding of: Is she waiving the attorney-client privilege? And what is the scope, what is the subject matter on which she is waiving it? So I know how we can go forward.

MR. LING: If she was to testify, we would ask the court to give a partial waiver.

THE COURT: Okay. What are the subject matters on which you propose to have her testify?

MR. LING: If she was to testify, she would testify basically based upon her understanding from what Mr. Silvert had informed her, and that's already on the record, what Mr. Silvert had said.

THE COURT: Well, probably not in as much detail as it will get to be on the record.

MR. LING: Well, based upon what Mr. Silvert had informed her, that's why she entered into the agreement.

THE COURT: Okay. Because one of the things is if -- on the knowing side, yeah, that's what you're talking about, what Mr. Silvert told her.

MR. LING: Right. Well, her understanding of what Mr. Silvert told her, she's going to testify to what her understanding of what Mr. Silvert told her, that's what she will testify.

THE COURT: But I'm going to want to

know what's in her mind also, which is not attorney-client privilege, and which is wide open once she gets on the stand and says this is what I thought. So one of the things of interest to me is: Did she have a conscious thought at the time that she could indeed have her lawyer cross-examine witnesses to elicit testimony contrary to what she was prepared to the tell the government?

Did she have in her mind the conscious thought that witnesses could get on the stand in the defense case in chief and testify differently from what she was about to tell the government? All of this goes to my evaluation of whether her signing the waiver was knowing, and I'm going to want to know those things.

Now if she answers: Yes, I had that conscious thought, there may be some legal consequences to that quite apart from the evidence that may come in at trial here, and I want to make sure she understands that: One, she may have told a false statement to the government or, two, she may have suborned perjury, or at least had an attempt to do so; and, three, she may have tried to obstruct justice, which, if she is convicted, may increase her prison term. And I want all of those consequences out

there before she takes the stand.

Do you understand everything I've said, Ms. Veloria? I need you to answer out loud.

THE DEFENDANT: Yes.

THE COURT: Okay. So you understand these possible consequences?

THE DEFENDANT: Yes.

THE COURT: And you understand you have a right to remain silent. You don't have to say -- you don't have to answer any of these things, but if you are going to get on the stand, these are fair subjects of inquiry. If you refuse to answer questions on these, then your statement about what was in your mind is not going to be given much weight by me because you didn't allow yourself to be fully examined. And if you know that you're going to invoke the Fifth Amendment right on these subjects, then tell me now because the proper thing for me then is to not let you get on the stand and give your version and then foreclose cross-examination.

So I really want this all clear. Because we're fighting about knowing waivers, I'm going to just do everything to make sure that any waiver you make in front of me is so knowing that you can never claim that you didn't know what you were doing.

THE COURT: I don't know why she can still invoke attorney-client privilege in this context. But I raised it for you to tell me if indeed that was the case. But you cannot say: My lawyer was ineffective and I didn't know things because of misinformation from my lawyer and at the same time bar an examination of what it was that her lawyer told her, what it was that she expressed back to her lawyer, which may or may not have indicated what you say is involuntariness and ignorance, and so forth. You can't have it both ways.

MR. LING: So right now --

THE COURT: But, yes, I'll go off the record so you can talk to your client, so you can talk to Mr. Silvert. But I don't see how you can have it both ways. So I'm pretty confused right now about exactly what your position is, but I'll go off the record.

MR. LING: Okay.

(Off the record discussion held - in court recess taken.)

THE COURT: We'll go on the record.

I just want to say this. I know earlier Mr. Brady had indicated that, you know, if I treat this as a motion to suppress and the ruling is against

unusual circumstance in which a magistrate was involved in the negotiation --

THE COURT: What I have -- I don't have anything that says what was said. All I have is the court minutes, and they don't even indicate Ms. Veloria was present. So I'm taking your word that she was. But the court minutes only say, "Settlement conference held on 8/28/01. Attorneys: Thomas J. Brady, Alexander Silvert. Reporter: Chambers. No record taken." That's all it says.

So I don't think that the existence of a conference that's shown by notes in the court docket, which doesn't even indicate that Ms. Veloria was there, I don't think that's enough for me to say that Ms. Veloria somehow involuntarily signed a proffer agreement. I'm sorry. So I disagree with you that I have any evidence of involuntariness with respect to the knowledge and with respect to the ineffective assistance of counsel.

I have something. I have Mr. Silvert's statement that here was his understanding, consistent with how he's always interpreted these proffer letters, he told Ms. Veloria his understanding. That doesn't -- that's not enough for me to conclude either that there was ineffective assistance of counsel or

requirements of such a motion. And that is, you've got to open the door. That's not just me.

Ms. Veloria may feel: Poor little, Ms. Veloria. The judge is making me trade one right against the other. That's the law. You have to be fair to the government. A defendant is not the only one with rights in this courtroom. And you have to give up that right, if you want me to give you the result that you're asking me to give you.

I'm not saying you're going to get that result anyway. But if you even want me to go down that road, that's the obligation on the defense. So, you don't want to carry your burden there, which is the burden to waive the privilege, I'm going to deny this motion.

So, is that the position still?

MR. LING: Unfortunately, I think that's -- what?

(Counsel conferring with defendant.)

MR. LING: Could we have a 10 minute recess?

THE COURT: Yes. Okay.

(Recess taken at 10:15 - 10:30 a.m.)

THE COURT: Okay. Mr. Ling, what is your position?

of 1997.

THE WITNESS: Yeah. Yeah. Because you was confusing me with the dates, yeah.

Q. (By Mr. Ling) Then there was a warrant for your arrest that was returned on January 26th, 1999, correct?

A. Yeah.

Q. All right. Now during this time frame, when you were -- when the police were -- when you were interviewed by the police, your case was still hanging around, wasn't it, at that time?

A. I was still on probation, yeah, I was.

Q. And, basically is, you wanted to help the police at that time to get favors for you?

A. No.

Q. Do them a favor, correct?

A. No. I never get no deals, no favors, no nothing. I'm here on a subpoena and I was made no promises.

Q. When you were resentenced on your case -- remember you got resentenced?

A. Yes.

Q. Okay. And then you had another charge that you had to make a change of plea, correct?

A. What was the other charge?

Q. Up to 10 years in jail, but then they decided to make it down to -- from a felony down to a misdemeanor, or you remember that they changed it?

A. That was --

THE COURT: Here, I'll --

THE WITNESS: Yeah.

THE COURT: Okay. Okay. Otherwise, I'll let him show you the document.

THE WITNESS: Yeah, we proved it in court that that wasn't a felony. That's why.

Q. (By Mr. Ling) Okay. So you didn't ask him for a favor that you were helping? You didn't tell your lawyer, oh, I'm helping the DEA or --

A. No.

Q. -- or the federal government?

A. No. Their names wasn't even mentioned.

Q. So they decided, just because you proved it in court, that they -- at that day, they decided to go ahead and change it down for a lower charge; is that correct?

A. Yeah. When the witnesses that we put on the stand, the truth was said, and the charge was dropped to a lower charge.

Q. On the spot right there, right?

A. I mean, I guess. I never get to go to the --