### AFFIDAVIT OF ALICIA VELORIA

STATE OF HAWAII                     )
                                    )
CITY AND COUNTY OF HONOLULU         )

      I, Alicia Veloria do herby affirm the following facts:

    1.  I am the single defendant in the criminal case numbered 00-00145 SOM and have filed a pro se motion under 28 USC § 2255 to vacate, set aside or correct my sentence (08-00019 SOM/BMK).

    2.  This declaration is being submitted in support of the claims raised and information provided in my pro se § 2255 motion. It appears necessary for me to clarify some additional points in light of my prior attorneys' respective affidavit and declaration. It should be noted that Mr. Silvert was relieved as counsel a year and a half before my trial ( 1/23/02) and not on November 26, 2002 as his affidavit states.

    3  On account of my pre-trial release in Anchorage, AK while awaiting trial in the District of Hawaii, I most often communicated with my attorneys in letter form by utilizing e-mail, fax and U.S. Postal Service, several of which have been submitted as exhibits to the claims raised within my 2255 motion.

    4.  I pleaded verbally and in writing for Mr. Silvert to obtain the police report of Myles Kurashige's arrest because of its potentially exculpatory value.

    5.  Prior counsel Mr. Silvert informed me that he would be submitting a motion to suppress the search of my truck based on an illegal seizure and that it would include a hampered litigation argument to protect my rights in the event the witnesses could not provide testimony which would meet the burden required for the motion to suppress. I recall a phone conversation with Mr.

EXHIBIT 36

Silvert wherein he was very positive about this proposed motion's viability on account of Mr. Keau Miles' death. As reported to Mr. Silvert, Mr. Miles would have been the closest and most observant witness to the circumstances of the truck seizure.

6. Mr. Silvert informed me on several occassions that the government would supeceede my indictment with a "drug money laundering charge." At no time did I, nor would I have agreed to waive indictment and enter a guilty plea for a charge of drug money laundering.

7. As noted in Mr. Silvert's affidavit, on June 25, 2001, a five-page letter was prepared and mailed to me detailing the perils of a trial and the government's plea offer as it stood. I promptly signed this letter thereby rejecting the proposed terms and returned the signed copy to Mr. Silvert.

8. I participated in the interview with IRS Agents so I could qualify for safety valve in the event my circumstances left no other choice than to enter a plea of guilty.

9. At no time did I understand that participating in this interview would preclude me from proceeding to trial. I understood that the statement would be used against me if I took the stand and testified differently. I never intended on testifying, at any time, anywhere, and so I did not view participation in this interview as a significant impediment to my ability to put the government to its burden and proceed to trial.

10. Mr. Silvert did not inform me that participating in this "debriefing" would restrict in any way any rights I may have at trial to have my attorney make openings, summations, engage in cross examination or call witnesses on my behalf; AUSA Brady did not inform me of this, nor did I understand the proffer agreement to affect these rights.

11. Throughout pre-trial release with the exception of the week

2

following the court's denial of the Motion to Suppress (construed as a Frank's hearing,) I always maintained my desire to proceed to trial. The interview, as I understood it, was <u>not</u> to "enter a plea" but to qualify me for safety valve.

12. I informed Mr. Ling, on several occassions, that my brother and his then girlfriend, Jessica Delima, lived and slept in the bed in bedroom #1 (where the cocaine base was found). Mr. Ling was well aware that my brother and Jessica had left the house that morning to go purchase cigarrettes and since they hadn't planned on being gone long, they left the front door unlocked. I informed Mr. Ling that when they returned from the store, shortly after 7:15am, they simply drove by the house, seeing that there were several unknown vehicles in the yard.

13. I have always maintained and informed Mr. Ling that I did NOT "live" in the house. I frequented the house and had on occassion spent the night when my brother was in town, but it was NOT my PLACE OF RESIDENCE. I did not own it and my name was not listed anywhere on the rental agreement or any paid rent receipts.

14. I repeatedly informed Mr. Ling of the various articles of personal property seized during the search which could be used to demonstrate that several other people occupied this house and should be considered suspect as well, including two males that were located and arrested within the house that day (Zachary Smith and Ignacio Andres).

15. In addition to the abundance of other peoples' personal property seized that day, a paid rent receipt for the month of the search in the name of Marlene Anduha was recovered and inventoried as evidence. On several occassions I reminded Mr. Ling of the existence of these items and persistently attempted to pursuade him to view all seized items prior to trial. I felt strongly that these items would have assisted us in creating reasonable doubt for

the jury. Mr. Ling assured me he would view the evidence but he never took any action in furtherance of this request.

16. Prior to trial, I discussed several potential motions with Mr. Ling, of which he consistently told me he would "look" into. However, upon arrival in Hawaii for trial, I learned that Mr. Ling had not pursued any of the possibilities. In an attempt to protect my interest and constitutional rights, I asked that a paralegal prepare these motions and e-mail them to Mr. Ling. Mr. Ling received these motions on the first day of trial and after days of discussions, he signed most of them in front of me and I assumed he filed them. Mr. Ling knew I wanted these filed, he agreed with most of the arguments and lead me to believe they were going to be filed. At no time did he inform me that he would not file them. Had he done this, I may have attempted to file them on my own.

17. At NO time did I inform Mr. Ling any of the following: 1) that I consented to the canine sniff of my truck; 2) that I owned, rented or otherwise resided at the house on 69 Mauna Loa Street; 3) that the drugs found in the house at 69 Mauna Loa Street belonged to Ignacio Andres as Mr. Ling argued this in closing arguments; 4) that I did not wish for him to contact my brother Richard Marble, as I wanted my brother subpoenaed to testify at my trial.

18. I have submitted copies of letters instructing Mr. Ling to subpoena my brother Richard Marble because it became very clear that although I provided him with a telephone number and address, he had no intentions of interviewing anyone for my upcoming trial.

19. I did not, and would not have agreed to forego using Barcena's various criminal convictions to impeach her credibility. At the time of my trial, I was aware of impeachment utilizing "crimes of dishonesty" (see Exhibit 14) and directed him to do so but once he stood up and walked away from the

4

defense table, he was out of reach of my urgings.

20. I would not have been "continuously talking" to Mr. Ling during my trial because I was much more concerned with taking notes and trying to highlight portions of police reports. I primarily communicated with him during trial by writing notes or questions on a yellow note pad which I still have. I stood to lose my freedom and would not have behaved in a manner that would distract my trial counsel's concentration on my case.

21. Mr. Ling did not inform me of or allow my involvement in any of the jury communications or the threatened juror issue. I did not agree to have my presence waived under any circumstances and was very disturbed when I learned that Mr. Ling had done so without my consent. As Mr. Ling notes in his declaration, I was "headstrong," and "took an active part in the case." I did not have any confidence in Mr. Ling after enduring a trial under the above mentioned circumstances and was very dissapointed to learn of my presence being waived.

22. Mr. Ling never conferred with me about the possibility of an Allen charge.

23. I wrote several letters to the Office of Disciplinary Counsel regarding Mr. Ling's ineffective representation with respect to my trial.

24. Sentencing attorney Samuel King Jr. was not receptive to my ideas and research because he believed the issues would not be suitable for direct appeal; He knew I planned on filing my appellate brief pro se if my court appointed attorney refused to raise the issues contained therein. Mr. King did not disregard my strong desire to review and agree with the issues to be filed in my appeal, because of my insistence on raising certain issues, of which he thought were not in my best interest, Mr. King withdrew as counsel.

25. Appellate counsel Sean Luiz never contacted me to discuss ANYTHING regarding my pro se appeal brief. Although I placed numerous pre-paid

calls to his office several times per week during the period between January through the middle of February, I only encountered an answering machine and was unable to leave a message.

26. Although I was not able to contact him by phone, I felt confident that Mr. Luiz was well aware of my insistence on raising the issues contained within my pro se appeal brief (which he received approximately two months before the February 23, 2005 opening brief deadline) as I had previously made it clear that if counsel of record would need to withdraw in order for me to file my pro se appellate brief then that is what would need to happen.

27. I was placed in Dublin FPC SHU on Administrative Dentention on or about February 14, 2005, and was unable to place any phone calls to check on the status of my appeal and or make arrangments to file my brief Pro se. Mr. Luiz was aware of the nature of Mr. King's withdrawal. Mr. Luiz recieved two copies of my pro se appeal brief, knew the brief wasn't prepared as a legal exercise and still, he completely ignored it, without even so much as placing a courtesy phone call to the person who would pay the consequences for failure.

28. I was absolutely at a loss for words when I received Mr. Luiz's opening appeal brief and very nearly gave up all hope that I would ever have any say or input in ANYTHING filed in the Federal criminal case against me.

29. If this Honorable Court chooses to further investigate or evaluate the various claims regarding attorney-client communications (since there are significant differences between attorney's and client's recollection); I believe the Veloria casefile which presumably has been passed from one attorney to another should contain copies of all written communications from me, thereby providing proof that many of defense counsel's representations contained within his declaration are patently false (I am speaking primarily of Trial Counsel Mr. Ling).

6

30. In regards to the 13 page Memorandum of Interview written by IRS Agent Pa, approximately one-half of the 69 entries contain inaccuracies and exaggerations, some of which pertain directly to my alleged personal admissions as well as implications of Zachary Smith.

31. If my Trial Counsel Mr. Ling had interviewed and subpoenaed my older brother, Richard Marble, I would have been able to offer a witness who would take personal accountability for small amounts of cocaine base and marijuana found in the house on 69 Mauna Loa Street.

32. I have copies of numerous letters that were sent to Mr. Ling insisting that he interviewed my brother, Richard Marble, and initiate the procedure to subpoena an out-of-state witness who is in custody. I personally was unable to call the jail to speak with my brother, although, I was able to verify that IF Mr. Ling had called, he would have been allowed to speak to Richard and determine the necessity to subpoena him in my defense.

33. I do not have an affidavit from my brother Richard Marble, because his life was ended in 2004, approximately a year after I was convicted.

34. Exhibits 18-21 submitted in support of 2255 are motions written by paralegals at my request in an attempt to try preserve what slight chance I may have to further litigate these areas. Prior to arriving in Honolulu for trial, I was under the impression that Mr. Ling intended on pursuing these avenues Pre-trial, only to learn the day before trial that NO SUCH MOTIONS had been prepared by him.

35. If, while on pre-trial release, and awaiting trial, I was familiar with an avenue by which I could personally obtain a copy of Exhibit 28, the withheld exculpatory police report, I undoubtedly would have. Exhibits 11, 29A, 31A and 31B illustrate the significant energy I expended in trying to pursuade counsel to obtain this police report.

36. At no time did I request my trial counsel, Mr. Silvert, to set up a meeting with Magistrate Judge Barry Kurren.

37. I **did not** question Mr. Silvert when he informed me that he would be taking me to meet with Judge Kurren on 08/28/01. At the time, I believed he was looking out for my best interest.

38. Mr. Silvert walked with me to Judge Kurren office, a phone call was made to AUSA Brady to apparently give him notice, and Mr. Silvert departed, leaving me alone with Judge Kurren.

39. Although all parties were notified of this exparte meeting, only Judge Kurren and I were present. I assumed this was a normal part of pre-trial activities.

40. Judge Kurren discussed the overwhelming obstacles criminal defendants face in the federal system as well as the fact that my case would be a difficult one because I was looking at a trial with two separate counts of drug possession.

41. Judge Kurren advised me that Mr. Silvert is a good attorney and that I should follow his advise and cooperate with the government.

42. At the end of the meeting, it seemed, to me, that the purpose of this meeting was to encourage me to cooperate with the government.

43. Upon review of Mr. Silvert's declaration regarding my claims of ineffectiveness, it appears that he does not address the allegations regarding this influencial and improper meeting with Judge Kurren.

44. I have never been known by any other name besides "Alicia", nor has the government made allegations of such.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED:   Honolulu, Hawaii, March    2008

_Alicia Veloria_
Alicia Veloria

"On this 26th day of March, 2008, before me personally appeared Alicia Veloria to me known to be the person(s) who executed the forgoing instrument and acknowledged that he / she / they executed the same as his / hers / their free act and deed."

Phillip P. C. La
My Commission Expires: 02/23/2011

[Notary Seal: PHILLIP P. C. LA, NOTARY PUBLIC, STATE OF HAWAII]