UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

ALICIA VELORIA,           )
                              )
         Plaintiff,    )
                              )
     v.              )  Cr. No. 00-00145
                              )
UNITED STATES OF AMERICA, )  HONORABLE SUSAN OKI MOLLWAY
                              )  JUDGE
        Respondent. )
_____)

AFFIDAVIT OF RONDA L. MARCY

STATE OF ALASKA       )
                       ) ss.
THIRD JUDICIAL DISTRICT   )

I, Ronda L. Marcy, being first duly sworn, deposes and states:

1. That I am an adult resident of the State of Alaska, that I am deposing the facts contained herein at the request of the Petitioner Alicia Veloria, and that the facts contained herein are true to the best of my knowledge and recollection of the events.

2. That I am the owner and sole proprietor of Professional Paralegal Services. I have worked as a paralegal for over 20 years, predominantly in the State of Alaska, but with experience in State and Federal Courts in several jurisdictions. Additionally, I have a Bachelor's degree in Justice, with a minor in Communication, from the University of Alaska, and a Master's degree in Communication and Leadership Studies from Gonzaga University.

1

EXHIBIT 44

3.  That I met Ms. Veloria at the University of Alaska where we both were attending a social service law class in the spring of 2003.  During the course of the semester, I came to admire her as a student whose presence positively contributed to the academic environment.  After Ms. Veloria and I got to know each other as classmates, she came to know about my work as a paralegal, and eventually, gave me two large vinyl notebooks of legal documents to review.  I did not realize that she was actually the defendant in the matter, until I began my review of the documents.   At that point, we began discussions about some of the varied aspects of her federal case.  Ultimately, I traveled to Hawaii to assist Mr. Ling and Ms. Veloria at trial, as I was also already working on another federal matter in Hawaii at that time.

4.  That I recall hearing Ms. Veloria inform Mr. Ling that she wanted to be present at all stages of her proceedings, and that she was not willing to waive her presence at all.  At the conclusion of the presentation of the case, during the initial days of deliberations, Ms. Veloria and I stayed in close proximity to the Courthouse, where she was available to be notified by phone, in case the parties were called to reconvene for questions from the jury.  I recall that Ms. Veloria instructed Mr. Ling, in my presence, that she was to be notified if the jury reconvened for any matters.

5.  That I also recall speaking with Ms. Veloria when she learned that she had not been brought in and consulted, after the conclusion of the jury deliberations, and she expressed that she was very upset that Mr. Ling had proceeded in her absence, waiving her right to be present without her consent.

2

6. That I clearly remember witnessing conversations with Mr. Ling prior to closing arguments, urging him to challenge the government to admit that the female clothes in bedroom did not fit, and could not have fit, Ms. Veloria, and it is unclear to me why Mr. Ling would state in his affidavit that he "believed the clothes belonged" to Ms. Veloria. I believe an interview conducted by Kristine Pagan indicated that the clothing could have belonged to Carmen Anduha, who admitted to living in the residence at some point in 1996. I recall another witness who indicated to Kristine Pagan that he had used drugs with Marlene Anduha and Jessica DeLima, both of whom he believed lived in the residence at 69 Mauna Loa.

7. That I clearly remember witnessing conversations with Mr. Ling urging him to challenge the government to disclose the utility records to prove the identity of the person that paid for the utilities.

8. That I clearly remember witnessing a conversation with Mr. Ling urging him to challenge the government to explain why Ms. Veloria would be sleeping on the floor in the living room, if there was a bed belonging to her in the residence.

9. That I clearly remember witnessing repeated conversations with Mr. Ling urging him to require the government to admit they knew the property did not belong to Ms. Veloria. I do remember discussing with him what evidence he felt had been produced that led him to believe whether Ms. Veloria may have lived in the residence at some prior time, and whether there was a lack of the proximity of that information to the July, 10th 1996 date.

3

10. That I clearly remember witnessing conversations with Mr. Ling urging him to challenge the government to admit that they had the house under surveillance, and knew the identity of everyone that entered and left the residence, and withheld that information from the defense.

11. That I clearly remember witnessing a conversation urging Mr. Ling to challenge the government's assertion that the wooden "A" found in the kitchen represented the name "Alicia," as alleged before the jury by Mr. Brady, as opposed to the first letter of the last name found on the rent receipt, "Anduhas". I believe that Mr. Brady was aware at the time that he said that, a witness had reported that the residence may have been rented by the HCPD for Marlene and Carmen Anduhas, two women in a witness protection program, and that the residence could have been under electronic surveillance.

12. That I clearly remember witnessing repeated conversations with Mr. Ling urging him to challenge the government's failure to introduce evidence of Ms. Veloria's residence or ownership of the home, and I remember the shock to Ms. Veloria and myself, when Mr. Ling mistakenly referred to the house as "Ms. Veloria's residence" during closing arguments. I do not understand Mr. Ling's statement that he argued that Ms. Veloria resided in Bedroom #2, or why Mr. Ling would refer to Ms. Veloria residing in a bedroom, when she was asleep on the living room floor. It was contrary to the tenor of the conversation that Ms. Veloria had with Mr. Ling, in my presence, prior to his closing statement, about the government's lack of evidence of her residency.

13. That, during trial, I sat at the table with Mr. Ling and Ms. Veloria, and clearly remember that Ms. Veloria did not talk to Mr. Ling continuously through the trial. I remember Ms. Veloria writing down notes, and leaving them on the table for Mr. Ling, so as not to distract him. I remember having to repeatedly help Mr. Ling with the pronunciation of the name "Kanehailua," the investigators' last names, at his request.

14. Additionally, I remember reviewing the memorandums to the file written by Kristine Pagan and Leo B. Casey concerning this case, that Mr. Silvert admits in his affidavit were turned over to Ms. Veloria's subsequent counsel, and I do not remember a single memorandum indicating credible evidence that Ms. Veloria lived in the residence at 69 Mona Loa at the time of the raid, and do not remember a single memorandum indicating evidence that the clothing in the bedroom belonged to Ms. Veloria. I also remember a couple of memorandums to the file from a Leo B. Casey, indicating that he had found some of the witnesses had criminal records. I remember that it appeared that many of the statements from the interviews were suspect, as it was apparent the witnesses were from the criminal mileu themselves, or had admitted animosities toward Ms. Veloria. In his affidavit, Mr. Silvert admits that he is only relying on his memory and he cannot point to a single memorandum prepared by Kristen Pagen that "confirmed that Ms. Veloria did, indeed, live at the residence where the drugs were found as charged by the government and was dealing drugs from that apartment" (pg. 2, emphasis added) on July 10th, 1996. In it unclear from his

his memory relies entirely on unsupported hearsay, or whether his memory has been tainted by his vindictive attitude toward Ms. Veloria.

15.  That I remember when I met with Mr. Silvert, he openly displayed vindictiveness in his attitude toward Ms. Veloria, and appeared to indicate that if called to the stand, his testimony would be purposely directed against her.

16.  That it was unclear to me whether Mr. Silvert's vindictiveness had led him to bring Ms. Veloria to Judge Kurren, and to leave her with the judge to direct Ms. Veloria to cooperate with the government.  His affidavit is absent his reason or intent for bring her to Judge Kurren, and facilitate an ex-parte communication between Judge Kurren and his client.

17.  Affiant sayeth further naught.

RESPECTFULLY submitted on this the 23rd day of March, 2008.

BY: _Ronda L. Marcy_
Ronda L. Marcy, Owner
Professional Paralegal Services


SUBSCRIBED AND SWORN to before me this 23rd day of March, 2008.

OFFICIAL SEAL
STATE OF ALASKA
KAREN HOWES
NOTARY PUBLIC
My Commission Expires 6-29-09

By: _Karen Howes_
Notary Public for Alaska
My Commission expires: 6-29-09

6